UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al., Plaintiffs,

v.

HARDIN COUNTY, KENTUCKY, et al., Defendants.

Civil Action No. 3:15-cv-66-DJH

United States District Court, W.D. Kentucky, Louisville Division.

Signed February 3, 2016

---

Benjamin S. Basil, David L. Leightty, Irwin H. Cutler, Jr., Priddy Cutler Naake & Meade, PLLC, Robert M. Colone, IBT Local, Louisville, KY, for Plaintiffs.

Jason M. Nemes, Fultz, Maddox, Hovious & Dickens PLC, John T. Lovett, Frost Brown Todd LLC, Louisville, KY, Jennifer B. Oldham, Elizabethtown, KY, Steven T. McDevitt, for Defendants.

## MEMORANDUM OPINION AND ORDER

David J. Hale, Judge, United States District Court

The National Labor Relations Act is a broad federal law that regulates the relationships between employers and unions. The NLRA permits agreements between employers and unions that require employees to join or pay dues to the union, known as union-security agreements. But the NLRA also permits "State or Territorial" laws that prohibit such agreements, commonly referred to as right-to-work laws. The primary question presented by this lawsuit is whether a right-to-work law may be enacted solely by a state or territorial government, or whether a local government—in this case a county—may pass a law prohibiting union-security agreements. Because the Court finds that local regulation of union-security agreements is preempted by the NLRA, the right-to-work ordinance at issue here is invalid.

## I. BACKGROUND

The Fiscal Court of Hardin County is the legislative body for Hardin County, a political subdivision of the Commonwealth of Kentucky. *See* Ky. Const. § 144; Ky. Rev. Stat. Ann. tit. IX (West 2015). In the absence of a Kentucky state law prohibiting union-security agreements, the Hardin Fiscal Court passed a county ordinance on January 13, 2015, Ordinance 300, which purports to ensure that no employee is required to join or pay dues to a union.[1] (Docket No. 5, PageID # 75) The right-to-

---

1. Kentucky is one of twenty-five states without such a law. *Right-to-Work States*, NATIONAL CONFERENCE OF STATE LEGISLATURES, http://www. ncsl.org/research/labor-and-employment/right-to-work-laws-and-bills.aspx (last visited Feb. 1, 2016).

work provision is found in Section 4 of Ordinance 300, which states that

> no person covered by the National Labor Relations Act shall be required as a condition of employment or continuation of employment:
>
> . . .
>
> (B) to become or remain a member of a labor organization;
>
> (C) to pay any dues, fees, assessments, or other charges of any kind or amount to a labor organization; [or]
>
> (D) to pay to any charity or other third party, in lieu of such payments, any amount equivalent to or a pro-rata portion of dues, fees, assessments, or other charges regularly required of members of a labor organization[.]

(D.N. 5-1, PageID # 96) Section 6 of the ordinance declares any such agreements "unlawful, null and void, and of no legal effect." (*Id.*, PageID # 97)

The plaintiff labor organizations assert that Sections 4 and 6 of the ordinance violate the Supremacy Clause of the Constitution. (*See* D.N. 1) According to the plaintiffs, the NLRA preempts right-to-work laws not specifically authorized in § 14(b) of the Act, including the Hardin County ordinance. (*See* D.N. 7-1, 31) Also preempted, they argue, is Ordinance 300's regulation of "hiring-hall" agreements—which require prospective employees to be recommended, approved, referred, or cleared by or through a labor organization—and "dues-checkoff" provisions—which require employers to automatically deduct union dues, fees, assessments, or other charges from employees' paychecks and transfer them to the union. (D.N. 7-1, PageID # 116-18) The defendants, various

Hardin County officials, contend that the ordinance constitutes state law within the meaning of § 14(b) and thus is not preempted by the NLRA. (*See* D.N. 14, 16-1, 34)

As the case presents exclusively legal issues, the parties have filed cross-motions for summary judgment on the validity of Ordinance 300.[2] (D.N. 7, 16) In deciding whether Ordinance 300 is preempted, the Court considers only the legal challenges to the ordinance and makes no finding as to the efficacy of right-to-work laws.

## II. DISCUSSION

In 1935, Congress enacted the National Labor Relations Act, which established federal labor relations standards and the National Labor Relations Board. *See* 29 U.S.C. § 151 *et seq.* In response to abuses of closed-shop agreements, which mandated that only union members be hired, Congress enacted the Taft-Hartley Act banning such agreements. *See Oil, Chemical & Atomic Workers Int'l Union, AFL–CIO v. Mobil Oil Corp.*, 426 U.S. 407, 414–17, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976). Congress still allowed for union-shop agreements, which require employees to join the union soon after they are hired, and agency-shop agreements, which require employees to pay union dues whether or not they are members of the union. *Id.* at 409 & n. 1, 96 S.Ct. 2140. In § 14(b) of the NLRA, however, Congress gave any State or Territory the option to exempt itself from that policy. *Id.* at 409 & n. 2, 96 S.Ct. 2140.

Section 14(b), entitled "Construction of Provisions," provides:

---

**2.** The Court heard oral argument on the cross-motions (D.N. 42) and also reviewed several amicus briefs (D.N. 26 (brief of former Kentucky Attorney General Jack Conway), 27 (brief of Kentucky State Senate President Robert Stivers), 28 (brief of National Labor Relations Board), 29 (brief of AFL-CIO, Kentucky chapter), 30 (brief of nine counties supporting Hardin County)), as well as supplemental legal authorities submitted by the parties. (*See* D.N. 39, 40)

Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b). Union-security agreements are also addressed in § 8(a)(3). Pursuant to that section, it is an unfair labor practice for an employer

by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization ... to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later[.]

29 U.S.C. § 158(a)(3). Thus, § 8(a)(3) provides that no federal statute shall preclude union-security agreements, while § 14(b) provides that state and territorial laws prohibiting such agreements shall take precedence over the NLRA. In other words, if Ordinance 300 constitutes state law within the meaning of § 14(b), it is valid and enforceable. If not, then the question is whether the NLRA preempts a regulation that falls outside of that section. The Court thus begins with the language of § 14(b).

## A. State Law Within the Meaning of § 14(b)

 Section 14(b) provides that nothing in the NLRA shall be read to authorize the execution or application of union-security agreements "in any State or Territory in which such execution or application is prohibited by State or Territorial law." 29 U.S.C. § 164(b). As the plaintiffs observe, it makes little sense to read "State or Territorial law" as encompassing local law in light of the statute's previous reference to "any State or Territory"—if "State or Territorial law" includes the laws of political subdivisions, then the statute must be read "in any State or Territory [or political subdivision thereof]" to avoid assigning two different meanings to "State" in the same sentence. This is not a logical reading; "[a] standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232, 127 S.Ct. 2411, 168 L.Ed.2d 112 (2007) (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005)); *see also Day v. James Marine, Inc.*, 518 F.3d 411, 416 (6th Cir.2008) ("It is not often that Congress gives the same term two different meanings in adjacent subsections of a statute, much less in the same sentence of one of those subsections. If words are known by the surrounding company they keep, they are surely known by how they are used in the surrounding sections of the same statute." (internal quotation marks and citations omitted)).

In their arguments, the defendants skip past the statute's reference to "any State or Territory." Instead, they rely on carefully selected quotations from two Supreme Court cases unrelated to the NLRA, *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991), and *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002). Each of those cases, however, turned on the specific language of the statute at issue.

In *Mortier*, the plaintiff challenged a local ordinance regulating the use of pesticides, arguing that it was preempted by

the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). The *Mortier* Court examined the relevant language of FIFRA in detail and ultimately concluded that the statute's express grant of regulatory authority to "a State" did not preempt local regulations. *See* 501 U.S. at 606–14, 111 S.Ct. 2476. The Court found that "[t]he exclusion of political subdivisions cannot be inferred from the express authorization to the "State[s]" because political subdivisions are components of the very entity the statute empowers." *Id.* at 608, 111 S.Ct. 2476 (alteration in original).

While the defendants quote this passage as black-letter law, the *Mortier* Court's conclusion was that "the express authorization to the "State[s]" *in FIFRA* could not be read to exclude political subdivisions. The paragraph begins, "Properly read, the statutory language tilts in favor of local regulation." 501 U.S. at 607, 111 S.Ct. 2476. The next paragraph starts, "Certainly no other textual basis for pre-emption exists." *Id.* at 608, 111 S.Ct. 2476. Taken in context, it is clear that the Court's conclusion was based on the specific statutory language at issue and thus was not a broad pronouncement regarding Congress' use of the term "State" in federal statutes.

The defendants also insist that the *Mortier* Court "addressed how political subdivisions of the States are to be treated for preemption purposes." (D.N. 34, PageID # 1164) They quote the following passage from *Mortier*: "It is, finally, axiomatic that 'for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.' " 501 U.S. at 605, 111 S.Ct. 2476 (quoting *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)). If this quote means what the defendants say it means—that if a state's laws are not preempted, then the laws of the state's political subdivisions are not preempted,

either—then the remainder of the *Mortier* opinion was superfluous, as the statute at issue in that case expressly granted regulatory authority to states. *See id.* at 606, 111 S.Ct. 2476 (quoting 7 U.S.C. § 136v); *see also id.* at 607, 111 S.Ct. 2476 ("Section 137v plainly authorizes the "States" to regulate pesticides ...."). The Court's statement is more logically read to mean that courts apply the same rules and principles when determining whether a local ordinance is preempted as they do when deciding whether a state law is preempted.

Likewise, the quotes highlighted by the defendants from *Ours Garage* are statements based on an analysis of the statute at issue in that case, the Interstate Commerce Act (ICA). Citing *Ours Garage*, the defendants argue, "In the words of the Supreme Court, federal statutes protecting 'State' laws from federal preemption 'should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts.' " (D.N. 14, PageID # 198 (quoting *Ours Garage*, 536 U.S. at 429, 122 S.Ct. 2226)) Read in context, however, this statement obviously refers to the language of the ICA: "Absent a clear statement to the contrary, Congress' reference to the 'regulatory authority of a State' should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts." *Ours Garage*, 536 U.S. at 429, 122 S.Ct. 2226 (quoting 49 U.S.C. § 14501(c)(2)(A)). Again, the Supreme Court based its conclusion on the specific statutory language at issue.

The defendants make no attempt to show that the NLRA sections at issue in this case are analogous to the FIFRA and ICA provisions discussed in *Mortier* and *Ours Garage*. This is likely because there are virtually no similarities that would justify similar treatment. Unlike the statutes

analyzed in *Mortier* and *Ours Garage*, the term "State" in § 14(b) is not used in an express grant or acknowledgment of states' regulatory authority. Rather, it identifies the political entities whose right-to-work laws withstand the NLRA. 29 U.S.C. § 164(b); *cf. Ours Garage*, 536 U.S. at 428, 122 S.Ct. 2226 ("As an exception to this general rule [of preemption], Congress provided that the preemption directive 'shall not restrict the safety regulatory authority of a State with respect to motor vehicles.'" (quoting 49 U.S.C. § 14501(c)(2)(A))); *Mortier*, 501 U.S. at 606, 111 S.Ct. 2476 ("A State may regulate the sale or use of any federally registered pesticide or device . . . ." (quoting 7 U.S.C. § 136v)).

Because the term "State" was used in a different context in FIFRA and the ICA than in the NLRA, the Supreme Court's interpretation of that term in *Mortier* and *Ours Garage* is not dispositive. Instead, standard principles of statutory interpretation control. Those principles lead the Court to read the two uses of the word "State" in § 14(b) as referring to the same thing. *See Powerex*, 551 U.S. at 232, 127 S.Ct. 2411 (citations omitted). Thus, "State" law does not include county or municipal law for purposes of § 14(b), and Ordinance 300 is not protected by § 14(b).

## B. Section 14(b) and NLRA Preemption

■ The next question, then, is whether § 14(b) is the only exception to NLRA preemption. The Supreme Court has observed that "[t]here is nothing in either § 14(b)'s language or legislative history to suggest that there may be applications of right-to-work laws which are not encompassed under § 14(b) but which are nonetheless permissible." *Mobil Oil Corp.*, 426 U.S. at 413 n. 7, 96 S.Ct. 2140. Although the defendants dismiss this statement as mere dictum (D.N. 14, PageID # 199), the Court's entire analysis in *Mobil Oil* was premised on the assumption that only a right-to-work law covered by § 14(b) can be valid.[3] *See* 426 U.S. at 412–13, 96 S.Ct. 2140 ("[T]he central inquiry in this case is whether § 14(b) permits the application of Texas' right-to-work laws to the agency-shop provision in the collective-bargaining agreement between the Union and respondent. Only if it is to be so read is the agency-shop provision unenforceable."). In other words, the Court recognized that § 14(b) is the sole source of authority for right-to-work laws. *See id.* at 413 n. 7, 96 S.Ct. 2140 ("[I]t is '§ 14(b) [which] gives the States power to outlaw even a union-security agreement that passes muster by federal standards.'" (second alteration in original) (quoting *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963))). Notably, the Court cited *Kentucky State AFL–CIO v. Puckett*, 391 S.W.2d 360 (Ky. 1965), in which the Kentucky Court of Appeals (then Kentucky's highest court) found a city right-to-work ordinance to be preempted by the NLRA. *See id.* at 362; *Mobil Oil*, 426 U.S. at 413 n. 7, 96 S.Ct. 2140.

Notwithstanding the *Mobil Oil* Court's treatment of § 14(b), the defendants contend that in an earlier case, *Schermerhorn*, "the Supreme Court took pains to explain that the [NLRA] never preempted State power." (D.N. 16-1, PageID # 232) Like *Mobil Oil*, *Schermerhorn* deals with §§ 8(a)(3) and 14(b) of the NLRA but is not directly on point. The question in *Schermerhorn* was whether state courts or the NLRB had jurisdiction to enforce a state's right-to-work law. *Schermerhorn*,

---

**3.** In *Mobil Oil,* the Court considered whether Texas' right-to-work laws applied to an agency-shop agreement covering employees who spent little work time in Texas. *See* 426 U.S. at 410, 96 S.Ct. 2140.

375 U.S. at 97–98, 84 S.Ct. 219. The *Schermerhorn* Court noted that in enacting § 8(a)(3),

> Congress undertook pervasive regulation of union-security agreements, raising in the minds of many whether it thereby preempted the field ..., and put such agreements beyond state control. That is one reason why a section, which later became § 14(b), appeared in the House bill—a provision described in the House Report as making clear and unambiguous the purpose of Congress not to preempt the field. That purpose was restated by the House Conference Report in explaining § 14(b).

*Id.* at 100–01, 84 S.Ct. 219 (footnotes omitted). The defendants focus on this excerpt but quote it selectively, omitting any mention of the House Reports. (*See* D.N. 16-1, PageID # 232) They take more liberties with a later quotation from *Schermerhorn*, asserting that "[t]he Court went on to state unequivocally: 'It was never the intention of the National Labor Relations Act ... to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism.'" (*Id.*, purportedly quoting *Schermerhorn*, 375 U.S. at 102, 84 S.Ct. 219) The passage quoted by the defendants was not a statement by the *Schermerhorn* Court, but rather a quote from the House Conference Report. *See* 375 U.S. at 101 n. 9, 84 S.Ct. 219.

In any event, *Schermerhorn* is not damaging to the plaintiffs' position. The Court's statement that Congress did not intend to preempt the field of union-security agreements is based on the House Reports it cites. *See id.* at 101 & nn. 8–9, 84 S.Ct. 219. Those reports do explain that

the amendments were not meant to preclude states from enacting and enforcing right-to-work laws, but they do not suggest that a right-to-work provision could never be touched by preemption. Indeed, the House Report recognized the NLRA's broad preemptive effect, indicating that state right-to-work laws would be preempted in the absence of § 14(b):

> "Since by the Labor Act Congress preempts the field that the act covers insofar as commerce within the meaning of the act is concerned, and since when this report is written the courts have not finally ruled upon the effect upon employees of employers engaged in commerce of State laws dealing with compulsory unionism, the committee has provided expressly in section 13 [now § 14(b)] that laws and constitutional provisions of any State that restrict the right of employers to require employees to become or remain members of labor organizations are valid, notwithstanding any provision of the National Labor Relations Act."

*Id.* at 101 n. 8, 84 S.Ct. 219 (quoting H.R. Rep. No. 510, 80th Cong., 1st Sess., p. 44). Likewise, the House Conference Report merely acknowledged that Congress did not intend to preempt right-to-work laws to the extent states had already been allowed to establish them:

> "Many states have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in those States illegal. It was never the intention of the National Labor Relations Act ... to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism."[4]

---

**4.** The *Schermerhorn* Court noted that "[b]y the time § 14(b) was written into the Act [in 1947], twelve states had statutes or constitutional provisions outlawing or restricting the closed shop and related devices" (i.e., right- to-work laws) and that "Congress seems to have been well informed" of such laws when it debated the 1947 amendments. 375 U.S. at 100, 84 S.Ct. 219.

*Id.* (omission in original) (quoting H.R. Rep. No. 510, 80th Cong., 1st Sess., p. 60).

NLRA preemption doctrine erases any lingering doubts about how to interpret *Schermerhorn.* In the context of the NLRA, there are two distinct preemption principles: *Garmon* preemption and *Machinists* preemption. *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 613, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986); *Metro. Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Only *Garmon* preemption is relevant here.

■ *Garmon* preemption forbids state and local regulation of "activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Golden State,* 475 U.S. at 613, 106 S.Ct. 1395; *see Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders · & Contractors of Mass./R.I., Inc.,* 507 U.S. 218, 224–25, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). "This rule of pre-emption is designed to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' 'integrated scheme of regulation.'" *Bldg. & Constr. Trades. Council,* 507 U.S. at 225, 113 S.Ct. 1190 (quoting *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)). Section 8(a)(3) of the NLRA protects union-security agreements. 29 U.S.C. § 158(a)(3) ("*Provided,* That nothing in

this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization ... to require as a condition of employment membership therein ....."). Thus, barring any exceptions, state and local regulation of union-security agreements is preempted by the NLRA.

■ There is, however, an exception to this preemption: § 14(b), which allows states and territories to prohibit union-security agreements. 29 U.S.C. § 164(b). The only logical reading of § 14(b), in light of *Garmon* and *Schermerhorn,* is that it is the sole exception to NLRA preemption of right-to-work laws. Thus, any regulation that falls outside the confines of § 14(b) is preempted.[5] And because § 14(b) does not apply to counties, the NLRA preempts Ordinance 300's right-to-work provision.

### C. Hiring Halls

■ Subsection (4)(E) of the ordinance provides that no employee shall be required "to be recommended, approved, referred, or cleared by or through a labor organization" as a condition of employment or continued employment. (D.N. 5-1, PageID # 96) The plaintiffs argue that this provision—which prohibits what are known as hiring-hall agreements—is preempted regardless of whether Ordinance 300 is a state law under § 14(b). In support, they cite *Local 514, Transport*

---

**5.** The defendants' citation of *NLRB v. Pueblo of San Juan,* 276 F.3d 1186 (10th Cir.2002), does not alter the Court's conclusion. In that case, which the defendants offer as an example of a court finding no preemption of a "local" right-to-work law, the Tenth Circuit conducted its entire preemption analysis using principles specific to tribal law. *See, e.g., id.* at 1190 ("The burden falls on the NLRB and the Union, as plaintiffs attacking the exercise of sovereign tribal power, 'to show that it has been modified, conditioned or divested by Congressional action.'" (quoting *Southland Royalty Co. v. Navajo Tribe,* 715 F.2d 486, 488

(10th Cir.1983))). And the defendants quote selectively from the decision to make it appear more persuasive and pertinent than it actually is. In short, *Pueblo of San Juan* is of little value in analyzing the constitutionality of Ordinance 300—with one exception that favors the plaintiffs: the Tenth Circuit noted that the NLRA "embraces diversity of legal regimes respecting union security agreements at the level of 'major policy-making units.'" *Id.* at 1197 (quoting *N.M. Fed'n of Labor v. City of Clovis,* 735 F.Supp. 999, 1003 (D.N.M. 1990)).

*Workers Union of America v. Keating*, 212 F.Supp.2d 1319 (E.D.Okla.2002), which they note "follows a unanimous line of circuit court precedent[ ] holding the state regulation of hiring hall agreements is preempted by the NLRA." (D.N. 7-1, PageID # 117) The *Local 514* court found an Oklahoma state law prohibiting hiring-hall agreements to be preempted because it fell "outside the grant of authority contained in section [14(b) ]." 212 F.Supp.2d at 1327.

The defendants offer little in response except to suggest that the Court depart from substantial precedent and find the hiring-hall provision valid as part of the ordinance's "overall intent ... to preclude compulsory union membership." (D.N. 16-1, PageID # 250) Noting that previous decisions have invalidated such provisions on the ground that hiring-hall agreements are technically separate from the employment relationship, the defendants point out that hiring-hall agreements occur exclusively in the construction industry, where "employment is often a 'revolving door' " and "[t]he line between the 'hiring process' and 'post-hiring' is a continuum." (*Id.*, PageID # 251) They argue that "[a]s a practical matter, required union referrals lead to pressure to join and pay union dues" and that "[m]andatory union referrals are inherently inconsistent with truly voluntary membership." (*Id.*) They cite no authority in support of their position, however.

The Court declines to depart from the unanimous line of circuit court precedent finding that the NLRA preempts regulation of hiring-hall agreements. *See Laborers' Int'l Union Local 107 v. Kunco, Inc.*, 472 F.2d 456, 458–59 (8th Cir.1973); *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768, 770–71 (9th Cir.1965); *NLRB v. Houston Chapter Associated Gen. Contractors*, 349 F.2d 449, 451 (5th Cir.1965). Those courts

found that § 14(b) is the sole exception to "the general rule that the federal government has preempted the field of labor relations." *Local 107*, 472 F.2d at 458. And § 14(b)—which, as explained above, is inapplicable to counties in any event—only provides a carve-out for "compulsory unionism." *Id.* Because hiring halls do not compel union membership, the power to regulate them does not fall within § 14(b). *Id.* at 459. The Court thus finds that the NLRA preempts Ordinance 300's hiring-hall provision.

### D. Dues Checkoff

██ Section 5 of Ordinance 300 provides:

> It shall be unlawful to deduct from the wages, earnings, or compensation of an employee any union dues, fees, assessments, or other charges to be held for, transferred to, or paid over to a labor organization, unless the employee has first presented, and the employer has received, a signed written authorization of such deductions, which authorization may be revoked by the employee at any time by giving written notice of such revocation to the employer.

(D.N. 5-1, PageID # 96) As with the hiring-hall provision, the plaintiffs argue that Section 5, the "dues-checkoff" provision, is not covered by § 14(b) of the NLRA because a dues-checkoff agreement is not an "agreement[ ] requiring membership in a labor organization as a condition of employment." 29 U.S.C. § 164(b). They cite several cases, most notably *SeaPak v. Industrial Technical & Professional Employees*, 300 F.Supp. 1197 (S.D.Ga.1969), in support of this position.[6] (*See* D.N. 7-1, PageID # 115-16)

---

**6.** *SeaPak* was adopted by the Fifth Circuit and affirmed by the Supreme Court without opinion. *See* 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434 (1971); *Seapak v. Indus. Tech. & Prof'l Emps.*, 423 F.2d 1229 (5th Cir.1970).

# 1014

The defendants maintain that dues checkoff is part and parcel of compulsory union membership. (D.N. 16-1, PageID #248) They further contend that there is no conflict between Section 5 of the ordinance, which makes authorization revocable "at any time," and the Labor Management Relations Act, which provides that authorizations "shall not be irrevocable for a period of more than one year." (*Id.* (citing 29 U.S.C. § 186(c)(4)) The defendants again offer no authority to support their position and instead ask the Court to depart from the precedent cited by the plaintiffs.

The Court again declines to depart from well-established precedent. The *SeaPak* Court found that the field of labor relations is preempted, that § 14(b) permits state regulation "only as to forms of union security which are the practical equivalent of compulsory unionism," and that dues-checkoff provisions do not amount to compulsory unionism. *SeaPak*, 300 F.Supp. at 1200–01. This Court agrees.

## III. CONCLUSION

The NLRA preempts the right-to-work, hiring-hall, and dues-checkoff provisions of Hardin County Ordinance 300. Section 14(b) is the only exception to NLRA preemption of the field of labor relations, and it does not extend to counties or municipalities. Because Ordinance 300 does not fall under § 14(b)'s narrow exception, sections 4, 5, and 6 of the ordinance are preempted and thus invalid. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1) The Plaintiffs' Motion for Summary Judgment (D.N. 7) is **GRANTED**.

(2) The Defendants' Motion for Summary Judgment (D.N. 16) is **DENIED**.

(3) The Defendants' Motion for Leave to File Supplemental Legal Authorities (D.N. 39) is **GRANTED**.

(4) The Plaintiffs' Motion for Leave to File Supplemental Legal Authority (D.N. 40) is **GRANTED**.

(5) A separate judgment will issue this date.

## HIS HEALING HANDS CHURCH, Plaintiff,

v.

## LANSING HOUSING COMMISSION, Defendant.

### Case No. 1:15-CV-1059

United States District Court,
W.D. Michigan, Southern Division.

Signed February 1, 2016

Timothy W. Denney, Rickard Denney Garno & Associates, Lapeer, MI, for Plaintiff.

Matthew Arthur Brauer, Rutledge Manion Rabaut Terry & Thomas PC, Detroit, MI, for Defendant.

## OPINION

GORDON J. QUIST, UNITED STATES DISTRICT JUDGE

Plaintiff, His Healing Hands Church (the Church), is a Lansing church affiliated with the Assemblies of God. On Sundays, the Church holds religious meetings that serve residents of public housing developments operated by Defendant, the Lansing Housing Commission (the Housing Commission). The Church previously requested permission to conduct its Sunday religious meetings in the community rooms of two housing developments operated by the Housing Commission. The Housing Commission refused the request on the grounds that it does not allow use of the community rooms for religious activities. The Church filed a complaint asserting that the Housing Commission had violated its rights under the First Amendment and the Equal Protection Clause, and sought a preliminary injunction. Because the Housing Commission's refusal to allow groups to use its community rooms for religious purposes constitutes impermissible viewpoint discrimination, the Court will grant the Church's motion and enter a preliminary injunction.

### Background

The Housing Commission is a public housing authority that provides subsidized housing to qualified individuals and families. (Dkt. # 15-2 at Page ID# 489, ¶ 2.)

The Housing Commission operates several housing developments, each of which has a community room. (*Id.* at ¶ 3.) The Housing Commission controls access to the community rooms, and keeps them locked when they are not in use. (*Id.*) The Housing Commission allows residents to use the rooms for private parties and other events, and the Housing Commission staff uses the community room to conduct meetings and put on events for residents. (*Id.* at ¶¶ 4-5.) In addition, the Housing Commission allows outside groups to use the community rooms "so long as the purpose is to benefit the residents of the [Housing Commission] facility." (*Id.* at ¶ 6.) The Housing Commission does not, however, allow outside groups to use the community room for "religious worship, services, or programs." (*Id.* at ¶ 8.)

The Housing Commission has permitted outside groups to use its community rooms for a variety of activities aimed at benefitting residents. Outside groups have used the community rooms to provide activities for children, including Boy Scouts and Girl Scouts meetings, tutoring, and programs aimed at character-building and teaching of life principles. (Dkt. # 22-1.) For example, a Lansing church sponsors a program called "Powerhouse," which uses the "Character First" program to teach character-building. (Dkt. # 21-1.) The program omits faith-based teachings and biblical references. (*Id.*) Youth Haven sponsors a "Kids Klub," which "focus[es] on teaching life principles and building the children's self-esteem through lessons, games, activities, and crafts." (Dkt. # 20-1 at Page ID# 554.) Similarly, the "Champions Club" has used the community rooms to teach children to "say no to negative peer pressure, to make the right choices and change their community for the better." (Dkt. # 20-1 at Page ID# 558.) Groups also use the community rooms to provide educational programs for adult residents related to health, financial literacy, and drug abuse prevention. (Dkt. # 15-2 at Page ID# 490-91, ¶ 7.) Finally, some groups use the community rooms to provide free food and diapers to residents. (*Id.*)

Dr. Eleanor Kue, a medical doctor, is the pastor of the Church. (Dkt. # 11-2 at Page ID# 305, ¶ 3.) During the week, Dr. Kue operates His Healing Medical Clinic, which provides medical services to an underserved community in Lansing. (*Id.* at ¶ 4.) On Sundays, Dr. Kue conducts "religious meetings," that serve the Housing Commission's residents. (*Id.* at ¶ 5.) Those meetings consist of Biblical teaching, including teaching related to morality, religious worship, and the provision of a meal. (Dkt. # 11-2 at Page ID# 306, ¶ 10.) The Church focuses on teaching children and their families "empowerment through Christ to turn away from the negative community cycles that face them, and to turn . . . toward a lifestyle that contains promise and Hope for the future." (Dkt. # 15-6 at Page ID# 513.)

In late August and early September 2015, Dr. Kue asked the managers of two different complexes operated by the Housing Commission if she could use their community rooms for the Church's Sunday religious meetings. (*Id.* at ¶¶ 6, 9.) The manager for one complex told Dr. Kue that she could use the community room to feed residents, but that she could not "say anything about Jesus" or "bring any Bibles." (*Id.* at ¶ 9.) A staff member at that complex later told Dr. Kue that the Church could not use the community room at all because it could not be used for religious activities. (*Id.*)

The managers of the housing complexes at issue have confirmed that they told Dr. Kue that "[the Housing Commission] does not grant access to the community room for religious purposes." (Dkt. # 15-3 at Page ID# 496, ¶ 8; dkt. # 15-4 at Page ID# 499, ¶ 7.) The managers stated that Dr. Kue could use the community rooms

"if the purpose of the access is for the secular benefit of the housing facility's residents," but that "[the Housing Commission] does not allow access to its housing facilities' private community rooms for churches to conduct religious worship, services, or programs." (Dkt. # 15-3 at Page ID# 496, ¶ 9; dkt. # 15-4 at Page ID# 500, ¶ 8.)

Following unsuccessful attempts to convince the Housing Commission to reconsider its decision, the Church filed this action. Shortly thereafter, the Church moved for a preliminary injunction.

### *Legal Standard*

■ A preliminary injunction is an "extraordinary remedy" that is warranted only upon a clear showing that the movant is entitled to relief. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). A plaintiff seeking a preliminary injunction must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20, 129 S.Ct. at 374.

■■ "[W]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002). "With regard to the factor of irreparable injury, for example, it is well-settled

that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (plurality opinion)). Thus, "in the First Amendment context, the other factors are essentially encompassed by the analysis of the movant's likelihood of success on the merits." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 890 (6th Cir.2012).

### *Discussion*

The Church argues that its exclusion from the Housing Commission's community rooms violates the First Amendment's freedom of speech, free exercise, and establishment clauses. The Church further argues that such action violates its rights under the Equal Protection Clause. Because the Court concludes that the Housing Commission has violated the Church's First Amendment right to freedom of speech, it need not consider the Church's other arguments.

■■ To determine whether a speech restriction on publicly-owned property is compatible with the First Amendment, courts consider: "(1) whether the speech is protected under the First Amendment; (2) what type of forum is at issue and, therefore, what constitutional standard applies; (3) whether the restriction on speech in question satisfies the constitutional standard for the forum." *Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010).[1] The Housing Commission does not

---

1. The Supreme Court's recent decision holding that "[c]ontent-based laws" are subject to strict scrutiny, *Reed v. Gilbert*, — U.S. —, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015), does not change the forum-based analysis applicable in this case. *Reed* addressed "laws" that restrict speech, rather than restrictions that the government imposes

in its role as a property owner. As the Court has previously held, "[w]here the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker

appear to dispute that the speech at issue falls within the First Amendment's protections. *See Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) ("[R]eligious worship and discussion... are forms of speech and association protected by the First Amendment."). Thus, the first issue the Court must determine is the type of forum involved.

### 1. Type of Forum

■ The Supreme Court has recognized three types of public fora: the traditional public forum, the designated public forum, and the limited public forum. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 469–70, 129 S.Ct. 1125, 1132, 172 L.Ed.2d 853 (2009). A traditional public forum is one which by tradition or government mandate has "been devoted to assembly and debate, such as a street or park." *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir.2001) (internal quotation marks omitted). "The government creates a designated public forum when it opens a piece of public property to the public at large, treating as if it were a traditional public forum." *Miller*, 622 F.3d at 534. Government restrictions based on the content of speech in traditional and designated public fora are subject to strict scrutiny analysis. *Pleasant Grove*, 555 U.S. at 469–70, 129 S.Ct. at 1132.

■ A limited public forum is distinct from a traditional or designated public forum. *Miller*, 622 F.3d at 535 n. 1. As the Sixth Circuit has explained, "a government entity may 'create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects.' " *Miller*, 622 F.3d at 534–35 (quoting *Pleasant Grove*, 555 U.S. at 470, 129 S.Ct. at 1132). "When the State establishes a limit-

ed public forum, the State is not required to and does not allow persons to engage in every type of speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 121 S.Ct. 2093, 2100, 150 L.Ed.2d 151 (2001). The State's power to restrict speech in a limited forum is not, however, unlimited. *Id.* Any such restriction "must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum." *Id.* at 106–07, 121 S.Ct. at 2100 (internal citations and quotation marks omitted).

■ "A nonpublic forum, in contrast, is a government-owned property that is not by tradition or governmental designation a forum for public communication." *Miller*, 622 F.3d at 534 (internal quotation marks omitted). For a nonpublic forum, the government may limit access "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir.2007) (internal quotation marks omitted). In determining whether a forum is some type of public forum or a non-public forum, the Sixth Circuit focuses on "whether the government intentionally opened the forum for public discourse." *Am. Freedom*, 698 F.3d at 890. Such analysis includes "not only... the government's explicit statements, policy, and practice, but also the nature of the property and its compatibility with expressive activity to discern the government's intent." *Id.* (internal citations and quotation marks omitted).

■ The Church argues that the community rooms are either traditional or des-

---

may be subject." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992). Thus, because the case at issue concerns the

Housing Commission's restriction on the use of its property, rather than any use of legislative power, the Court will employ a "forum based" analysis. *See id.*

ignated public fora because "no community groups are excluded except based on the religious content of their meetings." (Dkt. # 11, Page ID# 288.) That assertion, however, is belied by the record. The affidavits from the Housing Commission state that community groups may be granted access to the community rooms "so long as the purpose is to benefit the residents at the [Housing Commission] facility" (dkt. # 15-2 at Page ID# 489, ¶ 6), and there is no evidence that the rooms have been used beyond that purpose. Thus, the Housing Commission has not "open[ed] [the community rooms] to the public at large, treating [them] as if [they] were [ ] traditional public for[a]." *Miller*, 622 F.3d at 534. Rather, the Housing Commission has opened the rooms to outside groups for the limited purpose of hosting events that benefit the residents. Accordingly, the community rooms do not constitute traditional or designated public fora. *See Miller*, 622 F.3d at 535 (concluding that opening up Cincinnati's city hall to certain private groups did not transform it into a traditional or designated public forum because it was not open to public discourse).

The question thus becomes whether the community rooms are limited public fora or nonpublic fora. In distinguishing between the two, courts look to "whether the government intended to open the forum at issue." *Kincaid*, 236 F.3d at 348–49. To determine the government's intent, the Sixth Circuit instructs courts to "look to the government's policy and practice with respect to the forum, as well as to the nature of the property at issue and its 'compatibility with expressive activity.'" *Id.* at 349 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985)). The context in which the forum is found is also relevant to the determination. *Id.*

Courts that have completed the forum analysis with regard to rooms in public housing complexes have reached different results. The Eleventh Circuit previously held that the auditorium of a public housing development was a limited public forum because management had opened the space "to a wide range of expressive activities, including ceramics classes, political speeches, and religious services," but that the library was a nonpublic forum because there was no evidence that "tenants regularly or frequently met in the library." *Crowder v. Hous. Auth. of City of Atlanta*, 990 F.2d 586, 591 (11th Cir.1993). A district court reached a different conclusion in *Concerned Residents of Taylor–Wythe v. New York City Hous. Auth.*, No. 96 CIV. 2349 (RWS), 1996 WL 452432 (S.D.N.Y. Aug. 9, 1996), finding that a community center was a nonpublic forum because the primary purpose was to provide a space for residents' recreation, and that the housing authority had "sharply limited use of the Center by outside groups both in policy and in practice." *Id.* at *5. Finally, another district court concluded that a community room represented a nonpublic forum at times and a limited public forum at other times. *See Daily v. New York City Hous. Auth.*, 221 F.Supp.2d 390, 400 (E.D.N.Y.2002).

The question of whether the community rooms are limited public or nonpublic fora is a close one, but it is one the Court need not answer. Regardless of how the community rooms are classified, "the result would be the same, because government limitations on speech in both a limited public forum and a nonpublic forum receive the same level of scrutiny." *Miller*, 622 F.3d at 535–36. Any restrictions on speech imposed by the Housing Commission must be "reasonable and viewpoint neutral," whether the community rooms are deemed limited public or nonpublic fora. *Id.* at 536.

## 2. Application of Constitutional Standard

▉ The Housing Commission's restrictions on use of the community rooms "must not discriminate against speech on the basis of viewpoint, and...must be reasonable in light of the purpose served by the forum." *Good News Club*, 533 U.S. at 106–07, 121 S.Ct. at 2100 (internal quotation marks omitted). The Church argues that the Housing Commission engaged in viewpoint discrimination when it excluded the Church based on the religious nature of its speech. The Housing Commission argues that its restriction is viewpoint neutral because it does not allow any church to use its community room as a house of worship. As the Housing Commission explains, it "is not picking and choosing which religious worship to 'approve'—no religious worship is permitted, regardless of the religion." (Dkt. #15 at Page ID# 480.) The Supreme Court's decision in *Good News Club* forms the basis of the Court's analysis of the parties' arguments.

In *Good News Club*, a Christian organization geared toward children, the Good News Club, requested permission from a public school to use space in the building after hours to sing songs, read Bible lessons, and memorize scripture. *Id.* at 103, 121 S.Ct. at 2098. The school district's policy allowed school facilities to be used for "social, civic and recreational meeting and entertainment events, and other uses pertaining to the welfare of the community," but specifically prohibited use "by any individual or organization for religious purposes." *Id.* at 102–103, 121 S.Ct. at 2098. Based on that policy, the school district denied the Good News Club's request. *Id.* at 103, 121 S.Ct. at 2098.

Applying the standard for a limited forum, the Court concluded that the school's exclusion of the Good News Club constituted unconstitutional viewpoint discrimination. *Id.* at 109, 121 S.Ct. at 2101. The

Court explained the Club intended to teach morals and character development to children, that the policy allowed such activities generally, and that the exclusion of the Club based on the religious basis for their lessons constituted viewpoint discrimination. *Id.* at 108–109, 121 S.Ct. at 2100–2101. The Court rejected the idea that, by characterizing the activities as religious in nature, the school could treat the Good News Club's activities differently than other similar activities. *Id.* at 111, 121 S.Ct. at 2102. The Court explained:

> We disagree that something that is "quintessentially religious" or "decidedly religious in nature" cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint. What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons...[S]peech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Thus, we conclude that [the school's] exclusion of the Club from use of the school, pursuant to its community use policy, constitutes impermissible viewpoint discrimination.

*Id.* at 111–12, 121 S.Ct. at 2102 (internal citations omitted).

There is little relevant distinction between the facts at issue in this case and those in *Good News Club*. The Housing Commission allows outside groups to use the community rooms "so long as the purpose is to benefit the residents at the [Housing Commission] facility," and has permitted programs aimed at character-building, teaching life principles, and empowering children to make good choices.

Thus, like the school at issue in *Good News Club*, the Housing Commission allows the community rooms to be used for the teaching of moral and character development.

Those same lessons are central in the Church's religious meetings. The meetings focus on teaching moral lessons and empowering children and their families to break negative cycles and make good life choices. Thus, the content of the meetings is similar to that which has been permitted by the Housing Commission, with one important distinction—the Church's lessons are based on a religious foundation. The Housing Commission's affidavits make clear that it was this distinction that motivated the decision to deny the Church's request to use the community rooms, and that the decision would be different if the Church intended to use the rooms "for the secular benefit" of the Housing Commission's residents. As *Good News Club* makes clear, however, restricting speech based on its religious nature constitutes impermissible viewpoint discrimination.

The fact that the Church intended to include worship as part of its religious meetings does not change the analysis in this case. As previously noted, the Housing Commission's affidavit makes clear that it refused the Church's request because "[the Housing Commission] does not grant access to the community room for religious purposes," and has a policy excluding "religious worship, *services, or programs.*" (Dkt. # 15-3 at Page ID# 495-96, ¶¶ 6, 8 (emphasis added).) Thus, it was the religious viewpoint of the Church's meetings—rather than the fact that worship would be included—that formed the basis of the Housing Commission's decision to exclude the Church. In other words, the Housing Commission did not examine the content of the proposed meetings, but based its decision to exclude the Church solely on the religious viewpoint espoused.

Moreover, the Church's religious meetings include not only religious worship, but also biblically based lessons regarding morality and life skills. Thus, like the activities at issue in *Good News Club*, the Church's meetings "do not constitute mere religious worship, divorced from any teaching of moral values." *Good News Club*, 533 U.S. at 112 n. 4, 121 S.Ct. at 2102 n. 4. Rather, the meetings include religious worship as part of a program that includes singing, games, and lessons about morality. No matter what label the Housing Commission applies to the meetings, "what matters is the substance of [the Church's] activities," which are materially indistinguishable from those at issue in *Good News Club. Id.*

For those reasons, the decisions of courts in other circuits upholding the exclusion of worship services are distinguishable from the facts of this case. *See Bronx Household of Faith v. Bd. of Educ. of City of New York*, 650 F.3d 30 (2d Cir.2011); *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891 (9th Cir.2007) *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). In *Faith Center*, the Ninth Circuit held that a public library's exclusion of worship services was a "permissible limitation on the subject matter that may be discussed" in the forum, and thus did not constitute viewpoint discrimination. *Faith Ctr.*, 480 F.3d at 911. The court explained:

Pure religious worship . . . is not a secular activity that conveys a religious viewpoint on otherwise permissible subject matter. For every other topic of discussion that Faith Center engages in—the Bible, communication, social and political issues, life experiences—religious and non-religious perspectives exist. The same can be said for moral and character development in *Good News*

*Club* . . . Religious worship, on the other hand, is not a viewpoint but a category of discussion within which many different religious perspectives abound.

*Id.* at 915. The court acknowledged that it was not competent to distinguish between "pure religious worship" and other forms of religious speech, but explained that the plaintiff had made such distinction itself when it requested the forum for "praise and worship." *Id.* at 918. Thus, the court held that the exclusion of worship services was permissible.

In *Bronx Household*, the Second Circuit addressed the denial of the plaintiff's request to hold "Christian worship services" in a school facility. *Bronx Household*, 650 F.3d at 35. That denial was based on a policy that allowed school facilities to be used after-hours for many purposes, but specifically excluded "religious worship services." *Id.* at 34–35. The court held that the rule did not constitute viewpoint discrimination, explaining:

> The conduct of religious worship services, which the rule excludes, is something quite different from free expression of a religious point of view, which the Board does not prohibit. The conduct of services is the performance of an event or activity. While the conduct of religious services undoubtedly *includes* expressions of a religious point of view, it is not the expression of that point of view that is prohibited by the rule. Prayer, religious instruction, expression of devotion to God, and the singing of hymns, whether done by a person or a group, do not constitute the conduct of worship services. Those activities are not excluded. . . . The "religious worship services" clause does not purport to prohibit use of the facility by a person or group of persons for "worship." What is prohibited by this clause is solely the conduct of a particular type of event: a collective activity characteristically done according to an order prescribed by and

under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion.

*Id.* at 36–37. The court went on to explain that the exclusion was reasonable in light of the purpose of the forum, and thus passed constitutional muster. *Id.* at 40.

In this case, the Court need not answer the difficult questions posed in *Faith Center* and *Bronx Household*. The Housing Commission denied the Church's request to hold its meetings in the community rooms not because they were deemed worship services, but because they were intended to express a religious viewpoint. Moreover, the decisions in *Faith Center* and *Bronx Household* were based, in large part, on the plaintiffs' characterization of their activities as worship services. Unlike the plaintiffs in those cases, however, the Church has never characterized its Sunday meetings as pure worship. Although the Church acknowledges that worship is included in the meetings, it has emphasized that the meetings go beyond that, and the Court has no basis to question that. As the Supreme Court explained, "there is no indication when 'singing hymns, reading scripture, and teaching biblical principles'" cease being speech about religion and become worship. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 845, 115 S.Ct. 2510, 2524, 132 L.Ed.2d 700 (1995). In other words, while "[r]eligious worship services can be distinguished from other forms of religious speech by the adherents themselves," *Faith Ctr.*, 480 F.3d at 918, this Court is not competent to make such distinctions.

The Housing Commission allows outside groups to use its community rooms for activities intended to benefit the residents of the Housing Commission's facilities, but only if those activities are, in the opinion of the Housing Commission, of a secular nature. The Housing Commission denied the

Church's request to use its community rooms for religious meetings pursuant to its policy of excluding activities that have a religious purpose. In doing so, the Housing Commission engaged in impermissible viewpoint discrimination and violated the Church's First Amendment free speech rights.

### Conclusion

For the reasons discussed in this Opinion, the Court concludes that the Church is likely to succeed on the merits of its claim under the Free Speech Clause.[2] Accordingly, the Court will preliminarily enjoin the Housing Commission from denying the Church access to the community rooms for its religious meetings. An Order consistent with this Opinion shall follow.

**A.P., by next friend, Steven Pursley, et al., Plaintiffs,**

v.

**BOARD OF EDUCATION FOR CITY OF TULLAHOMA, TENNESSEE, et al., Defendants.**

Case No. 4:14–cv–65

United States District Court, E.D. Tennessee, Winchester Division.

Signed September 21, 2015

2. The Court's conclusion is based on the fact that the Housing Commission denied the Church's request to use its community rooms because the proposed meetings were religious in nature. There is no evidence in the record that the Housing Commission denied the request based on an exclusion for worship services specifically, or that the Church seeks to use the community rooms for a pure worship service. Thus, the Court offers no opinion on whether the Housing Commission could exclude worship services without violating the Constitution.

Iska Hoole, Legal Aid Society of Middle TN and The Cumberlands, Tullahoma, TN, Norman B. Feaster, II, Legal Aid Society of Middle TN and The Cumberlands, Cookeville, TN, Lenny L. Croce, Legal Aid Society of Middle Tennessee and The Cumberlands, Oak Ridge, TN, for Plaintiffs.

John D. Kitch, Cornelius & Collins, LLP, Michael K Markham, Office of The Attorney General, Nashville, TN, for Defendants.

### ORDER

HARRY S. MATTICE, JR., UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiffs' Motions for Attorney Fees (Docs.36, 37) and Defendant Board of Education for Tullahoma City Schools' Motion to Dismiss Request for Attorney Fees (Doc. 42). Plaintiffs move for attorney's fees pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1415(i)(3)(B).[1] (Docs.36, 37). This Court entered judg-

---

1. Plaintiffs also seek fees pursuant to 42 U.S.C. § 1988, presumably on the basis that they prevailed on the claim brought under 42 U.S.C. § 1983 for a declaratory injunction that the Defendants violated Plaintiffs' procedural rights in violation of 42 U.S.C. § 1983.

(See Doc. 1 at 10). The Court's October 10, 2014 decision, however, was based entirely on the Plaintiff's IDEA claim and did not address the Section 1983 claim at all. Therefore, the Court concludes that Plaintiffs were not prevailing parties for purposes of Section

ment in favor of Plaintiffs on the sole issue raised in this action: whether Plaintiff A.P. was entitled to a "stay put" order keeping him in his then-current education placement pending resolution of the underlying due process hearing requested by his father, Steven Pursley. (Doc. 34) For the reasons stated herein, the Court finds that Plaintiffs are "prevailing parties" pursuant to IDEA's attorney's fees provision, 20 U.S.C. § 1415(i)(3)(B), and are thus entitled to attorney's fees incurred in obtaining relief under the stay put provision. Accordingly, Plaintiffs' Motions (Docs.36, 37) will be **GRANTED,** Defendant Board of Education for Tullahoma City Schools' Motion (Doc. 42) will be **DENIED,** and Plaintiffs will be awarded fees in the amount of **$23,582.00** from Defendants in this action.

## I. FACTS

Most of the facts relevant to this motion are recited in the Court's October 10, 2014 Order granting Plaintiffs the stay put order allowing A.P. to remain in his then-current educational placement:

A.P. and his parent, Steven Pursley, filed their Complaint seeking injunctive and declaratory relief regarding the denial of procedural safeguards guaranteed by the Individuals with Disabilities Education Act ("IDEA"). (Doc. 1). The Court will summarize the facts relevant to the narrow determination currently before it.

In September 2011, a TCS [Tullahoma City Schools] individualized education program (IEP) team determined that A.P. had a disability that adversely affected his educational performance at his educational placement, East Middle School. (Doc. 1-1). The IEP team identified A.P.'s disabilities as "other health impairment" and "specific learning disability." (*Id.*).

A.P. began the 2013–2014 school year at the Behavior Adjustment Class ("BAC"), which is separate from the school district's middle school. (Doc. 1 at 5). On April 28, 2014, the IEP team met and decided that although A.P. has a disability, it did not adversely affect his educational performance. (Doc. 1-15). Steven Pursley and his attorney were present at this meeting and disagreed with the determination. On May 9, 2014, A.P. brought home a notice dated May 6, 2014, which stated that TCS planned to change A.P.'s placement back to high school as a regular education student. (Doc. 1-16). On May 16, 2014, Steven Pursley filed a request for a due process hearing in which he invoked A.P.'s stay-put rights. (Doc. 1-17). A.P. finished the remainder of the year at the BAC. (Doc. 1 at 7). At the beginning of the 2014–2015 school year, when Steven Pursley attempted to enroll A.P. at the BAC, TCS informed him that A.P. needed to be enrolled at the high school as a regular education student. (*Id.*).

On July 31, 2014, the Administrative Law Judge ("ALJ") presiding over A.P.'s case refused to issue a stay-put order because he determined that Steven Pursley was not timely in requesting a hearing. The ALJ based this ruling on the fact that Steven Pursley had "actual notice" of the change in placement because he was present at the eligibility determination on April 28, 2014. (Doc. 1-19 at 3). On September 4, 2014, Pursley moved for reconsideration, but his request was denied.

(Doc. 34 at 1–2). The sole issue before the Court was whether Plaintiffs had timely requested the due process hearing and were therefore entitled to a stay put order keeping A.P. in special education classes pending the due process hearing and a

---

1988 and will not address a request for attor- ney's fees under that particular statute.

determination by the state Administrative Law Judge ("ALJ") of his proper permanent placement. While Plaintiffs characterized their request for relief in the form of the stay-put order as a preliminary injunction, the Court found Plaintiffs were requesting a permanent injunction "given the narrow determination before the Court." (*Id.* at 5). The Court granted Plaintiffs' motion for injunctive relief concluding, based on the construction of two Tennessee regulations, that Plaintiffs had timely requested a due process hearing under the IDEA and therefore were entitled to a stay put order. (*Id.* at 4–8). The Court then entered judgment remanding the action to the ALJ for a determination on the merits of A.P.'s due process proceedings. (Doc. 35).

Plaintiffs subsequently moved for attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B) and 42 U.S.C. § 1988 in the amount of $23,582.00. (Doc. 37). While this motion was pending, Plaintiffs' due process proceedings continued at the state administrative level where the ALJ determined on April 10, 2015, that A.P., while disabled, "no longer requires special education services in order to access his education." (*See* Doc 42–1 at 2).

## II. ANALYSIS

### A. Prevailing Party Status

■ In the United States, under "the American Rule," parties are required generally to bear their own attorney's fees regardless of the outcome of a claim absent a fee shifting statute. *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources,* 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *McQueary v. Conway,* 614 F.3d 591, 596–97 (6th Cir.2010). Congress has passed numerous fee shifting statutes permitting an award of attorney's fees to a "prevailing party," and the Supreme Court has interpreted these stat-

utes consistently with one another. *Buckhannon,* 532 U.S. at 602–03, 603 n. 4, 121 S.Ct. 1835 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

Section 1415(i)(3)(B) of the IDEA provides that the court may, in its discretion, award attorney's fees in any action brought under the IDEA "to a prevailing party who is the parent of a child with a disability." Plaintiffs assert they are the prevailing party in this action because they obtained complete relief on the only claim they brought before this Court: whether they were entitled to a stay put order requiring that A.P. remain in special education classes pending the resolution of due process proceedings to determine his permanent placement. Defendants assert Plaintiffs are not prevailing parties because they obtained only interim relief which was not based on the merits of A.P.'s case. Rather, the argument continues, Plaintiffs cannot be prevailing parties because the state ALJ actually determined after a due process hearing that A.P. was not entitled to special education classes. While there is no binding precedent directly on point regarding the award of attorney's fees as a prevailing party for obtaining a stay put order, both sides cite persuasive authority in their favor. Before addressing these cases, however, the Court will discuss some leading United States Supreme Court cases on "prevailing party" status.

#### 1. Supreme Court Precedent

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) considered whether a party who has failed to secure a judgment on the merits or a court ordered consent decree is nonetheless entitled to attorney's fees as a prevailing party because the opposing party voluntarily changed its conduct as a result of the

lawsuit. The Supreme Court held it did not. *Id.* at 600, 121 S.Ct. 1835. In *Buckhannon*, the state of West Virginia (State) issued a cease and desist order requiring closure of a residential facility because some of the residents were not capable of moving themselves in the event of imminent danger, a violation of state law. The owners of the facility filed suit asserting the state law requiring "self-preservation" violated the Fair Housing Amendments of 1988 ("FHA"). While the action was pending, the West Virginia legislature amended state law repealing the self-preservation requirement. Accordingly, the district court dismissed the pending action as moot. The residential facility, however, sought attorney's fees under the FHA's fee shifting provision as a "prevailing party" on the ground that its lawsuit was the catalyst for the legislature's repeal of the self-preservation requirement. The Supreme Court rejected the catalyst theory for attorney's fees holding that in order to be a "prevailing party," that party must have received at least some relief on the merits of his claim and a "judicially sanctioned change in the legal relationship of the parties." *Id.* at 603–05, 121 S.Ct. 1835.

In *Sole v. Wyner*, 551 U.S. 74, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007), the Supreme Court considered whether a party was a prevailing party under 42 U.S.C. § 1988 by obtaining a preliminary injunction where the party ultimately was denied a permanent injunction in an action brought under 42 U.S.C. § 1983. In *Sole*, the plaintiff wanted to create an artistic peace symbol with nude persons on a Florida beach in violation of Florida's state bathing suit law. Plaintiff obtained a preliminary injunction from the district court to permit the nude demonstration provided plaintiff placed a screen around the demonstration in order to protect those who

did not want to see nudity on public beaches. After the demonstration was held and it became clear that participants in the demonstration refused to stay behind the screen, the district court concluded the screen was not sufficient to shield nudity from the public who did not want to see it and denied a permanent injunction which would have permitted future nude demonstrations on state beaches. *Id.* at 80–81, 127 S.Ct. 2188. The Court noted that "[a]t the preliminary injunction stage, the court is called upon to assess the probability of the plaintiff's ultimate success on the merits." *Id.* at 84, 127 S.Ct. 2188. In denying plaintiff attorney's fees for securing the preliminary injunction, the Supreme Court reasoned, "[o]f controlling importance to our decision, the eventual ruling on the merits for defendants, after both sides considered the case for final adjudication, superseded the preliminary ruling. [Plaintiff's] temporary success rested on a premise the District Court ultimately rejected," *id.* at 84–85, 127 S.Ct. 2188, and "[t]he final decision in [plaintiff's] case rejected the same claim she advanced in her preliminary injunction motion." *Id.* at 86, 127 S.Ct. 2188.

### 2. IDEA Case Law

Before discussing the authority cited by the parties, it is important to understand the nature of a "stay put" order under the IDEA. The language of the stay-put provision "is unequivocal." *Honig v. Doe*, 484 U.S. 305, 323, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). The so-called "stay put" provision of the IDEA states that "the child shall remain in the then-current educational placement" pending a due process proceeding to determine the appropriate permanent placement of the child unless the parents and the local educational agency agree otherwise. 20 U.S.C. § 1415(j) (emphasis added).[2] Furthermore,

---

**2.** 20 U.S.C. § 1415(j) provides:

Maintenance of Current Educational Place-

[t]he 'stay-put' provision is premised on the rationale that preservation of the status quo, rather than an inappropriate reaction to an emergent situation, provides for the best interests of a child. The 'stay put' provision insures that a school cannot eject a child and change his placement without complying with due process requirements.

*Tennessee Dept. of Mental Health and Mental Retardation v. Paul B.*, 88 F.3d 1466, 1472 (6th Cir.1996).

Defendants rely heavily on three cases to support their argument that Plaintiff is not the prevailing party and is thus not entitled to attorney fees. First, in *Edwards v. Cleveland Heights–University Heights Bd. of Educ.*, 1991 WL 270811 (6th Cir. Dec. 19, 1991) (unpublished), the United States Court of Appeals for the Sixth Circuit addressed the issue of whether a child who had not yet been determined to be disabled under the IDEA was entitled to attorney's fees as a prevailing party for obtaining a stay put order from the district court. In *Edwards,* the child was expelled for behavioral issues. While the action was pending in the district court, the school board agreed to a stay put order allowing the child to remain in school and to test the child for a disability. The district court entered an order reflecting the stay put agreement. While the issue of the child's disability was pending in the state administrative proceeding, the parents asked the district court for attorney's fees on the ground that they had prevailed in a discrete stage of the suit because they had obtained a stay put order. *Id.* at *4. The district court denied the motion for fees and the Sixth Circuit affirmed on the

ground that "the question whether [the child] has a learning disability had not yet been reached in the administrative proceedings" and the fee shifting statute, by its express language, applies only to parents or a guardian of a child with a disability. *Id.* at *5. The Sixth Circuit also flatly stated, "[m]oreover, plaintiffs were not prevailing parties," providing no analysis as to why it so concluded. *Id.* Plaintiffs in this case argue *Edwards* is distinguishable from the instant case because the district court's stay put order in *Edwards* was simply a reflection of the parties' agreement, whereas in this case the stay put provision was heavily litigated, and the resulting order (Doc. 34) changed the rights and actions of the parties. Furthermore, unlike in *Edwards,* it is undisputed that the child at issue in this case is disabled under the IDEA.

Second, in *Bd. of Educ. of Oak Park v. Nathan R.*, the United States Court of Appeals for the Seventh Circuit held that obtainment of a stay put order did not make parents prevailing parties under IDEA as the stay put order was non-merit based, interim relief that did not materially alter the legal relationship between the parties. 199 F.3d 377, 381–82 (7th Cir. 2000). Plaintiffs argue that this case is distinguishable because the plaintiff in *Nathan R.* was granted a stay put order by a hearing officer. In this case, however, the ALJ *denied* Plaintiff's request for a stay put order, thus forcing Plaintiffs to turn to this Court for relief.

Finally, in *J.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267 (3rd Cir.2002), another case cited by Defendants, the school board repeatedly suspended a student with a dis-

ment.—Except as provided in subsection (k)(4), during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current education-

al placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

ability. While a due process proceeding was pending on the state administrative level to determine if the student's conduct for which he was suspended was a manifestation of his disability, the parent sought what was in effect a stay put order for the child to remain in his current school placement. The ALJ granted the request and the parent subsequently filed suit in district court seeking attorney's fees under the IDEA as the prevailing party in the administrative proceeding. *Id.* at 270–71. The district court denied attorney's fees and the Third Circuit affirmed, finding a stay put order is only "interim relief," a type of "automatic preliminary injunction," "designed to maintain the status quo during the course of the proceedings" and as such, its award is not on the merits of plaintiff's claims. *Id.* at 272–74. Furthermore, the court noted that

> the fact that there could have been future proceedings does not necessarily make attorney's fees unavailable for this stage of the proceeding. In *Bagby v. Beal* . we affirmed an award of attorney's fees where the plaintiff succeeded on her due process claim for a hearing, even though she ultimately lost at that hearing, because the interim relief obtained (the hearing) remedied the violation.

*Id.* at 273 (citations omitted). Similarly to its argument distinguishing Nathan R, Plaintiffs argue that the ALJ's denial of the stay put request forced Plaintiffs to litigate the issue before this Court. This Court's ultimate order (Doc. 34), the Plaintiffs argue, remedied the violation like in *Bagby* by enforcing the stay put provision. (Doc. 39 at 5).

Several other cases not cited by the parties shed further light on the complexity of this issue. In *Y.B. v. Williamson Cnty. Bd. of Educ.*, 2009 WL 4061311 (M.D.Tenn. Nov. 20, 2009), for example, the school board suspended a student with a disability for one year after he brought vodka to school, drank it, and became ill. *Id.* at *1. Over the course of a year, the student's parents and the school board engaged in administrative proceedings to determine if the student's behavior was a manifestation of his disability. While the administrative proceedings continued on the manifestation issue, the parties agreed at a resolution session that the student be allowed to return to his original high school placement and engage in normal extra-curricular activities, that the parents be reimbursed for transportation costs incurred for the ten days they drove their student to a different placement, that the student have . a re-evaluation meeting in the Fall, and that the student's ten days of suspension constitute the full suspension. *Id.* at *2. Subsequently, the administrative judge entered a final order finding, *inter alia,* that while the student's conduct was not a manifestation of his disability, the parties' previous agreement would nevertheless constitute the final order in the proceeding. *Id.* at *3. The parents then filed an action in federal district court seeking attorney's fees under 20 U.S.C. § 1415(i)(3)(B) on the ground that they were prevailing parties since they had obtained a favorable order from the administrative judge. The district court first discussed the standard applicable to determine whether a party is prevailing for purposes of attorney's fees:

> "[S]uccess alone, however, is not enough" to be entitled to attorneys' fees as a "prevailing party." *Tompkins v. Troy Sch. Dist.,* 199 Fed.Appx. 463, 466 (6th Cir.2006). That is, the "term prevailing party also requires that there be 'a *court-ordered* change in the legal relationship between the plaintiff and the defendant.'" *Id.* (quoting *Buckhannon,* 532 U.S. at 604 [121 S.Ct. 1835]) (emphasis in *Tompkins*). Indeed, the change in legal relationship requires a "judicial im-

primatur" before "prevailing party" status can be granted. *Buckhannon,* 532 U.S. at 605 [121 S.Ct. 1835]. Both a judgment on the merits and a settlement agreement enforced through a consent decree qualify as such "court-ordered" changes in the legal relationship. *Id.* at 604–05 [121 S.Ct. 1835]. Therefore, for Y.B. "to be eligible for an award of attorneys' fees as [a prevailing party] under the IDEA, [he] must have (1) succeeded on a significant issue, and (2) this success must be embodied in either a judgment on the merits or in a settlement agreement enforced through a consent decree." *Tompkins,* 199 Fed.Appx. at 466.

*Y.B.,* 2009 WL 4061311, at *5. The district court then applied this standard to the particular facts of its case:

> To be clear, there is no dispute that the final conclusion of the AJ [administrative judge] was that the incident was not a manifestation of the impairment and that the plaintiff did not prevail on this issue. That said, as indicated above, prevailing party status is determined by taking a broad view of the entire litigation and examining whether the plaintiff, considering his goals at the outset, prevailed on "any significant issue" in the litigation. Here, while the plaintiff may not have prevailed on the foundational issue of manifestation and may have obtained much of the relief in this case through settlement negotiations, he clearly used litigation to produce a favorable result on many substantive issues, and that favorable result is embodied in the AJ's Final Order.

*Id.* at *6. Accordingly, the plaintiffs were awarded attorney's fees, but that award was based on the entry of the final order on all of Plaintiff's claims, not simply the stay put order.

In *Douglas v. District of Columbia,* 67 F.Supp.3d 36 (D.D.C.2014), the plaintiff, an eighteen year old student with a disability, brought an action in district court under 20 U.S.C. § 1415(j) seeking a stay put order to permit him to remain in his current high school placement after the school district's staff unilaterally decided that placement was no longer appropriate for him. This action was filed during the pendency of an administrative proceeding regarding plaintiff's ultimate placement. *Id.* at 39. The court explicitly rejected the Third Circuit's decisions denying prevailing party status for parents or guardians who obtain stay put orders stating, "[t]hese cases are inapplicable because the Third Circuit applies restrictions above and beyond *Buckhannon,* barring the recovery of attorney's fees for any 'interim' relief that does not 'resolve any merits-based issue in [the plaintiff's] favor.'" *Id.* at 41 (brackets original) (quoting *John T. ex rel. Paul T. v. Del. Cnty. Intermediate Unit,* 318 F.3d 545, 559 (3rd Cir.2003)). Rather, the correct standard for prevailing party status, the Douglas court held, is whether the party succeeded on a significant issue raised in the litigation, and secured some judicially sanctioned benefit which resulted in a change in the parties' legal relationship. *Id.* at 40 (relying on *Buckhannon,* 532 U.S. at 604–05, 121 S.Ct. 1835). The Douglas court concluded that, having obtained the stay put order, the plaintiff was the prevailing party entitled to fees under the IDEA. *Id.* at 41–42. As a secondary observation, the court noted the merits of that particular action had, indeed, been decided since the complaint asked for a stay put order and the plaintiff had obtained a stay put order. *Id.* at 42.

The court in *Hawaii Dep't of Educ. v. C.B.,* took an approach similar to that of the *Douglas* court, finding that parents who successfully obtained a stay put order from the district court were entitled to attorney's fees as prevailing parties because the stay put order materially altered

the relationship between the parties. 2013 WL 704934, *3–*6 (D.Hawaii Feb. 26, 2013). Plaintiff and his parents challenged the adequacy of plaintiff's Individualized Education Plan ("IEP") under the IDEA. A state administrative judge found for the plaintiff and against the Department of Education ("DOE") on this issue, but the district court reversed, finding no violation of the IDEA based on plaintiff's IEP. *Id.* at *2. The court, however, found the plaintiff and his parents were entitled to a stay put order requiring the DOE to reimburse the parents for the costs of plaintiff's placement in a private school, his then current placement. Furthermore, the court rejected the DOE's argument that plaintiff was not entitled to such a stay put order because plaintiff did not "prevail on the merits of a dispute." *Id.* at *4. Instead, the court noted that "the DOE vigorously contended that the 'stay put' provision did not apply at all and declined to pay any 'stay put' benefits," thus when the court ordered those benefits, plaintiff and his parents became prevailing parties. *Id.* at *5. The *C.B.* court also distinguished its case from the Third Circuit opinions by stating that its order requiring payment of tuition was "akin to a money judgment … more readily characterized as an 'enforceable judgment' materially altering the parties' relationship." *Id.* at *6.

### 3. *Application*

■ As this discussion has shown, there have been several approaches to requests for attorney's fees for obtaining a stay put order. One approach is to hold flatly that fees cannot be awarded for a obtaining a stay put order if the moving party does not receive a subsequent administrative or court order permitting the same placement as required by the stay put order. The rationale for this approach is that if the plaintiff does not prevail on his claim for permanent placement, then he has achieved no success on the merits of his claim by obtaining the stay put order. An-

other approach is to focus on the fact that monetary relief, as opposed to purely injunctive relief, was given.

The Court respectfully disagrees with both of these approaches, as they misapprehend what constitutes "the merits" in litigation waged to obtain a stay put order. Unlike in *Sole*, where "the court is called upon to assess the probability of the plaintiff's ultimate success on the merits" before granting a preliminary injunction, 551 U.S. at 84, 127 S.Ct. 2188, the merits of whether the moving party is entitled to a stay put order are entirely separate from the merits of a decision about a disabled child's permanent placement. The court is not called upon to evaluate the potential success of the child and/or his parents in obtaining the requested final placement— it has no bearing whatsoever on whether the child is entitled to a stay put order. The stay put order is important relief expressly provided by the IDEA to which a disabled child is entitled independent of considerations surrounding the child's permanent placement. As is often the true when evaluating a motion for attorney's fees under a fee shifting provision, there may be more than one claim to consider. In this case, the claim for the stay put order and the claim for permanent placement are two separate claims and should be evaluated independently for purposes of determining who is the prevailing party under the fee shifting provision of the IDEA.

■ With this understanding of the merits of a claim for a stay put order, the Court returns to *Buckhannon* to craft an appropriate test to determine when a party is a prevailing party for purposes of IDEA's fee shifting provision. First, in order to be the "prevailing party," a party must have received at least some relief on the merits of his claim. This relief must concern "any significant issue in litigation

which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Second, there must be a judicially sanctioned change in the legal relationship of the parties. Such relief must "materially alter[ ] the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). The Court will address these factors in turn.

With regard to the first factor, Plaintiffs unequivocally obtained relief on the merits of their claim that A.P. was entitled to a stay put order. The sole issue before this Court was whether Plaintiff had timely requested a due process hearing thereby entitling him to a stay put order. After a review of the state regulations in question, this Court found for Plaintiff and ordered injunctive relief requiring entry of the stay put order. (Doc. 34). Defendants argue that this was not a "decision on the merits but only on a procedural issue." (Doc. 43 at 3). Presumably the "merits" to which Defendant refers are the merits of Plaintiffs' claim that A.P. remained eligible for special education services under IDEA. This interpretation of what constitutes "the merits" of the claim at-issue, however, ignores reality. As indicated in both parties' briefs and in the Court's October 10, 2014 Order (Doc. 34), the sole issue before this Court was whether Plaintiffs were entitled to a stay put order. On this issue, the Court explicitly held that "Plaintiffs have established that they are successful on the merits of their challenge to the ALJ's ruling [that Plaintiff was not entitled to a stay put order]." (Doc. 34 at 9). Because Plaintiffs' sole objective in filing a lawsuit in this Court was to obtain a stay put order, the Court finds that Plaintiffs obtained not just some relief as to "any significant issue" but *complete* relief as to *all issues* Plaintiff sought in bringing suit in this Court.

Turning to the second factor, the Court finds that Plaintiff obtained his success on the merits of his claim through court ordered relief. Importantly, this is not a situation where the Court or the ALJ perfunctorily entered an unopposed stay put order at the request of one or both parties. Defendants vigorously opposed the stay put order litigating it at both the administrative and district court levels. Plaintiffs were forced to file an action in this Court, which entered an order for injunctive relief and a final judgment for Plaintiff that materially altered the legal relationship of the parties (i.e. the Defendant had to allow A.P. to remain in his then-current educational placement pending resolution of the administrative due process hearing). Because the Parties' legal relationship was changed by this Court's October 10, 2014 Order (Doc. 34), Plaintiffs have satisfied the judicially-sanctioned-relief element of the test for qualifying as a prevailing party.

Furthermore, this situation is not akin to the preliminary injunction at issue in *Sole v. Wyner*. Therein, the Supreme Court held that the "[p]revailing party status … does not attend achievement of a preliminary injunction that is reversed, dissolved, or otherwise undone by the final decision in the same case." 551 U.S. at 83, 127 S.Ct. 2188. The ultimate decision on the merits of a special education due process hearing, by definition, cannot dissolve a stay put order because a student's right to remain in his then-current educational placement under 20 U.S.C. § 1415(j) is separate and independent of the merits of the underlying due process hearing. The stay put order was not ultimately dissolved for lack of entitlement, but rather it was dissolved because it served its purpose in assuring that A.P. remained in his then-current educational placement until the ad-

ministrative due process hearing was complete.

Finally, the Court notes that its decision promotes the policy behind IDEA's stay put and fee shifting provisions. As articulated in *Tennessee Dept. of Mental Health and Mental Retardation v. Paul B.,*

> [t]he 'stay-put' provision is premised on the rationale that preservation of the status quo, rather than an inappropriate reaction to an emergent situation, provides for the best interests of a child. The 'stay put' provision insures that a school cannot eject a child and change his placement without complying with due process requirements.

88 F.3d at 1472. One of these due process requirements is the right to appeal an ALJ's denial of relief under the stay put provision, 20 U.S.C. § 1415(j), to this Court. *See* 20 U.S.C. § 1415(i)(2)(A). The purpose of the fee shifting provision is both to entice attorneys to represent parents and students in special education matters, and to enable parents to obtain counsel without having to worry about the associated financial pressures. If a plaintiff is only permitted to collect attorney fees for successfully appealing an ALJ's denial of a stay put order if the plaintiff ultimately succeeds on the merits of the underlying administrative proceeding, it will deter appeals to the district courts of administrative denials of stay put orders.[3] Such a disincentive is not in the best interests of the child, as it will necessarily result in fewer appeals of denials of stay put orders, and fewer students remaining in their then-current educational placement pending resolution of the underlying administrative due process hearing, as demanded by 20 U.S.C. § 1415(j).

Accordingly, the Court finds that Plaintiffs are the prevailing party in this action to obtain a stay put order for purposes of the IDEA's fee shifting statute, 20 U.S.C. § 1415(i)(3)(B).

**B. Calculation of Attorney's Fees**

■ The Court finds that a lodestar analysis is the appropriate means for determining the fees reasonably incurred. *See Hensley,* 461 U.S. at 433, 103 S.Ct. 1933 ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."); *see also Adcock–Ladd v. Sec'y of the Treasury,* 227 F.3d 343, 349 (6th Cir.2000).

Pursuant to the lodestar method, the Court considers, first, the reasonableness of the hourly rates charged by counsel. The Court finds that the hourly rates charged by Plaintiffs' counsel, (*see* Doc. 36–1 at 4; Doc. 36–2 at 4; and Doc. 36–3 at 5), are reasonable and are consistent with rates generally charged by practitioners in this region with experience equivalent to that of Plaintiffs' counsel.[4]

As the second component of the lodestar analysis, the Court considers the reasonableness of the hours expended in the litigation. Plaintiffs' counsel represent that 80.8 hours of attorney time was expended in securing a stay put order for Plaintiffs. (*See id.*). Plaintiffs' counsel further represent that they have only charged fees for services rendered between September 4, 2014 and October 9, 2014,[5] and that travel

---

**3.** Attorneys will not want to risk not being paid for an appeal to the district court, and parents will not want to risk running up a higher bill for legal fees in the event that they are not the prevailing party in the underlying administrative proceeding.

**4.** Defendants do not challenge the reasonableness of Plaintiffs' attorneys' claimed hourly rates. (*See* Doc. 38 at 4).

**5.** These dates represent the day on which the Administrative Law Judge denied Plaintiffs' motion to reconsider denial of a stay put order, and the date on which this Court held

time has been reduced by approximately 50%. (*Id.*). Defendants argue that "[i]t should not have taken three attorneys 80.8 hours ... to deal with this relatively simple issue," and that it was "unwarranted and excessive" to discuss and prepare a complaint detailing the alleged flaws in Defendants' school system (i.e. discussing the merits of the underlying administrative due process hearing). (Doc. 38 at 4).

 Notwithstanding Defendants' arguments to the contrary, the Court finds that the hours expended are reasonable. First, the Court notes that it is not uncommon for multiple attorneys within a single organization to collaborate on a case. Second, the Court has reviewed Plaintiffs' Complaint (Doc. 1) and agrees with Plaintiffs that the level of detail alleged was necessary to provide context for the Court to address Plaintiffs' request for a stay put order. Furthermore, it is far from clear that the stay put issue was "relatively simple," as two judicial authorities, the ALJ and this Court, disagreed on the proper outcome under Tenn. Comp. R. & Regs. 0520–01–09–.16 and 0520–01–09–.13, (*see* Doc. 34 at 8), and Defendants vigorously argued against entering a stay put order at both stages. This, coupled with Plaintiffs' self-imposed restrictions on billable hours discussed above leads the Court to find that the number of hours expended are reasonable and consistent with the amount of time needed to secure a stay put order.

Accordingly, Plaintiffs will be awarded $23,582.00 in fees from Defendants in this action.

## III. CONCLUSION

For the reasons stated herein, the Court finds that Plaintiffs are the prevailing party in this action seeking a stay put order. Having found that Plaintiffs' attorneys

a hearing on the stay put matter, respectively.

have billed reasonable hours at reasonable hourly rates, the Plaintiffs' Motions for Attorney Fees (Docs.36, 37) are hereby **GRANTED** and Defendants' Motion to Dismiss Request for Attorney Fees (Doc. 42) is hereby **DENIED**. Plaintiffs are hereby awarded $23,582.00 in fees from Defendants in this action.

A separate judgment will enter.

**SO ORDERED** this 21st day of September, 2015.

**Charles GARY, Plaintiff,**

v.

**CITY OF NORTH CHICAGO, et al., Defendants.**

**Case No. 13 C 8048**

United States District Court, N.D. Illinois, Eastern Division.

Signed February 1, 2016

(Doc. 39 at 13).

Muriel Collison, Collison & O'Connor, Robert D. Fink, Collison Law Offices, Chicago, IL, for Plaintiff.

Julie M. Koerner, Bhairav Radia, Brian Matthew Funk, Katharine P.A. Smeenk, O'Halloran Kosoff Geitner & Cook LLC, Northbrook, IL, Dominick L. Lanzito, Melissa D. Sobota, Patrick S. Wall, Paul A. O'Grady, Peterson, Johnson & Murray Chicago LLC, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Charles Gary has sued the City of North Chicago, its mayor Leon Rockingham, Jr., its former Chief of Police Michael Newsome, and North Chicago police officer William Bogdala. In count two of his amended complaint, Gary asserts claims against Bogdala and the City under 42 U.S.C. § 1983 based on Bogdala's alleged use of excessive force when effectuating Gary's arrest. Bogdala and the City have moved for summary judgment on this claim. For the reasons stated below, the Court denies their motion.

### Background

The following facts are not disputed except where otherwise noted. Late one night in November 2011, Waukegan police officer Adriana Cancino was on patrol when she observed a man walking southbound on North Green Bay Road toward a Citgo gas station in Waukegan. She also observed another two men running southbound on Green Bay beyond the Citgo station, between a car dealership parking

lot and a residential building. Cancino drove behind the residential building, where she observed two men in a gold sedan. She also observed a third man standing beside the sedan. That man was later identified as Charles Gary.

Cancino radioed for backup, turned on her emergency lights, and approached the sedan to speak with the men. As she approached, Gary departed. During her deposition, Cancino recalled that at the moment she parked and disembarked from her police car, Gary "immediately started running." Def.'s Ex. 1, dkt. no. 93-1, at 81:15. Cancino also looked at her report from the incident and testified that she first asked Gary what he was doing; after responding that he had just bought some cigarettes, Gary "proceed[ed] east through the building.... I did not write run, but he then proceed[ed] to run." *Id.* 82:6–10. Gary, on the other hand, recalls that as soon as he saw Cancino's police lights, he walked away from the scene. Def.'s Ex. 2, dkt. no. 93-2, at 14. He denies interacting with Cancino when she pulled up. Both parties agree that Gary departed because he was on probation at the time and was prohibited from having any contact with police. Upon arriving at the front of the residential building, Gary made his way to the right side of a metal railing lining the walkway to the building's entrance. Once there, he laid down on his stomach under some bushes.

At some point before, during, or after her first encounter with the men in the sedan (she could not remember the chronology during her deposition), Cancino became aware that a group of men, at least one of them armed, had robbed the Citgo down the street. Suspecting that the men in and around the gold sedan might have perpetrated the robbery, Cancino detained the men in the sedan and another man who had joined the group after Gary left the scene. Cancino or some other officer

then called to request the assistance of a canine unit in order to track and locate Gary.

North Chicago police officer Bogdala responded to the call for assistance with his police dog, Drago. Bogdala, a trained canine specialist, knew that he had been summoned to track a suspect involved in an armed robbery. He learned upon his arrival that Waukegan police had three suspects in custody and one suspect had fled on foot. Before beginning to track Gary, Bogdala loudly announced that he was releasing a police dog, declaring, 'North Chicago Police K-9, come out with your hands up.' Def.'s Stat. of Material Facts, dkt. no. 93, ¶ 24.

Cancino accompanied Bogdala as he began Drago's track, throughout which Bogdala kept Drago on a six-foot leather leash. After tracking for about fifteen to twenty feet, Drago located a firearm in the bushes. Drago continued tracking toward the entryway of the residential building. When the dog arrived at the building's front entrance, he tracked up and down the front walkway four to five times. From his position lying prone in the bushes, Gary could see Cancino and Bogdala walking along the walkway and could hear their radios and voices, in addition to the sound of Drago pacing the walkway.

According to Gary, Drago stopped pacing and began scratching and pawing at the pavement on the other side of the railing that separated Gary and the bushes from the walkway. Gary recalls one of the officers shining a flashlight on him and being told to put his hands on his head. By contrast, the officers both testified that they neither heard nor saw anything to indicate anyone was hiding in the bushes. Although Gary did not verbally respond to the officers' instructions, he placed his hands behind his head and continued to lie prone on his stomach in the bushes.

At this point, Drago jumped over the railing and into the bushes, where he bit Gary's hand, wrist, and the back of his head. Bogdala and Cancino heard Gary exclaim, "my hand," and Bogdala jumped over the railing into the bushes. Cancino waited a moment and then ran around the end of the railing and into the bushes as well. Drago had hold of Gary's hand or wrist and attempted to pull Gary from the bushes into an adjacent rocky area. Bogdala shined his flashlight on Gary, ordered him to "show me your hands" and stop fighting the dog, and assisted Drago in dragging Gary from the bushes.

Bogdala and Cancino both testified that they were unsure whether Gary was armed at the time, and Bogdala testified that he believed Gary might be dangerous because Drago had already located a weapon close by. Bogdala did not order Drago to release Gary until Bogdala had climbed over the fence and Cancino was in a position to cover him. When Bogdala ordered Drago to release, however, Drago did not respond. Drago continued to clamp his teeth down on Gary's hand, Gary continued to scream, and Bogdala continued to order Drago to desist. Bogdala gave at least three orders to disengage, spanning between eight seconds and one minute, before Drago finally let go of Gary's hand and wrist.

Gary sued the defendants in November 2013 alleging, among other things, that Drago's attack constituted excessive force in violation of the Fourth and Fourteenth Amendments. Bogdala and the City have moved for summary judgment on Gary's excessive force claim.

### Discussion

A party is entitled to summary judgment if it shows that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir.2009). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

 Claims that a police officer used excessive force in the course of an arrest are subject to the Fourth Amendment's reasonableness standard. *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir.2009) (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). This standard is applied to determine "whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an 'objectively reasonable' manner." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir.2010). To assess reasonableness, the court (or, at trial, the finder of fact) "must consider all of the circumstances, including notably '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Johnson*, 576 F.3d at 660 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

Defendants argue that all three of these factors weigh in their favor and that no reasonable jury could find that Bogdala's use of Drago to subdue Gary was unreasonable. First, defendants point out that Gary was suspected to have participated in a serious and violent crime. Second, given the nature of that crime, they contend that it was reasonable for Bogdala to believe that Gary might be armed. Third, although Gary was lying still when found and, upon being found, placed his hands behind his

head and did not move from his position, defendants argue that because he had previously left the sedan when Cancino approached and was hiding in the bushes, Gary was "attempting to evade arrest by flight." Defendants acknowledge that Gary had arguably surrendered, but they contend that due to his choice to flee, Bogdala acted reasonably in not accepting that Gary had completely and genuinely surrendered.

 Defendants liken this case to *Johnson*. There, a suspect in a shooting fled from police by car. The suspect violated numerous traffic laws in an effort to evade capture, and upon encountering a road block, he continued his flight on foot. When the suspect found himself cornered, he threw up his hands in surrender. An officer and his police dog were in pursuit only a few feet away when the suspect suddenly offered his surrender. In the split second (actually no more than one second) that followed, the dog lunged at the suspect, grabbing his arm and knocking him to the ground. *Johnson*, 576 F.3d at 659. It is well established that an officer may not continue to use force against a suspect who is subdued and complying with police orders. *See Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir.2001). The Seventh Circuit acknowledged this in *Johnson* but held that "[n]o law that we know of required [the officer] to take Johnson's apparent surrender at face value," because Jackson might have been able to retrieve and use a weapon, and in particular because no more than one second had passed between Johnson's surrender and the use of force. *Johnson*, 576 F.3d at 660. Defendants also note that a number of district courts have likewise found reasonable the use of a police dog to subdue a surrendering suspect. *See, e.g., Alicea v. Thomas*, No. 2:11 C 445, 2014 WL 4311079 (N.D.Ind. Sep. 2, 2014); *Martin v. Luckett*, No. 07 C 2800, 2011 WL 1231024 (N.D.Ill. Mar. 30, 2011); *Brady v.*

*Scott*, No. 1:09 C 110, 2010 WL 3946527 (N.D.Ind. Oct. 5, 2010).

This case is markedly different from *Johnson*. There, the suspect "had used every method at his disposal to flee from police," only surrendering "a split second" after he stopped running from them. *Johnson*, 576 F.3d at 660. It was unclear whether Johnson was armed, and the apparent peril of the situation was magnified by his erratic and reckless behavior while fleeing first by automobile and then on foot. *Id.* Moreover, the undisputed facts showed that there was almost no amount of time separating Johnson's surrender and the officer's use of force. *Id.* Ultimately, "[t]he critical fact in *Johnson* was that the officer 'had no idea how Johnson was going to behave once he was cornered.'" *Miller v. Gonzalez*, 761 F.3d 822, 830 (7th Cir.2014) (quoting *Johnson*, 576 F.3d at 660).

This case is also very different from the district court cases upon which defendants rely, all of which involved plaintiffs who shortly before their capture had led police on an active chase. In *Alicea*, police used a dog to subdue a suspect after chasing him through a neighborhood following a burglary. *Alicea*, 2014 WL 4311079, at *1–2. The plaintiff offered his surrender while standing inside an empty swimming pool. *id.* at *2. In light of the quickly evolving situation and the fact that police would be especially vulnerable to attack while climbing into the swimming pool to effectuate the arrest, the court found reasonable the officers' use of a dog to subdue the plaintiff. *Id.* at *4. In *Martin*, the suspect led police on an hour-long car chase through multiple jurisdictions while under the influence of alcohol and crack cocaine, breaking numerous traffic laws and actively demonstrating his indifference to human life and property in the process. *Martin*, 2011 WL 1231024, at *2. The suspect in *Brady* likewise led police on a car chase before jump-

ing out of his car to offer his surrender. *Brady*, 2010 WL 3946527, at *2.

■ By contrast, Gary's account—which the Court must accept as true for purposes of the present motion—is that he walked calmly away from Cancino's police cruiser and laid down in the bushes on the other side of the building. In addition, there is no evidence of any sort of active pursuit, nor is there evidence of any disregard on Gary's part, reckless or otherwise, for the safety or well-being of the officers or others. According to Gary, Bogdala found him lying in the bushes, plainly visible and complying with instructions to place his hands on his head. By Gary's account, Bogdala knew or should have known that Gary was subdued before he allowed Drago to jump the rail and bite him.

■ It is true that Gary left the scene when Cancino arrived, but the circumstances as he describes them did not create the type of danger or reasonable fear of harm that would justify the use of force given that he was lying on the ground, not moving, with his hands behind his head at the time of the use of force. As the Seventh Circuit stated in *Miller*, "[the] prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." *Miller*, 761 F.3d at 829. Viewing the record in the light most favorable to Gary—as the Court must at this juncture, *id.* at 826—the circumstances were such that a reasonable jury could find Bogdala used unreasonable force against Gary.

■ Lastly, defendants urge the Court that even if Bogdala's use of force was not objectively reasonable, summary judgment is proper on qualified immunity grounds. When a plaintiff shows that excessive force was used against him, to overcome an asserted defense of qualified immunity the plaintiff must further establish "that it was objectively unreasonable for the officer to believe that the force was lawful—i.e., [he] must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Abbott v. Sangamon Cty.*, 705 F.3d 706, 725 (7th Cir.2013).

■ Determination of whether a defendant is entitled to qualified immunity involves a two-part inquiry: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir.2013). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir.2014). The Seventh Circuit has further explained: "The relevant inquiry in determining whether a right is clearly established is whether it would have been clear to a reasonable officer that his conduct was unlawful in the situation the officer confronted." *Reher v. Vivo*, 656 F.3d 772, 776 (7th Cir.2011).

■ A constitutional right is "clearly established" for the purpose of qualified immunity where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To determine whether a right was clearly established at the time of an incident, courts look to controlling precedent from the Supreme Court and this circuit. If there is no such precedent, courts examine "all relevant case law to determine 'whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'"

*Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 528 (7th Cir.2012) (quoting *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir.2010)). "Importantly, the right must be clearly established in a particularized sense, rather than in an abstract or general sense." *Abbott*, 705 F.3d at 731. Still, "a case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Phillips*, 678 F.3d at 528 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

Construed in the light most favorable to Gary, the facts make out a clearly established constitutional violation. It was clearly established well before Bogdala's encounter with Gary that "force that is reasonable while a suspect poses a threat may no longer be reasonable as the threat decreases." *Miller*, 761 F.3d at 829 (citing *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir.2010)); *see also Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir.1993) (same). And at the time of Gary's arrest, it was clearly established that where a suspect is prone and subdued, it is objectively unreasonable to use significant force to effectuate his arrest. *See Miller*, 761 F.3d at 828–29 (collecting cases). In addition, in light of the evidence offered by Gary, which the Court must view in the light most favorable to him at this stage of the case, it would have been objectively unreasonable for Bogdala to believe that it was lawful to allow Drago to attack Gary while he was subdued and lying on the ground with his hands behind his head. For these reasons, Bogdala is not entitled to qualified immunity.

### Conclusion

For the foregoing reasons, the Court denies defendants' motion for summary judgment [dkt. no. 91]. The case is set for a status hearing on February 10, 2016 at 9:00 a.m. for the purpose of setting a schedule for further proceedings.

Johannes T. **MARTIN**, Plaintiff,

v.

**LIVING ESSENTIALS, LLC**, Defendant.

No. 15 C 01647

United States District Court, N.D. Illinois, Eastern Division.

Signed February 1, 2016

Johannes T. Martin, Des Plaines, IL, pro se.

David C. Van Dyke, Emily Elizabeth Bennett, Howard & Howard Attorneys, PLLC, Chicago, IL, Patrick M. McCarthy, Howard & Howard Attorneys PLLC, Ann Arbor, MI, for Defendant.

## MEMORANDUM OPINION AND ORDER

John J. Tharp, Jr., United States District Judge

Oscar Wilde once observed: "It is a curious fact that people are never so trivial as when they take themselves seriously." Case in point: Plaintiff Johannes T. ("Ted") Martin claims invasion of privacy and false advertising based on a television commercial in which an actor plugging an energy drink claims to have accomplished a series of seemingly impossible feats, all within the five-hour boost of energy the product purports to provide. These include mastering origami "while beating the record for Hacky Sack." Am. Compl. 2, ECF No. 8. Martin, who holds the world record for most consecutive kicks (no knees) in the footbag (*i.e.* hacky sack) singles category and has held that record since 1988 (with the exception of a brief period of 50 days in 1997), takes umbrage at the suggestion that consuming an energy drink could enable someone to break a record—*his* record—that doubtless requires a great deal of athleticism and countless hours of practice. He sees no humor in what he perceives to be an effort to exploit his achievement. But, whether Martin himself finds it humorous or not, the ad is clearly a comedic farce and in no way trades on Martin's identity. Were he to take a step back, Martin might even see that, if anything, the ad promotes the game to which he has given so much of himself (including, perhaps, his sense of humor). In any event, the amended complaint asserts no plausible cause of action and, for the reasons set forth more fully below, is dismissed with prejudice.

## BACKGROUND [1]

Martin brings claims against Defendant Living Essentials, LLC ("Living Essentials") under the Illinois Right to Publicity Act ("IRPA"), 765 ILCS 1075/1 et seq., and the Lanham Act, 15 U.S.C. § 1125(a). Currently before the Court is Living Essential's motion to dismiss the Amended Complaint in its entirety. ECF No. 10. At issue is a commercial for an energy drink called "5-hour ENERGY" ("5HE") in which an actor claims that "in the last 5 hours" he: disproved the theory of relativity; swam the English Channel and back; found Bigfoot; and mastered origami while beating "the record for Hacky Sack," all because he took a 5HE shot ("the Commercial").[2] Mem. in Supp. Ex. A, ECF No. 12. The specific portion of the Commercial that is at issue depicts a caucasian male actor kicking two hacky sacks while using his hands to construct an elaborate origami figure. *Id.* The Commercial also displays small-print text on the bottom of the screen stating, "For comedic purposes only. Not actual results[,]" and "Not proven to improve physical performance, dexterity or endurance." *Id.* Martin takes is-

1. For purposes of this motion to dismiss, the Court takes as true the following facts from Martin's Amended Complaint. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

2. The language of the Commercial is taken from a video of the Commercial included with Living Essentials' motion to dismiss. Mem. in Supp. Ex. A, ECF No. 12. Documents (or in this case, a film clip) that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in

the plaintiff's complaint and are central to his claim. *See Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993). Thus, the Court will consider the entire 5HE Commercial as part of the pleadings in analyzing Living Essentials' motion to dismiss. Moreover, because the Lanham Act requires considering the alleged false statements in context, the Court will look to the entire Commercial as context. *See Schering–Plough Healthcare Prods. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir.2009).

sue with the statement in the Commercial that the actor beat the record for hacky sack because he consumed 5HE, asserting that the statement is a false representation of fact and that the actor assumed his identity as the hacky sack world record holder, in violation of the IRPA and the Lanham Act.

## DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint must state a "plausible claim for relief," and "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief'" under Rule 8. *Iqbal.* at 679, 129 S.Ct. 1937. Although a court must accept all of the plaintiff's factual allegations as true when reviewing the complaint, conclusory allegations merely restating the elements of a cause of action do not receive this presumption: "A complaint must allege facts to support a cause of action's basic elements; the plaintiff is required to do at least that much." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014).

## I. Jurisdiction

Federal Rule of Civil Procedure 8 requires that a complaint contain "a short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1). Martin pleaded in his Amended

Complaint that, "The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332." Am. Compl. 2. While this statement alone is not sufficient to state the grounds for jurisdiction, Martin has adequately supplemented the jurisdictional statement in his response to the motion to dismiss, stating, "The Defendant is based in Michigan and I am a long term resident of the Northern District of Illinois. I seek damages in an amount exceeding $75,000." Resp. 15, ECF No. 15. Moreover, while Martin does not cite the statute, he correctly states that this Court has original jurisdiction over a Lanham Act case. Resp. 14; *see* 28 U.S.C. § 1331. Thus, Martin has fulfilled the requirements of Fed. R. Civ. P. 8(a)(1), and this Court has jurisdiction over this case.

## II. IRPA Claim

### A. Statute of Limitations

While a statute of limitations defense is not normally part of a Rule 12(b)(6) motion, when the plaintiff's allegations reveal that his claim is barred by a relevant statute of limitations, the complaint may be dismissed for failure to state a claim. *Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir.2011). IRPA claims are subject to a one-year statute of limitations, which begins to accrue at the time of the first publication of the allegedly infringing publication. *Blair v. Nevada Landing Partnership*, 369 Ill.App.3d 318, 307 Ill. Dec. 511, 859 N.E.2d 1188, 1192 (2006) ("The Right of Publicity Act does not identify a specific statute of limitations. However,...we find applicable the one-year statute of limitations that pertained to the common-law tort [of appropriation of likeness]."). [3] Martin's Amended Complaint ref-

---

**3.** Martin asserts that the general five-year statute of limitations applicable to "property" claims (*see* 735 ILCS 5/13–205) applies to claims under the Right of Privacy Act because the IRPA is codified in Chapter 765 of the Illinois Compiled Statutes, which is titled "Property." This argument ignores the fact

that, prior to enactment of the IRPA, the one-year statute of limitation claim applicable to common law claims involving "publication of matter violating the right of privacy" included right-of-publicity, also known as appropriation-of-likeness, claims. *Blair*, 307 Ill.Dec. 511, 859 N.E.2d at 1192. The IRPA codified

erences a CBS news piece about Living Essentials that aired November 16, 2012. Am. Compl. 3. Martin then states that "[Living Essentials] had just aired the 'Doctor's review' commercial and 'The last five hours: bigfoot...' commercial [the Commercial] was released *soon after*." *Id.*(emphasis added). Martin filed his original Complaint on February 24, 2015. Compl., ECF No. 1. For Martin's Complaint to be timely under the statute of limitations, the first publication date of the allegedly infringing Commercial would have to have been on or after February 24, 2014. Since Martin's Amended Complaint states that the Commercial aired "soon after" November 16, 2012 (regardless of whether "soon after" means a few days, a few weeks, or even a few months), well over a year had passed since the date of the Commercial's first publication when Martin filed his Complaint. Martin's IRPA claim against Living Essentials is, therefore, dismissed as time-barred.[4]

## B. Use of Identity

■ Even if Martin's IRPA claim were not time-barred, it could not succeed. The IRPA protects the exploitation of one's identity for commercial purposes without consent. The premise of Martin's argument is that by claiming that the hacky sack record holder used 5HE to set the record, the Commercial effectively says that *Martin* used 5HE to set his record. Living Essentials points out that the Commercial never uses Martin's name, or likeness, or voice, but IRPA's scope extends to the unauthorized use of "any attribute of an individual." 765 ILCS 1075/5. Martin contends that "the record for Hacky Sack" is a phrase that identifies him particularly, but the phrase is far too ambiguous to do so. The language and graphic of the Commercial depict vague generalities regarding "the record for Hacky Sack" and do not clearly indicate that someone has broken the specific record that Martin set (or any other particular hacky sack record). Living Essentials points to the diverse ar-

the common law right of publicity claim. *Id.* (IRPA sets forth "essentially the same three elements that were required for a common-law claim of appropriation of likeness"). Accordingly, in *Blair*, the Illinois Appellate Court expressly held that the same statutory limitations period that applied to the common law right-of-publication claim also applied to its statutory replacement. The Court is aware of no contrary authority and when applying or interpreting Illinois state law, the decisions of the intermediate appellate courts control "unless there are persuasive indications that the state supreme court would decide the issue differently." *Judson Atkinson Candies, Inc. v. Kenray Assocs., Inc.*, 719 F.3d 635, 639–40 (7th Cir.2013). There are no such indications here. *See also Berry v. Ford Modeling Agency*, 2012 WL 5470289, at *3 (N.D.Ill. Nov. 9, 2012) (expressly rejecting argument that five-year statute of limitations applies to IRPA claims and citing cases).

4. There is an exception to the general rule for the initiation of the statute of limitations period when the tort at issue involves a continu-

ing or repeated injury. *Blair*, 307 Ill.Dec. 511, 859 N.E.2d at 1192 ("Under the 'continuing violation rule,' where a tort involves a continuing or repeated injury the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease."). Where there is a single overt act from which subsequent damages may flow, however, the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury, and this is so despite the continuing nature of the injury. *Id.* (citing *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 278 Ill.Dec. 228, 798 N.E.2d 75, 85 (2003)). In *Blair*, the court held that although a picture of the plaintiff was used repeatedly over a period of time, it was used for the single purpose of advertising and therefore did not "denote a continuing course of conduct for which the limitations period can be tolled." *Blair*, 307 Ill.Dec. 511, 859 N.E.2d at 1193. Although Martin does not assert the "continuing violation rule," the Court notes that the repeated airing of the Commercial still constitutes a single overt act, such that the limitations period does not toll.

ray of hacky sack records (at least 14 different records, Mem. in Supp. 8 n.7), arguing that Martin's assertion that he holds *the* record is a mischaracterization. *Id.* 7-8. The Commercial, moreover, depicts a man kicking two footbags, not one. *Id.* Ex. A. Whether "the record" the fictitious consumer of 5HE claims to have broken is open singles footbag consecutive (Martin's record), open singles timed footbag consecutive, footbag (consecutive eclipses), or footbag (consecutive diving butterflies) or any of the other ten footbag records listed as a Footbag Guinness World Record is not evident in the Commercial. *See id.* Ex. C.[5] Martin notes the many different types of footbag records in his response, admitting that there "are actually more consecutive records than listed" on the Guinness World Records website. Resp. 5. He focuses on the open five-minute timed record and the record for juggling two footbags with one foot, then discusses the detailed differences between these two records— the difference between "consecutive" records and "freestyle" records, the difference between "kicks" and "tricks" such as "touches" or "stalls," the difference between "kicks" and "strikes," and when knees can and cannot be used. *Id.* 5-6. In describing the wide array of records and the specific knowledge necessary to discern between the records, Martin effectively concedes the ambiguity of a reference to "the Hacky Sack record."

But all of this misses the more fundamental point. The Commercial is a joke, a comedic farce. The claims it makes are not intended to be taken as true—and to the extent that there could be any doubt on that score, the commercial includes a clear disclaimer advising the most gullible among us that these are "not actual re-

sults." No one could watch the Commercial and reasonably conclude that the product spokesman actually holds "the record for Hacky Sack," much less that Ted Martin, who is listed in the Guinness Book of Records as holding just one of the many listed hacky sack records, is the person in (or portrayed by an actor in) the Commercial. Moreover, even if someone identified Martin as the holder of the record to which the Commercial refers, the Commercial portrays someone who not only set that hacky sack record, but also accomplished a series of additional equally improbable feats. If you didn't get the joke, and wanted to find out who this remarkable person is, you would also have to find out who had disproved relativity, and swum the English Channel, and found Big Foot, all in the same afternoon. Martin neither claims to have done these other things nor explains why anyone would believe that, in addition to unrivaled skill at keeping a footbag aloft, he possesses genius surpassing that of Einstein, twice the endurance of Diana Nyad, and hunting skills so refined that he is able to locate even mythical creatures. The Commercial's implication is to the contrary: whoever this remarkable human may be, he is someone other than Ted Martin (or Einstein, Nyad, or the biggest of big-game hunters, all of whom the Commercial portrays as being left in the wake of anyone who might consume a dose of 5HE).

To the maxim *de minimis non curat lex*, then, let us add a complementary proscription: *defectum humoris non curat lex*—the law does not reward humorlessness. Martin's premise that the Commercial exploits his identity because someone might believe that the actor (or whoever he portrays)

---

5. The Court may take judicial notice of the contents of a website. *LaBella Winnetka, Inc. v. Vill. of Winnetka,* 628 F.3d 937, 944 n. 3 (7th Cir.2010). Further, Martin does not dis-

pute that the records reflected on the Guinness site are authentic. Indeed, he relies on the site as evidence of the authenticity of his own record. *See* Resp. 4-5.

actually broke Martin's record depends on an interpretation so blind to its comedic nature that it is unreasonable and therefore beyond the law's protection. No reasonable person could conclude that the spokesman in the Commercial was actually Ted Martin, or even an actor playing Ted Martin. Accordingly, the Commercial does not use Martin's identity and his IRPA claim must be denied.

### III. Lanham Act Claim

■ Martin's false advertising claim under the Lanham Act fails for essentially the same reason: The Commercial is an obvious farce that would not lead anyone to believe that Martin, or anyone else, had actually accomplished all of the remarkable feats described. Even unsophisticated consumers would get the joke.[6]

Section 43(a) of the Lanham Act provides, in pertinent part that:

Any person who, on or in connection with any goods or services ...uses in commerce...any...false or misleading description of fact, or false or misleading representation of fact, which—

...

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's

goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1).

■ In assessing false advertising claims under § 43 of the Lanham Act, it is often said that where a statement is literally false, a plaintiff need not show that the statement actually deceived consumers; evidence of consumer confusion is required only where the actionable statement is literally true or ambiguous. There is, in other words, a presumption of consumer confusion where statements are literally false; where they are not, evidence of confusion must be adduced. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971–72 (7th Cir.1999); *Avila v. Rubin*, 84 F.3d 222 (7th Cir.1996); *see also Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir.2014).

As the Seventh Circuit has explained, however, the doctrine of "literal falsity" does not actually require literal falsity: "'literal' must be understood in the common colloquial sense in which Americans (not realizing, or perhaps not caring, that they are making Fowler turn in his grave) say things like 'I am literally out of my mind.'" *Schering–Plough Healthcare*

---

**6.** That the Commercial does not implicate Martin's identity also means that Martin is not even authorized to pursue a false advertising claim. In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, — U.S. ——, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014), the Supreme Court held that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 1390. As discussed further below, Martin asserts no such commercial interests. He is not a competitor of Living Essentials and is not otherwise involved in any commercial activity.

Although it has argued that Martin failed, as a matter of pleading, to adequately allege

harm and therefore to state a claim, Living Essentials has not argued that Martin's claim does not fall within the Lanham Act's zone of interest. As the Supreme Court explained in *Lexmark*, notwithstanding that the question of whether a plaintiff is authorized to sue based on the scope of a statute's substantive and remedial purposes has often been referred to as prudential or statutory "standing," the question is non-jurisdictional and can therefore be waived. *Id.* at 1387 n. 4 (question is non-jurisdictional); *American Institute of Certified Public Accountants v. Internal Revenue Service*, 804 F.3d 1193, 1193 (D.C.Cir.2015) (because non-jurisdictional, the question can be waived). Having failed to assert this argument, Living Essentials has waived it.

*Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512–13 (7th Cir.2009). Whether a statement is "literally" false or not, its actual meaning, and the risk that it may confuse consumers, depends on context. *Id.* ("[T]he meaning of the alleged literal falsehood must be considered in context and with reference to the audience to which the statement is addressed").

Living Essentials maintains that the Commercial is not literally false because it is ambiguous as to which hacky sack record it referred. "[O]nly an *unambiguous* message can be literally false," it argues; "if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." Mem. in Supp. 9 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir.2007)). In this case, however, the Commercial's ambiguity does not mean it is not literally false—the claim that a 5HE consumer broke *any* hacky sack record (while mastering origami, no less) *is* false. Here, there is no interpretation that renders the claim about breaking the hacky sack record truthful—the statement wasn't intended to be truthful because the Commercial is a farce. It is, in that sense, literally false.

■ That does not mean, however, that it is actionable without evidence of consumer confusion. "Many literally false statements are not deceptive." *Schering–Plough*, 586 F.3d at 512. Among them are statements of puffery and exaggeration so extreme that we can confidently say that no one could be fooled by them. *Id.* ("if no one is or could be fooled, no one is or could be hurt"). A leading authority on trademarks has defined puffery as "grossly exaggerated advertising claims such as blustering and boasting which no reasonable buyer would believe was true" and is therefore "not actionable under Lanham Act § 43(a)." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

*Competition* § 27.38 (4th ed. 1997) (adding further that "silly and unbelievable print and television advertising falls into this category"). Indeed, if a representation "is so grossly exaggerated that no reasonable buyer would take it at face value, there is no danger of consumer deception and hence, no basis for a false advertising claim." *Time Warner Cable*, 497 F.3d at 159 (rejecting false advertising claim based on grossly exaggerated depiction of cable television image quality). This is particularly so when such statements are made with disclaimers highlighting their intended farcical nature. *Faegre & Benson, LLP v. Purdy*, 367 F.Supp.2d 1238, 1244 (D.Minn.2005) (disclaimers on webpage "should alert the consumer that the web pages are parodies; thus, they are less likely to confuse consumers as to the sponsorship, affiliation, or source"); *Marriott Corp. v. Ramada Inc.*, 826 F.Supp. 726, 728 (S.D.N.Y.1993) (dismissing false advertising claim because ad was an obvious parody and one that no "reasonable person would be misled—even absent the disclaimer—into believing"). And here, there were two disclaimers removing any doubt that the Commercial was not to be taken literally.

As discussed above, the Commercial plainly falls into the category of farcical exaggerations that carry no risk of deceiving consumers. Martin is right when he says that Living Essentials "deliberately wants the audience to hear loud and clear that the record for Hacky Sack was accomplished because of 5-hour Energy," Am. Compl. 2 (capitalization altered), but that's the point of exaggeration. Telling consumers that they might cross one more item off their to-do list in the afternoon if they drink 5HE isn't necessarily a compelling or memorable sales pitch; consumers are much more likely to remember the claim that 5HE will enhance productivity if it is delivered in a more colorful and entertaining message. The entire gambit of the

commercial is to make claims that are so patently impossible and exaggerated that they are comical and therefore memorable. Claiming that by taking 5HE, one can disprove the theory of relativity, master origami while beating "the record" for hacky sack, swim the English Channel and back, and find Bigfoot all within the span of five hours, is obviously exaggerated hyperbole—better described as farce than mere puffery—upon which no reasonable consumer would rely.

*Stokely–Van Camp, Inc. v. Coca–Cola Co.*, 646 F.Supp.2d 510 (S.D.N.Y.2009), provides an instructive example that also confirms the farcical nature of the Commercial. There, the court addressed a false advertising claim arising from an advertisement for Powerade that contained the slogan, "Upgrade your game." *Id.* at 529. The court held that the advertisement was non-actionable puffery because it was "exaggerated and boastful, and no reasonable consumer, having read the slogan, would be justified in believing that it would actually result in improved athletic abilities, such as playing a better game of basketball." *Id.* at 530. So too here, where the boastful nature of the claim is the same but the message is delivered in a fashion that leaves no room for doubt that the literal claims being made are farcical.

Given the farcical nature of the Commercial, Martin cannot plausibly allege consumer confusion that has injured him, and he has not done so. He identifies no one who has been confused by the Commercial at all, much less in a way that harms his commercial interests. While Martin alleges that the Commercial has caused him "considerable angst," that he has suffered "severe injury to the commercial interest in [his] reputation," and that he seeks "treble damages from loss of

endorsement," Am. Compl. 4, Federal Rule of Civil Procedure 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Further, Martin also states that, although he has held the record since 1988, he has "never endorsed anything." Am. Compl. 2. Martin fails to claim any endorsements or financial opportunities that he lost as a result of the Commercial, or to identify endorsement opportunities that have been extended to other hacky sack elites. In conceding that in the 24 years of holding "his record" between 1988 and 2012 that he had no endorsement deals, Martin has failed to prove any alleged harm as required under the Lanham Act. *See Web Printing Controls Co. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1204–05 (7th Cir.1990) ("A plaintiff wishing to recover damages for a violation of the Lanham Act must prove... that the plaintiff suffered actual injury, *i.e.*, a loss of sales, profits, or present value (goodwill).").

If Martin's record has any commercial value—a dubious proposition given his admission that he has never endorsed anything—it would be among the Hacky Sack cognoscenti, but Martin does not claim that it is they who have been misled. Instead, he speculates in his Amended Complaint that "a young Hacky Sack player... *could be induced* by this commercial to take 5-hour ENERGY...," and "*hope[s]* this has not happened already." Am. Compl. 4 (emphasis added). Martin's concerns in this regard, though no doubt well-intentioned, fall short of providing a basis for his claim. Martin has no standing to assert claims on behalf of others who (according to Martin) may have been misled about the benefits of 5HE where Martin was not.[7] Martin, moreover, has merely

---

**7.** Unlike the question of whether the Lanham Act affords a cause of action to injured consumers (the "zone of interests" issue addressed in *Lexmark,* which is a non-jurisdictional question), the issue of whether a plaintiff is seeking redress for an injury that

speculated about the possibility of consumer confusion; he has not provided any facts showing consumer deception or confusion to support an allegation that the statement is misleading in context. *See Holland v. Lake Cty. Mun. Gov't*, 605 Fed.Appx. 579, 580 (7th Cir.2015) (plaintiff's claim "amounts to nothing more than speculation, which is insufficient to state a plausible claim for relief.").

\* \* \*

Because Martin's IRPA claim is time-barred and because he has failed to plead sufficient facts to support his claim under either the IRPA or the Lanham Act, Living Essentials' motion to dismiss is granted. And because repleading will not change the farcical nature of the Commercial, the dismissal is with prejudice. The Commercial is an obvious joke that employs hyperbole and exaggeration for comedic effect. Its claims could not deceive anyone with a modicum of common sense and wit. Mr. Martin (and the rest of us for that matter) would do well to remember: defectum humoris non curat lex.

David **NADOLSKI**, Plaintiff,

v.

**ASSOCIATES IN SLEEP MEDICINE, INC.**, Defendant.

No. 14 C 1294

United States District Court,
N.D. Illinois, Eastern Division.

Signed February 3, 2016

he has not sustained but others have is a question of Article III standing, which requires an injury-in-fact that is traceable to the challenged conduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Daniel Walker, Jr., Cesario & Walker, Hinsdale, IL, for Plaintiff.

Mark David Hansen, Graefe & Hansen, Ltd., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

Honorable Thomas M. Durkin, United States District Judge

David Nadolski alleges that he has Attention Deficit Hyperactivity Disorder ("ADHD") and that this condition qualifies as a disability for purposes of the Americans with Disabilities Act, 42 U.S.C. § 12101-213 ("ADA"). Nadolski also alleges that his former employer, Associates in Sleep Medicine, Inc. ("ASM"), violated the ADA by failing to accommodate his ADHD and firing him because of his ADHD. R. 26. ASM has moved for summary judgment. R. 27. For the following reasons, ASM's motion is granted.

### Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir.2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence"

and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir.2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## Background

### I. ADHD

In 1995, when he was 17 years old, Nadolski was diagnosed with mild ADHD. R. 42 ¶ 1. Nadolski states in an affidavit submitted in opposition to ASM's motion that he has been treated by doctors for his ADHD since his diagnosis. R. 34-6 ¶ 3. On January 21, 2012, he was evaluated by nurse Margaret Hahn on a referral from Dr. Maureen McNichols. *Id.* ¶ 6. The record does not include any documents or testimony directly from Dr. McNichols, and does not reveal her qualifications. Nurse Hahn diagnosed Nadolski with ADHD. *See* R. 34-8 at 3.

Nadolski briefly took Ritalin upon his initial diagnosis, took the pharmaceutical Strattera from 2005-06, and has taken the pharmaceutical Concentra since February 2012. *See* R. 34-8 at 2. Nadolski testified that his medication generally begins to wear off around 5:00 p.m., and his ability to concentrate and perform detail-orientated tasks decreases as the evening progresses. *See* R. 28-1 at 290 (12:5-22); *see also* R. 34-6 ¶ 5.

### II. Responsibilities at ASM

Nadolski was employed by ASM from April 24, 2012 to May 24, 2013. R. 28 ¶ 15; R. 34 ¶ 15. ASM evaluates sleep disorders, and seeks patient referrals from doctors. R. 28 ¶ 1; R. 34 ¶ 1. As a "Patient Care Coordinator," Nadolski was responsible for marketing ASM's services to doctors in a certain geographic area. R. 28 ¶ 15; R. 34 ¶ 15. In this role, Nadolski was expected to travel to doctors' offices in his territory, often meeting with them over lunch. R. 28 ¶ 15; R. 34 ¶ 15. Nadolski was required to log these doctor visits in ASM's database, and to submit expense and mileage reports to ASM staff. R. 28 ¶¶ 21-22; R. 34 ¶¶ 21-22. Nadolski received training in use of the database and understood how to enter this data. R. 28 ¶¶ 18-20; R. 34 ¶¶ 18-20. Nadolski and other Patient Care Coordinators were expected to log their activities on a daily basis, with a final weekly deadline of Monday at 8:00 p.m., *see* R. 28 ¶ 7; R. 34 ¶ 7, and to log their expenses monthly. R. 28 ¶ 22; R. 34 ¶ 22. Nadolski was responsible for setting his own schedule of visits with doctors in his territory and determining when to log his activities in ASM's database. R. 28 ¶¶ 23-24; R. 34 ¶¶ 23-24. Nadolski's employment agreement provided that he was expected to work a "minimum of 40 hours per week." R. 34-6 ¶ 9.

### III. Untimely Data Entry

Despite having the freedom to set his own schedule, it was Nadolski's practice to log all of his activity for a week at the very end of the weekly reporting period, after 5:00 p.m. on Mondays. *See* R. 28-1 at 399 (in an email to his supervisor, Nadolski stated, "I typically set aside time on Monday to get everything together."). This habit frequently caused Nadolski's reports to be late. Although Nadolski's performance reviews were otherwise good, the reviews noted that Nadolski was failing to ensure that he timely logged his activity in accordance with ASM policy. *See* R. 39 at 6 (in his performance review of July 27, 2012, Nadolski "freely admitted that he needs to focus more on getting [the database] updated in a timely manner"); R. 40 at 4 (Nadolski's performance review of March 13, 2013 notes that he "needs to focus more attention to completing expense reports and getting [the database] updated in a timely manner in accordance

with [ASM] policies."). ASM staff also frequently informed Nadolski that he was behind in submitting his expense and mileage reports. *See* R. 28-1 at 402 (Oct. 9-11, 2012); *id.* at 407 (Dec. 10-11, 2012); *id.* at 377 (Feb. 12, 2013); *id.* at 380 (Feb. 19, 2013); *id.* at 411 (Feb. 28, 2013); *id.* at 382 (Feb. 28, 2013); *id.* at 385 (Mar. 5, 2013); *id.* at 388 (Apr. 9, 2013); *id.* at 398 (May 14, 2013). ASM issued a written warning to Nadolski about his failure to file timely expense reports on December 10, 2012, threatening him with possible termination if he failed to comply. *See* R. 28-1 at 409.

Nadolski testified that he was aware of at least one other Patient Care Coordinator who was able to timely log her activities by doing so immediately after meeting with doctors, often while sitting in her car in the doctors' parking lots. *See* R. 28-1 at 246 (118:14–121:7). Nadolski, however, testified that there were too many distractions in parking lots, such as "cars and lights," that prevented him from logging his activity under such circumstances. *Id.* (119:1-4; 119:22–120:2). In testimony somewhat to the contrary, however, Nadolski also stated that he was able to record notes about his meetings by hand immediately following the meetings. *Id.* (121:1-7).

Nadolski attributes his difficulty in timely logging his activity to his ADHD. He testified that since his medication begins to wear off after 5:00 p.m. it was very difficult for him to log his activity by the 8:00 p.m. deadline. *See* R. 28-1 at 290 (12:15-22). Nadolski testified that Long knew that Nadolski had ADHD when he was hired. *See* R. 28-1 at 227 (44:24–45:8). Long testified that he first learned of Nadolski's condition in November 2012, *see* R. 28-1 at 79 (78:3-7), but that Nadolski never claimed that his ADHD was the reason for his late-filed activity reports. *See* R. 28-1 at 97 (96:3-5), 135 (134:5–136:1); *see also* R. 28-1 at 253 (147:18–150:5).

On February 28, 2013, Long sent Nadolski an email noting that he had not been updating the database as expected and requesting an explanation. R. 28-1 at 382. Nadolski responded by emailing Long a copy of a personality profile report created by the Dale Carnegie organization when Nadolski was employed there, which states that Nadolski did not have a detail-oriented personality. *Id.*; *see id.* at 353-75. Nadolski did not mention ADHD in this email exchange. *Id.* at 382-83. Nadolski testified, however, that in a subsequent conversation he told Long that his ADHD made it "difficult for me to get things in by [8:00] p.m. on Monday night," R. 28-1 at 253 (148:18-19), and requested an extension to 8:00 a.m. on Tuesdays, to which Long agreed. *Id.* at 253-54 (147:18–150:5). Nadolski also testified regarding this conversation, however, that he did not "know whether I was talking about ADHD directly or if it was the symptoms." *Id.* at 254 (150:2-3). Long testified that he never extended Nadolski's weekly deadline. R. 28-1 at 132 (131:4-8).

Long also testified that the only other Patient Care Coordinator to struggle with timely database entry was Scott Sobczak. Long testified, however, that he alerted Sobczak to this problem and Sobczak entered information in a timely manner from then on. *See* R. 28-1 at 118-19 (117:22–118:2) ("Q. Did you put Scott on a written warning? A. Nope. Q. Why not? A. Because Scott did what I asked him to do."); *see also id.* at 117-19 (116:3–118:9).

## IV. Other Issues Concerning Nadolski's Job Performance

In addition to logging their daily activities, Nadolski and the other Patient Care Coordinators were also expected to update information in the database about doctors in their respective territories. R. 28 ¶ 54; R. 34 ¶ 54. Long testified that Nadolski

consistently failed to adequately perform this task. According to Long's testimony, Nadolski and the other Patient Care Coordinators were expected to begin updating this information in the summer 2012. *See* R. 28-1 at 119 (118:10-21). Long testified that other Patient Care Coordinators were able to complete their updates by the end of 2012. *See id.* Nadolski disputes this characterization of the update process and expectations. Nadolski testified that although Patient Care Coordinators were expected to update doctor information on an ongoing basis, they were not expected to fully complete the update until they were "tapped" to take a few days off from the field in order to concentrate on the update. *See* R. 28-1 at 298 (44:6-11), 320 (130:9–132:3). Nadolski testified that he was not "tapped" to do so until May 2013, shortly before he was fired. *See id.*

Long also testified that Nadolski expressed on several occasions that he felt overwhelmed by certain aspects of his job, and that the detail oriented tasks required of Patient Care Coordinators were not in his "wheelhouse." R. 28-1 at 77 (76:9-13), 79-80 (78:24–79:7), 82-83 (81:1–82:23). Although detail-oreinted tasks are not in his "wheelhouse," Nadolski admits that while working for ASM, he had a second job teaching a college course two evenings a week and also participated in a dramatic production during December 2012, including rehearsals in the evenings.[1] Long testified that these activities distracted Nadolski from his work. *See* R. 28-1 at 125 (124:1-3), 179 (178:18-24). Nadolski disputes, however, that these activities detracted from his job performance, pointing to his favorable performance reviews as evidence to the contrary. *See* R. 34 ¶¶ 28, 31-32. Nadolski also states in his affidavit that Long and ASM knew of his second

job when he was hired. R. 34-6 ¶ 9. Further, ASM does not dispute that Nadolski requested and was granted permission to take time off to participate in the play.

### Analysis

Nadolski alleges that ASM violated the ADA when it (1) failed to accommodate his ADHD, and (2) fired him because of his ADHD. ASM's primary argument is that Nadolski is not disabled for purposes of the ADA. Since both of Nadolski's claims (failure to accommodate and discriminatory firing) require Nadolski to be disabled for the purposes of the ADA, the Court addresses that issue first.

### I. Disability

Under the ADA the "term 'disability' means, with respect to an individual, (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Further, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication . . . [or] reasonable accommodations." 42 U.S.C. § 12102(4)(E)(i)(I) and (III).

Nadolski alleges that his ADHD "substantially limits" his ability to think, con-

---

1. *See* R. 28-1 at 251 (141:7-9) ("We had set rehearsals throughout the week . . . which were a couple hours at night.")

centrate, and work.[2] He argues that his substantial limitation in these areas is shown by the fact that he "receives ongoing medical treatment and uses daily medications to ameliorate the effects of the ADHD." R. 32 at 3. Nadolski also points to his evaluation by Nurse Hahn, in which Nurse Hahn reported that Nadolski stated that:

he has trouble with detailed work. He often makes a lot of mistakes due to carelessness. He has trouble sitting still. He is always fidgety and moving his feet. He has unusual difficulty staying focused [on] boring or repetitive tasks. . . . He states that. . .it is hard for him to prioritize work and chores that almost anything can get his mind off what he is doing and is easily distracted by events around him such as noise or movement. He needs written reminders to get himself to do his activities or tasks.

R. 34-8 at 2-3. In an affidavit prepared for this motion, Nadolski also states as follows:

4. The medicine does not completely ameliorate my ADHD symptoms as described above, however it does reduce the impact of the condition such that I can focus and concentrate for longer periods of time, not as easily distracted but still am distracted by noises, lights, etc., and still have difficulty prioritizing and finishing projects.

5. When the medicine wears off which is about 5pm, my condition worsens and does so each hour thereafter. As I stated in my deposition at night my condition 'gets pretty difficult to deal with.' (DN Feb. p. 12). I lose the ability to concentrate for any sustained period of time making it difficult to complete projects. It takes more time than the average person to complete a project. The rea-

son, in part, is that I am easily distracted by other tasks. If while I am doing one task, another comes to mind I am likely to stop the project I am working on and start with the other project. It is difficult to prioritize the projects so I jump from one to the other.

R. 34-6 at 3.

■ This evidence is insufficient for a reasonable jury to conclude that Nadolski is "substantially limited" in his ability to think or concentrate. Certainly, this evidence establishes that Nadolski suffers from an impairment to his thinking and concentration. But this impairment does not "substantially limit" him as compared to the general public. Nadolski testified and stated that he takes medication and that it begins to wear off at 5:00 p.m., causing his symptoms to become progressively worse through the evening. Yet, Nadolski is able to prepare for and teach college courses in the evening, and was able to rehearse and perform a play in the evening over the course of a month. Teaching college courses and performing in a play are certainly activities that require a significant level of thinking and concentration. Nadolski contends that "defendant does not know if the accomplishments were done with ameliorative effects of the medications that Plaintiff takes to reduce the effects of his ADHD." R. 32 at 4. But the only evidence in the record on this issue is Nadolski's own testimony that his medication begins to wear off at 5:00 p.m. and his symptoms get progressively worse. Thus, Nadolski's ability to engage in these activities after his medication has worn off belies his testimony that he is "substantially limited" in his ability to think and concentrate.

Nadolski correctly points out that federal regulations provide that "[i]n determining whether an individual has a dis-

---

**2.** Federal regulations list thinking, concentrating, and working as "major life activities" for the purposes of the ADA. *See* 29 C.F.R. § 1630.2(1)(i) (2011).

ability...the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 29 C.F.R. § 1630.2(j)(4)(iii). "For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population." *Id.* But Nadolski has not presented any evidence that it was more difficult for him to engage in his teaching and dramatic activities compared to the general public. There is no evidence that Nadolski had to expend greater time or effort in order to teach his classes or prepare for his role in the play. Absent such evidence, Nadolski's ability to engage in such activities serves to undermine his testimony that he is "easily distracted" and has "difficulty ... finishing projects." Teaching a college course and memorizing a role in a play are complicated activities that require the ability to focus on particular tasks. The evidence in the record demonstrates that Nadolski was able to sufficiently focus on complicated activities after 5:00 p.m. without the assistance of his medication and without any greater difficulty than the average person.

■ Nadolski also argues that his ADHD substantially limits his ability to "work." To show that an impairment "substantially limits" an individual "in working, the individual can...show[ ] that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." *See* Appendix to 29 C.F.R. § 1630. However, "[d]emonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." *Id.*

Nadolski contends that his impairment substantially limits his ability to perform "jobs [that] involve record keeping...on a timely basis." R. 32 at 5. The evidence does not support this characterization of the effect Nadolski's impairment has on his ability to work. Nadolski admits that the "difficulty [he] experienced while working for [ASM] was *not* inputting data into the [database] as he knew how to do that. The difficulty was the repetitive nature of the task and the need to do it by a deadline caused by his ADHD." R. 33 ¶ 7 (emphasis added). But it was Nadolski's decision to leave a week's worth of data entry until the end of the weekly reporting period that transformed the task into one with a "repetitive nature." If Nadolksi had logged his activity after each meeting as other Patient Care Coordinators did, or even logged his activity at the end of each day, the task would not have been "repetitive" in nature. To the extent that Nadolski's impairment substantially limits his ability to perform repetitive record-keeping tasks, that impairment is only at issue here by his own doing.

Therefore, the evidence in the record is insufficient for a reasonable jury to find that Nadolski was disabled for purposes of the ADA, and ASM is entitled to summary judgment on both Nadolski's failure to accommodate and discrimination claims. Nadolski's claims fail for additional reasons, which the Court will address in the interest of completeness.

## II. Failure to Accommodate

■ Even if Nadolski's ADHD constituted a disability for purpose of the ADA (which it does not), the evidence is insufficient for a reasonable jury to find that ASM failed to accommodate that disability. Nadolski alleges that ASM failed to reasonably accommodate his inability "to timely complete the weekly [database] re-

ports," R. 26 ¶ 16, because Long initially granted and then revoked an extension of the reporting deadline for Nadolski.

█ "In order to establish a claim for failure to accommodate, a plaintiff must show that...the employer was aware of his disability[,] and...the employer failed to reasonably accommodate the disability." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir.2014). "Reasonable accommodations may include: (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 573–74 (7th Cir.2001) (quoting 42 U.S.C. § 12111(9)).

The problem with Nadolski's argument is that the evidence shows that he did not require an accommodation to timely log his activity in the database in the first place. Nadolski testified that his difficulty with timely logging his activity arose because he habitually attempted to log a week's worth of activity at the last minute before the Monday night deadline. Nadolski testified that this was difficult for him because his medication begins to wear off at 5:00 p.m. and his condition becomes progressively worse after that. But ASM never required Nadolski to log his acitivty within this narrow time window. Rather, Nadolski was free to log his activity whenever suited him best during the week. This freedom to set his own schedule is the ultimate accommodation for Nadolski's impairment. In fact, ASM encouraged Nadol-

ski to log his activity daily, or immediately after meeting with a doctor—a routine which would have avoided triggering Nadolski's impairment. Nadolski testified that this was not possible for him because there were "too many distractions" in the parking lots outside the offices of the doctors he visited. The Court finds this explanation entirely unreasonable and not one a reasonable jury would credit. But even if the Court were to credit Nadolski's explanation, it does not explain why Nadolski could not find a less distracting location to log his activity. There is no evidence that ASM's policies prevented Nadolski from devising a process for logging his activity in a manner that would avoid the need to spend several consecutive hours logging information after his medication lost its effectiveness for the day.

Instead of showing that ASM failed to accommodate Nadolski's impairment, the evidence indicates that Nadolski was unwilling to complete his data entry responsibilities at any point in time other than at the very end of the weekly reporting period after his medication had begun to wear off. Nadolski's procrastination created self-imposed pressure to meet ASM's deadline—a deadline that was otherwise highly accommodating to Nadolski's personal schedule. Despite the fact that his impairment made his chosen routine difficult for him, Nadolski testified that he was unwilling to log his activity on weekends because he had been promised that he would not have to work more than 40 hours a week and that ASM "does not own me." R. 28-1 at 291 (17:5). Additionally, Nadolski admits that he spent a substantial amount of time on his second job teaching college courses and participating in a play that he prioritized above ensuring that his marketing activity was timely logged. *See id.* at 291-92 (16:17–18:6).[3] This evidence demon-

---

**3.** Specifically, Nadolski testified as follows:

Q. Again, before we get to this—so is it your

strates that Nadolski *chose* not to log his activity in a manner that would enable him to avoid engaging in a repetitive task. Since the evidence indicates that Nadolski could easily have satisfied ASM's expectations without an accommodation, ASM's duty to accommodate was never triggered. See *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 852 (7th Cir.2015) ("A plaintiff cannot state a failure to accommodate claim if she was able to perform all essential functions of her job without regard to her physical or mental limitations. Thus, an employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job."). Therefore, ASM is entitled to summary judgment on Nadolski's failure to accommodate claim.[4]

## III. Discrimination

■ There is also insufficient evidence for a reasonable jury to find that Nadolksi was fired *because* of his ADHD. See *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir.2003) ("[W]hether a plaintiff proceeds under the direct or indirect method of proof, the ultimate standard is the same: the plaintiff must demonstrate that the employer would not have made the adverse employment decision in question but for his membership in a protected class."). The only evidence Nadolski cites to support such a finding is that Sobczak, a fellow Patient Care Coordinator, also had difficulty timely logging his activity in the database, but was not fired. Sobczak is not an adequate comparator, however, because he began recording his activity in the database in a timely fashion once Long insisted that he do so. This occurred in the fall of

---

testimony that it would take up to five hours to, perhaps, complete [the data entry], and, so, you would get home Monday evening, and it may take you all that evening, maybe from 6:00 to 12:00 or whatever to input [the data]?
A. Yeah.
Q. Is there some reason you couldn't have done that Sunday evening?
A. Yes, there is.
Q. Is there some reason that your ADHD prevented you from inputting into [the database] on Sunday evening?
A. Here's the thing. With Sunday evening—the company does not own me and my time, okay? And when I had been originally brought in and on board, I was told it was a 40-hour work week, and that is what we're doing, et cetera, et cetera. I have a life. I had a crumbling marriage I was dealing with on a regular basis, which was very stressful. I don't know if you know how distressful that—it was really, really tough. So I had a lot of life distractions, and, again, the company doesn't own me during those off times. I might as well sleep there.
Q. So can you answer the question? So is that to say your ADHD did not prevent you from inputting this information on Sunday?
A. No, sir. As a matter of fact, it says the opposite. It says, because I had other life

tasks, such as my marriage, and my now ex-wife to deal with, as well as obligations, that I had to deal with that. The Center For Sleep Medicine was not the only thing in my life, and my ADHD did prevent me from entering that information because of the distractions therein.
Q. And did your ADHD prevent you from inputting the information on Saturday evening?
A. Same answer.
Q. Did your ADHD prevent you from inputting this information during any part of the weekend?
A. During any part of the weekend, same answer.

4. ASM also argues that there is insufficient evidence for a jury to conclude that Nadolski sought an accommodation for his ADHD, which is also an element of a failure to accommodate claim. ASM, however, does not dispute that Nadolski told Long about his ADHD, and Nadolski testified that Long agreed to extend Nadolski's reporting deadline. This is sufficient evidence for a reasonable jury to conclude that ASM was aware that Nadolski thought he was entitled to an accommodation for his ADHD.

2012, around that same time that Long began to insist that Nadolski timely log his activity. Since Sobczak heeded Long's instructions in a timely fashion, whereas the evidence shows Nadolski continued to be late in logging his activity, ASM's failure to fire Sobczak is not evidence that it discriminated against Nadolski.

## Conclusion

For the foregoing reasons, ASM's motion for summary judgment, R. 27, is granted.

**FRIENDS OF THE PARKS, Sylvia Mann, and John Buenz, Plaintiffs,**

**v.**

**CHICAGO PARK DISTRICT and City of Chicago, Defendants.**

**Case No. 14-cv-9096**

United States District Court, N.D. Illinois, Eastern Division.

Signed February 4, 2016

Carol Tran Nguyen, Michael Paul Persoon, Thomas . Howard Geoghegan, Despres Schwartz & Geoghegan, Sean Morales Doyle, Despres, Schwartz & Geoghegan, Ltd., Chicago, IL, for Plaintiffs.

Joseph P. Roddy, Richard W. Burke, Burke, Warren, Mackay & Serritella, P.C., Susan M. Horner, Burke Warren Mackay & Serritella, Brian Douglas Sieve, Kirkland & Ellis LLP, William Macy Aguiar, Ellen Wight McLaughlin, Margaret R. Sobota, City of Chicago, Department of Law, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

JOHN W. DARRAH, United States District Court Judge

Plaintiffs brought this action, seeking to enjoin Defendants from proceeding with

the construction of a museum on land that is adjacent to Lake Michigan. Defendants filed a Motion to Dismiss the Complaint, which was denied in part and granted in part on March 12, 2015. After that ruling, the Park District and the Lucas Museum of Narrative Art entered into a new agreement, following legislation enacted by the Illinois General Assembly. Plaintiffs then filed a First Amended Complaint ("FAC"). Defendants have moved to dismiss the FAC.

## BACKGROUND

The following is taken from the FAC, which is assumed to be true for purposes of deciding a motion to dismiss. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir.2010). Plaintiff Friends of the Parks is a nonprofit park advocacy organization, dedicated to preserving, protecting, and improving Chicago's parks and forest preserves. Plaintiffs Sylvia Mann and John Buenz are residents of Illinois. Defendant Chicago Park District ("Park District") is "a body politic and corporate" established by state law. 70 Ill. Comp. Stat. § 1505/3. Defendant City of Chicago is a body politic and municipal corporation. (FAC ¶¶ 6-10.)

In May 2014, a task force appointed by Chicago Mayor Rahm Emanuel issued a report recommending the parking lots south of Soldier Field as the site for constructing a museum. The Museum is to be operated by a nonprofit corporation with the name, the Lucas Museum of Narrative Art (the "LMNA"); it will be dedicated to the exhibition of "narrative art" selected by the LMNA. The Mayor publicly endorsed the proposed location. (*Id.* ¶¶ 13-16, 27.)

On or about September 8, 2014, the Park District entered into a memorandum of understanding ("MOU") with the LMNA, memorializing the terms discussed between the Park District and the LMNA, including the construction, use and operation of the Museum. (*Id.* Ex. A at 2, ¶ G.) On November 13, 2014, Plaintiffs initiated this action.

After the Court's ruling on Defendants' motion to dismiss on March 12, 2015, the Illinois General Assembly, on April 23, 2015, amended the Park District Aquarium and Museum Act, 70 Ill. Comp. Stat. 1290/1 ("Museum Act"), and the Governor signed the bill into law on May 1, 2015. The amended Museum Act, in part, provides that:

> [t]he corporate authorities of cities and park districts having control or supervision over any public park or parks, including parks located on formerly submerged land, are hereby authorized to ... permit the directors or trustees of any corporation or society organized for the construction or maintenance and operation of an aquarium or museum as hereinabove described to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum within any public park now or hereafter under the control or supervision of any city or park district. . . .

70 Ill. Comp. Stat. 1290/1. After the legislation was enacted, the Park District and LMNA entered into a Ground Lease on October 14, 2015. (FAC Exh. A.) The Ground Lease permits LMNA to construct the Museum on, and to beautify and improve, the land lying south of Solider Field and north of the McCormick Place Lakeside Center (the "Project Area"). (FAC Ex. A, Recital D.)

The Ground Lease provides a term of 99 years with the option for renewal for two additional periods of 99 years. (FAC ¶¶ 25-26.) Under the terms of the lease, the LMNA assumes full and sole responsibility for the proposed building and has exclusive control over the construction,

maintenance and operation, repair and management of the building. (*Id.* ¶ 29.) The interest in the property is to be conveyed for a price of ten dollars. (*Id.* ¶ 28.)

On October 14, 2015, the Chicago Plan Commission voted to approve the Museum and to recommend to the City Council that it amend the zoning for the Project Area. On October 20, 2015, the City Council's Committee on Zoning, Landmarks and Building Standards held a public hearing on the requested zoning amendment and voted to recommend its passage to the City Council. The City Council approved the amendment on October 28, 2015. The subject property of the Ground Lease is located within Burnham Park and consists entirely of land recovered from the navigable waters of Lake Michigan, most during the 1920s. (*Id.* ¶ 20.)

On October 2, 2015, Plaintiffs filed the FAC. Plaintiffs seek to bar the transfer of control of land pursuant to the Ground Lease because, "the proposed ground lease...unlawfully conveys to a private party a right of continuing and exclusive control" over property recovered from the waters of Lake Michigan, which is held in trust by the State of Illinois for the people. (*Id.* ¶ 1.) Plaintiffs claim that the Ground Lease is a transfer to a private party, which violates the public trust. (*Id.*)

Plaintiffs assert a federal claim under § 1983 for violation of due process and an unlawful taking in violation of the Fifth Amendment (Count I) and state-law claims that Defendants acted *ultra vires* and in violation of the public trust (Counts II and III, respectively). Defendants have moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim.[1]

## LEGAL STANDARD

### *12(b)(6) Motion*

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Christensen v. County of Boone*, 483 F.3d 454, 458 (7th Cir.2007). To survive a 12(b)(6) motion, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Rather, the complaint must provide a defendant "with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

For purposes of a motion under Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and construes all reasonable inferences in favor of the plaintiff. *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir.2012); *Tamayo*, 526 F.3d at 1081.[2]

## ANALYSIS

### *Count I—Due-Process Claim*

As in the original Complaint, Count I of the FAC alleges a Fourteenth Amendment due-process claim.

---

1. Defendants again raise some issues previously resolved in the Opinion of March 12, 2015. Some of those issues will be addressed; but the prior Opinion, where applicable, is incorporated herein. Also, the three claims pled in the FAC present some overlapping and interrelated issues. However, each count will be discussed separately.

2. Defendants have raised several factual issues, *e.g.* the argument that the museum will substantially benefit the public, (Dkt. 66, pp. 13, 15; Dkt. 72, pp. 11, 12.), that are not properly considered in resolving a 12(b)(6) motion to dismiss.

"Due process is a flexible concept which 'calls for such procedural protections as the particular situation demands.'" *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir.1993) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). In order to state a Fourteenth Amendment procedural due process claim, Plaintiffs must allege that "(1) [they] had a constitutionally protected property interest, (2) [they] suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 943–44 (7th Cir.2010). The Constitution does not create property interests; rather, protected property interests must derive from an independent source such as state law. *Buttitta*, 9 F.3d at 1201 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), and *Bd. of Regents v. Roth*, 408 U.S. 564, 570, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

*Friends of the Parks v. Chicago Park Dist.*, No. 14–CV–09096, 2015 WL 1188615, at *9 (N.D.Ill. Mar. 12, 2015).

■ Plaintiffs allege that Defendants deprived them of property in violation of due process by executing the Ground Lease without specific approval from the General Assembly.

Defendants argue, first, that Plaintiffs do not have the private property interest in the Project Area required to state a due-process claim. As more fully discussed in the Memorandum Opinion and Order entered in this case on March 12, 2015, the Illinois Supreme Court held that each taxpayer of Illinois has a fractional beneficial interest in the property that the state of Illinois holds in trust for them, so as to create a protectable property interest. *Paepcke v. Public Bldg. Comm'm of Chicago*, 46 Ill.2d 330, 263 N.E.2d 11, 18 (1970).

Defendants argue that "an alleged misuse of private public property gives rise, at most, to a state-law public trust claim, not a due process claim," citing to *Paepcke* and *Reichlederfer v. Quinn*, 287 U.S. 315, 318–319, 53 S.Ct. 177, 77 L.Ed. 331 (1932), in support. (Dkt. 66 at 6.) However, *Paepcke*, citing to *Reichlederfer*, determined that there was no constitutionally protected property interest derived from proximity to public parks that had been designated for a particular purpose by the legislature. Rather, *Paepcke* held that the rights asserted by Plaintiffs are derived from the public-trust doctrine. When considering whether there is a public property right to enforce the public trust, the court in *Paepcke* held:

> "[i]f the 'public trust' doctrine is to have any meaning or vitality at all, the members of the public, at least taxpayers who are the beneficiaries of that trust, must have the right and standing to enforce it. To tell them that they must wait upon governmental action is often an effectual denial of the right for all time."

*Paepcke*, 263 N.E.2d at 18.

Defendants further argue that even if Plaintiffs have a constitutionally-protected property interest in the Project Area, the amendment of the Museum Act provided the necessary approval from the General Assembly and that the legislative procedure resulting in that amendment provided Plaintiffs with sufficient process for the deprivation of that interest. Plaintiffs, however, plead that the General Assembly, in enacting the legislation purportedly transferring control of the property, did not "refer specifically to the alienation, forfeiture or disposition of the land that is subject of the ground lease." (FAC ¶ 53.) Plaintiffs have alleged that, by failing to provide specific approval for the transfer of the subject land, the General Assembly

has acted in violation of Plaintiffs' right to due process. Construing the allegations in Plaintiffs' favor, Plaintiffs have sufficiently stated a procedural due-process claim under the Fourteenth Amendment. Thus, Defendants' Motion to Dismiss is denied with respect to Count I.

### Count II—Ultra Vires Claim

■ In Count II of the Complaint, Plaintiffs allege that the Park District is acting *ultra vires* by entering into a lease with the LMNA without a specific authorization from the General Assembly. Defendants contend that "in amending the Museum Act, elected representatives of the State discharged their legislative responsibilities in the manner prescribed by law." (Dkt. 66, p. 8.)

■ However, "[i]t is an established rule that the General Assembly cannot delegate its general legislative power to determine what the law shall be." *Hill v. Relyea*, 34 Ill.2d 552, 216 N.E.2d 795, 797 (1966). "[I]t may delegate to others the authority to do those things which the legislature might properly do, but cannot do as understandingly or advantageously." *Id.* "The former involves a discretion as to what the law shall be; the latter is merely an authority or discretion as to its execution, to be exercised under and in pursuance of the law." *Id.*

The amended Museum Act provides that:

a city or park district may enter into a lease for an initial term not to exceed 99 years, subject to renewal, allowing a corporation or society as hereinabove described to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum, together with grounds immediately adjacent to such aquarium or museum, and to use, possess, and occupy grounds surrounding such aquarium or museum as hereinabove described for the purpose of beautifying and maintaining such grounds in a manner consistent with the aquarium or museum's purpose, and on the conditions that (1) the public is allowed access to such grounds in a manner consistent with its access to other public parks, and (2) the city or park district retains a reversionary interest in any improvements made by the corporation or society on the grounds, including the aquarium or museum itself, that matures upon the expiration or lawful termination of the lease.

70 Ill. Comp. Stat. § 1290/1. Defendants argue that although the amendment did not grant authority to transfer control of the subject property to a private entity for a specific purpose benefitting the public, the above-cited language of the amendment alone is sufficient. However, formerly submerged land is held in "a title different in character from that which the state holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to pre-emption and sale." *Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 452, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). As discussed in the previous opinion of March 12, 2015, whether the use of previously submerged Illinois land protected by the public-trust doctrine is permissible has been determined by the courts in light of the authorizing legislation by the Illinois General Assembly. *Illinois Central Railroad*, the seminal opinion on this issue, held that land in the public trust is "held by the whole people for purposes in which the whole people are interested." *Illinois Cent. R. Co.*, 146 U.S. at 456, 13 S.Ct. 110 (emphasis added). "A disposition of these submerged lands, by the State, is a question of the power of the State, acting as a governmental body." *Bowes v. City of Chicago*, 3 Ill.2d 175, 120 N.E.2d 15, 22–23 (1954). Plaintiffs adequately plead that the amendment enacted by the General As-

sembly was not sufficient to transfer control of public-trust land to a private entity.

Defendants also argue that any specific grant of authority would violate the special legislation clause of the Illinois Constitution. The special legislation clause provides: "The General Assembly shall pass no special or local law when a general law is or can be made applicable." ILL. CONST. 1970, art. IV, § 13.

▇▇▇▇ This constitutional provision does not prohibit all classifications; rather, its purpose is to prevent arbitrary legislative classifications. . . . If any set of facts can be reasonably conceived that justifies distinguishing the class to which the statute applies from the class to which the statute is inapplicable, then the General Assembly may constitutionally classify persons and objects for the purpose of legislative regulation or control, and may enact laws applicable only to those persons or objects.

▇▇ *Petition of Vill. of Vernon Hills*, 168 Ill.2d 117, 212 Ill.Dec. 883, 658 N.E.2d 365, 367 (1995). "[T]he purpose of the special legislation clause is to prevent arbitrary legislative classifications that discriminate in favor of a select group without a sound, reasonable basis." *Best v. Taylor Mach. Works*, 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1069–70 (1997).

This concern has previously been addressed by the courts in the context of the public trust doctrine. As originally written, the Museums in Parks Act, "which limited the privilege to museums located in a public park on the first day of July, 1903, was intended to apply, and as a matter of fact did apply, only to [the Field Museum]." *S. Park Comm'rs v. Montgomery Ward & Co.*, 248 Ill. 299, 93 N.E. 910, 912 (1910). However, the legislature amended the statute to prevent a suit accusing the State of giving a special privilege to the Field Museum. *See* Journal of the Senate of the 47th General Assembly of the State of

Illinois, p. 941-42; *S. Park Comm'rs*, 93 N.E. at 912.

In *People ex rel. Attorney Gen. v. Kirk*, 162 Ill. 138, 45 N.E. 830 (1896), a case in which a grant to a private entity was upheld, the Illinois Supreme Court considered whether the transfer of public trust land to private parties was valid "under an act of the legislature of the state of Illinois passed in the year 1889, and for the purpose of having removed the filling, breakwaters, and extension of the drive already made under said contracts." *Kirk*, 45 N.E. at 830. In *People ex rel. Scott v. Chicago Park Dist.*, 66 Ill.2d 65, 4 Ill.Dec. 660, 360 N.E.2d 773 (1976), the Illinois Supreme Court analyzed whether a bill conveying submerged land to the United Steel Corporation violated the public trust doctrine. *Scott*, 4 Ill.Dec. 660, 360 N.E.2d at 777–781. In *Lake Michigan Fed'n v. U.S. Army Corps of Engineers*, 742 F.Supp. 441, 445 (N.D.Ill.1990), the court examined a grant by the General Assembly of the lakebed to Loyola University of Chicago. *Lake Michigan Fed'n*, 742 F.Supp. at 445. None of these cases raise the special legislation clause as a potential bar to public trust transfers.

Plaintiffs have plausibly stated a claim that conveyance of park lands by the Park District is *ultra vires* for the purposes of a motion to dismiss under 12(b)(6). Thus, Defendants' Motion to Dismiss is denied with respect to Count II.

#### Count III—Public Trust Claim

▇▇▇ In Count III of the FAC, Plaintiffs claim that Defendants are in breach of their duty to hold the property in trust for the people of Illinois.

▇▇▇ The State of Illinois "holds title to submerged land, as is involved here, in trust for the people, and . . . in general the governmental powers over these lands will not be relinquished." *Scott*, 4 Ill.Dec. 660,

360 N.E.2d at 779. Under the public-trust doctrine, the State cannot "abdicate its trust over property in which the whole people are interested...so as to leave them entirely under the use and control of private parties." *Illinois Central R. Co.*, 146 U.S. at 453, 13 S.Ct. 110. State control over public lands cannot be relinquished "except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining." *Id.* The purpose "of the public trust doctrine is to police the legislature's disposition of public lands." *Lake Michigan Fed'n*, 742 F.Supp. at 446. "If courts were to rubber stamp legislative decisions,..., the doctrine would have no teeth. The legislature would have unfettered discretion to breach the public trust as long as it was able to articulate some gain to the public." *Id.* Plaintiffs claim that that the General Assembly has abdicated its trust responsibilities over the subject property by delegating their responsibility as trustees to the Park District. Plaintiffs further assert that only the General Assembly, as representative of all of the people of Illinois, has the authority to determine whether the use of the subject land is for the public benefit and that this determination cannot be delegated to a lesser representative body.

■ The General Assembly may convey public-trust land as long as the transfer is consistent with the public interest and does not impair the remaining lands and waters. *Droste v. Kerner*, 34 Ill.2d 495, 217 N.E.2d 73, 76 (1966) ("The proper execution of this public trust with respect to submerged lands requires that the conveyance of any particular parcel to a shore owner be consistent with the public interest and not impair the interest of the public in the lands and waters remaining."). Courts have struck down legislative grants of public-trust land where the pri-

mary purpose is to benefit a private party. *Lake Michigan Fed'n*, 742 F.Supp. at 445.

> Three basic principles can be distilled from this body of public trust case law. First, courts should be critical of attempts by the state to surrender valuable public resources to a private entity....Second, the public trust is violated when the primary purpose of a legislative grant is to benefit a private interest....Finally, any attempt by the state to relinquish its power over a public resource should be invalidated under the doctrine.

*Id.* at 445 (internal citations omitted).

Defendants argue that the Park District may lease land to the LMNA without violating the public-trust doctrine. Defendants first argue that the public-trust doctrine is not implicated because the Park District has conveyed leasehold rights, and not ownership rights, to the LMNA. The Ground Lease provides for a 99-year lease with two renewal options, also for 99 years. (Ground Lease, ¶ 3.1.) Subject to the Park District's police and regulatory powers, the LMNA "shall be entitled to...quiet possession and enjoyment of the Museum Site." (*Id.* ¶ 2.5.) At the expiration or termination of the lease, the LMNA will return the Museum Site to the Park District. (*Id.* ¶ 3.3.) The Ground Lease further provides that "this Lease conveys to Lucas Museum of Narrative Art a leasehold estate in the Museum Site, and it is intended by the Park District and Lucas Museum of Narrative Art that the Park District shall be forever the holder of fee simple title to the Museum Site." (*Id.* ¶ 3.5.)

Defendants next argue that this situation is similar to the Illinois Supreme Court's decision in *Friends of Parks v. Chicago Park Dist* However, in discussing the agreement between the Chicago Bears and the Park District, the court noted:

The Park District is, and will remain, the owner of the Burnham Park property, including Soldier Field. Neither the Act, the implementing agreements, nor the project documents provide for a *conveyance* of the Soldier Field property to the Bears. There is no abdication of *control* of the property to the Bears. *Friends of Parks v. Chicago Park Dist.*, 203 Ill.2d 312, 271 Ill.Dec. 903, 786 N.E.2d 161, 170 (2003) (emphasis added). The Bears entered into a Permit and Operating Agreement with the Park District, allowing for the Bears to use Soldier Field for specific purposes; but Soldier Field itself was still owned and controlled by the Park District. In contrast, pursuant to the Ground Lease under consideration here, Museum is defined as "the museum building and related improvements, fixtures and facilities to be constructed or installed on the Museum Site by Lucas Museum of Narrative Art, pursuant to the terms and provisions of this Lease...", and which, during and upon completion *shall be owned by Lucas Museum of Narrative Art* for the Term of the Lease." (FAC Exh. A., p. 8) (emphasis added). *Friends of Parks* is not controlling in this instance.

Plaintiffs claim that a 99-year lease term is a "legal subterfuge" (Dkt. 77, p. 10) and, in effect, a surrender of ownership. In *Dep't of Pub. Works & Buildings v. Metro. Life Ins. Co.*, 42 Ill.App.2d 378, 192 N.E.2d 607 (Ct.1963), an Illinois Appellate Court stated: "It is well established that lessees for years holding under a valid lease have such an interest in real property as to be classified as owners in the constitutional sense and are entitled to compensation for the taking of their interest in the property." *Dep't of Pub. Works & Buildings v. Metro. Life Ins. Co.*, 192 N.E.2d at 610. In

*Pierce v. Pierce*, 4 Ill.2d 497, 23 N.E.2d 511 (1954), the Illinois Supreme Court held that a 99-year lease may be the subject of a partition. *Pierce*, 123 N.E.2d at 511. These cases stand for the proposition that a long-term lease may convey an interest in real property.

Defendants argue that the public-trust doctrine is only implicated when public-trust property is "*completely conveyed* (title is entirely relinquished) to a private entity." (Dkt. 66, p. 12) (emphasis added).[3] But in *Illinois Central Railroad*, the Supreme Court spoke in broader terms of *control*:

> Such abdication is not consistent with the exercise of that trust which requires the government of the state to preserve such waters for the use of the public. The trust devolving upon the state for the public, and which can only be discharged by the management and *control* of property in which the public has an interest, cannot be relinquished by a transfer of the property. The *control* of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.

*Illinois Cent. R. Co.*, 146 U.S. at 453, 13 S.Ct. 110 (emphasis added). Plaintiffs sufficiently plead that the Ground Lease effectively surrenders control of the Museum Site (FAC, ¶ 1) and places the public-trust land "entirely beyond the direction and control of the state." *Id.* at 454, 13 S.Ct. 110.

Defendants also argue that the LMNA will primarily benefit the public and not a

---

**3.** Conveyance includes a leasehold interest. A conveyance is "the voluntary transfer of a right or of property." Black's Law Dictionary (10th ed. 2014). A lease is "1. A contract by

which a rightful possessor of real property *conveys* the right to use and occupy the property in exchange for consideration, usu. rent...." *Id.* (emphasis added).

private interest. Plaintiffs have sufficiently pled that the proposed Museum is not for the benefit of the public but will impair public interest in the land and benefit the LMNA and promote private and/or commercial interests.[4] Moreover, as mentioned above, Defendants raise a question of fact in this regard not now properly considered. Plaintiffs have plausibly stated a claim for a violation of the public-trust doctrine. Thus, Defendants' Motion to Dismiss is denied with respect to Count III.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss [65] is denied.

**ARMADA (SINGAPORE) PTE LTD, Plaintiff,**

v.

**AMCOL INTERNATIONAL CORP., et al., Defendants.**

No. 13 C 3455

United States District Court, N.D. Illinois, Eastern Division.

Signed February 16, 2016

4. There is a balance between preservation of public-trust lands and encroaching upon those lands for the public good. *See Paepcke,* 263 N.E.2d at 21. However, courts must be skeptical with claims of public benefit; otherwise, "[t]he legislature would have unfettered discretion to breach the public trust as long as it was able to articulate some gain to the public." *Lake Michigan Fed'n,* 742 F.Supp. at 446. "Nor should the federal court carve out an exception to the law because the affected private party is a respectable non-profit entity." *Id.* at 449.

Alan Van Praag, Edward W. Floyd, Eaton & Van Winkle LLP, New York, NY, Dennis Minichello, Shari L. Friedman, Marwedel, Minichello & Reeb, P.C., Chicago, IL, for Plaintiff.

Julian Solotorovsky, Constantine Koutsoubas, Janine Nicole Fletcher, Michael Ryan Dover, Kelley Drye & Warren LLP, Chicago, IL, Ronald W. Zdrojeski, Travis J. Mock, Sutherland Asbill & Brennan LLP, New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

Jeffrey Cole, UNITED STATES MAGISTRATE JUDGE

■ The Amcol defendants have moved to quash a subpoena for the deposition of James Ashley, who was formerly general counsel for defendant, Amcol International Corporation. He is currently a partner at the law firm, Locke Lord LLP. The Amcol defendants bristle at the suggestion that an attorney be deposed. But, the one and a half million lawyers in this country are not automatically exempt from deposition. *Boston Edison Co. v. United States*, 75 Fed.Cl. 557, 562–563 (Fed.Cl. 2007); *Continental Cas. Co. v. Multiservice Corp.*, 2008 WL 73345, *6 (D.Kan.2008); *United States v. Philip Morris, Inc.*, 209 F.R.D. 13, 16 (D.D.C.2002). Like other citizens, they are subject to the long recognized obligation of all citizens to give evidence—an obligation expressed in the "fundamental maxim that the public...has a right to every man's evidence," and that "any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 131 S.Ct. 2313, 2332, 180 L.Ed.2d 187 (2011). Even the President of the United States is not immune from deposition. *Clinton v. Jones*, 520 U.S. 681, 704–05, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997).

■ Beyond that, the Amcol defendants assert that the information sought from Mr. Ashley is either privileged or redundant of information the plaintiff has already garnered from other sources. The short answer is that one cannot be sure of whether a particular question calls for privileged information until the questions are asked. And, unsupported statements in briefs that purport to resolve this or any other issue do not count. *See, e.g., INS v. Phinpathya*, 464 U.S. 183, 188–89 n. 6, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984); *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*, 437 F.3d 606, 610–611 (7th Cir.2006). *Cf. In re Payne*, 431 F.3d 1055, 1060 (7th Cir.2005) (Posner, J.)(unsubstantiated assertion at oral argument given no weight).

■ Questions of privilege must be assessed on a question by question basis and

cannot be resolved fungibly even before the deposition begins. Nor ought it be a valid objection to an otherwise permissible notice of deposition to say that the party seeking the deposition has or can get the same information elsewhere. Witnesses are not fungible, and thus the quality of the evidence each may provide can only be determined in retrospect. Answers given by lawyers during any given deposition are often extraordinarily revealing and significantly assist in the search for truth. *See, e.g., Tellabs v. Fujitsu*, 283 F.R.D. 374, 378–379 (N.D.Ill.2012); *Tellabs Operations, Inc. v. Fujitsu Ltd.*, 882 F.Supp.2d 1053, 1056 *et seq.* (N.D.Ill.2012).

Even if that were not the case, the Amcol defendants' motion to quash is unconvincing. The motion relies exclusive on a line of cases descending from a 30-year-old Eighth Circuit case, *Shelton v. American Motors Corporation*, 805 F.2d 1323 (8th Cir.1986). The various hurdles set up by *Shelton* for a party to clear in order to depose opposing counsel, are inapplicable here, because Mr. Ashley is not opposing counsel. The Eighth Circuit has said as much and has limited *Shelton* to depositions of opposing counsel. Thus, *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 729–30 (8th Cir.2002) explained that *Shelton* "was intended to guard against the 'harassing practice of deposing opposing counsel . . . that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process." *See also In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 71 (2nd Cir.2003).

Hence, and as the plaintiffs argue, the better, more incisive, and more accurate reading of *Shelton* is the one espoused by Judge Aspen in *Hunt Int'l Resources Corp. v. Binstein*, 98 F.R.D. 689, 691 (N.D.Ill.1983)—the view the Seventh Circuit explicitly approved in *N.L.R.B. v.*

*Modern Drop Forge Co.*, 108 F.3d 1379 (7th Cir.1997). In *Hunt Int'l*, Judge Aspen explained:

> [C]ompletely preventing the taking of a deposition on either of the above grounds would tend to limit or fix the scope of the examination before it began and would usurp the court's role in deciding whether certain questions seek privileged information. *The more appropriate method is to allow the deposition to be taken and permit the attorney to claim privilege in the face of certain questions, if necessary.*

98 F.R.D. at 691 (emphasis supplied).

On appeal, the Seventh Circuit pointed out that the district court was aware that the procedure it proposed could be problematic, but that a prior restraint of the deposition raised "even more troublesome issues." 108 F.3d 1379, 1997 WL 120572 at \*2. The Court agreed with the district court that permitting a prior restraint of the deposition would require two assumptions: (1) that everything to which the proposed deponent would testify would be subject to the attorney-client privilege and (2) that the deponent would, in some instances, fail to adequately assert the privilege in the deposition. *Id.* The district court concluded that there was no factual basis in the record to warrant those assumptions and therefore denied the motion to quash the deposition subpoena and ordered the parties to proceed to deposition.

Other district courts have used a similar approach of requiring the parties to proceed to deposition and assert their privileges and objections at the deposition. *See, e.g., Kaiser v. Mutual Life Ins. Co. of New York*, 161 F.R.D. 378, 380 (S.D.Ind.1994) ("[D]eponents are expected . . . to assert their objections during the deposition and to allow questioning parties to develop circumstantial facts in order to explore the propriety of the assertion of the privilege,

immunity, or other objection") (*citing* 8 Fed'l Prac. & Proc. § 2037 at 272); *Cooper v. Welch Foods, Inc.*, 105 F.R.D. 4, 6 (W.D.N.Y.1984) (finding that deposition of attorney should be taken and privileges asserted therein); *In re Arthur Treacher's Franchisee Litigation*, 92 F.R.D. 429, 437-38 (E.D.Pa.1981) ("If the questions to be asked of Mr. Griffin delve into privileged areas then his recourse will be to object and refuse to answer. Such an objection and refusal to answer should of course be predicated upon a sufficient demonstration that the matter inquired into is privileged. . . . In any event, the Court cannot rule in a vacuum, prior to the deposition, that every question to be asked will seek to elicit privileged information"); *Walker v. United Parcel Services*, 87 F.R.D. 360, 362 (E.D.Pa.1980) (refusing to allow defendant's attorney to be deposed, but stating that "[t]he Court would ordinarily require attorney-client privilege and work product exception questions to be resolved at a deposition rather than in the abstract in advance.") (*citing Jamison v. Miracle Mile Rambler, Inc.*, 536 F.2d 560, 565–66 (3rd Cir.1976) and *Scovill Mfg. Co. v. Sunbeam Corp.*, 61 F.R.D. 598 (D.Del.1973)). *See N.L.R.B. v. Modern Drop Forge Co.*, 108 F.3d 1379, 1997 WL 120572, at *2–3 (7th Cir.1997).

In sum, the Seventh Circuit's opinion in *Hunt* teaches that we cannot approve of a blanket immunity from deposition for attorneys, any more than we can accept a blanket assertion of privilege. *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir.1983). What the Amcol defendants want is *both*—the worst of both worlds. The concluding paragraph of the Seventh Circuit's opinion in *Hunt Int'l* bears repeating:

Kinney may answer each individual question she feels is appropriate and refuse to answer each individual question she feels is . . . privileged.[1] This course of action will enable the district court to identify specific challenged questions, as opposed to merely kinds of questions. This will also create a record more suitable for our legal analysis of the issues the parties have identified in their briefs and at oral argument.

*Modern Drop Forge Co.*, 108 F.3d 1379, 1997 WL 120572, at *4.

 That allows for a segue to a comment about Mr. Ashley's declaration. The breezy gloss on his activity is superficial and unhelpful in resolving the issue raised here. He claims that, in Amcol's dealings with plaintiff, he acted as transactional counsel and provided legal advice to facilitate the commercial transactions at issue in this case. [Dkt. #163]. This is the rationale for him being immune from deposition. As such, his affidavit is nothing more than a blanket assertion of privilege/work product, which is unacceptable. "The claim of privilege must be made and sustained on a question-by-question or document-by-document basis; a blanket claim of privilege is unacceptable." *Lawless*, 709 F.2d at 487. *Accord United States v. Christensen*, 801 F.3d 970 (9th Cir.2015); *In re: Grand Jury Subpoenas v. United States*, 144 F.3d 653 (10th Cir.1998).

It's the affidavit equivalent of cursory notations on a privilege log like "legal advice" or "attorney impressions" that courts reject time and again. *Cornejo v. Mercy Hosp. & Med. Ctr.*, 2014 WL 4817806, at *6 (N.D.Ill.2014); *Mold Masters Ltd. v. Husky Injection Molding Sys. Ltd.*, 2001 WL 1558303, at *3 (N.D.Ill.2001); *Ash v. Theros Int'l Gaming, Inc.*, 2001 WL

---

1. The Court approved the permissibility of the witness refusing to answer a question she thought irrelevant. That procedure is no longer permissible under more modern rules. *Redwood v. Dobson*, 476 F.3d 462, 468 (7th Cir. 2007); Fed.R.Civ.P. 30(c)(2).

648632, at *2 (N.D.Ill.2001); *Coltec Indus., Inc. v. Am. Motorists Ins. Co.*, 197 F.R.D. 368, 376 (N.D.Ill.2000); *Domanus v. Lewicki*, 2012 WL 6568227, at *5 (N.D.Ill. 2012).

Mr. Ashley's affidavit tells us precious little. It doesn't even pass muster in the context of a privilege log; it certainly, therefore, provides no support for quashing a subpoena. Perhaps, Mr. Ashley is so cryptic in his declaration *because he doesn't know what the questions will be.* But that only underscores the inapplicability of *Shelton* and its successors on which the Amcol defendants rely. But if one does not know the question, one cannot anticipatorily ask that no questions be asked.

The motion of the Amcol defendants to quash the subpoena of James Ashley [Dkt. #162] is DENIED. The deposition will proceed like any other deposition of any other person. If questions arise during the course of the deposition, the parties should feel free to call chambers at 312-435-5601.

Mark KNOX, Plaintiff,

v.

The TRUSTEES OF INDIANA UNIVERSITY, in their official capacities, and Patricia Nowak, individually, Defendants.

CAUSE NO. 2:15-CV-241-PRC

United States District Court, N.D. Indiana, Hammond Division.

Signed 02/01/2016

Lloyd P. Mullen, Mullen & Associates PC, Crown Point, IN, for Plaintiff.

James R.A. Dawson, Michael C. Terrell, Taft Stettinius & Hollister LLP, Indianapolis, IN, for Defendants.

## OPINION AND ORDER

PAUL R. CHERRY, UNITED STATES DISTRICT COURT

This matter is before the Court on Defendants' Motion to Dismiss First Amended Complaint [DE 27], filed by Defendants The Trustees of Indiana University and Patricia Nowak on October 14, 2015. The motion is fully briefed and ripe for ruling.

## BACKGROUND

On May 14, 2015, Plaintiff Mark Knox filed a Complaint against Indiana University Northwest Campus, Indiana University Northwest Police Department, and Patricia Nowak, alleging that he was illegally and unconstitutionally deprived of his property without due process of law when his employment as a sworn police officer was terminated on May 14, 2013. Defendants removed the case to this Court on June 22, 2015.

Plaintiff filed a First Amended Complaint on September 17, 2015, replacing Defendants Indiana University Northwest Campus and Indiana University Northwest Police Department with the Trustees of Indiana University in their official capacities, adding citations to the Indiana Code, and adding requests for declaratory and

injunctive relief. In the First Amended Complaint, Plaintiff alleges that he was employed by Defendant Trustees of Indiana University from January 2009 to May 2013 as a sworn police officer and that his employment was terminated on May 14, 2013, by Defendant Patricia No-wak, Police Chief of the Indiana University Northwest campus. Plaintiff alleges that Defendants denied him his rights in his job because he was not given a hearing before an impartial board, no determination of guilt was made in a lawful proceeding, he was not given written notice delivered by certified mail, he was not allowed to present witnesses or evidence in a proceeding assisted by an attorney, and he did not have an opportunity to file an appeal.[1] Although Plaintiff alleges in the Introduction that the action is brought pursuant to 42 U.S.C. § 1983 and 1988, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and under the common law, statutes, and Constitution of the State of Indiana, the only "Cause of Action" alleged is "Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983." (Am. Compl. ¶ 16-21). Plaintiff does not allege any state law cause of action in the First Amended Complaint, nor does he raise any state law cause of action in his response to the instant motion.

Defendants filed their Motion to Dismiss on October 20, 2015. Plaintiff filed a response in opposition on November 12, 2015, and Defendants filed a reply on December 7, 2015.

The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## ANALYSIS

Defendants seek dismissal of the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), which tests the sufficiency of the complaint and not the merits of the suit. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). In ruling on such a motion, the Court accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1082 (7th Cir.2008).

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must first comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the. . .claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Second, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955); *see also Tamayo*, 526 F.3d at 1082. The Supreme Court explained that the "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels

---

1. In his response brief, Plaintiff states that Patricia Nowak "terminated [him] for alleged misconduct without a hearing before an impartial board." (Pl. Br. 1 (citing First Am. Compl. ¶ 10)). However, there is no allegation in the First Amended Complaint that his termination was for alleged misconduct.

and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (quotation marks and brackets omitted); *see also Iqbal*, 556 U.S. at 678–79, 129 S.Ct. 1937; *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir.2009). Determining whether a complaint states a plausible claim for relief requires the Court to draw on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

█ Plaintiff's claim is based on an alleged unconstitutional deprivation of a property right in his employment by Defendants in violation of 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State...subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege that he was deprived of a right secured by the Constitution or federal law, by a person acting under color of law. *Heyde v. Pittenger*, 633 F.3d 512, 516 (7th Cir.2011) (quoting *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir.2007)).

█ The Fourteenth Amendment guarantees an individual the right to due process when a state or local government deprives him of life, liberty, or property. U.S. Const. amend. XIV, § 1. When a public employee claims that he has been terminated without due process, the court first determines whether the defendants deprived the plaintiff of a protected liberty or property interest. *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir.2010) (quoting *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1020 (7th Cir.2000)). In the instant motion, Defendants argue that Plaintiff

has not alleged that he was deprived of a right secured by the Constitution or federal law because he did not have a constitutionally protected property interest in his employment as a police officer for Indiana University.

█ "A protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract—those 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Kiddy–Brown v. Blagojevich*, 408 F.3d 346, 360 (7th Cir.2005) (quoting *Johnson v. City of Fort Wayne*, 91 F.3d 922, 943 (7th Cir.1996) (quoting *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir.1996))); *see also Moulton v. Vigo Cty.*, 150 F.3d 801, 804 (7th Cir. 1998) (quoting *Lawshe v. Simpson*, 16 F.3d 1475, 1480 (7th Cir.1994)); *Swoope v. Gary Cmty. Sch. Corp.*, No. 2:10–CV–423, 2012 WL 3732838, at *6 (N.D.Ind. Aug. 28, 2012) (considering the allegation that the plaintiff's property interest in employment arose out of a written contract). However, public employees "who serve only 'at will' or at the pleasure of their employers may have a desire in continued employment but they do not have a property interest." *Kivett v. Marion Cty. Sheriff's Dept.*, No. 1:095–CV–348, 2007 WL 906470, at *8 (S.D.Ind. Mar. 22, 2007) (citing *Lalvani v. Cook Cty.*, 269 F.3d 785, 791 (7th Cir. 2001)).

In this case, Plaintiff did not have a protected property interest in his employment because he served at the will of the board of trustees of Indiana University, and Plaintiff has not identified any statute, regulation, ordinance, or contract conferring the necessary entitlement. Indiana Code Title 21, Article 39 governs "State Educational Institutions: Regulation of Conduct." Therein, "Police Officer" is defined as a "police officer employed by a

state educational institution under IC 21-39-4." Ind. Code § 21-39-1-2. Plaintiff has alleged that he was a police officer employed by Indiana University, which is a state educational institution. *See* (Am. Compl. ¶ 11); Ind. Code § 21-20-2-1.

Indiana Code § 21-39-4 governs the "Powers to Appoint Police Officers." Under this chapter, the board of trustees of a state educational institution may

(1) appoint police officers for the state educational institution for which the board is responsible;

(2) prescribe duties and direct the conduct of the appointed police officers;

(3) prescribe distinctive uniforms for the police of the state educational institution or campus; and

(4) designate and operate emergency vehicles.

Ind. Code § 21-39-4-2. Police officers appointed under this chapter "take an appropriate oath of office in the form and manner prescribed by the appointing board of trustees." Ind. Code § 21-39-4-3.

Central to the issue in this case, the chapter next provides: "A police officer serves at the pleasure of the appointing board of trustees." *Id.* at § 21-39-4-4. The chapter then outlines the "Powers and duties of officers":

Sec. 5. (a) Police officers have the following powers, privileges, immunities, and duties:

(1) General police powers including the power to arrest, without process, all persons who commit an offense within the view of the officer.

(2) The same common law and statutory powers, privileges, and immunities as sheriffs and constables, except that the officers are empowered to serve

civil process only to the extent authorized by the employing board of trustees.

(3) The duty to enforce and to assist the officials of the state educational institutions at which the officers are employed in the enforcement of the rules and regulations of the state educational institution.

(4) The duty to assist and cooperate with other law enforcement agencies and officers.

(b) The board of trustees employing a police officer may expressly prohibit a police officer from exercising any of the powers otherwise granted by law.

Ind. Code § 21-39-4-5.

Pursuant to the statute, Plaintiff served at the pleasure of the board of trustees and, thus, was an employee at will. *See, e.g., Eller v. Gary Cmty. Sch. Corp.*, No. 208–CV–307, 2010 WL 3719536, at *4–5 (N.D.Ind. Sept. 14, 2010) (finding a school corporation police officer to be an employee at will because Indiana law provides that a school corporation police officer "serves at the governing body's pleasure" (citing Ind. Code § 20–26–16–6(a)(3))); *Moriarity v. Superior Ct. of Marion Cty.*, No. 1:06–CV–1413, 2007 WL 1106135, at *2–3 (S.D.Ind. Apr. 11, 2007) (noting that probation officers are at will employees based on statutory language that they "serve at the pleasure of the appointing court" (citing Ind. Code § 11-13-1-1(c)));[2] *Hilburt v. Town of Markleville*, 649 N.E.2d 1036 (Ind.Ct.App.1995) (finding that an untenured town marshal is an employee at will because the "marshal serves at the pleasure of the town legislative body" (citing Ind. Code § 36-5-7-3)). Thus, the termination of Plaintiff's employment

---

**2.** The Court notes that the decision in *Moriarity* was issued on April 11, 2007, and, thus, did not apply the dismissal standard first established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), which was decided on May 21, 2007.

was at the discretion of the board of trustees, and he did not have a protected property interest in his employment. Notably, Plaintiff fails to discuss Indiana Code § 21-39-4-4 in his brief.

■ Nevertheless, Plaintiff argues that other Indiana statutes create a property interest in his employment. First, Plaintiff reasons that the grant to university police officers in § 21-39-4-5(a)(2) of the "same powers, *privileges*, immunities, and duties as sheriffs and constables" (emphasis added), coupled with Indiana Code § 36-8-10-11, which governs mandatory sheriff merit board disciplinary and termination procedures, creates a property interest in Plaintiff's employment as an Indiana University police officer. The purpose of § 21-39-4-5, when read in the context of all of Chapter 4 on Powers to Appoint Police Officers, is to define university police officers' policing authority and powers; it does not deal with employment rights. For example, sheriffs enjoy a law enforcement investigatory privilege. *See Mickle v. City of Indianapolis*, 2015 WL 5098545, at *1 (S.D.Ind. Aug. 31, 2015). Thus, "privileges" of "sheriffs and constables" in § 21-39-4-5 references law enforcement privileges and does not logically include employment rights.

By way of comparison, the statute dealing with "special deputies" contains similar language, giving special deputies "the powers, *privileges*, and duties of a county police officer." Ind. Code § 36-8-10-10.6(a) (emphasis added). Yet, the same statute provides that special deputies may "be removed by a sheriff at any time, without notice and without assigning any cause." *Id.* Thus, both university police officers and special deputies are given the "powers, privileges, and duties" of "sheriffs and constables" and "county police officers," respectively, yet the grant of those "privileges" cannot be read to include merit board protections because both university police officers and special deputies are

subject to a more specific statute governing their status as employees at will.

■ Plaintiff incorrectly asserts that Indiana Code § 36-8-10-11 "creates in sworn law enforcement officers in Indiana a property interest in their jobs and entitles them to procedural due process protections." (Pl. Resp. 2 (citing *Marion Cty. Sheriff's Merit Bd. v. Peoples Broad. Corp.*, 547 N.E.2d 235, 239 (Ind.1989))). Plaintiff's statement suggests that § 36-8-10-11 applies to all law enforcement officers in Indiana. However, Chapter 10 is "titled "Sheriff's Department; Merit Board; Pensions." For purposes of Chapter 10, "eligible employee" is defined as "the sheriff of a county or a county police officer." Ind. Code § 36-8-10-2. Similarly, the decision in *Marion County* deals only with a sheriff's department. Neither the statute or the case purport to extend the statute's protections to law enforcement officers beyond those in sheriff's departments. There is no corresponding merit board statute for university police officers.

As discussed above, Indiana Code § 21-39-4-4 explicitly provides that a "police officer," which is defined for purposes of this [Article] as a "police officer employed by a state educational institution under IC 21-39-4," serves at the pleasure of the appointing board of trustees. The Indiana legislature defined a state university police officer's employment status in Title 21, a statute entirely separate from the statutes governing sheriffs and constables in Title 36. Even if § 21-39-4-4 and § 36-8-10-11 could be perceived as a specific and a general statute governing this situation, which they are not, a more specific statute is given precedence over a more general one. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). Moreover, to determine that Plaintiff nevertheless has a property right in his employment as an

Indiana University police officer based on a general statute dealing with police powers, rules violations, and standards of conduct would render § 21-39-4-4 meaningless.

There are many different types of law enforcement officers in Indiana, each governed by a different set of statutes. Some are protected by merit board disciplinary procedures before discipline can be imposed. *See* Ind. Code § 36-8-10-11 (sheriffs); Ind. Code § 36-8-3.5-17 (municipality and township law enforcement officers); Ind. Code § 36-8-3-4 (second and third class city police department). Others may be summarily suspended, with a review by a board. *See* Ind. Code § 10-11-2-15 (Indiana State Police officers). And, like university police officers, others may be dismissed without cause. *See* Ind. Code § 36-5-7-6 (town marshals, with certain exceptions); Ind. Code § 36-8-10-10.6 (special deputies); Ind. Code § 20-26-16-6(a)(3) (school corporation police officers).

In an attempt to establish a property interest in his employment, Plaintiff also cites Indiana Code §§ 21-39-2-4 and 5. These sections are in Title 21 governing Higher Education, as is Chapter 4 establishing the power to appoint university police officers; however, these two sections are in Chapter 2, which deals with discipline for violations of conduct regulations. Section 21-39-2-4 allows the board of trustees of Indiana University to "dismiss, suspend, or otherwise punish any student, faculty member, or employee of the state educational institution who violates the institution's rules or standards of conduct, after determination of guilt by lawful proceedings." Ind. Code § 21-39-2-4(b). Section 21-39-2-5(b) provides: "Conduct that constitutes a violation of the rules of the state educational institution may be punished, after determination of guilt by lawful procedures, without regard to whether the conduct also constitutes an offense un-

der the criminal laws of any state or of the United States or whether it might result in civil liability of the violator to other persons." Ind. Code § 21-39-2-5(b). However, there is no allegation in the Amended Complaint that Plaintiff's employment was terminated due to a violation of Indiana University's rules or standards of conduct. In other words, because he served at the pleasure of the board of trustees of Indiana University, the mere fact of the termination of his employment does not necessarily imply that Plaintiff was dismissed for cause. These statutes do not create a property interest in his employment.

Accordingly, because Plaintiff did not have a protected property interest in his employment as a university police officer, he has failed to state a claim upon which relief can be granted and dismissal is appropriate. The Court need not address Defendants' remaining arguments.

### CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** Defendants' Motion to Dismiss First Amended Complaint [DE 27].

SO ORDERED this 1st day of February, 2016.

**J.H., Plaintiff,**

v.

**SCHOOL TOWN OF MUNSTER, et al., Defendants.**

**Cause Number: 2:12-cv-69 PS**

United States District Court, N.D. Indiana, Hammond Division.

Signed February 3, 2016

Trent A. McCain, McCain Law Offices, Merrillville, IN, Ivan E. Bodensteiner, Valparaiso, IN, for Plaintiff.

Jacquelyn S. Pillar, Maryann Kusiak McCauley, Michael D. Sears, Crist Sears and Zic LLP, Munster, IN, Kathleen M. Maicher, Spangler Jennings & Dougherty PC, Merrillville, IN, for Defendants.

## OPINION AND ORDER

PHILIP P. SIMON, CHIEF JUDGE

It's often been said that high school is the best four years of your life. But for one young man, Plaintiff J.H., high school was anything but. J.H. was a student at Munster High School and a member of the high school swim team during his Freshmen and Sophomore years. J.H. soon discovered, however, that hazing was rampant on the team and much of it was directed at him. After enduring this physical and emotional mistreatment for two years, J.H. ultimately quit the team and left Munster High School early. He brings this § 1983 action against both the school and various school officials in their individual and official capacities, for the following claims: discrimination based on gender under the Equal Protection Clause and Title IX; retaliation under the First Amend-

ment; and a negligence claim under Indiana state law. Defendants now seek summary judgment on all claims. (DE 73.) For the reasons discussed in this Order, that motion will be **GRANTED-IN-PART** and **DENIED-IN-PART**.

### Factual Background

J.H.'s troubles on the Munster swim team started at least as early as February 2010. J.H. attended a pre-sectionals party as a Freshman where the team's members dyed and cut their hair and then wore it that way before they shaved their heads prior to the sectional meet. (The head shaving was designed to improve their swimming times because hair provides drag.) The trouble was that J.H. didn't want his hair dyed and cut. Despite his protests, J.H. states that he was physically dragged into the bathroom and forced to have his hair cut and dyed.

According to J.H., things didn't get much better after that. His teammates engaged in various hazing activities against both J.H. and his teammates, most of which he experienced first-hand on multiple occasions such as: applying Icy Hot to boys without their consent to create an uncomfortable burning sensation; "five starring" teammates whereby one boy hits another with an open palm, creating a red "star" on their bare back; beating teammates with a plastic wiffle ball bat known as the "peace maker;" forcing younger teammates to carry the lunch trays of older team members; forcing younger team members to clean the locker room and bus; and forcibly moving younger team members out of shower stalls when older members wanted to use them; stealing each other's swim equipment; and hitting each other with swim fins.

Eventually, all of this got to be too much and J.H. began telling his mother about the incidents around January 2011. Specifically, he told her about the February 2010 hair-dyeing party. Understandably concerned, Ms. Hunt met with J.H.'s coach, Coach Pavlovich, on January 21, 2011 to alert the coach to what was happening at those yearly parties. According to Ms. Hunt, Coach Pavlovich brushed off the incident by saying "[i]t's probably best if we don't do anything about it at this point. It happened a year ago. A lot of those kids are gone." (DE 83-1 at 29.) He also told Ms. Hunt that "there were a lot of traditions already in place when [I] took over this team." (*Id.* at 58.)

Not satisfied with this response, Ms. Hunt then met with Athletic Director Smith on February 3, 2011. They discussed the hair-dyeing parties and Smith asked if J.H. was planning on attending the next hair-dyeing party. Ms. Hunt responded that he was not. According to Ms. Hunt, when she referred to what happened at the February 2010 party as hazing, Smith said, the "boys don't look at it as hazing. They look [at it] as initiation." (DE 83-1 at 45.) Ms. Hunt also asked Smith to get the word out to other parents and swimmers about what happens at the pre-sectional parties. (*Id.* at 52.) When J.H. failed to attend the 2011 hair-dyeing party, his teammates were not happy and he was verbally threatened for not attending.

Still not feeling like she was getting any traction with school officials, Ms. Hunt then emailed Coach Pavlovich and Athletic Director Smith with an article about the dangers of hazing on February 9, 2011. (DE 79-11 at 3.) But just five days later, J.H. was violently attacked in the boys locker room after practice. According to J.H., some boys grabbed him, lifted him up, and carried him over to another boy who was holding electric hair clippers. J.H. resisted and eventually the boys dropped him to the cement floor, on his back. J.H. was able to run away from the boys before they attacked him any further. There were no coaches in the locker room at the time

of the incident, as was typical at that time because coaches were rarely in the locker room after practice.

At first, J.H. didn't tell his mother about the attack. In fact, he didn't tell her about it until late in May of 2011. So without knowing about this most recent incident, Ms. Hunt called Principal Tripenfeldas to report what happened at the pre-sectional hair-dyeing parties and to request that he made sure that Athletic Director Smith investigated the February 2010 incident she reported. A couple of days later, Ms. Hunt met with Superintendent Pfister about hazing in the boys swimming program. When Ms. Hunt told Mr. Pfister about what happened to J.H. at the February 2010 hair-dyeing party, his initial response was "[h]ey lady, your kid's hair got cut" and that the school would not be getting involved because the incident occurred off campus. (DE 83-1 at 90-91.) Pfister did concede to Ms. Hunt that J.H. may have a valid complaint against the parents who hosted the party, but concluded that it wasn't the school's problem. (*Id.* at 91.) Pfister did, however, order an investigation, but considered the matter closed once he learned it occurred off-campus. (DE 83-9 at 46-47.) Both he and Tripenfeldas later admitted that some measure of discipline could have been taken. (DE 83-9 at 44; DE 83-8 at 26.)

Aside from the hair-dyeing incident, Tripenfeldas' investigation didn't reveal anything that he considered to be hazing. What Tripenfeldas believes is hazing, and what J.H. thinks it is, may not be one and the same. Tripenfeldas characterized what he discovered in the investigation as incidents of "pranks and horse play."(DE 83-20 at 10.) And since the hair-dyeing parties occurred off-campus, he and Pfister both considered the matter closed.

Ms. Hunt next contacted the school on April 18, 2011 to schedule another meeting with Superintendent Pfister. She did not,

however, hear back from the superintendent until one month later, on May 18, 2011. On May 23, 2011, Ms. Hunt submitted a formal written complaint regarding hazing in the boys swim team and met with Superintendent Pfister. That same day, J.H. told his mom that he was being verbally harassed and pushed around by some swim teammates. J.H.'s mom met with the dean of students about the issue, and he then interviewed J.H. alone. Although the dean at first seemed to think there wasn't an issue to pursue, he later told Ms. Hunt that the issue had been addressed. (DE 83-1 at 115-116.) That same day, J.H. concluded that he could no longer attend Munster High School.

Communications between the school officials and Ms. Hunt really broke down after that point. Once Ms. Hunt learned what had happened to her son in the locker room in February 2011, she reported the incident to both the police and Principal Tripenfeldas. She informed Tripenfeldas that she wanted to be present when he interviewed J.H. Tripenfeldas told her "we don't have to do that."(DE 83-1 at 129.) After she said she thought she had a right to be there and that she had been consulting an attorney, Tripenfeldas gave her the school attorney's contact information and ended the discussion. (*Id.* at 130.) It doesn't appear there was much communication between Ms. Hunt and the school after that. In fact, when J.H. elected not to swim over the summer, his email address was removed from the team mailing list. J.H. decided not to return to swimming the following semester.

Athletic Director Smith investigated the February 2011 locker room attack, but ultimately didn't find any additional hazing in his interviews with the swimmers. (DE 83-7 at 43.) All he learned was that the pre-sectional parties had been happening for years at a parent's home, that swim-

mers were not required to attend, and that some boys may have had their hair cut or dyed involuntarily. (*Id.* at 10-11.) In fact, one student had later had his eyebrow shaved off involuntarily as retribution for not attending one of the parties. (*Id.* at 12.) Ultimately, Smith, Tripenfeldas and Pavlovich did want to ban the hair-dyeing parties, but decided not to do so after meeting with the mother of a swimmer who indicated that she and the other swim team parents wanted the parties to continue. (*Id.* at 17-18.) Smith did inform that parent that the school did not approve of the parties and that they preferred the parties not occur. (*Id.*) The parties, however, continued. (DE 83-8 at 17.)

All of this had a profound impact on J.H. According to J.H., the hazing he endured forced him to quit the swim team and graduate early. (DE 83 at 137-38, 169.) His grades also declined and he suffered psychological effects such as anxiety, depression, and thoughts of suicide, all requiring treatment. (DE 83 at 139-40, 148, 169.)

### Discussion

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. 2505. Failure to prove an essential element of a plaintiff's case necessitates summary judgment in favor of the defendant because "[i]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof con-

cerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### *"Official Capacity" Claims*

As noted above, J.H. has sued the school and the school officials in their official capacities (in addition to their individual capacities). But a claim against a school official in his official capacity "is not a suit against the official but rather is a suit against the official's office....As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (citation omitted). Therefore the claims against Pfister, Tripenfeldas, Smith, and Pavlovich in their official capacities are redundant of the claims against Munster. I will therefore **DISMISS** all claims against Pfister, Tripenfeldas, Smith, and Pavlovich in their official capacities.

### *Section 1983 Equal Protection Claim*

J.H.'s argument on his Equal Protection claim boils down to essentially this: boys who participate in swimming at Munster High School can expect an entirely different experience than girls can. The boys program is one where hazing runs rampant; not so in the girls swim program. To prove his equal protection claim, J.H. must offer evidence that demonstrates that (1) Munster acted with a discriminatory intent or deliberate indifference and (2) J.H. is a member of a protected class. *Hayden v. Greensburg Community School Corp.*, 743 F.3d 569, 577 (7th Cir.2014); *Doe v. Galster*, 768 F.3d 611, 622 (2014). The second part is easy—J.H. claims that he was discriminated against based on the fact that he is a male, and gender is a protected class under the Equal Protection Clause. *Hayden*, 743 F.3d at 577. But the

first requirement—that Munster acted with a discriminatory intent or deliberate indifference—requires more discussion.

 Whether a defendant has acted with discriminatory purpose is generally a question best left for a jury. *Locke v. Haessig*, 788 F.3d 662, 670–73 (7th Cir. 2015). At the outset, it should be noted that a school corporation is not generally responsible under Section 1983 for constitutional deprivations inflicted by its employees or agents, as there is no *respondeat superior* liability under Section 1983. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In other words, Munster generally speaking cannot be found liable for the acts committed by its coaches, teachers, administrators, etc. But there are three well known exceptions to this rule: Munster *can* be found liable under Section 1983 if J.H. can show: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir.2012); *see also Antle v. Portage Township Schools*, No. 2:11–cv–60–PRC, 2013 WL 4048543, at *17 (N.D.Ind. Aug. 9, 2013) (finding school corporation can be held liable under Section 1983 under this paradigm). Here, only the latter two options—a widespread practice or constitutional injury caused by a final policymaker—are at issue as there is no allegation that Munster had an express (*e.g.* written) policy of ignoring hazing.

 J.H.'s argument is essentially that the Defendants were willfully turning a blind eye to all of the awful things going on in the male swimming program because "boys will be boys." Such a policy of non-response—that is, "a deliberate refusal to respond to complaints of harassment"—is actionable under the Equal Protection Clause. *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1190 (7th Cir.1986) (Posner, J. concurring, *citing Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1421–1422 (7th Cir.1986)). In essence, it's not necessary to show that Munster had a policy of forcing the boys to do or not do something that didn't apply to the girls. Instead, indifference to the boys' welfare is enough. *Id.* at 1191.

In pursuing this theory, J.H. must show a connection between Munster's alleged custom or practice and his injury. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 670 (2012). So what all this boils down to is that J.H. must show that Munster engaged in a widespread practice of ignoring complaints of hazing from the boys' swimming program, either intentionally or with deliberate indifference to the boys' rights, simply because the complaints were coming from boys and not girls. *See e.g. Hayden*, 743 F.3d at 583 (intentional discrimination can be shown by either deliberate indifference or a discriminatory school policy). J.H. can show this based on evidence of his own treatment, in addition to the treatment of others on his team. *Bohen*, 799 F.2d at 1187 (Maj. opinion).

This case bears a striking resemblance *Hayden* where a public high school had various policies governing the appearance of its student athletes. 743 F.3d at 572. Although a written policy proscribed various restrictions on both males and females regarding how they could wear their hair, an unwritten (but enforced) policy set forth by the boys' basketball coach placed additional restrictions on his team members. *Id.* Namely, his players could not wear long hair and the plaintiff, who wore his hair long, was not allowed to play on the team until he cut his hair. *Id.* The court found that the policy led to the dis-

parate treatment of males versus females insofar as the males were "subject to a burden that a girl in the same position is not" and that was enough to make out a prima facie case of discrimination under the Equal Protection Clause. *Id.* at 580. As the court reasoned:

> The hair-length policy applies only to male athletes, and there is no facially apparent reason why that should be so. Girls playing interscholastic basketball have the same needs as boys do to keep their hair out of their eyes, to subordinate individuality to team unity, and to project a positive image. Why, then, must only members of the boys team wear their hair short? Given the obvious disparity, the policy itself gives rise to an inference of discrimination.

*Id.*

Which brings us back to J.H.'s situation. Here, I must determine whether J.H. has presented sufficient evidence for the jury to infer that Munster had a policy of ignoring hazing on the boy's team such that it ended up with a boys team that was infested with hazing and a girls team that apparently had none. Admittedly, the situation in J.H.'s case is a little more nuanced than that of *Hayden*. Here, there is no *express* policy of allowing hazing to occur in one program and not the other. But J.H. has presented evidence that would allow a jury to infer such an unspoken policy exists. In support of his theory, J.H. has presented a laundry list of ways that the officials at the school ignored hazing in the boys program:

- Coaches saw and either ignored or minimized incidents of hazing on the pool deck (*See e.g.* DE 83 at 36, 86, 187.)
- Coaches were not present in the locker rooms either before or after practices, even after J.H.'s mother notified school officials about her concerns regarding hazing in the boys program, including notifying: (1) Coach Pavlovich on January 31, 2011 and February 9, 2011; (2) Athletic Director Michael Smith on February 3 and 9, 2011 (in fact, the attempt to shave J.H.'s head in the locker room occurred just a short time after on February 16, 2011); (3) Principal Tripenfeldas on March 7 or 8, 2011; and (4) Superintendent Pfister on March 9; 2011 and May 23, 2011 (her formal complaint). In fact, coaches were not regularly in the locker room until the following school year. (*See e.g.* DE 83-2 at 21-22.)
- Coaches did not even mention any concerns regarding hazing to the swim team members until June of 2011, nearly six months after J.H.'s mother first raised her concerns and four-plus months after J.H. was attacked in the locker room. (*See e.g.* DE 83-11 at 27; DE 83 at 183-84; DE 83-2 at 40-42.)
- When school officials were informed about concerns of hazing, they minimized the acts as "pranks and horse play" (DE 83-20 at 10), or even worse, "initiation" (DE 83-1 at 45) and "tradition" (*Id.* at 58).

When viewed in the light most favorable to J.H., the non-moving party, a reasonable jury could conclude that Munster didn't really care whether their male swimmers were being harassed.

Munster argues that there isn't enough evidence to even infer such a policy exists because there simply isn't enough information about what's going on in the girls team to conclude there is any disparate treatment at play. But it is difficult to prove a negative. J.H. relies on basically one theory to support his claim that there is no hazing in the girls program: that because school officials were (and still are) unaware of any complaints of hazing in the girl's program, it must not be happening. In support, J.H. points to the depositions

of Superintendent Pfister, Principal Trippenfeldas, and Athletic Director Smith all stating that they have received no complaints of hazing in the girls program. (DE 83-9 at 52; DE 83-8 at 23; DE 83-7 at 31.) Munster also represented in its response to J.H.'s admission requests that "[i]nquiries were made which included whether there were any complaints made by a student, parent or third party as to any 'hazing' with respect to a member of the girls swim team" and that "the Defendants are unaware of whether any members of the girls swim team were subjected to 'hazing' due to the lack of any complaint from a student, parents or any other third party." (DE 83-19 at 4.)

I think this is enough for the jury to at least infer that there was no hazing in the girl's program. At a minimum, this creates a material fact question that precludes my granting summary judgment for the defendants. Although the evidence is admittedly far from overwhelming, the evidence was similarly thin in *Hayden* regarding whether the girl's basketball team had a similar hair-length policy to the boys' policy. There, the only evidence regarding the girl's team was that the parties had stipulated to the fact that both teams were subject to grooming policies, but there were no details provided as to what those policies were and whether they were comparable. *Hayden*, 743 F.3d at 580. All that was known was that the girls team did not have a hair-length policy. Even so, the court found that "absent any evidence as to the content of the grooming standards that are applicable to female athletes, we are not prepared to simply assume that an otherwise facially-discriminatory rule is justified." *Id.* And I should note that because that dispute was submitted to the court on stipulated facts for final judgment, the court actually found that evidence was sufficient to render *judgment* in the plaintiff's favor. *Id.* Certainly similar

evidence is sufficient to simply allow the question to get to the jury.

Further, requiring more definitive proof, as Defendants would have me do, would misapprehend the level of proof required at this stage. At this point, J.H. doesn't have to prove definitively that there was no hazing in the girl's program, just as the plaintiff in *Hayden* didn't have to show exactly which grooming policies applied to the girls program. It was enough that it appeared that the hair-length policy didn't apply to the girls and that there was no evidence to the contrary. *Hayden*, 743 F.3d at 582. Here too, there is enough evidence for a reasonable jury to infer that Munster maintained a hazing-infested swim team for boys and not for girls because there was a widespread practice at Munster of ignoring hazing on the boys team. Munster can, and I'm sure will, present evidence aimed at rebutting that presumption at trial. And at that point, it'll be up to the jury to decide what to do with it.

Aside from the *Monell* claim against Munster, J.H. has also provided enough evidence to allow a reasonable jury to conclude that the individual defendants named were deliberately indifferent to the hazing on the boys team. Showing a conscious failure of the defendants to protect J.H. from the abuse he endured is enough to establish deliberate indifference for an equal protection claim. *Bohen*, 799 F.2d at 1187; *see also id.* at 1190 (J. Posner) concurring ("a deliberate refusal to respond to complaints of harassment" is actionable under the Equal Protection Clause.). J.H. has set forth sufficient evidence to support his claim. There's no need to go through every bit of evidence at this point, and much of this evidence is the same as that already discussed directly above, but it's worth laying out some of the more salient points as they specifically relate to each defendant school official:

- **Coach Pavlovich:** Lack of supervision on both the pool deck and in the locker rooms despite his knowledge that he was expected to supervise those areas (*see e.g.* DE 83-2 at 21-22; DE 83-10 at 23-24); failure to even raise the issue of hazing at all with his swimmers until nearly six months after he was notified of the issue (*see e.g.* DE 83-11 at 13; DE 83 at 183-84; DE 83-2 at 40-42.); knowledge of the head-shaving parties prior to January 2011 and reference to them as "tradition" (DE-83-1 at 58); knowledge that J.H.'s hair was dyed and shaved involuntarily (DE 83-10 at 15, 35); brushing off the February 2010 head-shaving incident once he learned of it in January 2011 by saying "[i]t's probably best if we don't do anything about it at this point. It happened a year ago. A lot of those kids are gone." (DE 83-1 at 29); failure to discipline misuse of Icy Hot (DE 83 at 37); failure to investigate the February 2010 head-shaving incident and lack of knowledge as to whether Munster did so (DE 83-10 at 18); accusing J.H. of being "irresponsible" when J.H. reported having his equipment stolen, even though his equipment being stolen was a part of the hazing he was enduring (DE 83 at 23-24); knowledge that he could discipline swimmers for off-campus behavior (DE 83-10 at 43-44).

- **Athletic Director Smith:** Referring to the hazing incidents reported to him as "initiation" (DE 83-1 at 45); knowledge of the hair-dyeing parties by at least late January or early February 2011 (DE 83-1 at 52) and of the fact that J.H.'s hair had been dyed and cut against his will (DE 83-1 at 49); knowledge that someone had their eyebrow shaved against his will by at least June 2011 (DE 83-7 at 12); failure to prohibit hair-dyeing parties despite initial discussion about banning them after learning that some kids have their hair dyed and cut against their will (DE 83-7 at 24-25); failure to uncover any additional hazing in his own investigation of the boys swimmers after the report of the February 2011 locker room assault on J.H. (DE 83-7 at 43); belief that the February 2011 assault on J.H. was hazing (*Id.*); knowledge that the school could discipline swimmers for certain off-campus behavior (DE 83-7 at 21); failure to discipline coaches for not supervising the locker room, despite that Smith had the authority to do so (DE 83-10 at 23-24; DE 83-7 at 6-7).

- **Principal Tripenfeldas:** Minimization of hazing activity as "pranks and horse play" in the official report of his investigation into the allegations contained in J.H.'s formal report (DE 83-20 at 10); failure to prohibit hair-dyeing parties despite his desire to do so after learning what happened to J.H. at the February 2010 party (DE 83-8 at 17-19); knowledge that the school could discipline some off-campus activity if it impacted the educational environment of the entire school (*Id.* at 26); belief that the February 2011 locker room assault and the practice of swimmers carrying other swimmer's trays was hazing (*Id.* at 29); failure to discipline the swim coaches for not appropriately supervising the locker room or pool deck (DE 83-10 at 53-54; DE 83-8 at 12; 27-28).

- **Superintendent Pfister:** After learning what happened to J.H. at the February 2010 hair-dyeing party, he ordered an investigation, but considered the matter closed once he learned it occurred off-campus, despite that some measure of discipline could have been taken (DE 83-9 at 44, 46-47, DE 83-8 at 26); when Ms. Hunt told Pfister about what happened to J.H. at the February 2010 hair-dyeing party, his initial response wasn't exactly sympathetic:

"[h]ey lady, your kids's hair got cut" and that the school would not be getting involved because the incident occurred off campus (DE 83-1 at 90-91); when Ms. Hunt contacted Pfister's office about a month later to discuss a "very serious matter" relating to J.H., Pfister delayed meeting with her for a month (DE 83-1 at 98-99).

Of course most of what is above is disputed by Defendants. But that's the point—I can't grant summary judgment to Defendants where there are questions as to material facts like the ones above, because if these facts are as J.H. presents them, this is enough to support his claims. What does not appear to be disputed, however, is that each of these individuals had final policy-making authority. (*See* DE 77, 86.) Indeed, as outlined above and in J.H.'s briefing, each of the defendants had the power to discipline the swimmers for their behavior, to discipline those employees they supervised, and to set the rules for the swim team. But even if defendants do dispute this point (although it's not argued in the briefing), that just creates another fact question and another reason to deny their summary judgment motion. Whether their individual actions will be enough to past muster under a theory of constitutional deprivation at the hands of a final policy-maker will be something for the jury to decide.

■ The individual school official defendants, however, argue that regardless of whether the facts above are true, they should be shielded by qualified immunity which protects government officials from liability for performing discretionary functions so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Nabozny v. Podlesny*, 92 F.3d 446, 455 (7th Cir.1996). But the Seventh Circuit rejected the same argument under very similar circumstances in *Nabozny*. There, a high school student brought a claim against school officials in their individual capacities for a failure to protect him from harassment he endured based on his sex. *Id.* In evaluating whether the officials could be protected by qualified immunity, the court focused on two primary questions: (1) whether the law clearly established that the Equal Protection Clause required school officials to give equal protection to males and females; and (2) whether that law was clearly established in 1988 (when the plaintiff's issues first started). *Id.* at 455–56. The court found the answer to both questions was clearly yes, and therefore the officials' claims of immunity failed. *Id.* at 456. Here, too, the law was clearly established by 2009 or 2010, when J.H.'s issues started, that school officials were required to provide equal protection to males and females. A failure to comply with that law negates qualified immunity.

### Gender Discrimination Under Title IX

■ The same material fact questions above also prevent me from granting summary judgment to Defendants on J.H.'s Title IX claims. Section 901(a) of Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a). No one disputes that Munster is subject to Title IX's prohibition on sex discrimination. It is also undisputed that individuals may bring private suits for equitable relief and damages when a school violates Title IX. *Hayden*, 743 F.3d at 583.

While the standards for proving discrimination under Title IX and the Equal Protection clause "may not be wholly congruent," here the proof required overlaps

significantly. *Levin v. Madigan*, 692 F.3d 607, 614 (7th Cir.2012) (finding that to prove discrimination under Title IX, a plaintiff must show that a school administrator acted with deliberate indifference, whereas an equal protection claim requires proving a custom or practice was at play). In the typical Title IX discrimination case where students are harassing each other or where a teacher harasses a student, a plaintiff must show (1) discriminatory harassment of which the school has (2) actual knowledge and yet (3) treats with deliberate indifference, and (4) the harassment must be severe and objectively offensive enough that it deprives the plaintiff of access to educational opportunities. *Doe v. Galster*, 768 F.3d 611, 614 (7th Cir.2014). But in *Hayden*, the Seventh Circuit found that paradigm doesn't necessarily apply when the discrimination is, as here, a school policy. *Hayden*, 743 F.3d at 583 (attributing an intent to discriminate under Title IX to the school district where "[t]he discrimination at issue here takes the form of a school policy."). Instead, the policy alone suffices to establish an intent to discriminate. *Id.* The court did not, however, address whether a plaintiff still needs to demonstrate that the harassment is severe and pervasive enough to deprive the plaintiff of educational opportunities, or whether the "intent" is enough to show actual knowledge and/or deliberate indifference. Here, I think J.H. has also shown those elements, so his claim can proceed under either paradigm.

Again, J.H.'s argument is that Munster engaged in a practice or custom of deliberate indifference such that the school purposefully ignored complaints of hazing in the boys program based on gender. Thus, the same evidence supporting that the custom or practice exists, identified at length above, also supports deliberate indifference since the custom or practice *was* deliberate indifference. And since the basis of the claim is the school's own policy, they

obviously had actual knowledge of it (and in any event, as the evidence above shows, they had actual knowledge of the specific acts of hazing by at least the winter and spring of 2011).

So the only thing left not previously addressed is whether the actions were severe and pervasive enough to deprive J.H. of educational opportunities. To prove this element, J.H. must present evidence showing discrimination "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651, 119 S.Ct. 1661. Here, too, I find J.H. has presented enough evidence. J.H. has presented evidence that because of Defendant's inaction regarding hazing on the boy's swim team, he was forced to quit the swim team and graduate early, and that his grades declined. (DE 83 at 137-38, 148, 169). He also suffered psychological effects such as anxiety, depression, and suicidal thoughts, all requiring treatment. (DE 83 at 139-140.) Evidence of this nature is generally found to be enough for showing sufficiently pervasive and severe discrimination. *See Gabrielle v. Park Forest–Chicago Heights Ill. School Dist.*, 315 F.3d 817, 823 (7th Cir.2003) (examples of negative impact on education includes dropping grades and absenteeism; J. Rovner in dissent finding psychological impact alone can be enough); *Zeno v. Pine Plains Central School*, 702 F.3d 655, 667 (5th Cir.2012) (finding leaving a school program early is sufficient evidence of negative impact).

One key difference between an equal protection and Title IX claim is that unlike an equal protection claim brought under Section 1983, Title IX authorizes suits against institutions and programs *only* and does not authorize suits against school offi-

cials, teachers, or other individuals. *Levin*, 692 F.3d at 614. A plaintiff can, however, use evidence that "a single school administrator with authority to take corrective action responded to harassment with deliberate indifference" to establish liability under Title IX, whereas such a showing would be insufficient under the Equal Protection Clause without the additional showing of a widespread custom or practice. *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 257, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009). So basically, J.H. can't bring a Title IX claim against the school administrators, but can use evidence of what those administrators did (or, in this case, didn't do) to support his claim against the school itself. Thus, I will **DISMISS** J.H.'s Title IX claim against the individual school officials (Pfister, Tripenfeldas, Smith, and Pavlovich). But his Title IX claim based on the inequality between the girl's and boy's swimming programs will proceed against Defendant Munster.

### Gender Stereotyping, "Sex-Plus," and Class Year Claims

■ J.H. also argues that Defendants have discriminated against him based on gender stereotypes and his class year under both the Equal Protection Clause and Title IX. The same standards discussed at length above also apply here: for his Equal Protection Claim against Munster, he must show a custom or practice of discrimination based on gender stereotypes and/or class year; for the same claim against the school officials, he must show that they discriminated against him based on those same classifications; and under Title IX, he must show gender stereotyping-based discrimination that a school official has actual notice of and fails to act on (note that age is not protected under Title IX). *Teesdale*, 690 F.3d at 834; *Hayden*, 743 F.3d at 583.

J.H. argues that he was selected for hazing based on the following reasons: (1) he didn't conform to certain gender stereotypes (*i.e.* he wasn't "manly" enough); (2) his class year (*i.e.* freshmen were hazed; seniors were not); and/or (3) a combination of the two known as "sex-plus" whereby gender and class year both contributed to why he was selected. For his equal protection claims, all three fail because J.H. presents no evidence that the *school* or its *officials* engaged in either a custom/practice or with deliberate indifference towards him because he didn't conform with certain gender stereotypes or his class year. It may well be true that he was selected by his fellow students for hazing based on these criteria (although, based on the very thin evidence present, I'm dubious), but to prove his claim, he needs to show some action or inaction on the part of the school and/or its officials based on these criteria. And although I have found that J.H. has presented sufficient evidence that the school and its officials have discriminated against J.H. because of the fact that he is a boy and not a girl, J.H. hasn't presented any evidence that he was discriminated against because he was less of a stereotypical boy or that he was young. At bottom, the scant evidence he does present (*e.g.* being called a "cunt," "a pussy," or a "bitch" in the hallways by other students or the fact that underclassmen had to do certain things for upperclassmen) all goes to the actions of his fellow students, not school officials.

■ His Title IX claims based on these criteria fail for similar reasons. First, J.H. can't bring an age claim under Title IX as Title IX protects only gender-based discrimination. 20 U.S.C. § 1681(a). Regarding his gender stereotyping claim, although peer-on-peer harassment can suffice to support such a claim if J.H. can show that school officials had actual knowledge of the harassments and yet acted deliberately indifferently (*Hayden*, 743 F.3d at 583), J.H. hasn't presented

enough evidence that he was selected for hazing because he didn't conform to the gender stereotypes of a boy. The only evidence J.H. cites in support of his claim is that some fellow students called him a "cunt," "pussy," or "bitch" in the hallways. Although this is far from acceptable behavior, this type of behavior without more has been found insufficient to support a Title IX claim. *Davis v. Monroe Cty. Bd. of Ed.*, 526 U.S. 629, 651–52, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) ("in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender"); *Doe v. Galster*, 768 F.3d 611 (7th Cir.2014) (finding that although use of the terms "bitch" and "whore" in the employment context can be sufficient to show gender-based discrimination, "the issue is more subtle in the school context" because kids are still learning how to interact appropriately with one another; but declining to decide whether it was sufficient in that case because the claim failed for other reasons); *Sanches v. Carrollton–Farmers Branch Independent School District*, 647 F.3d 156, 166 (5th Cir.2011) (rejecting Title IX student-on-student harassment claim where alleged conduct was only name calling). Without more, J.H.'s claim cannot proceed. I will therefore **DISMISS** J.H.'s Equal Protection Clause and Title

IX claims based on gender stereotyping and class year.

### Retaliation Claim

J.H. argues that Defendants have retaliated against him in contravention of both Title IX and the First Amendment for his whistleblowing of the hazing in the boys swimming program. To prove his claim under Title IX, J.H. must show Defendants engaged in "[i]ntimidatory or retaliatory acts." *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005). Under the First Amendment, J.H. must show that Defendants' actions were sufficient to deter free speech. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir.2012), *cert. denied*, ––– U.S. ––––, 133 S.Ct. 489, 184 L.Ed.2d 298 (2012). In other words, he must show that "but for his protected speech, [Defendants] would not have taken the adverse action." *Id.* at 965. At the summary judgment stage, this translates into the following paradigm: J.H. must first present evidence that his speech was at least a motivating factor of Munster's actions and then Munster must rebut the inference created by that evidence. *Id.*

The only evidence J.H. brings forth is (1) his removal from the team email list after he chose not to swim over the summer; (2) his selection for random drug testing; (3) the refusal to protect him after reporting the hazing; and (4) Coach Pavlovich ignoring him in the hallway once.[1] To establish that any of these were motivated by his whistleblowing, J.H. can present either direct or circumstantial evi-

---

1. J.H. addresses a few more pieces of evidence in a footnote of his brief without much elaboration, probably because they are not very strong. For example, J.H. states that the hair cutting "ritual" on the swim team was listed as a "proud tradition" in the MHS yearbook, he wasn't selected as a scholar athlete on the tennis team, and Coach Pavlovich referenced the hair cutting parties favorably in some remarks at the team banquet. These allegations are all pretty vague—most of which don't even identify who was allegedly at fault—and some don't even appear to pertain to the swim team at all. In any event, J.H. claims that all of these fall under the "suspicious timing" camp, and I find that they do not constitute the rare situation under which suspicious timing alone can carry the day.

dence. *Kidwell*, 679 F.3d at 965. The evidence outlined above all appears to be circumstantial as the jury would have to make an inference to get to the final result of retaliation. *Id.* "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Id.* at 966 (internal quotation marks omitted). J.H. appears to rely primarily on (1) suspicious timing and (2) behavior towards him.

██ J.H.'s claims regarding his removal from the email list and his selection for random drug testing fall under the "suspicious timing" camp, which "will rarely be sufficient in and of itself to create a triable issue." *Id.* Here, I find it hasn't. Defendants have rebutted any inference of retaliation by showing that J.H. was removed from the email list because he elected not to swim during the summer session. (DE 83 at 136; DE 79-9 at 7.) They have also presented evidence that they have nothing to do with the drug-testing procedure and who is selected for drug testing—that is all done by an independent company. (DE 79-24 at 1.)

██ Regarding his claims about the school's failure to protect him after he reported the hazing, it is a stretch. It may very well be that Defendants engaged in impermissible discrimination or breached a duty to J.H. by failing to protect him, but I see no evidence that this was actually done in retaliation of his reporting. J.H.'s argument on his discrimination and negligence claims is that the coaches failed to supervise the locker room throughout 2009 and 2011, and in the absence of coaches being present, he was attacked. It's not as if the coaches used to police the locker rooms and then stepped out once J.H. reported the swim team hazing. Instead, the coaches did whatever they had previously done—for better or for worse. And as for Coach Pavlovich ignoring J.H. in the hall-

way on one occasion, that hardly strikes me as enough to support a claim for very serious misconduct on the part of a school official.

At bottom, I recognize that J.H.'s high school experience was an incredibly difficult one due to what he faced on the swim team and I agree with him that he has presented enough evidence to allow a reasonable jury to infer that he was unfairly discriminated against and that Defendants failed in their duty to protect him. But to also find that Defendants not only failed in these regards, but actually *retaliated* against J.H. due to his reporting stretches the evidence beyond its breaking point. I will therefore **DISMISS** J.H.'s retaliation claims.

### Indiana State Law Negligence Claim

██ To prove his negligence claim under Indiana state law, J.H. must show that (1) Defendants owed him a duty; (2) Defendants breached that duty; and (3) J.H. suffered injury proximately caused by Defendants' breach of that duty. *M.S.D. of Martinsville v. Jackson*, 9 N.E.3d 230, 243 (Ind.Ct.App.2014). Indiana courts further impose a "special duty" on schools to "exercise the level of care an ordinary, prudent person would exercise under the same or similar circumstances." *Id.* A school has a "duty to protect its student from criminal attack and breached that duty where the attacker had a propensity towards violence, the school system or school personnel was aware of this propensity; and school personnel's failure to provide adequate supervision allowed the attacker the opportunity to assault the student, proximately causing his injuries." *Id.* These questions are generally best resolved by a jury. *Mangold v. Ind. Dept. of Nat. Res.*, 756 N.E.2d 970, 975 (Ind.2001).

██ Here, J.H. has alleged his fellow students committed various acts against him on school property that amount to an

assault. He was routinely hit during practice (otherwise known as "five-starring") (DE 83 at 39); hit with a plastic wiffle ball bat (*id.* at 78-80); and was once violently attacked in the locker room in an attempt to cut his hair without his consent (*id.* at 104-106). According to the evidence J.H. presents, Defendants had notice of these or similar acts prior to some of them occurring. The most salient example is the fact that by January 2011, Defendants had notice that J.H. had been assaulted at an off-campus pre-sectional swim team party in 2010 where his hair was cut against his will, and then just one month after they received notice, in February 2011, he was assaulted in another attempt to cut his hair prior to sectionals in the boys locker room. All of this occurred in the absence of supervision. Under *M.S.D. of Martinsville*, that's enough evidence for a jury to decide whether Defendants were negligent.

■ Further, neither Munster nor the individual school officials are protected under the Indiana Tort Claims Act. That statute requires that any claims against a governmental employee personally must allege that the employee acted in a way that is "(1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally." Indiana Code § 34–13–3–5(c). J.H. has alleged that Defendants' actions were "intentional and in reckless disregard of a school's obligation to its students." (DE 15 at 7.) In other words, their actions were willful and wanton. *S.C. Nestel, Inc. v. Future Const., Inc.*, 836 N.E.2d 445, 451 (Ind.Ct.App.2005). And although the ITCA grants immunity to governmental entities for their "performance of a discretionary function" (I.C. 34–13–3–3), Munster is not immune as the issues presented here are "not the type of policy-making that [Indiana's] supreme court has since determined should be exempt from liability under the planning/operation test." *M.S.D. of*

*Martinsville*, 9 N.E.3d at 242 (denying immunity to school district for negligence claims brought by students regarding a school shooting). In other words, the ITCA isn't geared towards protecting policies and practices aimed at harming students.

### Motions to Strike

■ Defendants request that I strike Appendix I of J.H.'s summary judgment response brief for failure to comply with our local rules. I decline to do so. First, I have discretion as to whether to enforce our local rules. *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir.2011). Second, I don't really think J.H. flouted the local rules here. Although Munster claims that Appendix I contains improper conclusory statements and arguments that are undesignated, Appendix I is really just redundant of Appendices II and III, which both include all proper citations. Appendix I was intended to be helpful, and in some ways, it was. But make no mistake—I don't rely on evidence without confirming its precise designation in the record. Because I'm able to parse out what to rely on and what to ignore, I don't see any reason to strike J.H.'s filing. As the detailed citations in this order should show, I have relied on the record itself and not the parties' characterizations of the record in making my decision. Defendants' motion (DE 88) is therefore **DENIED**.

### Conclusion

For the forgoing reasons, Defendants' motion for summary judgment (DE 73) will be **GRANTED-IN-PART** and **DENIED-IN-PART**. All claims against the school officials (Defendants Pfister, Tripendfeldas, Smith, and Pavlovich) in their official capacities are dismissed. J.H.'s discrimination claims based on gender stereotyping and class year under Section 1983 and Title IX are also dismissed, as is his

claim for retaliation. J.H. may proceed, however, on his claims of gender discrimination under the Equal Protection Clause of the Fourteenth Amendment (via Section 1983) and Title IX, along with his state law negligence claim. The Section 1983 claim will proceed against Munster and the school officials (Defendants Pfister, Tripendfeldas, Smith, and Pavlovich) in their individual capacities, and the Title IX claim will proceed only against Munster (that claim is dismissed against the individual school officials).

Further, the Defendants' Motion to Strike J.H.'s Appendix I (DE 88) is **DENIED**.

**SO ORDERED.**

Victor LE, on Behalf of Himself
and All Others Similarly
Situated, Plaintiff,

v.

KOHLS DEPARTMENT STORES,
INC. and Kohls Corporation,
Defendants.

Case No. 15–CV–1171–JPS

United States District Court,
E.D. Wisconsin.

Signed February 8, 2016

E. Kirk Wood, Wood Law Firm LLC, Birmingham, AL, Erin G. Comite, Scott + Scott LLP, Colchester, CT, John T. Jasnoch, Joseph Pettigrew, Scott + Scott LLP, San Diego, CA, Joseph P. Guglielmo, Scott + Scott LLP, New York, NY, Jordan C. Loeb, Cullen Weston Pines & Bach LLP, Madison, WI, for Plaintiff.

Alex Beroukhim, Eskandar A. Beroukhim, James F. Speyer, Arnold & Porter LLP, Los Angeles, CA, John L. Kirtley, Godfrey & Kahn SC, Milwaukee, WI, for Defendant.

## ORDER

J.P. Stadtmueller, United States District Judge

The plaintiff, Victor Le ("Le"), on behalf of himself and others similarly situated, filed the complaint in this action on September 30, 2015. (Docket # 1). In short, Le claims that he and putative class members have suffered—and continue to suffer—from unfair, deceptive, and unlawful business practices implemented by the defendants, collectively "Kohls."[1] (Docket # 1 ¶ 1). Before any issues related to class certification could be resolved, however, Kohls moved to dismiss Le's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Docket # 18). That motion is now fully briefed and ripe for adjudication. As explained in further detail below, Kohls' motion will be denied.

## 1. BACKGROUND

Before delving into the complex legal issues underlying this motion, the Court must first provide an overview of: (1) the parties; (2) the factual background of this case; and (3) Le's claims in relation to the pending motion to dismiss.

### 1.1 The Parties

Plaintiff, Victor Le, is a citizen of California.[2] (Docket # 1 ¶ 10). During the relevant time period, Le alleges that he pur-

---

1. The defendants both spell the name of their corporation with an apostrophe, that is, "Kohl's." *See* KOHL'S, http://www.kohls.com (last visited Jan. 27, 2016). However, for the purpose of this Order, the Court will refer to the defendants collectively as "Kohls," without an apostrophe. This will be done with no other purpose than to avoid the Court's grammatical resort to the double genetive. *See Possessives and Attributives*, THE CHICAGO MANUAL OF STYLE ONLINE, http://www.chicagomanualofstyle.org/qanda/data/faq/topics/PossessivesandAttributives.html (last visited Feb. 2, 2016).

2. Unless otherwise stated, the Court will draw the relevant facts from Le's complaint. (Dock-

chased merchandise from Kohls at a "sale" or "discount" price off of the "regular" or "original" item prices. (Docket # 1 ¶ 10).

Defendant Kohls Corporation is a Wisconsin company with its principal place of business located at N56 W17000 Ridgewood Drive, Menomonee Falls, Wisconsin. (Docket # 1 ¶ 11). Defendant Kohls Department Stores, Inc., is a Delaware company with its principal place of business located at N56 W17000 Ridgewood Drive, Menomonee Falls, Wisconsin.[3] (Docket # 1 ¶ 11). Kohls operates approximately 1,162 department stores in 49 states, including 37 stores in Wisconsin, 126 stores in California, and an e-commerce website (www.Kohls.com). (Docket # 1 ¶ 16). Kohls sells private label, exclusive and national brand apparel, footwear, accessories, beauty, and home products. (Docket # 1 ¶ 16).

## 1.2 Factual Background

The gravamen of Le's complaint is that Kohls uses inflated or fabricated "original" prices on its merchandise so that Kohls' products—and Kohls' "sale" prices—appear more attractive to consumers. (Docket # 1 ¶¶ 2, 8, 20-28). Le describes this

practice as a "misleading discount price comparison scheme," which is, according to Le, deceptive and thereby harms consumers. (*See* Docket # 1 ¶ 5).

More specifically, Le alleges that Kohls engages in a company-wide, pervasive, and continuous campaign of falsely claiming that each of their products sells at far higher prices than by other merchants. (Docket # 1 ¶ 27). He asserts that this practice in turn induces consumers to purchase merchandise at purportedly marked-down sale prices. (Docket # 1 ¶¶ 23-29). Le thus claims the "item prices" or "original" prices advertised by Kohls do not reflect a price at which Kohls' products are routinely, if ever, sold to retail customers. (Docket # 1 ¶¶ 23-29). This concept was most aptly demonstrated by the plaintiff in a graph (*see* Table 1), which was prepared by Consumers' Checkbook/Center for the Study of Services ("CSS"), an independent, non-profit consumer organization based in Washington, D.C. (Docket # 1 ¶ 35).[4] Quoting CSS, Le claims that graph proves the point that, "at Kohl's, the sales often never end." (Docket # 1 ¶ 40) (internal citations omitted).

---

et # 1); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir.2002) ("As a general rule, on a Rule 12(b)(6) motion, the court may consider only the plaintiff's complaint.").

3. As referenced above, the Court will herein refer to the plaintiff as "Le" and the defendants collectively as "Kohls."

4. According to Le, beginning in June 2014, and continuing through March 2015, CSS conducted a survey of seven national retail chains and Amazon.com, tracking prices weekly for six to ten big-ticket items from each retailer. (Docket # 1 ¶ 36).

Kohl's

How "today's sale price" compared to "regular sale" for a specific chasmes consumer see week after week

Table 1: Comparison of Kohls' Regular Prices and Offer Prices

According to Le, the issue with Kohls' advertising scheme is that it misleads consumers into believing that Kohls' prices are significantly lower than the prices regularly offered for those products—by Kohls itself or other merchants. (Docket # 1 ¶¶ 20-27). Under this theory, Kohls' marketing tactics are economically harmful because they deceive consumers to: (1) buy products that they would not have bought "but for" the illusory "sale"; or (2) pay more for products than they would have paid had they been fully informed of the actual "item price" for that merchandise. (Docket # 1 ¶¶ 23-29).

This is, in fact, exactly what Le claims happened to him in March, April, May, and July of 2015 when he shopped at various Kohls stores located in California. (Docket# 1 ¶¶ 42-47). Le claims that he "and the members of the [putative] Classes would not have purchased the [Kohls] merchandise...at all, or would not have paid as much for the merchandise were it not for the purported 'savings' adverted to by [Kohls]." (Docket # 1 ¶ 50).

### 1.3 Le's Claims and Kohls' Motion to Dismiss

On September 30, 2015, Le filed this putative class action on behalf of three potential classes. (Docket # 1 ¶¶ 64-70, 78-126). He alleged statutory violations of:

1. The Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. § 100.18 ("WDTPA") (Docket # 1 ¶¶ 64-70) on behalf of a nationwide class;

2. The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL") (Docket # 1 ¶¶ 93-117) on behalf of a California class;

3. The Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA") (Docket # 1 ¶¶ 118-126) on behalf of a California class; and

4. Forty consumer protection laws on behalf of a multi-state class of consumers (Docket # 1 ¶¶ 78-92).

Le also brings a common law unjust enrichment claim on behalf of a nationwide class or, in the alternative, a California class. (Docket # 1 ¶¶ 71-77). The plaintiff

brings this unjust enrichment claim under Wisconsin law or, in the alternative, under California law. (Docket # 1 ¶¶ 72, 73).

Kohls has moved to dismiss all of these claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). (Docket # 18). In support of its motion, Kohls argues that Le: (1) failed to adequately plead the necessary facts showing that he is entitled to restitution under the UCL and CLRA; (2) lacks Article III standing to sue for injunctive relief under the UCL and CLRA; (3) lacks Article III standing to sue under any state law other than California (where he lives and was allegedly injured by Kohls); (4) fails to state a claim under the WDTPA because Le "saw" the allegedly deceptive statements in California; (5) fails to state an unjust enrichment claim under Wisconsin law because he entered into express contracts with Kohls; and (6) fails to state an unjust enrichment claim under California law because unjust enrichment is not a cognizable cause of action in California. (*See generally* Docket # 19). Le opposes all of these arguments. (Docket # 24).

## 2. LEGAL STANDARD

"A motion to dismiss pursuant to [Rule] 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir.2014). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must state enough facts that, when accepted as true, 'state a claim for relief that is plausible on its face.'" *Spierer v. Rossman*, 798 F.3d 502, 510 (7th Cir.2015) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))."A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir.2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). The Court must "tak[e] all factual allegations as true and draw[ ] all reasonable inferences in favor of the plaintiffs." *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir.2008).

Similarly, "[m]otions to dismiss under Rule 12(b)(1) are meant to test the sufficiency of the complaint, not to decide the merits of the case." *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir.2014) (citing *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n. 1 (7th Cir.1996)); *see also Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990) (applying the same principle to motions under Rule 12(b)(6)). As when deciding a Rule 12(b)(6) motion, "[i]n the context of a motion to dismiss for lack of subject matter jurisdiction, [the Court must] accept as true the well pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff." *Iddir v. INS*, 301 F.3d 492, 496 (7th Cir.2002). However, "a plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met." *See Burwell*, 770 F.3d at 588–89 (citing *Kontos v. U.S. Dep't Labor*, 826 F.2d 573, 576 (7th Cir.1987)).

## 3. ANALYSIS

Kohls argues that "each and every" one of Le's purported claims for relief should be dismissed under Rule 12(b)(1) and/or Rule 12(b)(6). (*See* Docket # 19 at 2). For the sake of clarity, the Court will discuss these issues on an argument-by-argument basis.

### 3.1 Monetary Damages under the UCL and CLRA

 On behalf of a class of California citizens, Le seeks restitution[5] under the

---

**5.** Restitution is the only form of monetary relief available under the UCL. *See Cel-Tech*

UCL (Docket # 1 ¶¶ 100, 108, 117) and CLRA (Docket # 1 ¶¶ 124–25); *see also* Cal. Bus. & Prof. Code § 17200 (West); Cal. Civ. Code § 1770 (West). On the one hand, "[a] UCL action is an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices." *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 173, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000). The UCL "covers a wide range of conduct," including "unlawful, unfair or fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising." *See* Cal. Bus. & Prof. Code § 17200 (West); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1142, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). Similarly, the CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code, § 1770(a) (West). This includes: (1) "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have"; (2)"[a]dvertising goods or services with intent not to sell them as advertised"; and (3) "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code, § 1770(a) (5), (9), (13) (West). "The standards for determining whether a representation is misleading under the UCL apply equally to claims under the CLRA." *Colgan*, 135 Cal.App.4th at 675–76, 38 Cal. Rptr.3d 36. Likewise, the same standards for recovering restitution apply both to the

UCL and CLRA. *Id.*; *see also Paz*, 2008 WL 111046, at *3.

Before delving into the parties'. arguments, the Court must clarify the precise issues that are raised in Kohls' Rule 12(b)(6) motion. At bottom, the heart of this motion to dismiss is whether Le states a viable claim for restitution under the UCL and CLRA.

Kohls argues that the *only* legally cognizable method of calculating Le's restitution is through the price-to-value method. (Docket # 19 at 9-17; Docket # 26 at 7-15). In other words, Kohls claims that Le is only entitled to restitution if he can prove that there was a difference between: (1) the value of the products that Le purchased; and (2) the price that Le paid for those products. (Docket # 19 at 11-14) (describing the price-to-value method as "price paid minus value received"). Therefore, because Le did not *allege* that he purchased Kohls' products at prices that exceed those products' values, Kohls argues that Le did not plead a cognizable claim for restitution and his UCL and CLRA claims must be dismissed under Rule 12(b)(6). (Docket # 19 at 13-14).

Le responds that Kohls' interpretation of California law is overly narrow and inappropriate in this case. (*See* Docket # 24 at 13-18). He argues that the UCL and CLRA permit courts to rely on a variety of measures when calculating restitution, not just price-to-value method proposed by Kohls. (Docket # 24 at 15-18). Le alleges that, based on the type of harm that he has suffered, an appropriate methodology for calculating restitution will likely in-

---

*Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 179, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Although the CLRA provides for damages rather than restitution, the standard for recovering damages under the CLRA is the same as the standard for recovering restitution under the UCL. *Compare Colgan v.*

*Leatherman Tool Grp., Inc.*, 135 Cal.App.4th 663, 675–76, 38 Cal.Rptr.3d 36 (2006) *with Paz v. Playtex Products, Inc.*, No. 07CV2133 JM (BLM), 2008 WL 111046, at *3 (S.D.Cal. Jan. 10, 2008). The parties acknowledge this in their briefs. (Docket # 19 at 18; Docket # 24 at 13).

clude either: (1) full restitution; (2) partial restitution based on the false "transaction value" promised by Kohls; or (3) partial restitution in the amount that Kohls profited from its allegedly deceptive pricing scheme. (Docket # 24 at 5; Docket # 25, Ex. 3 at 4-6). Ultimately, however, Le emphasizes that deciding the appropriate method by which to calculate his restitution is fact-intensive and premature at this stage of the litigation. (Docket # 24 at 18-20).

In light of these arguments, the Court must address three interrelated questions: (1) whether California law recognizes any other alternative measures of restitution under the UCL and CLRA (*i.e.*, is the price-to-value method the *only* permissible way to calculate restitution?);[6] (2) assuming alternative restitutionary measures do exist, whether the nature of Le's economic "loss" requires the Court to consider the value of the merchandise that Le received when calculating restitution; and (3) whether the Court must determine the proper measure of restitutionary recovery at the pleading stage. Of course, each of these questions must be viewed from the procedural lens from which the court sits: a Rule 12(b)(6) motion to dismiss.

First, the Court agrees with Le's interpretation of California law, namely, that restitutionary relief under the UCL and CLRA is not strictly and categorically confined to the price-to-value method as proffered by Kohls. Second, the Court concludes that it need not decide Kohls' contention that any potential restitution in this case must take into account the value that Le received from the merchandise that he purchased. Though Kohls presents persuasive arguments in this regard, such

a decision is not one that can or should be made at this juncture.

### 3.1.1 Restitution Under the UCL and CLRA is not Confined to the Price-to-Value Method

In order to decide whether restitution under the UCL and CLRA is strictly confined to the price-to-value measure, the Court must provide some background on California consumer protection law. Courts have broad equitable powers to enforce both the UCL and CLRA. *See Yanting Zhang v. Superior Court*, 57 Cal.4th 364, 371, 304 P.3d 163, 168, 159 Cal.Rptr.3d 672 (2013) (citing *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 173, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000)); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 506 (S.D.Cal.2013) ("A court awarding restitution under the California consumer protection laws has 'very broad discretion to determine an appropriate remedy award as long as it is supported by the evidence and is consistent with the purpose of restoring to the plaintiff the amount that the defendant wrongfully acquired.'") (internal citations omitted). For example, to enforce the UCL's unfair competition provisions, the California legislature authorized "court[s] [to] make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203 (West). Similarly, the CLRA authorizes courts to award to "[a]ny consumer who suffers any damage as a result of" conduct proscribed in that statute "to recover or obtain any of the following: (1) [a]ctual damages, but in no case shall the

---

**6.** Le does not dispute that his complaint fails to allege that he purchased Kohls' merchandise at prices greater than their value. (*See generally* Docket # 1). Thus, if the price-to-value method is the only method by which the Court can calculate Le's restitution under the UCL and/or CLRA, the Court need not go any further as Le's complaint would surely fail to state a claim under Rule 12(b)(6).

total award of damages in a class action be less than one thousand dollars ($1,000); (2) [a]n order enjoining the methods, acts, or practices; (3) [r]estitution of property; (4) [p]unitive damages; [and] (5) [a]ny other relief that the court deems proper." Cal. Civ. Code § 1780(a) (West).

The California Supreme Court, however, has not articulated a single definition for what an "order[ ] for restitution" means under these statutes. On the one hand, in *Kraus*, the Court broadly held that a restitution order is one that "compel[s] a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply Co.*, 29 Cal.4th at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937 (citing *Kraus v. Trinity Mgmt. Servs., Inc.*, 23 Cal.4th 116, 126–27, 96 Cal.Rptr.2d 485, 999 P.2d 718 (2000)). On the other hand, in *Cortez*, the Court more narrowly described restitution as "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received." 23 Cal.4th at 174, 96 Cal.Rptr.2d 518, 999 P.2d 706; *see also In re Vioxx Class Cases*, 180 Cal.App.4th 116, 131, 103 Cal.Rptr.3d 83 (2009) (same).

Despite these different forms, however, California jurisprudence reveals that restitution under the UCL and CLRA is consistently awarded with the goal of "restoring" plaintiffs with money and/or property that has been wrongfully taken as a result of the defendant's unlawful practices. *See Korea Supply Co.*, 29 Cal.4th at 1147–48, 131 Cal.Rptr.2d 29, 63 P.3d 937 ("[T]he language of section 17203 is clear that the equitable powers of a court are to be used to 'prevent' practices that constitute unfair competition and to 'restore to any person in interest' any money or property acquired through unfair practices."); *Cortez,*

23 Cal.4th at 168, 96 Cal.Rptr.2d 518, 999 P.2d 706 ("The object of the restitution order [in a UCL] case [is] money that once had been in the possession of the person to whom it was to be restored. The *status quo ante* to be achieved by the restitution order [is] to again place the victim in possession of that money."); *Kraus*, 23 Cal.4th at 129, 96 Cal.Rptr.2d 485, 999 P.2d 718 ("The statutory authorization in section 17203 to make orders necessary to restore money to any person in interest is clear."); *cf. Yanting Zhang*, 57 Cal.4th at 371, 159 Cal.Rptr.3d 672, 304 P.3d 163 ("In deciding whether to grant the remedy or remedies sought by a UCL plaintiff ... consideration of the equities between the parties is necessary to ensure an equitable result.") (internal citations omitted); *In re Tobacco Cases II*, 240 Cal.App.4th 779, 794, 192 Cal.Rptr.3d 881 (2015) (underscoring the principle that "restitution under the UCL may not be based *solely* on deterrence") (emphasis added).

Keeping in mind the goal of restitution, the California Supreme Court's holdings reveal that the appropriate measure of recovery depends on the nature of the case and the alleged harm that he/she suffers. *Cf. Russell v. Kohl's Dep't Stores, Inc.*, Case No. 5:15–CV–01143–RGK–SP, slip op. at 4 (C.D.Cal. Oct. 6, 2015) ("[A]lternative measures of restitution may be appropriate based on the circumstances of each case."). This is precisely why, in *Cortez*, the Court held that a restitution award of backpay wages—which are frequently the subject of actual damage awards—was an authorized measure of recovery to restore money to plaintiffs who were deprived overtime wages. *Cortez*, 23 Cal.4th at 178, 96 Cal.Rptr.2d 518, 999 P.2d 706; *cf. Korea Supply Co.*, 29 Cal.4th at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937 (explaining that the remedy sought by the plaintiffs was not "restitutionary because plaintiff

d[id] not have an ownership interest in the money it s[ought] to recover from defendants").

Other courts have likewise interpreted California's consumer protection laws to authorize multiple forms of restitutionary recovery. *See e.g., Pulaski & Middleman, LLC v. Google, Inc.,* 802 F.3d 979, 983 (9th Cir.2015); *Russell,* Case No. 5:15–CV–01143–RGK–SP, slip op. at 3–5; *Spann v. J.C. Penney Corp.,* No. SA CV 12–0215 FMO, 2015 WL 1526559, at *5 (C.D.Cal. Mar. 23, 2015). In fact, a recent California appellate court addressed this precise issue, explaining that *"Vioxx* ['s] [price-to-value method] does not purport to set forth the *exclusive* measure of restitution potentially available" in a consumer fraud case. *In re Tobacco Cases II,* 240 Cal. App.4th at 792, 192 Cal.Rptr.3d 881 (emphasis added); *see also Johns v. Bayer Corp.,* No. 09–CV–1935–AJB DHB, 2012 WL 1520030, at *5 (S.D.Cal. Apr. 30, 2012) (finding that neither *Vioxx* nor any other case cited by the defendant "suggest[ed] that the difference in price paid and value received is the only proper measure of restitution").

Thus, this Court agrees that California case law has not cabined restitution under the UCL and/or CLRA to the price-to-value method as argued by Kohls.

### 3.1.2 Determining an Appropriate Restitution Award is Inappropriate at the Pleading Stage

Next, the Court must address the related issues of: (1) whether, *in this case,* the price-to-value method is nonetheless the only cognizable legal theory under which Le could recover restitution; and, therefore, (2) whether Le's failure to allege the value that he received for Kohls' merchandise affects the viability of Le's complaint. *See Russell,* at *4, No. 5:15–CV–01143–RGK–SP, slip op. at 4 (explaining the distinction between the availability of alternative restitutionary measures under the

UCL and the viability of such measures). On the one hand, Kohls argues that even if there are alterative ways to calculate restitution under the UCL and CLRA, the price-to-value method is the only appropriate measure where, as here, a plaintiff receives some value from his/her purchases. (Docket # 19 at 11-13). Otherwise, according to Kohls, Le's proposed restitution measures will over-compensate Le's financial loss and thereby will put him in a better position than if the alleged misconduct had not occurred. (Docket # 19 at 14-17). Le does not specifically address how the value of his Kohls' merchandise might figure into his proffered restitutionary measures. Rather, he argues that even if the products' value is considered, the appropriate restitution award—and method by which restitution is calculated—must be resolved at a later date with a more complete factual record. (Docket # 24 at 15-20).

The Court again agrees with Le that, at this juncture: (1) the Court need not decide whether the price-to-value method is the only cognizable measure of Le's restitution in this case; and (2) therefore, Le's failure to plead that he purchased Kohls' products at a price greater than their value is not fatal to Le's claim. *See In re Tobacco Cases II,* 240 Cal.App.4th at 794 n. 8, 192 Cal.Rptr.3d 881 (explaining that the lower court had rejected the plaintiff's request to determine the applicable measure of restitution before trial, during "which time plaintiffs were free to argue for any measure of restitution they deemed proper"); *see also Russell,* at *4, Case No. 5:15–CV–01143–RGK–SP, slip op. at 3 (finding that the plaintiff's failure to plead the value of the defendant's merchandise was not sufficient to bar his claim UCL claim under Rule 12(b)(6)). On the one hand, this Court acknowledges—as Kohls points out—that the appeals court in *In re Tobacco Cases II* ultimately conclud-

ed that "[b]ecause plaintiffs obtained value from Marlboro Lights apart from the deceptive advertising," the price-to-value method was indeed "the proper measure of restitution" under California law. *Id.* at 794, 192 Cal.Rptr.3d 881. Importantly, however, Kohls fails to highlight that the *In re Tobacco Cases II* court determined the appropriate restitutionary remedy with the benefit of a full trial record before it. *Id.* at 784, 192 Cal.Rptr.3d 881; *see also id.* at 794 n. 8, 192 Cal.Rptr.3d 881 (explaining how the court had "rejected [the] plaintiffs' request that it determine the measure of restitution applicable" before trial because it did not want to "potentially bind itself to a remedy that may or may not be appropriate given the state of evidence"). Unlike the court in *In re Tobacco Cases II*, this Court does not have the benefit of discovery and a complete evidentiary record from which to conclude that price-to-value differential is indeed the "proper measure" of restitution in this case. And, Kohls does not direct the Court to any cases holding that a UCL plaintiff must *plead* the precise measure of restitution that is appropriate for his/her case in order to survive a Rule 12(b)(6) motion to dismiss.

Similarly, at this early stage the Court declines to decide what role the value of Le's merchandise will ultimately play in a potential recovery. This question is inextricably tied to the facts and theories that the parties develop during the course of the litigation, particularly as they relate to the alleged "loss" that Le has suffered. *Cf. Pulaski & Middleman, LLC*, 802 F.3d at 989 (holding that the plaintiff's proposed alternative method of restitution was sufficient for the purpose of class certification purposes because it "measure[d] the monetary loss 'resulting from the particular injury' alleged") (internal citations omitted). For its part, Kohls maintains that Le has not suffered any loss because he does not allege to have paid more for Kohls' products than what those products were val-

ued. (Docket #26 at 10-11). Under this theory, the value of Kohls' merchandise is indeed critical to Le's potential recovery. However, Le does not claim his "loss" flows from having purchased products over the prices at which they were valued. (Docket #1 ¶¶ 8, 29, 50). Instead, he claims that, as a result of Kohls' marketing tactics: (1) he bought products that he would not have bought "but for" Kohls' illusory "sales;" and/or (2) he paid more for products than he would have paid had he been fully informed of the actual "item prices" for that merchandise. (*See* Docket #1 ¶¶ 8, 23-29, 41-50). Thus, the value or benefit that the Kohls' merchandise conferred to Le and the putative plaintiffs may play a more nuanced role than Kohls appreciates in any potential restitution award in this case.

The Ninth Circuit addressed a strikingly similar set of arguments when reviewing a class certification decision in *Pulaski & Middleman, LLC.* 802 F.3d at 983. In that case, the plaintiffs claimed that Google's Adwords program violated the UCL "by failing to disclose the placement of AdWords ads on parked domains and error pages." *Id.* Indeed, even though the plaintiffs may have gained some benefit or value as a result of their advertisements appearing on unauthorized webpages, the Court evaluated Pulaski's proposed restitution measures with goal of "restoring" the plaintiff's loss. *Id.* at 988–989.

To determine the appropriate measure of restitution, the Ninth Circuit closely analyzed the nature of Pulaski's alleged economic harm. *Id.* The court explained that the loss associated with being "deceived by misrepresentations into making a purchase" is that "the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Id.* In this infor-

mation gap type of circumstance, the court held that a proper form of restitution must take into account "what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Id.* (adding that restitution in this type of case "need not account for benefits received *after* purchase because the focus is on the value of the service at the time of purchase. Instead...the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information.") (emphasis added); *see also Russell,* No. 5:15–CV–01143-RGK–SP, slip op. at 4–6. At least one of Le's proposed measures of restitution seems to correlate with the theory articulated by the *Pulaski* court. (Docket # 25, Ex. 3 at 6-9) (describing the "transaction value" method of restitution, which would be calculated by measuring "the amount that each class member would have paid had Defendants offered a discount from the actual 'regular' price").

Kohls spills much ink arguing that measures such as those proposed in *Pulaski, Spann,* and by Le are not restitutionary in nature. (Docket # 19 at 14-17). Kohls argues that neither Le's full refund, false discount value, nor net profits method takes into account the value that a purchaser like Le might have received from Kohls' merchandise. As such, Kohls argues that Le's proposed measure would allow him to recover *more* than what would be available to him under a theoretical tort claim. (Docket # 19 at 14-17).

■ Indeed, this Court recognizes that Le's proposed monetary damages under the UCL and CLRA are confined to restitutionary damages. *See Korea Supply Co.,* 29 Cal.4th at 1148, 131 Cal.Rptr.2d 29, 63 P.3d 937. Le himself concedes this point. (Docket # 24 at 13). Moreover, "restitution without proof of any loss to any plaintiff cannot be characterized as restitutionary."

*In re Tobacco Cases II,* 240 Cal.App.4th at 801, 192 Cal.Rptr.3d 881. Contrary to Kohls' view, however, this Court does find that Le has alleged sufficient loss to support his claims under the UCL and CLRA at this juncture of litigation. And, like the court in *In re Tobacco Cases II,* the Court need not decide the precise method of restitution under which Le will be able to recover restitution, if he recovers anything at all. Indeed, Courts such as this one do not have unlimited power to fashion monetary remedies under the UCL and CLRA. *See Korea Supply,* 29 Cal.4th at 1148, 131 Cal.Rptr.2d 29, 63 P.3d 937 ("A court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices."). And, Kohls raises valid concerns regarding a potential windfall in this case if Le's restitution is not designed and/or limited in such a way as to restore only those losses which are attributable to Kohls' allegedly unlawful acts. (Docket # 26 at 11-13). Moreover, the fact that Le argues that alternative forms of restitution—*i.e.,* forms that look beyond the price-to-value method—may be available to him does not relieve him of the duty to support his purported measure of restitution "by substantial evidence." *Colgan,* 135 Cal.App.4th at 672, 38 Cal.Rptr.3d 36. Ultimately, however, these are issues for another day.

In sum, all that this Court deems necessary to decide with respect to Kohls' motion at this pleading stage is that Le has alleged sufficient facts to show that: (1) he has suffered some cognizable economic loss under the UCL and CLRA; and (2) that restitutionary remedies to restore Le's alleged loss *may* be available to him under California law. *Cf. Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 740 (7th Cir.2014) (upholding the dismissal of a state consumer fraud claim that failed to set forth "any facts to support his conclu-

sory assertions of actual damage"). (Docket # 1 ¶¶ 23-29). It is simply too premature to define what those potential restitutionary remedies are. And, as such, Le's failure to allege that his purchased Kohls' merchandise at a price higher than its value is not fatal to his claim.[7]

### 3.2 Injunctive Relief under the UCL

Le also seeks injunctive relief under the UCL. (Docket # 1 ¶¶ 100, 108, 117). However, Kohls moves to dismiss Le's claim for injunctive relief under Rule 12(b)(1) because they assert that Le lacks Article III standing to pursue his claim.[8] Specifically, Kohls argues that because Le is aware of Kohls' alleged deceptive price comparison scheme, he cannot be "realistically threatened by a repetition of the violation." (Docket # 19 at 18-20) (citing *Cattie v. Wal–Mart Stores, Inc.* 504 F.Supp.2d 939, 951 (S.D.Cal.2007)).

██ In response, Le contends that the fact he is "aware" of the defendants' conduct does not deprive him of standing. (Docket # 24 at 20-23). Rather, he argues that standing doctrine recognizes that where the defendants have engaged in "years-long and repeated misconduct," there is a sufficient likelihood that the unlawful conduct will continue. (Docket

# 24 at 20). Moreover, Le points out that if Kohls' theory is accepted, injunctive relief would become impossible for UCL plaintiffs to obtain. (Docket # 24 at 21-22). This is because a plaintiff must know that the defendant's advertising scheme is deceptive in order to sue; and, under Kohls' theory, as soon as plaintiffs would become aware of such unlawful conduct, they would automatically lose standing to seek an injunction. (Docket # 24 at 21-22).

For reasons explained below, the Court concludes that Le has constitutional standing to pursue a claim for injunctive relief under the UCL and will deny Kohls' motion to dismiss this claim pursuant to Rule 12(b)(1).

Article III of the Constitution limits the federal courts' ability to decide "cases and controversies." U.S. CONST. art. III, § 2. Springing out of this limitation, courts have created a number of justiciability doctrines to cabin the courts' power. *See O'Sullivan v. City of Chicago*, 396 F.3d 843, 853 (7th Cir.2005). One of those doctrines is that of standing. *Id.* In layman's terms, standing seeks to determine whether the proper plaintiff is before the court. *See Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir.2015).

---

7. Kohls also argues in its reply brief that Le's allegation of loss is merely sufficient to show that he standing to sue under the UCL; it does not suffice to show that he is *"entitle[d]"* to restitution. (Docket # 26 at 13-14) (emphasis in original). This Court acknowledges that standing and entitlement to restitution are indeed two distinct concepts. *See Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 337, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011). However, as described above, this Court has not only concluded that Le has suffered cognizable loss under the UCL (*i.e.*, that he has standing), but also that, based on this alleged loss, Le *may* be entitled to alternative measures of restitutionary relief, such as those articulated in *Pulaski* and *Spann. Cf. Prata v. Superior Court*, 91 Cal.App.4th 1128, 1139, 111 Cal.Rptr.2d 296 (2001) (finding that the

plaintiff was not entitled to "restitution of the finance and interest charges if any were incurred by him. But the record reflects that he refused to pay these charges. Therefore, he [wa]s not entitled to individual restitution."). As discussed above, making a definitive decision on Le's entitlement to restitution is not a proper subject for a motion to dismiss. *Id.; see also In re Tobacco Cases II*, 240 Cal.App.4th at 794 n. 8, 192 Cal.Rptr.3d 881.

8. Besides restitution, the UCL also permits recovery in the form of an injunction. *See In re Tobacco II Cases*, 46 Cal.4th at 319, 93 Cal.Rptr.3d 559, 207 P.3d 20 ("[T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction.").

In order to establish they have standing under Article III, plaintiffs must demonstrate: "(1) an 'injury in fact,' that is, 'an invasion of a legally protected interest which is...concrete and particularized, and...actual or imminent'; (2) a causal connection between the injury and the challenged conduct, meaning that the injury is 'fairly traceable' to the challenged conduct; and (3) a likelihood 'that the injury will be redressed by a favorable decision.'" *Dunnet Bay Const. Co.*, 799 F.3d at 688 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Moreover, "to invoke Article III jurisdiction a plaintiff in search of prospective equitable relief, [a plaintiff] must show a significant likelihood and immediacy of sustaining some direct injury." *Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir.2000).

However, "past wrongs, while not sufficient to confer standing for injunctive relief, may be evidence that future violations are likely to occur." *Id.; see also Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir.2000) (" '[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief...if unaccompanied by any continuing, present adverse effects.' ") (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)); *cf. Schirmer v. Nagode*, 621 F.3d 581, 588 (7th Cir.2010) (explaining that while "an isolated" ordinance violation was not sufficient to confer standing, "if we had a record showing a persistent pattern of similar police misconduct" the plaintiffs "might be able to show that they were entitled to injunctive relief of some kind"); *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir.2001) (explaining that "there are at least two ways in which to demonstrate that [prospective] injury is likely to recur": (1) by showing "that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy"; or (2) by showing "that

the harm is part of a pattern of officially sanctioned...behavior, violative of the plaintiff's...rights' ") (internal citations omitted). It is the plaintiff's burden to prove that he/she has standing to pursue the relief that he/she seeks. *See Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013).

Kohls' argument rests on its position that Le does not suffer from "a real and immediate danger" that any alleged harm "will occur in the future." (Docket #19 at 18) (internal citations omitted). However, viewing the facts in the light most favorable to Le, the Court concludes that Le has alleged a "significant likelihood and immediacy" of injury from Kohls' advertising scheme, and that an order from this Court would be able to redress that harm.

Le claims that Kohls' allegedly deceptive advertising scheme is "company-wide, pervasive, and continuous." (Docket #1 ¶27). Thus, Le sufficiently pleads the likelihood of recurring economic injury for Article III standing purposes. *Cf. Perry*, 222 F.3d at 313–14 (dismissing the plaintiff's claim for injunctive relief because he could not "demonstrate a realistic threat that he would be the subject of" the allegedly unlawful conduct).

The Court rejects Kohls' argument that Le's "awareness" of Kohls' alleged pricing scheme somehow strips him of Article III standing. (Docket #19 at 18-20). Though Kohls does not make clear what prong of the standing test they attack with this argument, the Court agrees that "[t]his [question] is best understood as an argument directed to redressability." *Ries v. Arizona Beverages USA, LLC*, 287 F.R.D. 523, 533 (N.D.Cal.2012); *see also Cattie v. Wal–Mart Stores, Inc.*, 504 F.Supp.2d 939, 951 (S.D.Cal.2007) ("Even if [plaintiff] was [injured], however, it is unclear how prospective relief will redress her injury, since

she is now fully aware of the linens' thread count.").

Courts have addressed the issue of how a plaintiff's "awareness" of allegedly unlawful conduct affects standing for the purpose of injunctive relief in different ways. *See Russell*, No. 5:15–CV–01143–RGK–SP, slip op. at 6; *compare Henderson v. Gruma Corp.*, 2011 WL 1362188 (C.D.Cal. 2011) (finding "awareness" of an allegedly false advertising campaign did not preclude standing for injunctive relief) *with Conrad v. Boiron, Inc.*, No. 13 C 7903, 2015 WL 7008136, at *2 (N.D.Ill. Nov. 12, 2015) (ruling there was no standing to pursue injunctive relief for a claimant who challenged the marketing of a homeopathic drug because "[a]t the time the case was filed, he was already well aware of the alleged inefficacy of Oscillo"). However, as explained by another district court faced with this same "one bitten, twice shy" argument, were the Court to accept Kohls' position that Le's awareness "of the alleged deception [would] operate[ ] to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases [under the UCL], a wholly unrealistic result." *Ries*, 287 F.R.D. at 533; *see also Henderson*, 2011 WL 1362188, at *7. This is because as soon as a UCL plaintiff would become "aware" of his/her cause of action—at least sufficiently enough to be able to meet the pleading requirements of Federal Rule of Civil Procedure 8(a)—they would be denied standing to pursue an injunction. *See Russell*, No. 5:15–CV–01143–RGK–SP, slip op. at 7. Such a broad holding would "eviscerate the intent of the California legislature," which undeniably provided UCL plaintiffs with the right to seek injunctive relief. *Koehler v. Litehouse, Inc.*, 2012 WL 6217635 (N.D.Cal.2012); *see also Spann*, 2015 WL 1526559, at *12.

Moreover, while Kohls' argument may be appropriate in the context of a product-specific complaint, the Court cannot agree that Kohls' argument applies with the same force where, as here, the complaint is aimed at a "company-wide, pervasive, and continuous" false advertising campaign. *Cf. Conrad.*, 2015 WL 7008136, at *2; *Bohn v. Boiron, Inc.*, 2013 WL 3975126, at *4 (N.D.Ill. Aug. 1, 2013). Unlike *Bohn*, where the plaintiff was clearly put on notice of a certain's drug inefficacy, without further factual development, the Court is unclear just exactly what Le would be expected to be "aware" of in order to avoid future harm from Kohls. *Id.* For example, should Le be "aware" that housewares are deceptively priced, while men's apparel is not? Should Le be "aware" that Kohls' holiday sales are more egregiously deceptive than their day-to-day offers? These hypothetical questions underscore the point that discovery is necessary to parse out the salient facts in relation to Le's claim for relief.

Kohls relies heavily on *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 741 (7th Cir.2014). In that case, the plaintiff claimed that the defendants violated various consumer protection statutes by advertising normal retail prices as temporary price reductions. *Id.* at 735. On review, the Seventh Circuit upheld the district court's dismissal of the plaintiff's claim for injunctive relief under the Uniform Deceptive Trade Practices Act ("UDTPA"). *Id.* at 740. The court reiterated that a plaintiff cannot "obtain injunctive relief" if he/she "fail[s] to sufficiently allege that [the defendant's] conduct will likely cause him harm in the future." *Id.* (citing *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill.App.3d 1, 330 Ill.Dec. 826, 909 N.E.2d 848, 857 (2009) ("To be eligible for injunctive relief under the Deceptive Practices Act, a plaintiff must show that the defendant's conduct will likely cause it to suffer damages in the future.")). It is true, as Kohls argues, that the court pointed out that the plaintiff

was "now aware of [the defendant's] sales practices," and as such he was not *likely* to be harmed by the practices in the future." *Id.* (emphasis added). However, the court's observation reflected the unremarkable conclusion that "[w]ithout more than the speculative claim that [a plaintiff] will again be harmed by [the defendant], [a plaintiff] is not entitled to injunctive relief." *Id.* As highlighted by the district court, Camasta's complaint had merely put forth the bare assertion that " 'there [wa]s a substantial danger that these wrongful retail practices w[ould] continue.' " *Camasta v. Jos. A Bank Clothiers, Inc.*, No. 12–CV–7782, 2013 WL 474509, at *6 (N.D.Ill. Feb. 7, 2013).

Kohls' argument with respect to *Camasta* is flawed for two reasons. First, from a legal perspective, the *Camasta* court merely repeated the well-accepted rule that the standing inquiry for the purpose of injunctive relief is probabilistic, *i.e.*, is there "likelihood" that some harm will be suffered by the plaintiff in the future? *Camasta*, 761 F.3d at 740–41. Interpreting the *Camasta* court's dicta to instead announce a broad rule that strips a prospective plaintiff of standing to seek an injunction solely because they are aware of a past wrong overreads that court's language and leads to anomalous results. For example, just because someone is aware that the police have acted brutally in the past does not automatically deprive that person of standing to enjoin brutal police activity *so long as* they can show such brutality is *likely* to harm him/her in the future. *Cf. Schirmer v. Nagode*, 621 F.3d at 588 (highlighting that, in such a case, official action conducted pursuant to a policy and/or procedure may be sufficient to establish Article III standing).

Second, *Camasta* is factually distinguishable. The only allegation in the complaint with respect to Camasta's likelihood of suffering future harm was the sweeping assertion that " 'there [wa]s a substantial danger that [the defendant's] wrongful retail practices w[ould] continue.' " *Camasta*, 2013 WL 474509, at *6. Here, Le has alleged that Kohls "continues" to engage in a "company-wide, pervasive" marketing campaign that "has been consistently implemented" across the nation. (Docket # 1 ¶¶ 27-28). While Le may recognize that Kohls' allegedly deceptive scheme is afoot, Le has alleged a realistic fear that Kohls' misleading marketing scheme will likely continue to cause economic harms to consumers. At this juncture in the litigation, these allegations suffice to establish Article III standing. *See e.g.*, *Russell*, No. 5:15–CV–01143–RGK–SP, slip op. at 7 (dismiss the defendant's standing challenge).

In sum, Le has alleged all that is required of him under Article III for the purpose of maintaining his claim for injunctive relief under the UCL. Kohls' motion to dismiss on this ground will be denied.

### 3.3 Le's Claim on Behalf of a Multi-State Class of Consumers

Le's third claim for relief alleges that Kohls' conduct has violated the consumer protection laws of 40 states and the District of Columbia. (Docket # 1 ¶¶ 78-92). Le brings this claim "individually under the laws of California and on behalf of all other persons who purchased merchandise in" states that maintain consumer protection laws similar to those of California. (Docket # 1 ¶¶ 79-92). Kohls argues that Le's claim must be dismissed under Rule 12(b)(1) because he lacks constitutional standing to sue under the laws of states in which he does not reside and has suffered no injury. (Docket # 19 at 20-21). Le responds that: (1) he has constitutional standing to pursue his claim; and (2) Kohls' argument conflates standing with class certification under Federal Rule of Civil Procedure 23. (Docket # 24 at 23-28).

As discussed previously, "[s]tanding is an essential component of Article III's case-or-controversy requirement." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir.2009). Article III courts must be sure of their own jurisdiction before deciding the merits of the case before them.[9] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). "Plaintiffs have standing if they have been injured, the defendants caused that injury, and the injury can be redressed by a judicial decision." *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir.2011). "When deciding questions of standing, courts must look at the case as a whole, rather than picking apart its various components to separate the claims for which the plaintiff will be entitled to relief from those for which he will not." *Arreola*, 546 F.3d at 795.

Standing issues in the context of class actions can be nuanced and confusing. *See Payton*, 308 F.3d at 681 ("This question of 'standing' is just one part of a rather complex network of rules regulating class actions, under which the named plaintiff is the critical actor for some purposes, every individual member of the class is relevant for other purposes, and the class as a

whole is the focal point for yet other purposes."); *cf. Arreola*, 546 F.3d at 794–95 ("Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing. Standing is a prerequisite to filing suit, while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is entitled to relief."). On the one hand, it is well settled that "[b]efore a class is certified... the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir.2009). Less clear, however, is whether a named plaintiff, like Le, has constitutional standing to maintain a class action claim under the laws of states in which he does not reside and/or was injured. *Compare In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.*, 701 F.Supp.2d 356, 377 (E.D.N.Y.2010) *with In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090 (D.N.J. Oct. 20, 2011).

District judges across the nation have decided this question differently,[10],[11] and the parties both cite to a litany of cases reflecting this split in authority—none of

9. Though not argued by the parties in this case, some district courts in the Seventh Circuit have interpreted *Payton v. Cnty of Kane*, 308 F.3d 673 (7th Cir.2002), to require resolution of class certification issues prior to resolving issues related to standing. *See, e.g., Kuhl v. Guitar Ctr. Stores, Inc.*, No. 07 C 214, 2008 WL 656049, at *1 (N.D.Ill. Mar. 5, 2008). In light of *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir.2008), others have not. *See, e.g., In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CR 3690, 2013 WL 4506000, at *5 (N.D.Ill. Aug. 23, 2013). Neither Le nor Kohls argue that this court should defer a ruling on the standing question with respect to Le. As such, the Court finds itself obliged to address the issue here.

10. For cases ruling that standing existed see: *In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.*, 701

F.Supp.2d 356, 377–78 (E.D.N.Y.2010); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *5 (N.D.Ill. Nov. 5, 2009); *Indergit v. Rite Aid Corp.*, 2009 WL 1269250, at *4 (S.D.N.Y. May 4, 2009); *Ramirez v. STi Prepaid LLC*, 644 F.Supp.2d 496, 505–06 (D.N.J. 2009); *Doyel v. McDonald's Corp.*, 2009 WL 350627, at *1 (E.D.Mo. Feb. 10, 2009); *Sheet Metal Workers Nat. Health Fund v. Amgen Inc.*, 2008 WL 3833577, at *9 (D.N.J. Aug. 13, 2008); *Potts v. United Parcel Serv., Inc.*, 2007 WL 551555, at *1 (N.D.Ill. Feb. 15, 2007); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 504–05 (S.D.N.Y.1996).

11. For cases ruling that standing did not exist see: *Martin v. LG Elecs. USA, Inc.*, 2015 WL 1486517, at *17 (W.D.Wis. Mar. 31, 2015) (failing to address the effect of *Morrison*); *Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*, 2014 WL 943224, *12 (D.Minn.

which are binding on this Court. (Docket # 24 at 25-28; Docket # 26 at 17-19). However, in light of Seventh Circuit precedent, the Court is obliged to conclude that Le has standing to pursue his claim on behalf of a putative, multi-state class of consumers at this time.

Though the Seventh Circuit has not decided the precise question at issue here, its opinion in *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir.2011) is instructive. In that case, plaintiffs from Missouri, Georgia, Illinois, and Utah brought a class action claim under the Illinois Consumer Fraud Act ("ICFA") against a conglomerate of online travel agencies, referred to collectively as "YTB." *Morrison v. YTB Int'l, Inc.*, 641 F.Supp.2d 768, 782 (S.D.Ill. 2009). The lower court granted YTB's motion to dismiss the claims made by the non-Illinois plaintiffs on the ground that they did not have Article III standing. *Morrison*, 649 F.3d at 534.

The Seventh Circuit found error in that decision. *Id.* at 536. It held that the out-of-state plaintiffs did have constitutional standing to pursue claims under the ICFA. *Id.* ("Plaintiffs allege that they are victims of a pyramid scheme that saddled them with financial loss, which YTB caused. The judiciary can redress that injury by ordering YTB to pay money to the victims. Nothing more is required for [constitutional] standing."). Though the plaintiffs did not live in Illinois, and were (potentially) uninjured in Illinois, those facts did not— from an Article III standing perspective— bar them from pursuing claims under Illinois' consumer fraud statute. *Morrison*, 649 F.3d at 536. Rather, the Court, in keeping with its instruction in *Arreola*,

"look[ed] at the case as a whole" to determine whether the plaintiffs were injured by the defendant's conduct and whether the court could redress that harm. *Id.*; *see also Arreola*, 546 F.3d at 795. Furthermore, the court explained that even if the ICFA did "not apply because events were centered outside Illinois, then plaintiffs must rely on some other state's law; this application of choice-of-law principles [however] has nothing to do with *standing*, though it may affect whether a class should be certified...." *Id.* (emphasis in original). In this sense, the court distinguished subject-matter jurisdiction—"a synonym for adjudicatory competence"— from the merits of the suit or the law under which a claim may proceed. *Id.*; *see also Cohan v. Medline Indus., Inc.*, 2014 WL 4244314, at *1 (N.D.Ill. Aug. 27, 2014) (ruling, under *Morrison*, that a non-Illinois plaintiff, on behalf of putative class members from across the nation, had standing to sue under Illinois law even though he did not work and was not injured in Illinois).

■ Under *Morrison*'s reasoning, the Court concludes that Le has constitutional standing to pursue his claim on behalf of a multi-state class of consumers. Like the out-state-plaintiffs in *Morrison*, the fact that Le does not live, nor was injured, in the 40 states under which his claim may arise is of no constitutional moment. *Id.* Similar to *Morrison*, Le has asserted that Kohls' allegedly deceptive pricing scheme injured him, and this Court can remedy Le's alleged injury by ordering Kohls to pay Le some measure of restitution (assuming he proves up those damages under the applicable law). That is all that the

Mar. 11, 2014); *In re Dairy Farmers of Am., Inc. Cheese Litig.*, 2013 WL 4506000, at *7–*8 (N. D.Ill. Aug. 23, 2013) (also failing to recognize *Morrison* ); *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, *10 (D.N.J. Oct. 20, 2011); *In re Packaged Ice Antitrust Litig.*, 779 F.Supp.2d 642, 657 (E.D.Mich.

2011); *Catlin v. Hanser*, 2011 WL 1002736, at *8; *In re Potash Antitrust Litig.*, 667 F.Supp.2d 907, 924 (N.D.Ill.2009); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 152–56 (E.D.Pa.2009); *In re AIG Advisor Group Sec. Litig.*, 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007).

Article III standing inquiry requires. *See id.* That California law may not apply to this claim is likewise of no constitutional significance because "application of choice of law principles has nothing to with *standing* ...." *Id.* (emphasis in original).

Moreover, with regard to the choice of law issue, it bears mentioning that Le is pursuing this claim *"individually under the laws of California,"* namely the UCL and CLRA. (Docket #1 ¶79). As discussed above, Le has constitutional standing to pursue relief under those statutes. It is unclear, at least on the pleadings, whether the claim will continue to be litigated under the laws of California or some combination of other states' statutes. *Cf. In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.,* 701 F.Supp.2d at 377 ("Whether the named plaintiffs have standing to bring suit under each of the state laws alleged is "immaterial" because they are not bringing those claims on their own behalf, but are only seeking to represent other, similarly situated consumers in those states."). This will be the proper focus of the class certification process. *Morrison,* 649 F.3d at 536; *see also* 7A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 1780.1 (3d ed. 2014) ("As a matter of general principle, the predominance requirement of Rule 23(b)(3) will not be satisfied if the trial court determines that the class claims must be decided on the basis of the laws of multiple states" because "the legal issues no longer pose a common question").

The Court's conclusion also recognizes that "[t]he underlying standing principle is that the injury that a plaintiff suffers defines the scope of the controversy that she is entitled to litigate." NEWBERG ON CLASS ACTIONS § 2:6 (5th ed.). Here, Le claims

that he and the putative class members have suffered a common injury as a result of Kohls' nationwide, pervasive advertising scheme. (Docket #1 ¶¶27-28, 84-92); *see also In re Aftermarket Filters Antitrust Litig.,* 2009 WL 3754041, at *5 ("All Plaintiffs have allegedly suffered identical injuries caused by several parties related by a conspiracy to fix prices. Therefore, the named plaintiffs' capacity to represent individuals from other states depends upon obtaining class certification, and the standing issue would not exist but for their assertion of state law claims on behalf of class members in those states.") (internal citations omitted). Whether or not Le may adequately represent these yet unnamed and uncertified classes of consumers with which he has suffered a common injury is a proper subject of the Rule 23 inquiry.

While the Court appreciates Kohls' prudential concerns about the effect of such a claim, the legislature, through the Class Action Fairness Act, has "authorize[d] federal judges to resolve big-stakes, multistate class actions." *Morrison v. YTB Int'l, Inc.,* 649 F.3d at 536. These prudential concerns are not sufficient to override the Court's conclusion that the plaintiff has constitutional standing. Thus, the Court will deny Kohls' motion to dismiss on this ground, with the understanding that should standing issues again arise during the course of class certification, the parties may raise them as they deem appropriate.

### 3.4 WDTPA Claim

Le also claims that Kohls violated the WDTPA. (Docket #1 ¶¶64-70). Kohls argues that Le's claim under the WDTPA must be dismissed under Rule 12(b)(6) because the statute applies only to statements "made" in Wisconsin.[12] (Docket #19 at 21-22). Thus, according to Kohls, since

---

12. Kohls' constitutional standing argument also applies to all of Le's non-California claims. (Docket #19 at 20-21). However, for

the reasons discussed above (*see supra,* Part 3.3-3.4), the Court finds that Le does have

the only deceptive statements Le "saw" were in California, he fails to state a claim under the WDTPA. (Docket # 19 at 21-22). Le frames this issue differently, and argues that non-Wisconsin residents have statutory standing to sue under the WDTPA. (Docket # 24 at 24).

 The WDTPA provides that: No...corporation...with intent to sell...merchandise...to the public for sale,...*shall make*, publish, disseminate, circulate, or place before the public,...*in this state*, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind... which...is untrue, deceptive or misleading.

Wis. Stat. Ann. § 100.18(1) (emphasis added). "[S]tatutory interpretation 'begins with the language of the statute.'" *State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 45, 271 Wis.2d 633, 663, 681 N.W.2d 110, 124. This rule reflects the Wisconsin Supreme Court's command that courts are to "assume that the legislature's intent is expressed in the statutory language." *Id.* at ¶ 44. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.* at ¶ 45.

 The Court concludes that Le alleged sufficient facts to maintain his claim under the WDTPA. On the one hand, the statute's language requires that actionable statements under the WDTPA be "made" in Wisconsin.[13] *See* Wis. Stat. § 100.18(1) (West); *see also Gilson v. Rainin Instrument, LLC*, 2005 WL 955251, at *12 (W.D.Wis. Apr. 25, 2005) ("[I]n order for liability [under Wis. Stat. § 100.18(1)] to attach there must be some statement made in Wisconsin."). However, the ordinary meaning of the verb "to make" is "[t]o cause (something) to exist." *See* MAKE, BLACK'S LAW DICTIONARY (10th ed. 2014). Here, Le alleges that Kohls' principal place of business is in Wisconsin and its "acts, practices and policies pertaining to the advertising, marketing, and sale of merchandise...*were established and emanated from Wisconsin.*" (Docket # 1 ¶¶ 11-12, 14); *see also* ESTABLISH, BLACK'S LAW DICTIONARY (10th ed. 2014) ("2. To make or form; to bring about or into existence"). Moreover, Le alleges that Kohls' scheme was executed "company-wide" across all of Kohls' stores. (Docket # 1 ¶¶ 27-28). Thus, even if Le "saw" Kohls' allegedly deceptive statements in California, the advertisements that comprise the basis of Le's claims indeed were "made," and then "disseminated," by Kohls from its Wisconsin headquarters. Kohls' motion to dismiss Le's WDTPA claim will, therefore, will be denied.[14]

---

constitutional standing to pursue claims that do not arise under California law. *See Morrison*, 649 F.3d at 534.

**13.** The WDTPA has been amended numerous times since its inception in 1913. *See State v. Automatic Merchandisers of Am., Inc.*, 64 Wis.2d 659, 662, 221 N.W.2d 683, 685 (1974) (providing an overview of the amendments made to the WDTPA, which is currently codified as Section 100.18). Since 1913, it has contained the language at issue here. *See* Wis.

Stat. § 1747(k) (1913) (proscribing false advertisements "ma[de]...in this state"). As legislative histories were not recorded in Wisconsin until 1927, this Court does not have the benefit of the enacting legislature's drafting records with respect to this text. *See Drafting Files*, WISCONSIN STATE LEGISLATURE, https://docs.legis.wisconsin.gov/drafting_files (last visited Feb. 4, 2016).

**14.** As referenced above, Le responds to Kohls' position by arguing that he has *statutory*

### 3.5 Unjust Enrichment Under Wisconsin Law

Le's complaint also alleges a common law unjust enrichment claim. (Docket # 1 ¶¶ 71-73). He pleads this claim under Wisconsin law, on behalf of himself and national class of consumers, and, alternatively, under California law, on behalf of himself and a class of California consumers. (Docket # 1 ¶¶ 71-73). Each of these claims will be discussed separately. (*See infra*, Part. 3.6).

On the one hand, Kohls moves to dismiss Le's Wisconsin unjust enrichment claim on the grounds that Le's purchases from Kohls formed "express contracts" between the parties. (Docket # 19 at 22). These "express contracts," according to Kohls, bar Le's recovery under the equitable doctrine of unjust enrichment, and thus Le's claim should be dismissed under Rule 12(b)(6). (Docket # 19 at 22). On the other hand, Le agrees with the principle of law articulated and argued by Kohls, but clarifies that his unjust enrichment claim does not proceed on an "express contract." (Docket # 24 at 30-31). Rather, Le argues that he brings this unjust enrichment claim in an equitable sense, *i.e.*, he is suing off the contract for restitution. (Docket # 24 at 30-31). And, Le argues that even if an express contract were formed when he purchased Kohls' merchandise, such a contract was voidable in light of Kohls' deceptive price scheme. (Docket # 24 at 30-31).

The Court concludes that Le's claim for unjust enrichment can survive a motion to dismiss because Le has alleged that any purchase contracts between himself and Kohls are potentially voidable.

 "The elements of an unjust enrichment claim are: (1) conferral of a benefit[;] (2) with the knowledge of the party benefitted[;] and (3) under circumstances where it is inequitable to permit the party to retain the benefit without payment." *U.S. ex rel. Roach Concrete, Inc. v. Veteran Pac., JV*, 787 F.Supp.2d 851, 858 (E.D.Wis.2011); *see also Watts v. Watts*, 137 Wis.2d 506, 531, 405 N.W.2d 303, 313 (1987). "In Wisconsin the quasi-contractual theories of quantum meruit and unjust enrichment are legal causes of action grounded in equitable principles and can be invoked only in the absence of an *enforceable* contract." *Carroll v. Stryker Corp.*, 658 F.3d 675, 682 (7th Cir.2011) (emphasis added). A purchase transaction, for example, forms a contract between the buyer and the seller. *Meyer v. The Laser Vision Inst.*, 2006 WI App 70, ¶ 22, 290 Wis.2d 764, 779, 714 N.W.2d 223, 230 (holding that the parties' purchase transactions formed a "valid and enforceable [contract], thereby barring [the plaintiff's] equitable claims"). However, where there is not an underlying, enforceable contract between the parties, an unjust enrichment claim may lie. *Cf. Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir.2014) ("A contract induced by fraud is voidable at

standing to sue under the WDTPA, even though he is a non-resident. (Docket # 24 at 24). This argument is confusing. First, Le neither states nor applies the "zone of interests" test, which is required when raising the issues of statutory standing. *United States v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607, 617 (7th Cir.2015). Second, Le's argument is entirely distinct from Kohls' point, which is that Kohls allegedly did not "make" any actionable statements under the WDTPA because Kohls

"made" no actionable statements in California. (Docket # 24 at 21-22). Ultimately, Kohls' argument is one that is best understood as one that arises under Rule 12(b)(6), rather than Rule 12(b)(1). Moreover, as discussed at length above, this Court does find that Le has Article III standing to pursue his claims, and that Kohls has "made" actionable statements under the WDTPA because its allegedly deceptive marketing scheme was "established" and "disseminated" from Wisconsin.

the option of the party whose assent was fraudulently induced . . . 'If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.' ") (citing RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (1981)); *Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir.2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well.").

Le alleges that Kohls misrepresented the prices on its merchandise, and that Le would not have purchased (or would have paid less for) Kohls' products but for being misled about the merchandise's prices. (*See generally* Docket # 1). The facts are not sufficiently developed for the Court to be able to opine on the viability of Le's unjust enrichment claim, because the allegations underlying Le's claims have not be fully fleshed out. On the one hand, discovery may reveal that Le's purchase transactions with Kohls may have indeed formed valid and enforceable contracts between the parties, thereby precluding Le's claim under Wisconsin law. *Carroll*, 658 F.3d at 682. However, the bases of Le's claims under the UCL, CLRA and WDTPA are that Kohls misrepresented the true value of its goods and, with these claims still outstanding, it is simply too premature to dismiss Le's related claim of unjust enrichment. (Docket # 1 ¶¶ 8, 21, 23-29).

Kohls also argues that Le's claims should be dismissed because: (1) Le did not allege that he "justifiably" relied on any misrepresentations from Kohls; and (2) Le did not allege that he "in fact voided the contracts." (Docket # 26 at 21). These

arguments are not persuasive. First, Le did allege that he and other consumers "reasonably rel[ied]" on Kohls' deceptive advertising scheme. (Docket # 1 ¶¶ 23, 31, 113). Though, it is true that Le did not insert the word "justifiable" into the complaint, the Court refuses to adopt such a strained reading of the pleading. *Cf. Van Dorn v. Peters,* No. 14–CV–03920, 2015 WL 1396492, at *4 (N.D.Ill. Mar. 24, 2015) ("The terms 'justifiable' and 'reasonable' when considering reliance are used interchangeably."). Second, Kohls' one sentence reference to the difference between a void and voidable contract does nothing to support its position that Le's claim should be dismissed. (Docket # 26 at 21). To be sure, there is a difference between a void and voidable contract. *See* RESTATEM ENT (SECOND) OF CONTRACTS § 7 (1981). But, Kohls cites to no authority standing for the proposition that a party must allege in his/her complaint that a contract has *already* been disaffirmed in order to maintain an equitable claim for relief. *Id.* at cmt. d. ("In some cases the power [to disaffirm] may be lost by unreasonable delay in returning benefits received or in manifesting the election to avoid. In other cases . . . manifestation of intention [to disaffirm] is necessary until an action is brought against the party having the power of avoidance.").

In sum, because Le's underlying purchase transactions may be voidable, the Court declines to dismiss Le's unjust enrichment claim at this juncture. *See In re JPMorgan Chase Bank Home Equity Line of Credit Litig.*, 794 F.Supp.2d 859, 884 (N.D.Ill.2011) ("The court agrees that the existence of an express contract potentially covering these claims is not fatal at this stage and declines to dismiss Plaintiffs' unjust enrichment claims on this basis."); *Yakas v. Chase Manhattan Bank, U.S.A., N.A.*, No. C 09–02964 WHA, 2010 WL 367475, at *7 (N.D.Cal. Jan. 25, 2010) ("At this point, the Court is unwilling to

categorically exclude the possibility that unjust enrichment will turn out to be an appropriate remedy.").

### 3.6 Unjust Enrichment under California Law

Alternatively, Le seeks to pursue his claim for unjust enrichment on behalf of himself and a California Class under California law. (Docket # 1 ¶¶ 71-73). Kohls argues that a free-standing unjust enrichment claim is not recognized under California law. (Docket # 19 at 20) (citing *Levine v. Blue Shield of Cal.*, 189 Cal. App.4th 1117, 1138, 117 Cal.Rptr.3d 262 (2010); *Corby v. Am. Exp. Co.*, 2011 WL 4625719, at * 9 (C.D.Cal. Oct. 5, 2011)). However, Le points out that Kohls' position stems from a single California appellate decision which has since been called into question. (Docket # 24 at 32) (citing *Hirsch v. Bank of Am.*, 107 Cal.App.4th 708, 721–22, 132 Cal.Rptr.2d 220 (2003); *Hernandez v. Lopez*, 180 Cal.App.4th 932, 938, 103 Cal.Rptr.3d 376 (2009)).

Under the reasoning of the Ninth Circuit's recent opinion in *Astiana v. Hain Celestial Grp, Inc.*, the Court finds that Le's claim for unjust enrichment under California common law can proceed at this pleading stage. 783 F.3d 753, 762 (9th Cir. 2015); *see also Ghirardo v. Antonioli*, 14 Cal.4th 39, 50, 54, 57 Cal.Rptr.2d 687, 924 P.2d 996 (1996) (holding that a plaintiff was "entitled to seek relief under traditional equitable principles of unjust enrichment" where other remedies were unavailable and that a claim "for payment of money . . . rest[ed] on a theory of unjust enrichment") (internal quotation marks omitted). On the one hand, it is correct, as Kohls argues, that until very recently "federal courts [had] consistently followed [*Melchior v. New Line Prods., Inc.*, 106 Cal.App.4th 779, 793, 131 Cal.Rptr.2d 347 (2003)] and held that California law does not recognize a cause of action for unjust enrichment, so long as another cause of action is available that permits restitutionary damages." *In re ConAgra Foods Inc.*, 908 F.Supp.2d 1090, 1114 (C.D.Cal.2012). However, the Ninth Circuit has since clarified that while "there is not a standalone cause of action for unjust enrichment, which is synonymous with restitution . . . when a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Astiana*, 783 F.3d at 762. The *Astiana* court instructed that such a claim should not be dismissed because a party may set out alternative claims for relief. *Id.* (citing Fed. R. Civ. P. 8(d)(2)). Accordingly, the Ninth Circuit found the allegation that the defendant had enticed plaintiffs "to purchase their products through false and misleading labeling, and that [defendant] was unjustly enriched as a result," was "sufficient to state a quasi-contract cause of action." *Id.*

Several federal district courts "have permitted what were previously considered to be superfluous unjust enrichment claims to survive the pleading stage in light of the Ninth Circuit's decision in *Astiana*." *Valencia v. Volkswagen Group of America, Inc.*, 119 F.Supp.3d 1130, 1142, 2015 WL 4747533, at *9 (N.D.Cal. Aug. 11, 2015) (denying a motion to dismiss an unjust enrichment claim because "*Astiana* provides that plaintiffs are permitted to plead an unjust enrichment claim in the alternative . . . even if, as here, it is questionable whether that alternative claim provides any prospect for relief independent of the causes of action already alleged"); *Trazo v. Nestle USA, Inc.*, 113 F.Supp.3d 1047, 1049–50 (N.D.Cal.2015) (finding "*Astiana* requires this court to . . . reinstate his claim for restitution based on unjust enrichment/quasi-contract."); *Khasin v. R.C. Bigelow, Inc.*, 2015 WL 4104868, at *3 (N.D.Cal. July 7, 2015) (permitting plaintiff to amend complaint to allege unjust enrichment cause of action given the Ninth

Circuit's decision in *Astiana*); *Romero v. Flowers Bakeries, LLC*, 2015 WL 2125004, at *9 (N.D.Cal. May 6, 2015) (relying on *Astiana* to deny motion to dismiss an unjust enrichment claim because, even though "the claim may be duplicative of Plaintiff's statutory claims under the UCL, FAL, and CLRA[, that] is not a proper ground for dismissal at this stage of the litigation. . . ."); *but see Lanovaz v. Twinings N. Am., Inc.*, 2015 WL 3627015, at *5 (N.D.Cal. June 10, 2015) (declining to reinstate unjust enrichment claim).

In keeping with the Ninth Circuit's interpretation of California law, the Court concludes that, at this stage, to the extent Le alleges an unjust enrichment/quasi contract claim under California law, the Court will allow it to proceed.

## 4. CONCLUSION

In conclusion, the Court finds that Kohls' motion to dismiss pursuant to Rule 12(b)(1) and 12(b)(6) must be denied in its entirety. (Docket # 18). As explained more fully above, Le: (1) may be entitled to restitution under the UCL and CLRA; (2) has constitutional standing to pursue each of his claims; (3) alleged sufficient facts to show that the purportedly deceptive statements made by Kohls were indeed "made" in Wisconsin for the purpose of his WDTPA claim; and (4) pled all that is necessary under Wisconsin and California law for the purpose of his unjust enrichment/quasi contract claim.

Accordingly,

**IT IS ORDERED** that Kohls' motion to dismiss (Docket # 18) be and the same is hereby **DENIED.**

UNITED STATES of America,
Plaintiff,

v.

Randy **BELTRAMEA**, Defendant.

No. **13-CR-20-LRR**

United States District Court,
N.D. Iowa, Cedar Rapids Division.

Signed February 3, 2016

---

Charles J. Williams, US Attorney's Office, Cedar Rapids, IA, for Plaintiff.

Webb L. Wassmer, Wassmer Law Office PLC, Marion, IA, for Defendant.

### ORDER

LINDA R. READE, CHIEF JUDGE, U.S. DISTRICT COURT, NORTHERN DISTRICT OF IOWA

### TABLE OF CONTENTS

*I. INTRODUCTION* .... 1121

*II. RELEVANT PROCEDURAL HISTORY* .... 1121

*III. RELEVANT FACTUAL BACKGROUND* .... 1122

*IV. ANALYSIS* .... 1124

 *A. Applicable Law* .... 1124

 *B. Scope of Eighth Circuit Remand* .... 1125

 *C. "Involved In" and "Traceable To"* .... 1126

 *D. Double Counting* .... 1128

 *E. Excessive Fines Clause* .... 1130

*V. CONCLUSION* .... 1133

### I. INTRODUCTION

The matters before the court are the government's forfeiture allegations against Defendant Randy Beltramea in the Second Superseding Indictment (docket no. 59).

### II. RELEVANT PROCEDURAL HISTORY

On October 24, 2013, the grand jury returned a sixteen-count Second Superseding Indictment (docket no. 59) charging Defendant with various counts of wire fraud, identity theft, money laundering, false statements and tax offenses. The Indictment further contained forfeiture allegations for the wire fraud counts (Counts 1-2), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and the money laundering counts (Counts 4-7), pursuant to 18 U.S.C. § 982(a)(1). On October 31, 2013, Defendant pled guilty to counts 1-4, 7, 8, 12 and 16 of the Second Superseding Indictment. *See* October 31, 2013 Minute Entry (docket no. 81) (reflecting Defendant's entry of his guilty pleas); October 31, 2013 Order (docket no. 84) (accepting Defendant's guilty pleas). On December 11, 2013, the government filed a "Motion for a Preliminary Order of Forfeiture" ("Motion for Preliminary Order") (docket no. 87), which listed seven pieces of real property and two monetary amounts that the government alleged were subject to forfeiture. Motion for Preliminary Order at 2-3. The real property listed by the government included three rental properties and land comprising Parcel A and Parcel B

of a proposed land development called "Castlerock Estates" ("Castlerock"). *Id.* The Motion for Preliminary Order reflected that Defendant had consented to forfeiture of the real property and money described therein. *Id.* at 1. That same day, the court entered a Preliminary Order of Forfeiture (docket no. 88) as to all of the items listed in the Motion for Preliminary Order. The court based the Preliminary Order of Forfeiture "on the guilty plea entered on October 31, 2013 and the consent of the defendant." Preliminary Order of Forfeiture at 1. On April 4, 2014, the court sentenced Defendant to 111 months of imprisonment. *See* April 4, 2014 Minute Entry (docket no. 120). As part of the court's judgment, Defendant was ordered to forfeit the property listed in the Preliminary Order of Forfeiture. *See* Judgment (docket no. 121) at 7.

On April 14, 2014, Defendant timely filed a Notice of Appeal (docket no. 124) to the United States Court of Appeals for the Eighth Circuit. In its opinion, dated May 6, 2015, the Eighth Circuit affirmed Defendant's sentence but vacated the forfeiture because "[t]he government presented no factual allegations connecting the [properties allegedly subject to forfeiture] to any offense for which [Defendant] was convicted," finding that ordering forfeiture absent such factual nexus was plain error. Opinion of USCA (docket no. 220) at 8; *see also United States v. Beltramea*, 785 F.3d 287, 291 (8th Cir.2015). The case was remanded to the court for further proceedings on the

forfeiture issue. *Beltramea*, 785 F.3d at 291.[1]

In light of the Eighth Circuit's opinion and judgment (docket no. 221), the court set a forfeiture hearing. *See* June 30, 2015 Order (docket no. 228). On July 16, 2015, the government filed a "Brief in Support of Forfeiture" ("Government Brief") (docket no. 229). That same day, Defendant filed a brief on the issue. *See* Defense Brief (docket no. 230). On July 30, 2015, the court held the forfeiture hearing. *See* July 30, 2015 Minute Entry (docket no. 232). The matter is fully submitted and ready for decision.

### III. RELEVANT FACTUAL BACKGROUND [2]

The wire fraud and money laundering offenses underlying the government's forfeiture allegations arise from Defendant's attempt to develop approximately eighty acres of land into a housing development called Castlerock. In 2000, Defendant funded his purchase of the Castlerock land with a $270,000 loan from "Community Savings Bank" ("CSB"). PSIR ¶ 12. In 2004, Defendant received a line of credit from CSB, in the amount of $500,000, to further fund Castlerock. PSIR ¶ 14. For both the loan and the line of credit, Castlerock served as collateral.[3] The CSB loan and line of credit were originally divided such that one funded Parcel A of Castlerock and the other funded Parcel B. In 2009, Defendant had the CSB loan and line

---

1. The Eighth Circuit vacated and remanded "the forfeiture order." *Beltramea*, 785 F.3d at 291. The court understands this language to vacate both the Preliminary Order of Forfeiture and the final order of forfeiture included in the Judgment.

2. The court finds the relevant facts from the "Final Presentence Investigation Report" ("PSIR") (docket no. 92); Defense Exhibits A (docket no. 231-1), D (docket no. 231-4) and E (docket no. 231-5), admitted at the forfei-

ture hearing; Government Exhibits 10, 28, 67, 70, 85-88, 90, 92, 93, 130 and 131 (docket nos. 233-37), admitted without objection at the forfeiture hearing; and witness testimony from the forfeiture hearing.

3. Defendant further financed Castlerock and other investments through loans with U.S. Bank and Third Federal Savings Bank of Cleveland, Ohio. PSIR ¶¶ 13, 15. These loans were not secured by Castlerock.

of credit refinanced and consolidated into a single loan secured by both parcels of Castlerock. PSIR ¶ 25.

Defendant was an investment advisor from the 1990s until his license to sell securities was revoked in 2005. PSIR ¶¶ 9, 11. After 2005, in his efforts to develop Castlerock, Defendant contacted former investment clients to solicit funds for his use on the project. *See, e.g.,* PSIR ¶¶ 17, 21, 22, 35, 40. When soliciting funds from three former clients, Bob Wheeler and James and June Cook, Defendant fraudulently misrepresented the purpose for which he intended to use their funds. Instead of describing his plans for Castlerock, Defendant falsely told Wheeler and the Cooks that he would use their funds to purchase and operate a series of Subway restaurants.[4] PSIR ¶¶ 35, 40. Defendant falsely stated that he currently owned a restaurant called Hot Harry's and that he and a partner were finalizing the purchase of multiple Subway restaurants. PSIR ¶¶ 35, 40. In fact, Defendant did not own Hot Harry's, Subway denied his application to purchase a Subway franchise and his efforts to buy a five percent stake in another Subway restaurant ultimately failed. PSIR ¶¶ 27, 35, 38. Based on Defendant's misrepresentations, on November 30, 2009, Wheeler wrote a $50,000 check payable to "Angelwing Equity" ("Angelwing"), which was Defendant's real estate investment company. PSIR ¶ 35; Government Exhibit 70. Likewise, on August 25, 2010, the Cooks wrote a $75,000 check payable to Angelwing. PSIR ¶ 40; Government Exhibit 86.

Upon receiving the $50,000 check from Wheeler, Defendant deposited it into An-

gelwing's bank account, Government Exhibit 70, and then immediately wrote a $44,831.10 check to Abode Construction. PSIR ¶ 35; Government Exhibit 130. The check satisfied an outstanding invoice for work that Abode Construction performed at Castlerock. Government Exhibit 130. The work billed on the Abode invoice spanned both Parcel A and Parcel B of Castlerock. Prior to his deposit of Wheeler's $50,000 check, Defendant lacked sufficient funds to cover the invoice. *Compare* Government Exhibit 67 (reflecting a $10,479.08 balance on November 30, 2009, before the deposit of Wheeler's $50,000), *with* Government Exhibit 130 (reflecting a $44,831.10 obligation to Abode Construction). Defendant's fraudulent inducement of $50,000 from Wheeler and his subsequent deposit of those funds and payment to Abode Construction provide the basis for the wire fraud and money laundering charges in Counts 1 and 4. *See* Second Superseding Indictment at 2-6.

On August 26, 2010, the day after Defendant received the $75,000 check from the Cooks, he deposited it into the Angelwing account. Government Exhibit 86. After the deposit, the account totaled $79,372.02. Government Exhibit 85. In the subsequent weeks, Defendant made two cash withdrawals from the Angelwing account, totaling $13,900, and ultimately closed the account on September 13, 2010 by withdrawing the remaining $65,472.02 as a cashier's check. PSIR ¶ 41; Government Exhibit 87; Government Exhibit 88. Defendant used the cashier's check to open a bank account in his mother's name on September 14, 2010. Government Exhibit 90; Government Exhibit 92. Using

4. The Cooks had previously given $115,000 to Defendant to invest in Castlerock, without Defendant's resort to fraudulent statements about Subway restaurants. *See* PSIR ¶ 17 (describing a $65,000 payment by the Cooks on September 20, 2006); PSIR ¶ 36 (describing a

$50,000 payment by the Cooks on April 10, 2010). Defendant approached the Cooks about the false Subway venture only after the Cooks stated that they did not want to make additional real estate investments. PSIR ¶ 40.

funds from the newly created account—composed of the remaining balance of the Cooks' $75,000 "investment"—Defendant made a $16,058 payment on the past-due consolidated CSB loan and a $16,303.50 payment on a past-due invoice from Abode Construction for work done on both Parcels A and B of Castlerock. *See* PSIR ¶ 41; Government Exhibit 93; Government Exhibit 131. Without the $75,000 from the Cooks, Defendant would have lacked sufficient funds to cover these payments. *Compare* Government Exhibit 85 (reflecting a $4,372.02 balance on August 23, 2010, before the deposit of the Cooks' $75,000), *with* Government Exhibit 93 (reflecting a $16,058 payment on Defendant's bank loan), *and* Government Exhibit 131 (reflecting a $16,303.50 obligation to Abode Construction). Defendant's fraudulent inducement of $75,000 from the Cooks and his subsequent transfer of those funds to the new checking account provide the basis for the wire fraud and money laundering charges in Counts 2 and 7. *See* Second Superseding Indictment at 2-5, 7-8.

## IV. ANALYSIS

In his appeal to the Eighth Circuit, Defendant conceded that the $125,000 monetary proceeds of the wire fraud offenses in Counts 1 and 2 shall be forfeited. Brief and Addendum of Defendant–Appellant at *26–27, *U.S. v. Beltramea*, 785 F.3d 287, 2014 WL 3827733. Further, the government "has elected to forgo seeking forfeiture of any of the three rental properties identified in" its earlier forfeiture allegations.

Government Brief at 6-7. Accordingly, forfeiture of Castlerock as it relates to the money laundering offenses in Counts 4 and 7 is the sole remaining issue.

The government seeks forfeiture of the entirety of Castlerock. *Id.* at 8. Defendant resists forfeiture of Castlerock on numerous grounds, including the scope of the Eighth Circuit remand, the meaning of the terms "involved in" and "traceable to" in the relevant forfeiture statute and principles of double counting. *See* Defense Brief at 3, 5-9, 17-18.[5]

### A. Applicable Law

18 U.S.C. § 982(a)(1) provides that persons convicted of certain money laundering offenses (including violations of 18 U.S.C. §§ 1956 and 1957, charged in Counts 4 and 7) shall "forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). When the government seeks forfeiture, "the court must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). The government must establish this nexus by a preponderance of the evidence. *Beltramea*, 785 F.3d at 290. Therefore, the government must prove by a preponderance of the evidence either (1) that the property at issue was "involved in" an enumerated money laundering offense for which the defendant was convicted, or (2) that the property at issue is "traceable to" property involved in such an offense. *See, e.g., id.*; *United States v.*

---

**5.** Defendant makes further arguments regarding various third-party claims to Castlerock. *See* Defense Brief at 10-14 (regarding a claim made by Defendant's company, Randy L. Beltramea, L.L.C.); *id.* at 15-17 (regarding potential claims by a mortgagee bank, investors associated with Defendant and a former investment client of Defendant who sent him significant amounts of money for investment). However, as the court and the parties clarified at the forfeiture hearing, the court will only address whether there is a sufficient factual nexus between Defendant's crimes and Castlerock to warrant forfeiture of that property. It was on this issue that the Eighth Circuit remanded for further proceedings. *See Beltramea*, 785 F.3d at 291. Accordingly, any potential third-party claims to Castlerock are not presently before the court.

*Hasson*, 333 F.3d 1264, 1279 (11th Cir. 2003).

### B. Scope of Eighth Circuit Remand

As an initial matter, Defendant argues that the Eighth Circuit's opinion expressly found that no factual nexus existed between the undeveloped portions of Castlerock and Defendant's crimes. Defense Brief at 5. Consistent with this interpretation, Defendant suggests that only Castlerock's 14.29 developed acres (out of 81.24 total acres) are colorably subject to forfeiture on remand. *See id.* Defendant points to the following language from the opinion in support of his interpretation:

> [T]he record regarding some of the Castlerock lots sought for forfeiture— 26.33 acres of undeveloped land in Parcel B and 40.620 acres of undeveloped land in Parcel A (collectively "Undeveloped Lots")—appear[s] lacking in facts establishing a nexus between the Undeveloped Lots and the offense of conviction.

*Beltramea*, 785 F.3d at 291. Defendant construes this language as the Eighth Circuit's controlling determination that no factual nexus actually exists between Defendant's conduct and the undeveloped portions of Castlerock and that, accordingly, the court is bound to that determination as the law of the case. *See* Defense Brief at 3 (citing *United States v. Wisecarver*, 644 F.3d 764, 770 (8th Cir.2011)). The court disagrees.

Defendant is correct that "a district court has no authority to re-examine an issue settled by a higher court." *United States v. Castellanos*, 608 F.3d 1010, 1016 (8th Cir.2010) (quoting *Bethea v. Levi Strauss & Co.*, 916 F.2d 453, 456 (8th Cir.1990)). However, Defendant reads the Eighth Circuit's opinion too broadly. The Eighth Circuit did not conclude that no facts existed to establish the nexus required for forfeiture, but instead observed that no such facts appeared in the record.

*See, e.g.*, *Beltramea*, 785 F.3d at 291 ("[I]t appears that there is no evidence *in the record* that the government met its burden to show a nexus between the property sought for forfeiture and an offense of conviction with respect to certain properties." (emphasis added)); *id.* ("[T]he record regarding some of the Castlerock lots ... appear[s] lacking in facts establishing a nexus between the Undeveloped Lots and the offense of conviction." (emphasis added)). Indeed, because the government relied solely on Defendant's consent to the preliminary order of forfeiture, the Eighth Circuit observed that "[t]he government presented no factual allegations" on the issue. *Id.* Absent development of a record on the factual nexus issue, the Eighth Circuit cannot be understood to have "settled" the issue of whether such a factual nexus exists. Instead, the Eighth Circuit settled the issue of whether a factual nexus can be established based solely on a defendant's consent, answering in the negative. *Id.* ("[W]e do not believe a defendant's consent to forfeiture abrogates the requirement that a nexus exist between the property sought for forfeiture and the [offense of conviction].")

The Eighth Circuit "vacate[d] and remand[ed] the forfeiture order for proceedings consistent with [its] opinion." *Id.* Notably, the Eighth Circuit remanded "the forfeiture order," and not just the portion of the forfeiture order associated with the 14.29 developed acres of Castlerock. In the context of the Eighth Circuit's opinion, its mandate requires the court to develop a factual record and revisit the relevant portions of the now-vacated forfeiture order to determine whether, and to what extent, forfeiture is warranted in this case. Aided by a factual record unavailable to the Eighth Circuit at the time of its opinion, the court will proceed to consider the government's forfeiture allegations as to the entirety of Castlerock.

### C. "Involved In" and "Traceable To"

 The parties dispute whether, and to what extent, Castlerock was "involved in" or "traceable to" the money laundering offenses found in Counts 4 and 7, as required under § 982(a)(1). "Property 'involved in' an offense includes the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. Hawkey*, 148 F.3d 920, 927 (8th Cir. 1998) (quoting *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir.1998)) (internal quotation marks and alterations omitted). "Property 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *Id.* at 928 (quoting *Bornfield*, 145 F.3d at 1135) (internal quotation marks omitted).

Defendant first argues that Count 4 is the only count capable of supporting forfeiture under § 982(a)(1). *See* Defense Brief at 6 n.4. Both counts reflect violations of money laundering statutes enumerated in § 982(a)(1). However, because Count 7 solely alleged Defendant's transfer of fraudulent funds into the bank account created in his mother's name—without any reference to payments benefitting Castlerock—Defendant contends that Count 7 "does not directly involve Castlerock." *Id.*; *see also* Second Superseding Indictment ¶¶ 13-14. On the other hand, the government argues that Count 7 weighs on the forfeiture of Castlerock because Defendant used the bank account in his mother's name to make a payment on the CSB loan and to satisfy an invoice for construction work improving Castlerock. Government Brief at 9-10. Defendant points out, however, that the loan and construction payments were charged in separate counts (Counts 5 and 6) that the government dismissed, and impliedly argues that the for-feiture allegations previously attached to those dismissed counts cannot be transferred to another count to which Defendant pled guilty. *See* Defense Brief at 6 n.4; *see also* Second Superseding Indictment ¶¶ 9-12 (alleging the $16,058 loan payment as Count 5 and the $16,303.50 construction payment as Count 6); Judgment at 1 ("Counts 5, 6, 9, 10, 13, 14, and 15 of the Second Superseding Indictment are dismissed on the motion of the United States.").

Defendant is correct that the conduct underlying Count 7 "does not directly involve Castlerock" insofar as Castlerock was not "the money or other property being laundered . . ., any commissions or fees paid to the launderer, [or] any property used to facilitate the laundering offense." *Hawkey*, 148 F.3d at 927 (quoting *Bornfield*, 145 F.3d at 1135). However, that does not end the inquiry because § 982(a)(1) further provides for forfeiture of "any property *traceable to* such property [that is involved in the offense]." 18 U.S.C. § 982(a)(1) (emphasis added). The "traceable to" provision reaches any "property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *Id.* at 928 (quoting *Bornfield*, 145 F.3d at 1135). By way of illustration, if Defendant "[laundered] $10,000 and used $5,000 of those funds to purchase a motorcycle, the motorcycle is 'traceable to' the unlawful monetary transaction and is, therefore, subject to forfeiture." *Id.*

 Defendant's circumstances are analogous to the illustration. In Count 7, he pled guilty to laundering $65,472.02, and the government has proved by a preponderance of the evidence that he used $32,361.50 of those funds to pay for improvements and the overdue CSB loan associated with Castlerock. *See* PSIR ¶ 41; Government Exhibit 93; Government Ex-

hibit 131. As such, the Castlerock-related payments are "traceable to" the laundering scheme alleged in Count 7. Dismissal of charges corresponding to specific payments does not eliminate the traceability of those payments to the broader money laundering conduct to which Defendant pled guilty in Count 7. Defendant cites no case to the contrary, and the court is aware of none. Accordingly, the court finds that the $32,361.50 in payments made toward Castlerock is traceable to Count 7. Further, Defendant concedes that the $44,831.10 in payments toward Castlerock alleged in Count 4 is traceable to that offense, Defense Brief at 6, and the record bears out that conclusion by a preponderance of the evidence. *See* PSIR ¶ 35; Government Exhibit 130.

■ Where, as here, payments toward a "real estate contract and improvements on the property" are made with laundered money, the property that benefitted from those payments is subject to forfeiture under § 982(a)(1). *See United States v. Myers*, 21 F.3d 826, 831 (8th Cir.1994) (finding that real property was "involved in" money laundering and subject to forfeiture pursuant to § 982(a)(1) when the laundered money was spent toward the property); *accord. In re 650 Fifth Ave. and Related Props.*, 777 F.Supp.2d 529, 564 (S.D.N.Y.2011) (" '[S]ome direct financial link between a defendant's money laundering and his real property must be shown before a court will order forfeiture of the property.' ... [R]eal [p]roperty is involved in a money laundering offense if laundered funds are used ... to pay for improvements." (citations omitted)); *United States v. Real Property and Premises*, 657 F.Supp.2d 1060, 1069 (D.Minn.2009) (interpreting the "traceable to" language in the civil forfeiture equivalent to § 982(a)(1) to leave "no serious dispute that, by spending allegedly tainted funds on renovations and property taxes for [a property], the property is 'traceable to' a money-laundering offense" (citing *Hawkey*, 148 F.3d at 927)). Therefore, it is not merely the payments toward Castlerock that are subject to forfeiture—Castlerock itself is subject to forfeiture as the object of those payments. Accordingly, because Castlerock is traceable to both Counts 4 and 7 via the series of payments made with laundered funds, the court will proceed to consider the extent to which Castlerock is subject to forfeiture.

■ Defendant argues that, because the amount of laundered money paid toward Castlerock is easily traceable, Castlerock is only forfeitable to the extent of those payments. Defense Brief at 7-9. The government argues that Castlerock is forfeitable in its entirety because it was treated as one singular piece of property, both by the consolidated CSB loan securing Castlerock in a single note and by Defendant's use of laundered funds to improve each of the purportedly separate parcels comprising Castlerock. Government Brief at 10-11.

Defendant's argument implies that, because the money paid toward Castlerock is traceable via checks paid and invoices satisfied, it necessarily follows that Castlerock is itself divisible in proportion to the payments made with laundered funds. According to this reasoning, forfeiture should extend only to the "tainted" portions of Castlerock. *See* Defense Brief at 9. Defendant cites to a series of cases wherein the government sought forfeiture of entire bank accounts in which defendants commingled laundered funds and legitimate funds. Defense Brief at 9-10 (citing *In re Rothstein*, 717 F.3d 1205 (11th Cir.2013); *United States v. Puche*, 350 F.3d 1137 (11th Cir.2003); *United States v. McGauley*, 279 F.3d 62 (1st Cir.2002); *United States v. Stewart*, 185 F.3d 112 (3d Cir. 1999); *United States v. Tencer*, 107 F.3d 1120 (5th Cir.1997)). From these cases, Defendant identifies three recurring threads: (1) "merely pooling tainted and

untainted funds in an account does not, without more, render that account subject to forfeiture," Defense Motion at 9 (quoting *Tencer*, 107 F.3d at 1134); (2) an account containing tainted and untainted funds is forfeitable in its entirety only if the government proves "the defendant ... pooled the funds to disguise the nature and source of his scheme," Defense Motion at 9 (quoting *Tencer*, 107 F.3d at 1135); and (3) "forfeiture of the entirety of an account is not appropriate when the amount of laundered money traceable to that account can be readily determined." Defense Motion at 9 (citing *Stewart*, 185 F.3d at 129). Defendant acknowledges that Castlerock was funded by tainted and untainted money, like the commingled accounts in the cases he cites. But Defendant further argues that he engaged in "no complicated transfers of money designed to disguise the source of the funds" and that the laundered money spent toward Castlerock is easily traceable. Defense Motion at 9. Therefore, treating Castlerock as equivalent to commingled bank accounts, it is subject to forfeiture only to the degree associated with the laundered funds.

The court finds Defendant's analogy to be flawed. It is true that the laundered money that benefitted Castlerock is traceable and divisible from Defendant's untainted funds. *See* Government Exhibit 70 ($50,000 check from Wheeler to Angelwing); Government Exhibit 67 (showing a $50,000 deposit into Angelwing account); Government Exhibit 130 ($44,831.10 check from Angelwing to Abode Construction for work done on Castlerock); *see also* Government Exhibit 86 ($75,000 check from the Cooks to Angelwing); Government Exhibit 85 (showing a $75,000 deposit into Angelwing account); Government Exhibit 87 (showing a $65,472.02 withdrawal to close the Angelwing account); Government Exhibit 92 (showing a $65,472.02 deposit into the bank account opened in Defendant's mother's name); Government Exhibit 93

($16,058 check from the bank account in Defendant's mother's name paid toward the CSB loan); Government Exhibit 131 ($16,303.50 check from the bank account in Defendant's mother's name paid to Abode Construction for work done on Castlerock); *see also* Government Exhibit 28 (tracing various monetary transactions involving Defendant). However, as the court concluded above, Castlerock is subject to forfeiture due to Defendant's use of laundered funds to pay on the CSB loan and make improvements to the property. Thus, it is not simply the traceability and divisibility of the funds that are at issue, but the traceability and divisibility of Castlerock itself. And unlike situations where laundered funds are deposited into a commingled bank account such that each deposit of laundered funds can be divided from each deposit of untainted funds, there is no such mechanism for dividing portions of Castlerock funded by laundered funds from those funded by untainted funds. *See United States v. Hull*, 606 F.3d 524, 529 (8th Cir.2010) (discussing circuit precedent prohibiting district courts from subdividing real property subject to forfeiture). Here, Defendant used laundered funds to make a $16,058 payment toward the consolidated loan financing Castlerock, which was secured by the entire property. Likewise, testimony from the forfeiture hearing established that Defendant used laundered funds—vis-a-vis payment of the Abode Construction invoices—to make improvements upon both parcels making up the property. Accordingly, the entire property is subject to forfeiture.

### D. Double Counting

■ Defendant argues that, even if the court otherwise finds Castlerock subject to forfeiture on Counts 4 and 7, the forfeiture amounts to double and triple counting when combined with the additional forfeiture of the proceeds of Defendant's wire

fraud, because the funds associated with the wire fraud were the same funds that were ultimately laundered and paid toward Castlerock. *See* Defense Brief at 17.

To support this argument, Defendant relies on *United States v. Genova*, 333 F.3d 750 (7th Cir.2003), wherein the Seventh Circuit interpreted the forfeiture provision of the "Racketeering Influenced and Corrupt Organizations Act" ("RICO"). *Genova*, 333 F.3d at 760–63. In *Genova*, the Seventh Circuit addressed the issue of whether it was permissible to order the defendant to forfeit both the funds he received as unlawful kickbacks and his home, improvements on which were assumed to be partially paid for with unlawful funds. *Id.* at 762. The Seventh Circuit ultimately concluded that, while the unlawful kickbacks "could be *traced* to the home," ordering forfeiture of the tainted funds "once as cash and a second time as building materials [was] double counting" and was impermissible. *Id.* Defendant relies on this holding to argue that ordering forfeiture of "the ·$125,000 obtained from the Wheelers and the Cooks through fraud cannot be forfeited both as cash and as improvements to real property." Defense Motion at 18.

Two observations warn against reading *Genova* as applicable to this case. First, the Seventh Circuit's analysis operated under the framework of RICO's forfeiture provision, rather than 18 U.S.C. § 982(a)(1). As such, even though it identified that the bribes could be "traced" to the home—consistent with the "traceable" language of § 982(a)(1)—the Seventh Circuit, in fact, sought to determine "how much of this value [the improvements to the home] represent[ed] 'proceeds' of crime." *Genova*, 333 F.3d at 762. Forfeiture of the "proceeds" of crime corresponds with RICO forfeiture, but not with criminal forfeiture under § 982(a)(1); likewise, forfeiture of property "traceable to"

property involved in a crime corresponds with § 982(a)(1), but not with RICO forfeiture. *Compare* 18 U.S.C. § 1963(a)(3) (requiring forfeiture of, among other unlawful gains, "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity"), *with* 18 U.S.C. § 982(a)(1) (requiring forfeiture of "any property, real or personal, involved in such offense, or any property traceable to such property"). Given the mutual exclusion of the "proceeds" and "traceable" analyses, combined with the plain meanings of the terms—which imply a broader reach for something that is "traceable"—the court is reluctant to treat *Genova's* holding as to the double counting of "proceeds" as persuasive authority for the instant issue of "traceability."

The second significant distinction between *Genova* and the instant case is that, in *Genova*, RICO forfeiture was warranted based solely on the defendant's acts of mail fraud. *See Genova*, 333 F.3d at 759 (stating that "[w]hether Genova's RICO conviction is tenable depends on the mail fraud convictions (and the predicate acts based on mail fraud)" after concluding that other alleged racketeering acts could not support a RICO conviction). Therefore, the double counting problem arose in a situation where the district court ordered multiple forfeitures based on a single fraudulent scheme. Here, however, the court does not double count because it does not order forfeiture of both cash and Castlerock based solely on Defendant's fraudulent scheme. Instead, the court orders forfeiture of $125,000 in tainted funds based on Defendant's fraudulent scheme and orders forfeiture of Castlerock based on Defendant's money laundering.

In an unpublished opinion, the Second Circuit applied § 982(a)(1) to the same offenses on which Defendant was convicted,

and it addressed a similar double counting argument:

> [The defendant] argues that the District Court erred in ordering the forfeiture of certain funds twice—once as proceeds of mail and wire fraud and once as property involved in money laundering. We disagree. Criminal forfeiture is a form of punishment. . . . [The defendant's] fraud and money laundering are two offenses impacting two distinct sets of victims. "The 'victims' of fraud counts are those persons who have lost money or property as a direct result of the fraud. The 'victim' of money laundering is, by contrast, ordinarily society at large." *United States v. Napoli*, 179 F.3d 1, 7 (2d Cir.1999) (internal citation omitted). [The defendant] does not deny that he is subject to separate sentences for the fraud counts and the money laundering counts; consequently, the proceeds of those crimes are subject to separate orders of forfeiture.

*U.S. v. Schlesinger*, 261 Fed.Appx. 355, 361 (2d Cir.2008). The court finds *Schlesinger* far more analogous to the instant case than *Genova* and finds its rationale more persuasive. The Second Circuit effectively concluded that no double counting exists when forfeiture is increased to account for multiple offenses causing distinct harms. This echoes the framework applicable to double counting in other contexts. *See, e.g., United States v. Myers*, 598 F.3d 474, 476 (8th Cir.2010) (finding double counting in the sentencing context only where factors "increase a defendant's punishment on account of a kind of harm that *has already been fully accounted for*" (emphasis added)). Because forfeiture is a form of punishment, and because each of Defendant's offenses caused a distinct harm to be accounted for, the court concludes that ordering forfeiture of both the defrauded funds and the real property paid for and improved upon by laundering those funds does not amount to impermissible double counting.

### E. Excessive Fines Clause

■ Concluding that the entirety of Castlerock is subject to forfeiture does not end the forfeiture analysis. Forfeiture ordered pursuant to § 982(a)(1) must comport with the requirements of the Eighth Amendment's Excessive Fines Clause. *See United States v. Bajakajian*, 524 U.S. 321, 324, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).

■ The Excessive Fines Clause of the Eighth Amendment provides that "excessive fines [shall not be] imposed." U.S. Const. Amend. VIII. The Clause "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Bajakajian*, 524 U.S. at 328, 118 S.Ct. 2028 (quoting *Austin v. United States*, 509 U.S. 602, 609–10, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)) (internal quotation marks omitted). "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334, 118 S.Ct. 2028. As such, criminal forfeiture "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.*

■ In the Eighth Circuit, this analysis has two steps. First, "the defendant has the initial burden of making a prima facie showing of gross disproportionality." *United States v. Dodge Caravan Grand SE* ("*Dodge Caravan*"), 387 F.3d 758, 763 (8th Cir.2004) (quoting *United States v. Premises Known as 6040 Wentworth Ave. S., Minneapolis, Hennepin Cty, Minn.* ("*6040 Wentworth Ave. S.*"), 123 F.3d 685, 688 (8th Cir.1997)). Second,

"[i]f the claimant can make this showing, the court considers whether the disproportionality 'reach[es] such a level of excessiveness that injustice [of] the punishment is more criminal than the crime.'" *Id.* (quoting *6040 Wentworth Ave. S.*, 123 F.3d at 688) (second alteration in original). In its disproportionality analysis, the court must consider "the extent and duration of the criminal conduct, the gravity of the offense weighed against the severity of the criminal sanction, and the value of the property forfeited." *Id.* (quoting *United States v. Bieri*, 68 F.3d 232, 236 (8th Cir. 1995)). In addition, the court may consider other factors it deems relevant. *See id.* (listing other permissible factors to consider).

A 2010 appraisal of Castlerock determined its value to be $640,000. *See* Government Exhibit 10 at 3 (reflecting a $315,000 value for the residential lots plus a $325,000 value for the surrounding undeveloped land).[6] Counts 4 and 7 involved $110,303.12 in laundered funds. *See* Second Superseding Indictment ¶¶ 8, 14. Defendant spent $77,192.60 of those funds toward Castlerock. *See* Government Exhibits 93, 130, 131. The proportionality analysis compares the amount of forfeiture to "the gravity of the *offense*." *See Hull*, 606 F.3d at 529 (quoting *Bajakajian*, 524 U.S. at 334, 118 S.Ct. 2028) (emphasis added). In other words, it is Defendant's money laundering—the offense Defendant committed—that is relevant to the proportionality analysis, and not the degree that the mon-

ey laundering impacted the property forfeited. Therefore, the court will rely on the $110,303.12 in laundered money when assessing the proportionality of Defendant's offense to the forfeiture of Castlerock.

Regarding step one of the two-step proportionality analysis, the court notes that Defendant makes no prima facie showing of gross disproportionality insofar as he does not raise the issue in his brief. *See generally* Defense Brief. Because Defendant has failed to make a prima facie showing under step one, the court recognizes that he has not triggered step two of the analysis. *See Dodge Caravan*, 387 F.3d at 763 (stating that the court considers disproportionality "[i]f the claimant can make [a prima facie] showing" (emphasis added)). The failure to satisfy step one is likely sufficient to foreclose a finding that the forfeiture is grossly disproportional under the Excessive Fines Clause. Nevertheless, the court shall proceed to consider the issue under step two.

■ First, the extent and duration of Defendant's conduct weighs against a finding of gross proportionality. Defendant's money laundering conduct spanned approximately one year: the conduct associated with Wheeler's funds occurred in November of 2009 and the conduct associated with the Cooks' funds occurred in August of 2010. *See* PSIR ¶¶ 35, 41. Defendant laundered over $100,000 defrauded from two different sources (Wheeler and the Cooks), using two separate bank accounts

---

6. In Defendant's list of assets in the PSIR, Defendant self-reported Castlerock's value to be $432,000. PSIR ¶ 97 (referring to Castlerock as "Land—80 acres"). Although the record is unclear, the court assumes without deciding that the discrepancy reflects the difference between the actual value of Castlerock ($640,000) and Defendant's equity in Castlerock ($432,000). In any event, because the lesser valuation would necessarily result in lesser potential disproportionality, the

court's analysis remains the same under either valuation—$640,000 or $432,000.

The court also notes that, in documents provided to CSB in 2009, Defendant valued Castlerock at $6,634,295. *See* Government Exhibit 47 at 1. The court does not find this valuation to be credible, due to the extreme $6 million discrepancy between it and the formal appraisal conducted only one year later.

(the Angelwing account and the account created in his mother's name) to conduct transactions with the laundered funds. *See id.* Defendant's conduct also reflects an escalation of his criminal behavior. In 2009, Defendant laundered approximately $45,000 through his own investment company's account and made a single payment with the laundered funds to Abode Construction. In 2010, he laundered a greater amount of money (approximately $65,000) through a newly created account (purportedly belonging to his mother) and made two payments with the laundered funds, one to Abode Construction and the other to CSB.

Second, balancing the severity of the sanction and the gravity of the offense further weighs against a finding of gross proportionality. The Supreme Court has identified each of the following as relevant to the gravity of an offense: the relationship to other unlawful activity, the punishment authorized by law and the harm caused by the offense. *See Bajakajian*, 524 U.S. at 337–39, 118 S.Ct. 2028; *see also Dodge Caravan*, 387 F.3d at 763 (permitting inquiry into a defendant's culpability and other similar factors). Here, Defendant obtained the laundered funds through other unlawful activity, namely fraud, which he perpetrated by exploiting the trust of former clients from his prior career as an investment advisor. The maximum authorized fines for the money laundering violations are $250,000 for the conduct alleged in Count 4 and $500,000 for the conduct alleged in Count 7. 18 U.S.C. § 3571 (setting a $250,000 fine for individuals convicted of a felony offense, unless a specific fine is authorized by the statute defining the offense); 18 U.S.C. § 1956 (setting "a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater" for the offense charged in Count 4). Although statutory fines cannot trump the constitutional inquiry, forfeiture of the

$640,000 property presumptively complies with the Excessive Fines Clause because it abides by the statutory scheme permitting a net fine of not more than $750,000—$250,000 for Count 4 and $500,000 for Count 7. *Cf. United States v. Aleff*, 772 F.3d 508, 513 (8th Cir.2014) (finding a monetary sanction that was "about 4.3 times the actual damages" was not grossly disproportional where it was within the statutory limits); *Hull*, 606 F.3d at 529 ("Our court has said that if the value of forfeited property is within the permissible range of fines under the sentencing guidelines, then it is presumptively not excessive." (internal quotation marks and citation omitted)). Lastly, money laundering inflicts significant harm on society as a whole because it attempts to legitimize criminally obtained funds and impedes law enforcement. *See e.g., United States v. Martin*, 320 F.3d 1223, 1227 (11th Cir. 2003). While the forfeiture of property valued at $640,000 is certainly a severe sanction, these relevant characteristics of Defendant's conduct establish that the severity of the sanction does not outweigh the gravity of the offense.

Third, the $640,000 value of Castlerock does not, in itself, favor a finding of gross disproportionality. While $640,000 is a substantial figure, so too is Defendant's offense a serious one, as noted above. Further, greater forfeitures and fines have been found not to be grossly disproportional where the gravity of the offense corresponds with the severity of the sanction. *See, e.g., Aleff*, 772 F.3d at 513 (finding a $1.3 million fine was not grossly disproportional); *United States v. Sigillito*, 899 F.Supp.2d 850, 866–68 (E.D.Mo.2012), *aff'd*, 759 F.3d 913 (8th Cir.2014) (finding a $51,568,087.17 forfeiture was not grossly disproportional).

Thus, the court finds that Defendant has failed to make a prima facie showing of

gross disproportionality. However, even if Defendant did make such a showing, the court is satisfied that forfeiture of Castlerock is not grossly disproportional to the gravity of the offense and, accordingly, does not run afoul of the Excessive Fines Clause of the Eighth Amendment.

### V. CONCLUSION

For the foregoing reasons, the court finds by a preponderance of the evidence that the requisite nexus has been established between Defendant's money laundering convictions, Counts 4 and 7, and the entirety of Castlerock. Additionally, the court finds that ordering forfeiture of Castlerock does not amount to double counting and does not violate the Excessive Fines Clause of the Eighth Amendment. Accordingly, the court **ORDERS** that Castlerock be forfeited.

**IT IS SO ORDERED.**

**DISABILITY SUPPORT ALLIANCE and Scott Smith, Plaintiffs,**

v.

**GELLER FAMILY LIMITED PARTNERSHIP III, Defendant.**

Civil No. 15-3714 (JNE/JJK)

United States District Court, D. Minnesota.

Signed February 3, 2016

Paul R. Hansmeier, Class Justice PLLC, Minneapolis, MN, for Plaintiffs.

Edward P. Sheu, Ashleigh M. Leitch, Sarah E. Crippen, Best & Flanagan LLP, Mpls, MN, for Defendant.

## ORDER

JOAN N. ERICKSEN, United States District Judge

Disability Support Alliance (DSA) and one of its members, Scott Smith, brought

this action against Geller Family Limited Partnership III (Geller). They asserted claims for violations of the Americans with Disabilities Act (ADA) and the Minnesota Human Rights Act (MHRA), as well as a claim for civil damages for bias offenses. The case is before the Court on Geller's Motion to Dismiss Plaintiffs' Complaint, or Alternatively, to Strike Counts II and III of Plaintiffs' Complaint. For the reasons set forth below, the Court dismisses the ADA claim for lack of subject-matter jurisdiction. Because the Court lacks jurisdiction over the ADA claim, the Court cannot exercise supplemental jurisdiction over the remaining claims. The Court dismisses the action without prejudice.

## I. BACKGROUND

The following summarizes the Complaint's allegations. DSA is a Minnesota corporation whose purposes are to eliminate discrimination on the basis of disability and to promote the betterment of the lives of those living with disabilities. Each member of DSA has a disability and lives in Minnesota.

Scott is a member of DSA. He has arthrogryposis and uses a wheelchair for mobility.

Geller is the owner and lessor of real property in Eagan, Minnesota. A multi-tenant commercial building, the Eagan Convenience Center, is located on the property.

On or about April 22, 2015, Smith visited the Eagan Convenience Center. Its tenants included a mattress retailer, a coffee shop, a restaurant, a hair salon, and a mortgage company. Of more than 90 parking spaces in the Eagan Convenience Center's parking lot, Smith found two accessible parking spaces marked with paint and signage and accompanied by an adjacent access aisle. The access aisle was not level; it included a ramp that extended away from the curb and down to the surface of the parking lot.

Smith's car uses a car-top wheelchair carrier. He cannot use the carrier if a vehicle is parked in an adjacent parking spot. A sloped access aisle presents the danger of his wheelchair rolling away during a transfer between his wheelchair and his vehicle. In light of the accessible parking spaces that he encountered at the Eagan Convenience Center, Smith and other members of DSA are allegedly deterred from visiting it. They intend to patronize the Eagan Convenience Center when they learn that it has been made fully accessible to individuals who use wheelchairs for mobility.

Smith and DSA identified two allegedly unlawful physical barriers at the Eagan Convenience Center. First, there were only two accessible parking spaces with adjacent access aisles instead of the four required by the 2010 ADA Standards for Accessible Design (2010 Standards). Second, the access aisle adjacent to the two accessible parking spaces was not level, in violation of the 2010 Standards.

DSA and Smith asserted three causes of action in their Complaint, which they filed in September 2015. Seeking declaratory and injunctive relief, they asserted violations of Title III of the ADA in their first cause of action. Seeking declaratory, injunctive, and monetary relief, Smith and DSA asserted violations of the MHRA in their second cause of action. They sought civil damages for bias offenses in their third cause of action.

## II. DISCUSSION

Citing Rule 12(b)(6) of the Federal Rules of Civil Procedure, Geller asserted that Smith and DSA failed to state a claim for violation of the ADA because they lack standing. "[I]f a plaintiff lacks standing, the district court has no subject matter

jurisdiction. Therefore, a standing argument implicates Rule 12(b)(1)." *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir.2002) (citation omitted).

■■■ "Article III of the U.S. Constitution limits the jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 956 (8th Cir.2015). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The "irreducible constitutional minimum of standing" requires the plaintiff to show he has suffered an injury in fact that is fairly traceable to the challenged conduct of the defendant and that will likely be redressed by a favorable decision. *Id.*; *see Dig. Recognition Network*, 803 F.3d at 956. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir.2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth*, 528 U.S. at 185, 120 S.Ct. 693. Standing is assessed as of the time a lawsuit is commenced. *Iowa League of Cities*, 711 F.3d at 869. As the parties asserting federal jurisdiction, DSA and Smith bear the burden of establishing their standing. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006); *Glickert v. Loop Trolley Transp. Dev. Dist.*, 792 F.3d 876, 880 (8th Cir.2015).

■■■ "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729 n. 6 (8th Cir.1990). In a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Id.* (citation omitted); *see Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir.2015). "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Osborn*, 918 F.2d at 729 n. 6 (citation omitted); *see Branson Label*, 793 F.3d at 914–15.

■■■ Geller asserted a factual attack. It asserted that it had renovated the Eagan Convenience Center's parking lot in June and July 2015, that the renovations were carried out as part of a site modification plan set in place by a conditional use permit that the City of Eagan approved in October 2013, and that the renovations to the parking lot redressed the alleged violations of the ADA identified by Smith and DSA in their Complaint. Declarations attached to Geller's motion support its assertion that the renovations to the Eagan Convenience Center's parking lot in June and July 2015 yielded four handicapped-accessible parking spaces that abut level access aisles. Because it redressed the alleged ADA violations before Smith and DSA commenced this action, Geller asserted that Smith and DSA lack standing to pursue their ADA cause of action.

■■■ Although Smith and DSA did not contest that Geller renovated the Eagan Convenience Center's parking lot after Smith's visit in April 2015, they raised several arguments in opposition to Geller's assertion that they lack standing. First, Smith and DSA asserted that the declara-

tions submitted by Geller failed to establish that the renovations complied with the ADA. Specifically, Smith and DSA contended that the declarations did not address "nearly every single one of [eight] requirements" set forth in the 2010 Standards. The requirements identified by Smith and DSA are (1) minimum width, (2) minimum length, (3) marking/identification requirements, (4) access aisle requirements, (5) required location, (6) maximum slope, (7) minimum vertical clearance, and (8) relationship to accessible routes. DSA and Smith's speculation about ADA violations that might exist in the renovated parking lot is insufficient to satisfy their burden to establish their standing. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) ("It is a long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings,' but rather 'must affirmatively appear in the record.' And it is the burden of the 'party who seeks the exercise of jurisdiction in his favor' 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" (citations omitted)).

Next, Smith and DSA argued that the declarations submitted by Geller demonstrated ongoing violations of the ADA. According to Smith and DSA, the renovated access aisles, which are marked with diagonal striping, lack required "no parking" signage. The 2010 Standards state that "[a]ccess aisles shall be marked so as to discourage parking in them." An advisory note follows the quoted requirement: "The method and color of marking are not specified by these requirements but may be addressed by State or local laws or regulations." To support their assertion that Geller failed to install a required "no parking" sign, Smith and DSA relied on Minnesota Rules, part 1341.0502, which states in part: "Access aisles shall be marked so as to discourage parking in them and be provid-

ed with the designation 'no parking.' The 'no parking' designation shall be provided on a sign centered at the head end of the access aisle ...." An exception, which Geller cited in its reply, provides that "[a] sign indicating no parking shall not be required where the sign would obstruct a curb ramp or pedestrian route. In this case, the no parking designation shall be provided on the surface of the access aisle." That Geller might have violated Minnesota Rules, part 1341.0502, an issue on which the Court expresses no opinion, does not support Smith and DSA's assertion of ongoing ADA violations. *See* 28 C.F.R. § 36.406 ("Unless specifically stated otherwise, the advisory notes, appendix notes, and figures contained in the 1991 Standards and 2010 Standards explain or illustrate the requirements of the rule; they do not establish enforceable requirements.").

Third, Smith and DSA asserted that Geller's motion is premature. The Court disagrees. *See Johnson v. United States*, 534 F.3d 958, 964 (8th Cir.2008); *Osborn*, 918 F.2d at 730.

Finally, Smith and DSA argued that the Eighth Circuit's decision in *Steger v. Franco, Inc.*, 228 F.3d 889 (8th Cir.2000), "holds that [they] have standing to conduct a site inspection of [Geller's] premises and demand removal of the barriers they discover during that site inspection." In *Steger*, one of the plaintiffs, a blind individual, entered the defendant's building to use the restroom. 228 F.3d at 891. After he received directions to it, he was unable to locate the restroom because it was not marked with signage that would identify it to a blind person. *Id.* at 891–92. A couple of months later, he sued the building's owner to bring the building into compliance with the ADA. *Id.* at 891. Almost two years after the action's commencement, the district court heard a motion for a preliminary injunction. *Id.* At the hearing,

the plaintiff's expert testified that she had visited the building approximately eight months after the complaint's filing; that, at the time of her visit, the signage for the restroom that the plaintiff had attempted to use complied with the ADA; and that there were numerous structural barriers that violated the ADA. *Id.* at 892. Concluding that the plaintiff was injured by the signage that was not ADA-compliant and that his injury had been redressed because the signage currently complied with the ADA, the district court dismissed the plaintiff's claim for lack of standing. *Id.* The Eighth Circuit reversed. *Id.* at 893–94. The Eighth Circuit concluded that the plaintiff was injured by the restroom signage that did not comply with the ADA, that he lacked standing to redress ADA violations unrelated to his disability, that the redressability of his injury was not restricted to the restroom's signage, and that he had standing to seek relief for any ADA violations in the building affecting his disability. *Id.*

*Steger* does not confer "standing [on Smith and DSA] to conduct a site inspection" so that they may "demand removal of the barriers they discover during that site inspection." In their Complaint, Smith and DSA identified two alleged violations of the ADA: an insufficient number of accessible parking spaces and an access aisle that was not level. Before Smith and DSA brought this action, Geller had renovated the Eagan Convenience Center's parking lot. The renovations redressed the ADA violations identified by Smith and DSA in their Complaint. Unlike the plaintiff in *Steger*, Smith and DSA identified no other violations of the ADA at the Eagan Convenience Center. *See id.* at 893 ("[T]he redressability of [the plaintiff's] injury is not restricted to the signage at the first-floor men's restroom as [the owner] contends. Although [the plaintiff] was injured by [the owner's] failure to employ ADA-compliant signage, [the plaintiff's expert]

testified that the building contains other violations that could injure blind persons."); *cf. id.* at 892 (stating that "plaintiffs need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying, [but] they must at least prove knowledge of the barriers and that they would visit the building in the imminent future but for those barriers" (citation omitted)). Smith and DSA have not demonstrated a right to discovery. *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1043–44 (9th Cir.2008) ("[W]here a disabled person has Article III standing to bring a claim for injunctive relief under the ADA because of at least one alleged statutory violation of which he or she has knowledge and which deters access to, or full use and enjoyment of, a place of public accommodation, he or she may conduct discovery to determine what, if any, other barriers affecting his or her disability existed at the time he or she brought the claim."). Nor have they adequately supported their request for discovery. *See Johnson*, 534 F.3d at 964–65.

A private party may seek injunctive relief under Title III of the ADA. 42 U.S.C. § 12188(a)(1) (2012); *Stebbins v. Legal Aid of Ark.*, 512 Fed.Appx. 662, 663 (8th Cir. 2013) (unpublished per curiam); *Steger*, 228 F.3d at 892. Because it is not likely that their alleged injury will be redressed by a favorable decision, the Court concludes that Smith and DSA lack standing to assert their ADA cause of action. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Because respondent alleges only past infractions of EPCRA, and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury."); *Cnty. of Mille Lacs v. Benjamin*, 361 F.3d 460, 463 (8th Cir.2004) ("The controversy requirement of the Declaratory Judgment Act is synonymous

with that of Article III of the Constitution.").

In short, DSA and Smith lack standing to assert their ADA claim. Because the Court lacks subject-matter jurisdiction over their ADA claim, the Court cannot exercise supplemental jurisdiction over their state-law claims. *City of Kansas City v. Yarco Co.*, 625 F.3d 1038, 1041 (8th Cir.2010) ("Given the absence of standing on the FHA claim, the state and local claims cannot proceed in federal court. Supplemental jurisdiction requires at least one claim within the district court's original jurisdiction."). Thus, the Court dismisses this action without prejudice. *See Benjamin*, 361 F.3d at 464.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Geller's Motion to Dismiss Plaintiffs' Complaint, or Alternatively, to Strike Counts II and III of Plaintiffs' Complaint [Docket No. 8] is GRANTED.

2. This action is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

**FOX BROADCASTING COMPANY, et al., Plaintiffs,**

v.

**DISH NETWORK LLC, et al., Defendants.**

**Case No. CV 12–4529 DMG (SHx).**

United States District Court, C.D. California.

Signed Jan. 12, 2015.

Filed Jan. 20, 2015.

Amy M. Gallegos, Andrew Jackson Thomas, David R. Singer, Richard Lee Stone, Jenner and Block LLP, Los Angeles, CA, for Plaintiffs.

Jeremiah J. Burke, Susan K. Jamison, Coblentz Patch Duffy and Bass LLP, Annette L. Hurst, Orrick Herrington and Sutcliffe LLP, Mark Alan Lemley, Michael H. Page, Durie Tangri LLP, San Francisco, CA, E. Joshua Rosenkranz, Elyse D. Echtman, Lisa T. Simpson, Peter A. Bicks, Orrick Herrington and Sutcliffe LLP, New York, NY, William A. Molinski, Orrick Herrington and Sutcliffe LLP, Los Angeles, CA, for Defendants.

**ORDER RE: PLAINTIFF FOX BROADCASTING COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT DISH NETWORK LLC'S MOTION FOR SUMMARY JUDGMENT [372, 383] [UNDER SEAL]**

DOLLY M. GEE, District Judge.

This matter is before the Court on the parties' motions for summary judgment. The parties appeared for a hearing on their motions on October 17, 2014. The Court has duly considered the parties' written submissions presented in support of and in opposition to the motions, as well as oral argument. For the reasons discussed below, Plaintiffs' motion for partial summary judgment is **GRANTED** in part and **DENIED** in part and Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.

## I.

### PROCEDURAL BACKGROUND

On May 24, 2012, Plaintiffs Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings, Inc. ("Fox") filed a Complaint against Defendants DISH Network LLC, DISH Network Corporation, and EchoStar Technologies LLC ("DISH") alleging copyright infringement and breach of contract. [Doc. # 1.] Specifically, Fox alleged that DISH's PrimeTime Anytime ("PTAT") service and the AutoHop Sling Adapter feature copied and streamed Fox's programming over the Internet in violation of copyright law and DISH's contractual agreements with Fox. [Doc. # 1 at 3–4.]

On August 22, 2012, Fox filed a Motion for a Preliminary Injunction requesting that the Court enjoin DISH from offering, operating, distributing, or selling both the original and current iterations of PTAT and AutoHop. [Doc. # 41.] On November 7, 2012, this Court denied the motion. [Doc. # 109.] Fox appealed the ruling to the Ninth Circuit Court of Appeals. [Doc. # 110.] On February 21, 2013, Fox filed a First Amended Complaint ("FAC") adding DISH's new 2013 services (DISH Anywhere with Sling technology and Hopper Transfers) to the list of offending services. [Doc. # 135.] On February 22, 2013, Fox filed another Motion for Preliminary Injunction seeking to enjoin DISH from offering those additional services. [Doc. # 129.] On September 23, 2013, this Court also denied that motion. [Doc. # 196.] Fox again appealed the decision to the Ninth Circuit. [Doc. # 205.] The Ninth Circuit affirmed both of the District Court's decisions. [Doc.## 218, 356.]

On August 22, 2014, Fox moved for partial summary judgment on its claims that

DISH (1) is infringing Fox's exclusive right to publicly perform its copyright works by streaming them over the Internet using DISH Anywhere; (2) is breaching the 2010 Letter Agreement by retransmitting Fox's programming over the Internet using DISH Anywhere; (3) is breaching the parties' 2002 Retransmission Consent Agreement ("2002 RTC Agreement") by distributing Fox's programming on a "video-on-demand or similar basis" using PTAT; (4) is breaching the parties' 2002 RTC Agreement by authorizing DISH's subscribers to copy Fox's programming for viewing outside their homes with its Hopper Transfers service; (5) breached the 2002 RTC Agreement by making copies of Fox's programming in connection with the operation of the AutoHop service; and (6) infringed Fox's exclusive right to reproduce its copyrighted works by making copies of Fox's programming in connection with the operation of the AutoHop service. [Doc. ## 383, 439, 479.] DISH moves for summary judgment on all of Fox's copyright and contract claims. [Doc.## 372, 373, 495.]

## II.

### *FACTUAL BACKGROUND*[1]

#### A. The Parties and Affiliates

Fox is one of the four major commercial networks that broadcast television over the airwaves in the United States. Declaration of Michael Biard in Support of Plaintiffs' Opposition to Defendants' Mo-

tion for Summary Judgment ("Biard Opp. Decl.") at ¶ 4. [Doc. # 535.] In addition to broadcasting the Fox programs over the airwaves, Fox enters into retransmission consent ("RTC") agreements with various cable television systems, satellite television services, and other multichannel video programming distributors ("MVPDs") such as DISH, which retransmit Fox's broadcast signal and the Fox programs to their subscribers. Declaration of Sherry Brennan in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Brennan Decl.") at ¶ 11. [Doc. # 537.] Fox separately licenses to cable, satellite, and other MVPD service providers the right to air video-on-demand ("VOD"). *Id.* at ¶ 17(a). Fox also enters into agreements with companies like Hulu, Netflix, Amazon, and Apple to offer the right to stream Fox programming to subscribers over the Internet on their computers and mobile devices, with or without commercials, depending on the nature of the licensing agreement and the user's subscription. *Id.* at ¶ 17(b)-(g). Fox also licenses older seasons of its programming to subscription VOD services such as Netflix and Amazon Prime. Defendants' Reply to Plaintiffs' Statement of Additional Facts ("DISH Reply SAMF") at ¶ 25. [Doc. # 522].

Fox holds the copyright for many of the programs broadcast on the Fox Network, including *American Dad, Bob's Burgers, Family Guy, Glee, King of the Hill, New Girl, The Simpsons,* and *Sleepy Hollow,* among others.[2] Defendants' Statement of

---

1. The Court sets forth the material facts and views all reasonable inferences to be drawn from them in the light most favorable to the non-moving party. The facts presented are materially uncontroverted, unless otherwise indicated. In addition, both sides make numerous evidentiary objections. The Court addresses the objections only where it relies on the evidence as to which objections have been interposed.

2. DISH disputes this fact, stating that "Fox has never claimed to own the copyrights in all programs broadcast on its network, and the McGuire Declaration does not provide evidence that it does own copyrights in all such programs (or even direct evidence of ownership of any of them)." DISH GDMF at ¶ 1. Exhibit A to the McGuire Declaration includes numerous copyright registrations for Fox shows owned by Fox. There is no genuine

Genuine Disputes and Undisputed Facts in Support of Opposition to Plaintiffs' Partial Motion for Summary Judgment ("DISH GDMF") at ¶ 1 [Doc. # 456.]; Declaration of Mary McGuire in Support of Plaintiffs' Motion for Partial Summary Judgment at ¶¶ 2, 7–8, Ex. A. [Doc. # 387.]

The majority of Fox's revenues come from advertising sales. DISH Reply SAMF at ¶ 27. To maintain ratings and launch new programs, Fox engages in substantial self-promotion and advertising for its own programs. *Id.* at ¶ 36. Over the past fiscal year, 14% of the total commercial spots that appeared during Fox Network programming were Fox Network's own advertisements. *Id.* at ¶¶ 40–41. Fox itself is, in fact, the single largest advertiser on the Fox network. *Id.* Fox owns the copyrights for the clips from Fox programs used in these promotional advertisements. *Id.* at ¶ 39; Declaration of Mary McGuire in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at ¶¶ 8–9. [Doc. # 437–1.]

DISH is the nation's third-largest pay television provider, delivering satellite services to millions of households nationwide. Defendants' Reply to Plaintiffs' Statement of Genuine Disputes of Material Fact in Support of Motion for Summary Judgment ("DISH Reply GDMF") at ¶ 120. [Doc. # 521]. DISH is currently a party to RTC Agreements with each of the four major broadcast television networks, including Fox, which allows it to retransmit the content shown on the local affiliate stations that are owned and operated by those networks. Declaration of David Shull in Support of Defendants' Motion for Summary Judgment ("Shull Decl.") at ¶ 10.

[Doc. # 499.] DISH pays [Redacted] dollars each year for those rights. *Id.* DISH has offered its subscribers Digital Video Recording ("DVR") since May of 1999. Declaration of Dan Minnick in Support of Defendants' Motion for Summary Judgment ("Minnick Decl.") at ¶ 5. [Doc. # 501.]

EchoStar Technologies LLC ("EchoStar") is a technology vendor closely affiliated with DISH that, among other things, supplies DISH with satellite television and retransmission services, the set-top boxes ("STBs") and DVRs that DISH sells and leases to its customers, and technology support service. Minnick Decl. at ¶ 1. EchoStar is not the same entity as EchoStar Satellite Corporation, DISH's predecessor. *See* n. 3, *infra.* DISH has a "SlingService Services Agreement" with Sling Media, Inc., which is owned by EchoStar. DISH GDMF at ¶ 34.

### B. The Agreements

Under Fox and DISH's agreements, DISH has the right to retransmit Fox programming to its subscribers via satellite. DISH Reply GDMF at ¶ 129. DISH's right to broadcast Fox programming by satellite is governed by an RTC Agreement entered into by the parties[3] on July 1, 2002 (the "2002 RTC Agreement") that has subsequently been amended and extended numerous times (in 2004, 2005, 2006, 2007, 2009, and 2010). Shull Decl., Ex. 1 [Doc. # 499–1]; Biard Opp. Decl. ¶ 11, Ex. 15.

#### 1. The 2002 RTC Agreement

The relevant provisions of the 2002 RTC Agreement are:

---

dispute as to the fact that Fox holds the copyright for many of the programs shown on the Fox Network.

3. The 2002 RTC Agreement is between Fox Television Holdings, Inc., Fox/UTV Holdings,

Inc., and EchoStar Satellite Corporation. Shull Decl., Ex. 1. DISH is the successor to EchoStar for the 2002 Agreement to the extent that the Agreement remains in effect. Fox GDMF at ¶ 131.

2. Retransmission Consent.... [Redacted]

3(d). *Carriage of Stations* ... [DISH] acknowledges that it shall have no right to distribute all or any portion of the programming contained in any Analog signal on an interactive, time-delayed, video-on-demand or similar basis; *provided* that Fox acknowledges that the foregoing shall not restrict [DISH's] practice of connecting its Subscribers' video replay equipment.

9(a). *Copyright and Trademark Licenses* ... "[DISH] shall not, for pay or otherwise, record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission of any portion of any Station's Analog Signal without prior written permission of the Station, except as is specifically permitted by this Agreement."

## 2. The 2004 Agreement

On October 1, 2004, the parties entered into another agreement (the "2004 Agreement"). Shull Decl. ¶ 17, Exh. 2. The relevant provision of that Agreement is:

29. Limitation of Liability ... [Redacted]

## 3. The 2010 Letter Agreement

The 2002 RTC Agreement was amended most recently in a Letter Agreement in 2010 (the "2010 Letter Agreement"). Dish Reply GDMF at ¶ 141; Shull Decl., Ex. 3. The relevant provisions of the 2010 Letter Agreement are as follows:

**Other Technologies.** [Redacted]

\* \* \*

3. a). **FOX Video ON Demand (SD and HD)** ... [Redacted]

\* \* \*

4. DISH will disable fast forward functionality during all advertisements; [Fox] and DISH may include a pre-roll announcement prior to each show regarding the fast-forward disabling. DISH and [Fox] will discuss in good faith the timing of DISH's implementation of such fast-forward disabling and messaging to consumers; provided that DISH acknowledges and agrees that such fast-forward disabling is a necessary condition to distribution of the Fox broadcast content via VOD.[4]

\* \* \*

5. At no time during the Term may any of the Fox Parties or DISH take any action whatsoever intended to frustrate or circumvent, or attempt to frustrate or circumvent, the protections granted to the other Party pursuant to any provision in this Letter Agreement.

The 2010 Letter Agreement contains a merger clause stating that the Letter Agreement "constitutes the entire understanding between the Parties concerning the subject matter of this Letter Agreement." 2010 Letter Agreement at ¶ 13. It also states that "this Letter Agreement sets forth the complete understanding among the Parties with respect to Retransmission Consent and DISH's distribution of the Services" and that "[t]his Letter Agreement will not operate as a modification, limitation or waiver of any provision of the Continuing Agreements." *Id.* at ¶¶ 10–11.

## 4. Choice of Law

All of the agreements at issue have choice-of-law provisions. The 2002 RTC Agreement states that "[t]his Agreement shall be governed by and construed under

---

4. According to David Shull, DISH's Chief Commercial Officer and Executive Vice President, DISH has not taken advantage of this option to offer Fox VOD because of technical difficulties in implementing the disabling of fast-forwarding functionality. Shull Decl. at ¶ 20.

and in accordance with the laws of that State of Colorado." 2002 RTC Agreement at ¶ 18. The 2004 Agreement states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York." 2004 Agreement at ¶ 30. The 2010 Letter Agreement incorporates the New York choice-of-law provision of the 2004 Agreement. 2010 Letter Agreement at ¶ 11.

Although the 2002 RTC Agreement states that Colorado law shall apply—and no choice-of-law principle contravenes that express designation—both sides have briefed the issues at all stages of the proceedings on the assumption that New York law applies to each of the agreements. Because Colorado law is substantively different from New York law, particularly with respect to the types of damages available for a breach of contract, it would be prejudicial to the parties to apply Colorado law without any briefing on Colorado law. The Court therefore applies New York law to construe the 2002 RTC Agreement because, through their course of conduct, the parties appear to have waived the provision of the 2002 RTC Agreement that specifies that Colorado law shall apply. *See Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1267 (9th Cir.2006) (California law applied in spite of a Massachusetts choice-of-law clause provision because "the parties through their course of conduct have waived the provision of the agreement that specifies the application of Massachusetts law.").

## C. The Challenged Products and Features

### 1. The Hopper and the Hopper with Sling

In January of 2012, DISH announced the Hopper "Whole Home" High Definition DVR to its subscribers. Minnick Decl. at ¶ 12. One year later, in January of 2013, DISH debuted the "Hopper with Sling," which is DISH's next-generation Hopper. Minnick Decl. at ¶ 13; Fox GDMF at ¶ 76. The new Hopper includes a faster processor, built-in wireless capability, built-in Sling functionality, PTAT with AutoHop, and Hopper Transfers. Fox GDMF at ¶ 78. Sling and Hopper Transfers were new features first introduced at that time. Declaration of David Kummer In Support of Defendants' Motion for Summary Judgment ("Kummer Decl.") at ¶ 14. [Doc. # 500.]

### 2. Sling Technology

DISH offers various products, including the "Hopper with Sling," that make use of "Sling" technology. DISH Reply GDMF at ¶ 157; Kummer Decl. at ¶ 5. Sling technology allows consumers to view television content from their home STBs over the Internet by use of a device that communicates using Internet protocols, such as a laptop, tablet, or smartphone. DISH Reply GDMF at ¶ 85.

Sling technology involves the use of both hardware and software. DISH Reply GDMF at ¶ 86. The Sling hardware is a computer chip that rapidly "transcodes" small packets of audiovisual data from either the live satellite signal coming off of the Hopper tuner or from a pre-existing Hopper DVR recording. *Id.* at ¶ 87. Using the Sling hardware together with the Sling software loaded on a tablet, smartphone, laptop, or personal computer, the subscriber can send the television content to herself to watch in another location. *Id.* at ¶ 85. Sling can only be used by a subscriber to gain access to her own home STB/DVR and the content on that box, either live or recorded. DISH Reply Fox GDMF at ¶ 90. The programming content to which DISH subscribers have access using Sling is that which they have already received via their DISH subscription. *Id.* at ¶ 105.

DISH has a "SlingService Services Agreement" with Sling Media, Inc., which is owned by EchoStar. DISH Reply SAMF at ¶ 141. [Redacted] *Id.* at ¶ 143. [Redacted] *Id.* at ¶ 146. [Redacted] *Id.* at ¶ 147. [Redacted] *Id.* at ¶ 148.

It is undisputed that the Sling process or architecture that enables DISH subscribers to watch live TV on DISH Anywhere requires the operation of various servers and equipment located outside the home. *Id.* at ¶ 149. The parties dispute whether, when a subscriber requests television content using DISH Anywhere, the programming travels entirely "point-to-point" over the Internet or home WiFi from the subscriber's STB to her Internet-connected device without any assistance from DISH's, EchoStar's, or Sling Media's external equipment and technicians, or whether that external equipment and those technicians are necessary for DISH Anywhere to function. *See* DISH Reply GDMF at ¶¶ 88–89, 91–92; DISH GDMF at ¶¶ 35–55. For example, in his August 15, 2014 Deposition, David Kummer, EchoStar's Chief Technology Officer and Rule 30(b)(6) witness, agreed that [Redacted] Declaration of Amy M. Gallegos in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Gallegos Opp. Decl."), Ex. 28, Transcript of August 15, 2014 Deposition of David Kummer ("Kummer Tr.") at 49:24–50:2. [536–1.] [Redacted] Kummer also stated that [Redacted] *Id.* at 114:17–22. In his October 17, 2014 Declaration, however, Kummer stated that [Redacted] Kummer Decl. at ¶ 30. He also stated that, "[t]he audio/video content on the STB travels point-to-point from the source to the consumer's Internet-connected device using standard TCP/IP and UDP/IP communication point-to-point protocol, through whichever Internet service provider (or providers) the consumer is using in each location." *Id.* at ¶ 28. "Directions from the customer for channel changes and fast-forward or rewind functionality also travel point-to-point, without any interaction from Sling." *Id.* [Redacted] *Id.*

It is undisputed that [Redacted] [5] DISH Reply GDMF at ¶ 93; Kummer Decl. at ¶¶ 26, 28–29 [Redacted]

### 3. DISH Anywhere

DISH Anywhere refers to Sling technology that enables subscribers who have either a Hopper with Sling or a Sling Adapter to access live and recorded programming from their STBs remotely on computers and mobile devices. DISH Reply SAMF at ¶¶ 121, 133; Fox GDMF at ¶ 85; Shull Decl. at ¶ 32. In its quick-start features guide for the Hopper with Sling, DISH states that "[o]nly Dish Anywhere lets you access all of your live TV channels … while on the go via your Internet-connected smartphone, computer, or tablet." DISH Reply SAMF at ¶ 121.

To use DISH Anywhere, a subscriber must either log in to DISHAnywhere.com on a personal computer and download a browser extension called SlingPlayer or download the free DISH Anywhere app for a tablet or smartphone. DISH Reply SAMF at ¶ 135. The subscriber may then send herself live or recorded television on her computer or mobile device. *Id.* at ¶ 135. When a DISH subscriber logs into the DISH Anywhere website and clicks "Live TV," she will see a progress bar that shows the process of sending the video to the transcoder, starting to transcode, sending the information to the client, buffering it, and then starting to display it to the end user. *Id.* at ¶ 133.

---

**5.** DISH disputes this fact stating that the "characterization of a 'Dish Anywhere video stream' is disputed, because the video comes from the subscriber's Sling-enabled home STB, not DISH Anywhere, and is initiated by the subscriber, at the subscriber's direction." DISH GDMF at ¶ 44. This does not create a genuine dispute as to the fact that [Redacted]

A subscriber need only create an online ID and download the SlingPlayer once. *Id.* at ¶ 137. A subscriber who is not in good standing with DISH because she has not paid her bill (or multiple bills) cannot use the Hopper with Sling to activate DISH Anywhere. DISH GDMF at ¶ 20.

DISH subscribers can *stream* certain live programming (as opposed to viewing via a Sling-enabled STB, as described above) of certain cable television networks—but *not* Fox programming—on the DISHAnywhere.com website under the "Shows" tab. DISH GDMF at ¶ 198; DISH Reply SAMF at ¶ 140. The networks available for live streaming include USA, MSNBC and others, but not Fox. *Id.* at ¶ 139. This programming stream does originate from centralized servers, but does not involve Sling technology or require a Sling-enabled STB. Kummer Opp. Decl. at ¶ 24.

### 4. Hopper Transfers

The Hopper with Sling incorporates a feature originally called Hopper Transfers, now incorporated within the DISH Anywhere mobile application ("app"). Declaration of Paul Horowitz in Support of Defendants' Motion for Summary Judgment ("Horowitz Decl.") at ¶ 122. [Doc. # 504.] Hopper Transfers is a feature that allows DISH subscribers, using the DISH Anywhere app, to copy recordings that are saved on their Hopper DVRs to their mobile devices and play them back at any location, even if the mobile device is not connected to the Internet. DISH Reply GDMF at ¶ 107. Copies on the mobile device will not play if the device has not contacted the DISH Anywhere site for 30 days. *Id.* at ¶ 111. [Redacted] DISH Reply SAMF at ¶ 315. There are some types of DVR recordings that can only be transferred once (*i.e.*, HBO content), after which the original recording will be deleted from the Hopper. *Id.* at ¶ 313.

### 5. PTAT with AutoHop

#### a. PTAT

The Hopper with PTAT was first announced on January 9, 2012, and first became available to subscribers on March 15, 2012. FOX GDMF at ¶ 6. A subscriber may use PTAT to set a single timer on the Hopper to record all of the primetime programming shown on any or all of the four major broadcast networks any or all nights of the week. DISH Reply GDMF at ¶ 13;[6] Minnick Decl. at ¶ 24.

The PTAT recordings are made in approximately three-hour blocks, depending on the night, and not on a show-by-show basis. DISH Reply GDMF at ¶ 20.[7] If a primetime show is preempted by local breaking news or a Presidential address, the Hopper will record exactly what is aired during primetime in that local television market. DISH Reply GDMF at ¶ 22.

Recordings made with the PTAT feature will be saved for up to eight days and will

---

**6.** Fox disputes this fact stating that, "[b]y default, every day of the week is selected to be recorded. PTAT users only have the ability to de-select which nights of the week to record within the parameters set by Dish, [Redacted]" DISH Reply GDMF at ¶ 13. This does not create a genuine dispute as to the fact that subscribers can choose which nights of the week to record on any or all of the four major broadcast networks.

**7.** Fox disputes this fact, stating that "EchoStar designed the PTAT software to identify as

'Prime Time' any program that is fifty percent within the 'PrimeTime Anytime Window.' If a primetime show on any one of the big four networks is marked as a PTAT recording but extends beyond the primetime window, PTAT will continue to record all four networks until the end of the last event." DISH Reply GDMF at ¶ 20. This does not create a genuine dispute as to the fact that recordings are made in *approximately* three-hour blocks, or that they are not on a show-by-show basis.

be deleted after that time, unless the subscriber decides to save the PTAT recording for a longer period of time in her "My Recordings" folder. DISH GDMF at ¶¶ 63–64; DISH Reply GDMF at ¶ 14. The PTAT recording settings cannot be changed while the recordings are in progress, or fifteen minutes before the PTAT recordings are scheduled to begin. DISH Reply SAMF at ¶ 203.

### b. AutoHop

The AutoHop feature of PTAT was announced and first provided to DISH subscribers on May 10, 2012. Fox GDMF at ¶ 46. Using AutoHop, users can choose to automatically skip commercials while playing back certain recorded shows. *Id.* at ¶ 65.

AutoHop works when an announcement file is sent from DISH to the user's STB with a timestamp for the end of each program segment and the beginning of the next. DISH Reply GDMF at ¶ 65.

If AutoHop is available for a recorded program, an "Enable AutoHop" pop-up screen appears that states, "You can automatically hop over this event's commercial breaks. Would you like to enable AutoHop for this event?" Fox GDMF at ¶ 49. If the user clicks "yes," she can watch the recorded show without the commercials. *Id.* at ¶ 51. At the end of each segment of a show, when a viewer would ordinarily see a commercial break, the recording will automatically skip ahead to the beginning of the next show segment. *Id.* The commercials are not removed from the recordings viewed with AutoHop, and the recorded files are not altered in any way. *Id.* at ¶¶ 53–54.[8]

### c. The Quality Assurance Copies

Until November 14, 2012,[9] EchoStar employees performed Quality Assurance ("QA") testing on DISH's AutoHop feature before delivering the announcement files to the DISH subscribers' Hoppers to manually confirm the time-stamps in the announcement files. Fox GDMF at ¶ 66; DISH GDMF at ¶ 152; Declaration of Steven M. Casagrande in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Casagrande Opp. Decl.") at ¶¶ 34–35. [Doc. # 457.] EchoStar began testing AutoHop with primetime programming in December of 2008, and by March 17, 2011, EchoStar was testing AutoHop on all primetime events on the four major networks, including Fox. DISH GDMF at ¶¶ 146–47.

The QA Hopper DVRs recorded the full primetime schedule on each major network, including Fox. Minnick Decl. at ¶ 87. The QA copies were used to mark the start and stop time of the show's segments, in order to allow users to skip commercials, and to quality-test the functionality of AutoHop. *Id.* The copies were used exclusively for testing the AutoHop announcement files and never distributed to any customer. Fox GDMF at ¶ 68.[10]

---

**8.** Fox disputes this fact, stating that "AutoHop only works with PTAT, and Dish causes the PTAT copies to be made." Fox GDMF at ¶¶ 53–54. This does not create a genuine dispute as to whether the commercials remain present in the recordings.

**9.** EchoStar used two different types of copies to test and develop AutoHop: copies made using [Redacted] and copies of primetime programming broadcast from Kentucky, Pittsburgh, and Jacksonville, Florida ("Kentucky–Pittsburgh–Jacksonville copies") to test the ef-

fectiveness of the AutoHop marking process. DISH GDMF at ¶¶ 145–152. It is undisputed that EchoStar [Redacted] stopped making the Kentucky–Pittsburgh–Jacksonville copies on November 14, 2012. *Id.* at ¶¶ 149, 152.

**10.** Fox disputes this fact, stating that "[t]he copies made during the quality-assurance process were necessary to ensure the overall function of AutoHop, which is distributed to Dish's subscribers every day." Fox GDMF at ¶ 68. This does not create a genuine dispute

### D. The Market for Fox's Programming [11]

Fox has licensed the right to livestream Fox Network programming over the Internet to certain other MVPDs, including [Redacted] DISH Reply SAMF at ¶ 436. Brennan Decl. at ¶ 16; Declaration of Benjamin (B.J.) Elias in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Elias Opp. Decl.") at ¶ 13. [Doc. # 437–18]. There is a genuine dispute as to [Redacted].[12] *See* DISH Reply SAMF at ¶ 436.

Fox also licenses third parties (such as Apple, Amazon, Vudu, and Microsoft) the right to distribute its programs in a commercial-free, downloadable format, which is typically available the day after a program airs on television and viewable on mobile devices, personal computers, or certain Internet-connected TVs. DISH Reply SAMF at ¶ 23.[13] Fox makes its programs available for free, with commercials, eight days after they air, on approved Internet-streaming websites such as fox.com and

hulu.com. *Id.* at ¶ 24. Viewing is limited to personal computers and the fast forward functionality is disabled during commercials. *Id.* Fox sells advertising for online VOD services where consumers are able to watch a library of previously-aired Fox Programs over the Internet or on mobile devices. *Id.* at ¶ 25.

## III.

### *LEGAL STANDARD*

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *accord Wash. Mut. Inc. v. United States,* 636 F.3d 1207, 1216 (9th Cir.2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris,* 682 F.3d 1144, 1147 (9th Cir.2012) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A

---

as to the fact that the QA copies themselves were not distributed to customers.

11. DISH makes a variety of objections to Fox's market harm evidence on the basis that Fox failed to properly disclose this evidence during the discovery period. *See* Defendants' Evidentiary Objections to Declarations and Exhibits Offered by Plaintiffs in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("DISH Obj. to Evid.") [Doc. # 527]; Defendants' Statement of Correction re: Defendants' Evidentiary Objections to Declarations and Exhibits Offered by Plaintiffs in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Statement of Correction") [Doc. # 556]. On the basis of Fox's responses to evidentiary objections [Doc.## 529, 553] and Fox's Response to the Court's Order Seeking Clarification re: Defendants' Motion for Review of Magistrate Judge's Order [Doc. # 546], the Court is satisfied that Fox produced adequate evidence related to market harm during the discovery period to permit it to rely on that evidence now.

12. DISH points to media license agreements between Fox and MVPDs that include the right to livestream Fox programming over the Internet [Redacted] DISH Reply SAMF at ¶ 436; Elias Opp. Decl. ¶¶ 13–14; Biard Opp. Decl., Ex. 20 at 457 ¶ 10 [Redacted]" DISH Reply SAMF at ¶ 436.

13. DISH asserts that Fox has failed to respond to relevant interrogatories, denying DISH the opportunity to more fully analyze Fox's purported fact, but does not dispute that Fox licenses the right to distribute certain programs to third parties in a commercial-free, downloadable format. DISH Reply SAMF at ¶ 23.

Fox does not specify whether the programs it distributes in a commercial-free downloadable format are primetime shows, but the Court assumes that they are unless the parties state otherwise. *See* Brennan Decl. at ¶¶ 2, 17(d).

dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c), (e)); *see also Norse v. City of Santa Cruz,* 629 F.3d 966, 973 (9th Cir.2010) (*en banc* ) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV.

### *DISCUSSION*

Viewing the evidence in the light most favorable to the non-moving party, the Court addresses whether summary judgment is appropriate as to any of Fox's claims below.

### A. DISH Anywhere

#### 1. Copyright Claim: Right of Public Performance

Fox contends that DISH has publicly performed Fox's copyrighted works by streaming them over the Internet to DISH subscribers using DISH Anywhere with Sling. The Copyright Act grants the owner of a copyright the "exclusive right" to "perform the copyrighted work publicly."

17 U.S.C. § 106(4). Section 101 of the Copyright Act defines the relevant terms:

> To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible. 17 U.S.C. § 101.

> To "transmit" a performance is to communicate [a work] by any device or process whereby images or sounds are received beyond the place from which they are sent. *Id.*

> To perform a work "publicly" is to transmit or otherwise communicate a performance or display of the work to ... the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times [the "Transmit Clause"]. *Id.*

 For the Transmit Clause to apply, there must be (1) a transmission or other communication; (2) of a performance of a work; (3) to the public. Not all transmissions are performances, and not all performances are transmissions. *See United States v. Am. Soc. of Composers, Authors, Publishers,* 627 F.3d 64, 74 (2d Cir.2010) ("transmittal without a performance does not constitute a 'public performance.' ").

It is undisputed that, under the 2002 RTC Agreement, DISH has the right to retransmit Fox programming to its subscribers via satellite. DISH Reply GDMF at ¶ 129. This initial transmission clearly constitutes a public performance under the Copyright Act in that DISH (1) shows images and sounds from an audiovisual work; (2) beyond the place from which they are sent; (3) to a large number of

people outside of a normal circle of family and friends. *See id.* at ¶ 120 (DISH delivers satellite service to millions of subscribers). DISH has a valid license for this initial public performance. *Id.* at ¶ 129. The salient question is whether any of the additional products or features that DISH offers to its subscribers—DISH Anywhere with Sling Technology, in particular—constitute a public performance that infringes on Fox's exclusive copyrights.

### a. DISH Anywhere Does Not "Publicly Perform" Fox's Copyrighted Works

Fox contends that the Supreme Court's recent decision in *American Broadcasting Companies, Inc. v. Aereo, Inc.* is a game-changer that governs the outcome of its copyright claims in this case. The Court disagrees.

In *Aereo,* the Supreme Court held that Aereo, a service which streamed broadcast television programming to subscribers over the Internet, "publicly performed" the programming as defined by the Transmit Clause. —— U.S. ——, 134 S.Ct. 2498, 2503, 189 L.Ed.2d 476 (2014). Aereo neither owned the copyright to the broadcast works nor held a license from the copyright owners to perform those works publicly. *Id.*

The Court described Aereo's service as follows:

> When a subscriber wants to watch a show that is currently airing, he selects a show from a menu on Aereo's website. Aereo's system, which consists of thousands of small antennas and other equipment housed in a centralized warehouse, responds roughly as follows: A server tunes an antenna, which is dedicated to the use of one subscriber alone, to the broadcast carrying the selected show. A transcoder translates the signals received by the antenna into data that can be transmitted over the Internet. A server saves the data in the subscriber-specific folder on Aereo's hard drive and begins streaming the show to the subscribers' screen once several seconds of programming have been saved. The streaming continues, a few seconds behind the over-the-air broadcast, until the subscriber has received the entire show.

*Aereo,* 134 S.Ct. at 2500.

The Supreme Court determined that Aereo "performed" the copyrighted material. *Id.* at 2501. It noted that, "[c]onsidered alone, the language of the Act does not clearly indicate when an entity 'performs' (or 'transmits') and when it merely supplies equipment that allows others to do so." *Id.* at 2504. The *Aereo* Court, therefore, looked to the history of the Copyright Act and, in particular, to the 1976 amendment intended to clarify that "community antenna television" ("CATV") providers are covered by the Act. *Id.* This amendment "ma[de] clear that an entity that *acts like* a CATV system itself performs, even when it simply enhances viewers' ability to receive broadcast television signals." *Id.* (emphasis added).

Unlike traditional cable services, "Aereo's system remained inert until a subscriber indicate[d] that she want[ed] to watch a program." *Id.* at 2507. This fact did not alter the Court's conclusion that Aereo performed, "given Aereo's overwhelming likeness to the cable companies." *Id.* at 2507. The Court noted that "[i]n other cases involving different kinds of service or technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act." *Id.* In an effort to cabin the potential overreach of its decision, however, the Court specifically cautioned that its "limited holding" should not be construed to "discourage or to control the emergence or use of different kinds of technologies."

*Id.* at 2510. The Court specifically reserved "questions involving cloud computing, remote storage DVRs, and other novel issues not before the Court, as to which Congress has not plainly marked the course," as not before the Court. *Id.* at 2510 (internal quotation marks omitted).

The Supreme Court did not expressly address the general volitional conduct requirement for direct liability under the Copyright Act. The volitional conduct doctrine is a significant and long-standing rule, adopted by all Courts of Appeal to have considered it, and it would be folly to presume that *Aereo* categorically jettisoned it by implication. *See Fox Broadcasting Co. v. Dish Network, LLC,* 723 F.3d 1067, 1073–1074 (9th Cir.2013) (infringement requires "copying *by* the defendant"); *Cartoon Network LP, LLP v. CSC Holdings, Inc. ("Cablevision"),* 536 F.3d 121, 131 (2d Cir.2008) ("volitional conduct is an important element of direct liability"); *Parker v. Google,* 242 Fed.Appx. 833, 837 (3d Cir.2007) (plaintiff does not state a claim of direct copyright infringement because plaintiff "failed to assert any volitional conduct"); *CoStar Group, Inc. v. LoopNet, Inc.,* 373 F.3d 544, 550 (4th Cir. 2004) ("The Copyright Act ... describ[es] only the party who *actually engages* in infringing conduct—the one who directly violates the prohibitions") (emphasis in original).

The *Aereo* majority's analysis can be reconciled with the volitional-conduct requirement for direct infringement. The *Aereo* Court distinguishes between an entity that "engages in activities like Aereo's" and one that "merely supplies equipment that allows others to do so." *Id.* at 2504. The Court held that a sufficient likeness to a cable company amounts to a presumption of direct performance, but the distinction between active and passive participation remains a central part of the analysis of an alleged infringement.

The *Aereo* Court cited three points of comparison that established Aereo's "overwhelming likeness" to traditional cable providers: (1) Aereo sold a service that allowed subscribers to watch television programs almost as they were being broadcast; (2) Aereo used its own equipment, housed in a centralized warehouse, outside of its users' homes; and (3) by means of its technology (antennas, transcoders, and servers), Aereo's system received programs that had been released to the public and carried them by private channels to the additional viewers. 134 S.Ct. at 2506.

■ DISH Anywhere also allows subscribers to watch television programs almost as they are being broadcast. *See* DISH Reply SAMF at ¶ 130 (subscribers can watch live broadcast programming using DISH Anywhere). DISH Anywhere depends on equipment and technology both inside and outside of the user's home. DISH Reply SAMF at ¶ 149 (DISH Anywhere requires the operation of various servers and equipment located outside the subscriber's home); ¶ 133 (a DISH subscriber must have either a Hopper with Sling or a Sling Adapter in her home in order to use DISH Anywhere).

DISH does not, however, receive programs that have been released to the public and then carry them by private channels to additional viewers in the same sense that Aereo did. DISH has a *license* for the analogous initial retransmission of the programming to users via satellite. DISH Reply GDMF at ¶ 129. Aereo streamed a subscriber-specific copy of its programming *from Aereo's hard drive* to the subscriber's screen via individual satellite when the subscriber requested it, whereas DISH Anywhere can only be used by a subscriber to gain access to *her own home STB/DVR* and the authorized recorded content on that box. *Aereo,* 134

S.Ct. at 2500; DISH Reply Fox GDMF at ¶¶ 90, 105 (emphasis added). Any subsequent transfer of the programming by DISH Anywhere takes place after the subscriber has validly received it, whereas Aereo transmitted its programming to subscribers directly, without a license to do so.

Once the DISH subscribers receive the authorized programming, DISH Anywhere facilitates the transfer of those recordings in the STB/DVR to other devices owned by the subscriber. While the parties dispute the extent to which external equipment and employees are involved in this transfer process, there is no material dispute that—[Redacted] the programming does not *originate* from the external servers. The ultimate function of DISH Anywhere is to transmit programming that is already legitimately on a user's in-home hardware to a user's Internet-connected mobile device. Relying on external servers and equipment to ensure that content travels between those devices properly does not transform that service into a traditional cable company. *Aereo*'s holding that entities bearing an "overwhelming likeness" to cable companies publicly perform within the meaning of the Transmit Clause does not extend to DISH Anywhere.

**b. Direct Infringement: DISH Does Not Engage in Volitional Conduct to Infringe**

■ As discussed above, volitional conduct remains the touchstone of direct infringement. If any public performance occurs when subscribers use DISH Anywhere, DISH may be directly liable if it engages in sufficient volitional conduct enabling that performance. As the Ninth Circuit noted at the preliminary injunction stage in this case, direct infringement turns on *who* commits the infringement. *Fox Broadcasting*, 723 F.3d at 1074. "[O]perating a system ... at the user's command does not mean that the system

operator, rather than the user, caused the [infringement]." *Id.; see also Cablevision*, 536 F.3d at 131 ("a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct."); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1168 (C.D.Cal.2002) (defendants must *actively engage* in one of the activities recognized in the Copyright Act) (emphasis in original).

■ To use DISH Anywhere, a subscriber must create an online ID and download the SlingPlayer. DISH's system verifies the subscriber's log-in information, and verifies that the subscriber is in good standing and has paid her bills. The subscriber logs in to DISH Anywhere or opens the DISH Anywhere app, selects the television program she would like to watch, and requests that the live or recorded television programming be sent from the STB in her home to her computer or mobile device. The programming either travels "point-to-point" between the STB and the mobile device [Redacted]. This process depends to some extent on external equipment and services provided by DISH, but it is the user who initiates the process, selects the content, and receives the transmission. No DISH employee actively responds to the user's specific request or directly intervenes in the process of sending the programming between the devices. *See, e.g.*, DISH Reply SAMF at ¶ 143 (EchoStar employees provide user interface, software infrastructure, and server support and maintenance). DISH subscribers, not DISH, engage in the volitional conduct necessary for any direct infringement.

### c. Secondary Infringement: DISH Subscribers do not "Publicly" Perform by using DISH Anywhere

■■ DISH may still be liable for secondary liability if its users are engaging in direct infringement by using DISH Anywhere. "One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930, 125 S.Ct. 2764, 2776, 162 L.Ed.2d 781 (2005); *see also Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1175 (9th Cir.2007). There can be no secondary infringement without primary infringement. *Grokster,* 545 U.S. at 930, 940, 125 S.Ct. 2764; *Perfect 10,* 508 F.3d at 1169 ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.") (internal citation and quotation marks omitted).

■ DISH Anywhere users "transmit" a "performance" within the meaning of Section 101 of the Copyright Act, in that they use a device or process to transmit images and sounds from audiovisual work beyond the place from which they are sent. The remaining question is whether they perform a copyrighted work "publicly."

In rejecting Aereo's argument that it did not transmit a performance "to the public," the *Aereo* Court noted that nothing in the record before it suggested that the subscribers received the performances "in their capacities as owners or possessors of the underlying works," and that this factor could affect whether or not the subscribers constituted "the public." 134 S.Ct. at 2510.

DISH subscribers are not "owners" of the copyrighted programming. DISH has expressly disclaimed any ownership rights in the underlying programming, and agreed to various restrictions on its use of the material as a condition of the license. DISH is a licensee, and therefore cannot transfer title or ownership to its subscribers.

DISH subscribers are, however, valid "possessors" of the copyrighted works that are stored in the STB in their home. *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 456, 104 S.Ct. 774, 795, 78 L.Ed.2d 574 (1984); *see also Vernor v. Autodesk, Inc.,* 621 F.3d 1102, 1112 (9th Cir.2010) (noting that some users "rightfully possess, but do not own, a copy of copyrighted [material]."). DISH has a valid license and is permitted to transmit Fox programming to subscribers accordingly.

When an individual DISH subscriber transmits programming *rightfully in her possession* to another device, that transmission does not travel to "a large number of people who are unknown to each other." The transmission travels either to the subscriber herself or to someone in her household using an authenticated device. This is simply not a "public" performance within the meaning of the Transmit Clause. Because DISH Anywhere subscribers do not directly infringe the public performance right, DISH cannot be liable for secondary infringement.

The Court **GRANTS** DISH's motion for summary judgment as to the claim for copyright infringement by DISH Anywhere with Sling and **DENIES** Fox's motion for partial summary judgment as to the same.

### 2. Contract Claims

### a. DISH Anywhere Does Not Breach the Other Technologies Provision of the 2010 Letter Agreement

The 2010 Letter Agreement states that [Redacted] [hereinafter "Other Technologies Provision"]. Fox contends that DISH is "distributing" Fox's programming over

the Internet in breach of the Other Technologies Provision of the 2010 Letter by providing subscribers with DISH Anywhere with Sling. Fox MSJ at 8, 19.

Under New York law, courts determine the meaning of a contract by "looking within the four corners of the document, not to outside sources." *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174, 180–81 (1998). "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 997 N.Y.S.2d 339, 21 N.E.3d 1000, 1003 (2014). Clear and unambiguous terms should be understood in their plain, ordinary, and non-technical meaning. *DDS Partners, LLC v. Celenza*, 775 N.Y.S.2d 319, 321, 6 A.D.3d 347, 348 (App.Div.2004). "[E]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *Golden Gate Yacht Club v. Societe Nautique De Geneve*, 12 N.Y.3d 248, 256, 879 N.Y.S.2d 363, 907 N.E.2d 276, 281 (2009).

"Where a contract contains a merger clause, a court is obliged to require full application of the parol evidence rule." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436, 963 N.Y.S.2d 613, 986 N.E.2d 430, 433–34 (2013) (internal citations and quotation marks omitted); *see also Schron v. Grunstein*, 917 N.Y.S.2d 820, 825, 32 Misc.3d 231, 236 (Sup.Ct.2011), *aff'd sub nom. Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 963 N.Y.S.2d 613, 986 N.E.2d 430 (2013) (agreements containing merger provision evidence an intent of the parties that full application of the parol evidence rule is appropriate to bar the introduction of extrinsic evidence to vary, contradict, or add to the terms of the writing).

Under the parol evidence rule, "conversations, negotiations, and agreements made by the parties either prior to or contemporaneously with the execution of a written lease are considered as having been merged in the final written instrument, and ... therefore, parol or extrinsic evidence in relation to such conversations, negotiations, and antecedent or contemporaneous agreements cannot be admitted in evidence for the purpose of attempting to vary or contradict an unambiguous written [agreement]." *Deutsche Bank Nat. Trust Co. v. Debonis*, 22 Misc.3d 1128(A), 880 N.Y.S.2d 872 (2009) (internal citations and quotation marks omitted); *see also N. Fork Bank & Trust Co. v. Bernstein & Gershman*, 607 N.Y.S.2d 135, 136, 201 A.D.2d 472, 472–73 (App.Div.1994) ("[t]o the extent that the defendants relied upon prior or contemporaneous negotiations with the plaintiff at the time of the execution of the notes and guarantees in order to vary the terms of those documents, such assertions violated the parol evidence rule"); *Morpheus Capital Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 533, 992 N.Y.S.2d 178, 181 (2014) (emails between the parties and earlier drafts of the agreement considered parol evidence).

Both sides offer extensive and much-disputed parol evidence regarding the negotiations of the Other Technologies Provision, and, in particular, whether the provision was intended to permit or prohibit the use of Sling technology. *See, e.g.,* DISH Reply GDMF at ¶¶ 161–170; DISH Reply SAMF at ¶¶ 52–68. Because the 2010 Letter Agreement has a merger clause [*see* ¶ 13], the parol evidence rule must be strictly applied. Therefore, no evidence of conversations, negotiations, and agreements made by the parties either prior to or contemporaneously with the

execution of the Agreement are admissible to vary, add to, or contradict the terms of the Agreement.

Here, the only terms genuinely at issue are [Redacted] and [Redacted].[14] The Court must therefore look to the four corners and the plain meaning of the words of the Agreement to determine its meaning.

It is undisputed that DISH Anywhere with Sling makes use of the Internet. DISH Reply SAMF at ¶ 53. The remaining questions are therefore (1) whether DISH Anywhere "distributes" or "retransmits" Fox's programming, (2) whether DISH or DISH's subscribers do the retransmitting or distributing, and (3) what it means that [Redacted] ["Applicable Law Clause"].

### i. DISH Anywhere Users Retransmit Fox's Programming

Merriam–Webster defines "transmit" as: "to send (information, sound, etc.) in the form of electrical signals to a radio, television, computer, etc." or "to give or pass (information, values, etc.) from one person to another." http://www.merriam-webster.com/dictionary/transmit (last visited January 7, 2015). Black's Law Dictionary defines "transmit" as "to send or transfer (a thing) from one person or place to another." Black's Law Dictionary (9th ed.2009). Macmillan Dictionary defines "re-" as a prefix meaning "again" that is "used with many verbs, nouns, or adjectives." http://www.macmillandictionary.com/us/dictionary/american/re_9 (last visited January 7, 2015).

■ As discussed above, under the Copyright Act, "transmit" means to "communicate [a work] by any device or pro-

cess whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. While statutory definitions do not definitively govern the interpretation of terms in a private agreement, the meaning of a term within an applicable body of law can guide a court in determining a contract term's unambiguous meaning. *See Madison Ave. Leasehold, LLC v. Madison Bentley Associates LLC,* 811 N.Y.S.2d 47, 53, 30 A.D.3d 1, 8 (App.Div.2006), *aff'd,* 8 N.Y.3d 59, 828 N.Y.S.2d 254, 861 N.E.2d 69 (2006) (in interpreting a contract term, the reasonable expectations of parties to an agreement will be interpreted with reference to existing law at the time the agreement was made); *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP,* 348 F.Supp.2d 255, 265 (S.D.N.Y.2004) (New York law presumes that contracts, especially those drawn by attorneys, are concluded with reference to applicable law); *see also Mayo v. Royal Ins. Co. of Am.,* 242 A.D.2d 944, 662 N.Y.S.2d 654, 655 (1997) ("unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made and the contract will be construed in the light of such law."); *Nau v. Vulcan Rail & Constr. Co.,* 286 N.Y. 188, 198, 36 N.E.2d 106 (1941) (the sense in which words were used in a contract is to be determined by the applicable law).

■ DISH argues that "retransmission" is used in the agreement to mean a

---

**14.** The parties dispute whether the press release attached to the 2010 Letter is part of the Agreement. DISH Reply Fox's GDMF at ¶ 167. Whether the press release may be considered part of the Agreement or not, the Court is not persuaded that the mere mention of the existence of Sling technology in the fine print of the description of DISH at the very end of the press release is relevant to the interpretation of the disputed terms in the Other Technologies Provision and whether the contract permits DISH to use Sling with Fox's programming specifically.

"DBS-based multicast," and "Sling is not a DBS multicast." DISH GDMF at 158, DISH's Responses to Fox's Conclusions of Law ("DISH Response COL") at ¶ 4. Nothing in the Agreement, however, expressly limits "retransmit" to the context of a DBS-based multicast. Indeed, the Other Technologies Provision at issue here [Redacted] It is not logical to interpret retransmission as applying only to DBS-based satellite transmission (which is permitted by the Agreement [15]) in the context of language that [Redacted]

Applying the plain and ordinary meaning of the term "retransmit," DISH Anywhere "retransmits" Fox's programming. The fundamental purpose of DISH Anywhere is to transfer programming from one device to another device in a different location, communicating sounds and images by sending electrical signals to a computer or mobile device.

The remaining question, however, is whether it is DISH or the DISH subscriber who is doing the retransmission. It is undisputed that to use DISH Anywhere, a subscriber must log in to DISH Anywhere or open the DISH Anywhere app, select the television program she would like to watch, and send herself the live or recorded television programming on her computer or mobile device. DISH Reply SAMF at ¶¶ 133–135. This process depends to some extent on external equipment and services provided by DISH, but it is the user who initiates the process, makes her selection, and receives the selected transmission. DISH provides a system allowing the user to send a transmission to herself and provides support for that system, but it does not otherwise dictate the user's conduct. On this record, even when viewing the evidence in the light most favorable to Fox, the Court concludes that it is the DISH user, not DISH, who does the retransmitting.

### ii. DISH Anywhere Does Not Distribute Fox Programming

 Merriam–Webster defines "distribute" as "to give or deliver (something) to people," "to deliver (something) to a store or business," or "to divide (something) among the members of a group." http://www.merriam-webster.com/dictionary/distribute (last visited January 7, 2015). Black's Law Dictionary defines "distribute" as "1. To apportion; to divide among several. 2. To arrange by class or order. 3. To deliver. 4. To spread out; to disperse." Black's Law Dictionary (9th ed.2009). Under the Copyright Act, distribution is defined as "actual dissemination of a copy" that "changes hands." *Fox Broadcasting Co., Inc. v. Dish Network, LCC*, 905 F.Supp.2d 1088, 1106 (C.D.Cal. 2012), *aff'd*, 723 F.3d 1067 (9th Cir.2013) (citing *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d at 1162).

 According to any of the above-quoted dictionary or statutory definitions, the plain meaning of "distribute" is (1) to deliver (2) to multiple people or a group of people. While DISH Anywhere may facilitate delivery of programming to another device owned by the subscriber, it does not disseminate programming to a group of people. The subscriber transmits the programming to herself or other members of her household who use the same authenticated device. This does not constitute "distribution" under the plain meaning of the term.

### iii. The Applicable Law Clause

DISH contends that the Applicable Law Clause means rights under the Copyright

---

**15.** *See* 2002 RTC Agreement at 1: "WHEREAS, [DISH] and Fox desire to have such broadcast stations' signals retransmitted over the Satellite Service; as used herein, 'Satellite Service' shall mean the direct broadcast satellite ('DBS') television distribution system...."

Act, "the 'applicable law' for so much of the parties' relationship." DISH MSJ at 31. Fox does not appear to dispute this interpretation. *See* Fox MSJ at 4 (asserting that because *Aereo* establishes that DISH Anywhere is a public performance in violation of the Copyright Act, DISH "cannot take refuge" in the "rights under applicable law" clause); Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Fox MSJ Opp.") at 12 [Doc. # 531.] DISH contends that because "[a]pplicable law in 2010 recognized the fair use right of DISH's customers to place-shift for non-commercial purposes ... [w]hether DISH or the subscriber uses Sling, *Sony* provides a fair use safe harbor." DISH Response COL at ¶ 4. *See Sony,* 464 U.S. at 449–450, 104 S.Ct. 774; *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1019 (9th Cir.2001); *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.,* 180 F.3d 1072, 1079 (9th Cir.1999).

The Applicable Law Clause, however, refers to the clause directly preceding it, which prohibits *DISH* from retransmitting or distributing Fox programming over the Internet. It would be a *non sequitur* in this context to interpret the Applicable Law Clause to refer to the rights of DISH *subscribers* to time- and place-shift. The parties have not argued that place-shifting *by DISH* would be fair use, given that such conduct would be unlikely to be characterized as a "non-commercial" use. Neither party has offered a plausible interpretation regarding what legal rights of DISH, as opposed to those of the DISH subscriber, are reserved under the Applicable Law Clause that would not deprive the preceding clause of full force and

meaning. *See Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 133 N.E.2d 688, 690 (1956) (rules of contract construction require courts, if possible, to adopt an interpretation that gives meaning to every provision of the contract and leaves no provision of a contract without force and effect).

In any event, as discussed above, the uncontroverted material facts show that DISH subscribers, rather than DISH itself, "retransmit" Fox's programming using DISH Anywhere, and that DISH Anywhere does not "distribute" Fox's programming. Therefore, even assuming the Applicable Law Clause preserves *subscribers'* rights to time- and place- shift from the effect of the preceding clause, it does not change the conclusion that DISH subscribers' use of DISH Anywhere does not breach the Other Technologies Provision.

DISH's motion for summary judgment as to this issue is **GRANTED** and Fox's motion for summary judgment as to this issue is **DENIED.**

### b. DISH Anywhere Breaches The No Copying Provision of the 2002 RTC Agreement.

■ Section 9(a) of the 2002 RTC Agreement states that "[Dish] shall not, for pay or otherwise, record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission of any portion of the Stations' analog signal without prior written permission of the Station, except as is specifically permitted by this Agreement." 2002 Agreement at ¶ 9(a) ["No Copying Provision"]. Fox contends that DISH "authorizes" its subscribers to "retransmit" Fox's programming [16]

---

**16.** Neither side argues that there is a distinction between "the Station's analog signal" and the programming contained therein, and the parties often use the terms interchange-

ably. The Court assumes that when subscribers retransmit Fox's programming over DISH Anywhere, they are considered to be retrans-

when DISH's subscribers use DISH Anywhere. Fox MSJ at 21. Fox argues that, given the fact that only DISH subscribers who have paid DISH a subscription fee and logged into DISH's website can watch Fox programs using DISH Anywhere, DISH is "authorizing" them to do so. Fox MSJ at 21. As discussed above, DISH Anywhere users clearly "retransmit" Fox programming. The Court finds that DISH also "authorizes" them to do so.

Black's Law Dictionary defines "authorize" as "to give legal authority; to empower" or "to formally approve; to sanction." Black's Law Dictionary (9th ed.2009). Merriam–Webster defines "authorize" as: "to give power or permission to (someone or something)" or "to give legal or official approval to or for (something)." http://www.merriam-webster.com/dictionary/authorize (last visited January 7, 2015).

DISH subscribers agree to a contract with DISH in which DISH provides them with equipment and services, and the subscribers make use of those features and products. DISH Reply SAMF at ¶ 133; Fox GDMF at ¶ 85 (DISH Anywhere is a service available to DISH subscribers who have a Hopper with Sling or Sling Adapter). DISH "authorizes" its subscribers to use its products in their intended manner because it gives them the power to do so (by providing the equipment and services) and the permission to do so (by granting them status as subscribers for payment). Conversely, non-DISH subscribers would not be "authorized" to use DISH Anywhere to retransmit Fox programming to their electronic devices.

The No Copying Provision includes a carve-out for "private home use" by consumers. Thus, DISH subscribers may time- and place-shift Fox programming within the confines of their home. DISH argues that the word "home" in the phrase "private home use" does not literally mean "inside the home," but rather "private noncommercial use of the sort done at home." DISH MSJ Opp. at 30 (internal quotation marks omitted). The ordinary and unambiguous meaning of the words "private home use" belies this definition. Use outside of the home may be "private noncommercial use," but it is not "home use." The parties could have used the words "private noncommercial use," but chose to insert the words "home use."

 Given our knowledge of current technologies, it may seem absurd that a contract would allow subscribers to use DISH Anywhere on their mobile devices inside the home, but not the moment they step outside the home. Those are the terms, however, to which the parties agreed. Courts must interpret a contract to give effect to the parties' reasonable expectations. *Greater New York Mut. Ins. Co. v. Mut. Marine Office, Inc.*, 3 A.D.3d 44, 769 N.Y.S.2d 234, 239 (2003). Nothing in the record suggests that, at the time the parties entered into the 2002 RTC Agreement, DISH possessed the technology allowing subscribers to make portable recordings of programming on mobile devices. *See, e.g.*, DISH Reply Fox GDMF (DISH first offered subscribers the ability to make portable recordings of programs in 2005). The narrow exception to the general prohibition on copying was made with reference to the then-existing technologies, such as DVRs, which were used exclusively in the home. *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 775 N.Y.S.2d 757, 807 N.E.2d 869, 872 (2004) ("It is well settled that our role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract."). Had the parties wished to define the exception more broadly to include any private, non-com-

---

mitting Fox's "analog signal" in the sense it is used in the 2002 RTC Agreement.

mercial use, including future technologies not then contemplated, they could have explicitly done so. The Court does not find that any subsequent amendments stripped out the explicit home use limitation in the No Copying Provision.

The plain language of the 2002 RTC Agreement prohibits all copying of Fox programming for any use other than private use in the home, *absent Fox's written permission.* It is not genuinely disputed that DISH Anywhere permits users to retransmit Fox content to electronic devices for use outside of the home. DISH Reply SAMF at ¶ 121 ("Only Dish Anywhere lets you access all of your live TV channels . . . while on the go via your Internet-connected smartphone, computer, or tablet."). Devices like tablets, iPads, laptops, and smartphones are frequently used outside the home, and users are encouraged to "access" their live TV channels "on the go." *Id.* Fox did not give DISH its consent to offer this service to subscribers for use outside the home.

 To the extent DISH authorizes its users to retransmit Fox programming for use outside of the home without Fox's consent, it has violated the No Copying Provision. New York law requires, however, a showing that there are damages flowing from a breach in order to state a claim for a breach of contract. *J.P. Morgan Chase v. J.H. Elec. of New York, Inc.,* 69 A.D.3d 802, 893 N.Y.S.2d 237, 239 (2010). Fox has adduced evidence to show that it charges third parties a licensing fee in a variety of contexts, including those that permit viewers to watch Fox programming on mobile devices at their own time and place of choice. While DISH contests the validity of such analogies, there is certainly a triable issue of fact as to whether a reasonable royalty would have been charged for the exercise of such a right where the contract restricts it.

Fox's motion for partial summary judgment for DISH Anywhere's breach of the No Copying Provision is **DENIED** because there is a triable issue of fact as to the damages flowing . from the breach. DISH's motion for summary judgment on the DISH Anywhere contract claim is also **DENIED.**

### B. PTAT

#### 1. Copyright Claims

A copyright holder has the exclusive right "to reproduce the copyrighted work in copies" or authorize the same ("Right of Reproduction"). 17 U.S.C. § 106(1). "Copies . . . are material objects, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. A copyright holder also has the exclusive right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3).

#### a. Direct Liability: DISH Does Not Engage in Volitional Conduct Giving Rise to Liability for Direct Copyright Infringement.

 PTAT makes recordings of the primetime programming on the four major networks automatically if a subscriber sets a timer assigning it to do so. As the Ninth Circuit noted at the preliminary injunction phase, infringement of the reproduction right requires "copying *by* the defendant." *Fox Broadcasting v. Dish Network L.L.C.,* 747 F.3d 1060, 1060 (9th Cir.2014).

The Ninth Circuit upheld this Court's earlier finding that the user, not DISH, makes the PTAT copies:

> Here, Dish's program creates the copy only in response to the user's command.

Therefore, the district court did not err in concluding that the user, not Dish, makes the copy. That Dish decides how long copies are available for viewing, modifies the start and end times of the primetime block, and prevents a user from stopping a recording might be relevant to a secondary or perhaps even a direct infringement claim. *Cf. Cablevision*, 536 F.3d at 132–33 (finding that factors evidencing Cablevision's control over copying process seemed "more relevant to the question of contributory liability" but reserving the question "whether one's contribution to the creation of an infringing copy may be so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy"). But these facts do not establish that Dish made the copies.

*Fox Broadcasting*, 723 F.3d at 1067–68.

■■■ The current record reflects essentially the same facts about how PTAT works and how much control DISH has over the process as it did at the preliminary injunction stage. DISH subscribers can choose to enable PTAT, after which PTAT will automatically record the entire portion of the evening broadcast designated as "primetime" by DISH. Subscribers need not schedule individual recordings on a show-by-show basis, because PTAT defaults to record all four broadcast networks every night of the week for the entire primetime broadcasting block.[17] Subscribers may choose to designate fewer nights of the week or record only certain networks, but DISH establishes the default settings. The recordings will be saved for up to eight days and then auto-

matically deleted unless a subscriber moves them to a separate folder to save. Subscribers cannot change the PTAT recording settings while the recordings are in progress, or fifteen minutes before the recordings are scheduled to begin.

■■■ Fox contends that *Aereo* has altered the test for direct infringement by rejecting the argument that only the subscriber who pushes the button initiating the infringing process is liable for direct infringement. Fox MSJ Opp. at 16. As discussed above, *Aereo* did not fundamentally alter the volitional conduct requirement for direct infringement. More than one actor may be liable for direct infringement, but there must still be some volitional conduct for direct liability. A system that operates automatically at a user's command to make a recording does not in itself render the system's provider a volitional actor for purposes of direct copyright infringement. *Fox Broadcasting*, 723 F.3d at 1074; *Cablevision*, 536 F.3d at 131. While DISH has set certain parameters and controls for PTAT, PTAT is essentially a more targeted version of a DVR that is set to make block recordings or recordings of an entire season of a show. The ability to set a DVR and then leave it to automatically record without having to select individual programs or set it repeatedly for each recording occasion is not unique to PTAT, and is not enough to show direct infringement by the service provider.

The analysis regarding the fact that DISH does not engage in volitional conduct in making the PTAT recordings applies equally to any direct infringement

---

17. Fox argues that because DISH advertises that PTAT "does the work for you," that it provides "on demand access to all primetime television programs," and that subscribers will no longer have to "spend time finding your shows [and] setting recordings," DISH admits to having made the copies. DISH

Reply SAMF at ¶¶ 205–206. The undisputed facts already establish how PTAT works. The language DISH uses to advertise the product is not dispositive, or even particularly probative, of how the technology actually functions or should be classified.

claim based upon "distribution." PTAT does not "distribute" Fox's programming or "transmit" any public performance under the meaning of the Copyright Act. Distribution under the Copyright Act requires "actual dissemination of a copy" that "changes hands." *Fox Broadcasting Co., Inc.*, 905 F.Supp.2d at 1106. As discussed above regarding DISH Anywhere, transmission means "to communicate [a work] by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. PTAT is a system for automatically recording programming as it is being received by a subscriber's STB, inside the subscriber's home. Those recordings are not distributed, delivered, or transmitted to any other location or person using PTAT alone.

On appeal of this Court's denial of its request for a preliminary injunction, Fox argued (in the contract breach context) that "distribute" simply means to "make available." *Fox Broadcasting*, 723 F.3d at 1070. While neither the Ninth Circuit nor any other circuit court has addressed the "make available" theory of distribution under the Copyright Act, it has been considered by a number of courts, and "[t]he great majority of courts that have considered the question ... have stopped short of fully endorsing the 'make available' right." *Elektra Entm't Grp., Inc. v. Barker*, 551 F.Supp.2d 234, 243 (S.D.N.Y.2008) (collecting cases); *see also Atl. Recording Corp. v. Howell*, 554 F.Supp.2d 976, 983 (D.Ariz.2008) ("The majority of district courts have rejected the recording companies' 'making available' theory"); *Capitol Records, Inc. v. Thomas*, 579 F.Supp.2d 1210, 1218–19 (D.Minn.2008) ("The Court's examination of the use of the term 'distribution' in other provisions of the Copyright Act, as well as the evolution of liability for offers to sell in the analogous Patent Act, lead to the conclusion that the plain meaning of the term 'distribution' does not include making available and, instead, requires actual dissemination."). This Court finds these cases persuasive and concludes that DISH's act of merely "making available" copyrighted programming to its subscribers through PTAT does not amount to distribution without actual dissemination.

**b. Secondary Liability: PTAT Use by DISH Subscribers is Fair Use.**

As discussed above, there can be no secondary infringement without primary infringement. *Grokster*, 545 U.S. at 930, 940, 125 S.Ct. 2764. Fox must demonstrate that DISH subscribers' use of PTAT constitutes direct infringement to show secondary infringement by DISH.

 The "fair use" of a copyrighted work is not an infringement of copyright. 17 U.S.C. § 107. "[I]t is well established that a court can resolve the issue of fair use on a motion for summary judgment." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir.2008); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir.2006) (although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues).

 *Sony* established that it is fair use for users to make individual copies of television shows from broadcast television for purposes of noncommercial, nonprofit time-shifting. 464 U.S. at 449–50, 104 S.Ct. 774; *see also Napster, Inc.*, 239 F.3d at 1019; *Recording Indus. Ass'n of Am.*, 180 F.3d at 1079. *Sony* addressed only secondary infringement claims, and held that the suppliers of equipment used to make such copies were not liable for derivative infringement. 464 U.S. at 454–56, 104 S.Ct. 774.

*Sony*'s holding, however, is not absolute. The Court noted that "[a] challenge to a noncommercial use of a copyrighted work requires proof that either the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work." *Id.* at 451, 104 S.Ct. 774. "Actual present harm need not be shown .... Nor is it necessary to show with certainty that future harm will result." *Id.* "What is necessary is a showing ... that *some meaningful* likelihood of future harm exists." *Id.* (emphasis added). The effect of the use upon the market for or value of the copyrighted work is the "most important" element of fair use. *Fox Broadcasting,* 723 F.3d at 1069 (internal citation omitted).

The *Sony* plaintiffs' predictions of harm hinged on "speculation about audience viewing patterns and ratings, a measurement system [described as] a 'black art' because of the significant level of imprecision involved in the calculations." 464 U.S. at 451, 104 S.Ct. 774. The Supreme Court ultimately held that there was no basis to support the plaintiffs' argument that time-shifting would reduce audiences for telecast reruns or decrease live television audiences, and affirmed the district court's finding that "[h]arm from time-shifting is speculative and, at best, minimal." *Id.* at 453–54, 104 S.Ct. 774.

As the Ninth Circuit noted at the preliminary injunction stage, "[b]ecause Fox licenses its programs to distributors such as Hulu and Apple, the market harm analysis is somewhat different than in *Sony,* where no such secondary market existed for the copyright-holders' programs." 723 F.3d at 1069. At that time, the record established that any market harm resulted from the automatic commercial-skipping, and not simply the recording of programs through PTAT. *Id.* The Court pointed to the fact that Fox often charges no addi-

tional license fees for providers to offer Fox's licensed video on demand, so long as providers disable fast-forwarding of commercials. *Id.* The Court affirmed the lower court's finding that "the ease of skipping commercials, rather than the on-demand availability of Fox programs, causes any market harm." *Id.*

At this stage, Fox has produced additional evidence of a secondary market for its programming. In addition to licensing the right to livestream its programming to certain MVPDs, Fox licenses third parties such as Apple, Amazon, Vudu, and Microsoft the right to distribute its programs in a commercial-free, downloadable format, available the day after a program airs and viewable on mobile devices, personal computers, or certain Internet-connected televisions. Fox also licenses older seasons of its programming to subscription VOD services such as Netflix and Amazon Prime. DISH asserts that Fox does not charge MVPDs for the right to stream its programming, and thus no real "market" exists. DISH Reply SAMF at ¶ 436. Fox responds that the license to stream is part of a comprehensive agreement and "in exchange for valuable consideration." *Id.*

The record now before the Court establishes that a market for Fox programming on demand exists beyond the value of the advertisements. Fox licenses its programming to at least some third parties to be distributed commercial-free. Nonetheless, the record does not create a triable issue as to the likelihood of future harm to this market.

While Fox has provided some evidence that PTAT co-exists with services like Hulu that offer streaming of Fox programming with commercials, and that PTAT may help DISH attract subscribers, it has not demonstrated that any of this is genuinely likely to cause harm to the secondary

market for Fox programming that rises beyond the speculative, such that the question should be presented to a jury.[18] Only DISH subscribers have access to PTAT, and those subscribers also have access to a litany of other services, including the ability to record primetime programming manually using more traditional DVR technology. DISH's expert John Hauser contends that "the Hopper represents only a small fraction [of households with DVR]." Declaration of John Hauser in Support of Defendants' Motion for Summary Judgment ("Hauser Decl.") at ¶ 19. [Doc. # 498.][19] Even limiting the potential impact to the universe of DISH subscribers, Hauser contends that, "[d]ata from DISH indicate that for the periods from January 24 to March 17, 2014, and from April 6 to May 31, 2014, the PTAT feature [Redacted] Hopper set-top boxes on any given day." Hauser Decl. at ¶ 16. [Doc. # 498.] Hauser notes that, while "the total number of Hopper set-top boxes on which this calculation is based is lower than the total number of Hopper boxes in use ... there is no reason to expect that PTAT activation, AutoHop usage, or Sling activity is greater among non-reporting households." *Id.*

Furthermore, PTAT recordings are only available for up to eight days, unless the subscriber makes the effort to save them in a special folder for a longer period of time. Services that offer older seasons of Fox programming cannot be in competition with recordings that are only available for up to eight days after a program airs. Similarly, the commercial-free programming Fox licenses to third parties is only potentially in competition with PTAT for

up to eight days after a show airs, and then only for the group of people who both subscribe to DISH and use PTAT.

Even in the unlikely event it were possible to demonstrate that DISH subscribers are less likely to purchase Fox programming on Amazon, or that erstwhile Microsoft or Vudu customers will eschew these services in favor of DISH (which the record here does not demonstrate beyond the level of conjecture), it would be highly speculative and likely impossible to demonstrate that PTAT in particular, as opposed to other DISH features and services, is the likely cause of market harm, or is likely to be in the future. *See Sofa Entm't, Inc. v. Dodger Prods., Inc.*, 782 F.Supp.2d 898, 910 (C.D.Cal.2010), *aff'd*, 709 F.3d 1273 (9th Cir.2013) ("the Court agrees with Defendant that the notion that any such market could ever materialize is speculative at best"); *A.V. v. iParadigms Liab. Co.*, 544 F.Supp.2d 473, 484 (E.D.Va.2008), *aff'd in part, rev'd in part sub nom. A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir.2009) ("Because Plaintiffs have presented no evidence of harm and the potential harm alleged is both speculative and highly unlikely, the fourth factor strongly favors a finding of fair use."); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 n. 18 (2d Cir.1994) (even if harm to "the potential market in licensing royalties" exists, it may be considered "too insubstantial to tilt the fourth fair use factor in favor of the copyright holder.").

The potential for market harm to the secondary market for Fox's programs caused by PTAT alone is simply too speculative to defeat a finding of fair use by a

---

**18.** [Redacted].

**19.** Fox objects to the admissibility of the Hauser Declaration on the basis that it does not apply a valid methodology and does not "fit" the facts. Objections to Evidence Submitted

in Support of Defendants' Motion for Summary Judgment ("Fox Obj. to Evid.") at 3–4. [Doc. # 534.] The Court is satisfied that the Hauser Declaration meets the admissibility standard for expert testimony, and the declaration is therefore admissible.

time-shifting technology which enhances consumers' non-commercial private use of recorded programming. Even when viewing the evidence in the light most favorable to Fox, this Court concludes that DISH subscribers' use of PTAT is fair use under *Sony,* and DISH is not liable for contributory infringement.

DISH does not directly or secondarily infringe Fox's right of reproduction, distribution, or public performance by offering PTAT to its subscribers. Fox's motion for partial summary judgment as to the PTAT copyright claim is **DENIED** and DISH's cross-motion for summary judgment on this claim is **GRANTED**.

### 2. Contract Claims

Fox contends that PTAT violates the 2002 RTC Agreement, which states that DISH "shall have no right to distribute all or any portion of the programming contained in any Analog signal on an interactive, time-delayed, video-on-demand or similar basis; *provided* that Fox acknowledges that the foregoing shall not restrict [DISH's] practice of connecting its Subscribers' video replay equipment" ["No–Distribution Provision"]. Fox asserts that PTAT violates the No–Distribution Provision because it "distributes" Fox programming on a "VOD or similar basis." DISH contends that the No–Distribution Provision was superseded by the 2010 Letter Agreement, because the latter contains a clause granting DISH the right (but not the obligation) to distribute Fox VOD under certain prescribed circumstances. DISH MSJ at 21; 2010 Letter Agreement at 23.

### a. The 2010 Letter Agreement Does Not Supersede the No– Distribution Provision.

 "Generally, under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract. However, a subsequent contract not pertaining to precisely the same sub-

ject matter will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract. To determine if a particular provision is superseded by a provision in a subsequent contract, the Court considers: (1) whether there is an integration and merger clause that explicitly indicates that the prior provision is superseded; (2) whether the two provisions have the same general purpose or address the same general rights; and (3) whether the two provisions can coexist or work in tandem." *A & E Television Networks, LLC v. Pivot Point Entm't, LLC,* 10–CV–09422 (AJN), 2013 WL 1245453, at \*10 (S.D.N.Y. Mar. 27, 2013) (internal citations and quotation marks omitted); *see also Cont'l Stock Transfer & Trust Co. v. Sher–Del Transfer & Relocation Servs., Inc.,* 298 A.D.2d 336, 750 N.Y.S.2d 8, 9 (App.Div.2002) (to find that proposal letter superseded former agreement "would not be consonant with the basic rule of contract law that requires a clear expression of intention, best manifest in the language of the later writing, that the subsequent agreement supersedes the prior one.").

 There is no express language indicating that the 2010 Letter Agreement was intended to supersede the No–Distribution Provision of the 2002 RTC Agreement. While both the general prohibition on distributing "VOD-or-similar" in 2002 and the express permission to distribute FOX VOD in 2010 pertain to VOD distribution rights, they can be construed to work in tandem. The original clause generally prohibits distribution on a VOD-or-similar basis, whereas the newer provision carves out a narrow exception to that rule only for Fox VOD, and only under the conditions specified. Otherwise, the existence of the clause granting DISH permission to distribute Fox VOD in the 2010 Letter

Agreement does not impair the general No–Distribution Provision of the 2002 RTC Agreement.

### b. PTAT Does Not Breach the No–Distribution Provision.

■ According to dictionary and statutory definitions already discussed above, the plain meaning of "distribute" is (1) to deliver (2) to more than one person. PTAT does neither of these things. PTAT is a mechanism for automatically recording a specific sub-set of programming that has already been permissibly streamed to a subscriber, and does not disseminate those recordings beyond that subscriber's home. PTAT does not "distribute" anything.

Fox contends that the uses of "distribute" and "distribution" elsewhere in the contract do not support the "change hands" definition of the term. FOX MSJ at 33. For example, the 2002 RTC Agreement defines the DISH Network as a "distribution system for video programming." DISH GDMF at ¶ 3. The initial, licensed transmission of the programming by DISH may be a distribution, even though no copy is transferred to the consumer, as it simultaneously delivers that content from its source to a large number of people. This is not what PTAT does, and the use of "distribute" elsewhere in the contract largely refers to the authorized initial transmission of the programming. Nothing about the use of the term "distribute" in other parts of the Agreement alters the fact that PTAT does not "distribute" content.

DISH's motion for summary judgment as to whether PTAT breaches the 2002 RTC Agreement is therefore **GRANTED** and Fox's motion for partial summary judgment as to this claim is **DENIED.**

### C. AutoHop and the QA Copies
#### 1. Copyright Claims
##### i. Right of Reproduction

Until July 20, 2012, EchoStar employees made QA copies of primetime programming to ensure that AutoHop functioned properly on PTAT recordings made by DISH subscribers. Fox contends that DISH infringed Fox's exclusive right to reproduce its works by having EchoStar make Quality Assurance copies [Redacted] (together the "QA copies") of copyrighted Fox programming in order to offer its AutoHop service. DISH counters that AutoHop is non-infringing, and the QA Copies are fair use, because they are intermediate copies that allow for testing and development of new, non-infringing technology without affecting any licensing market in which Fox participates or reasonably would participate. *See Sega Enterprises v. Accolade, Inc.,* 977 F.2d 1510 (9th Cir.1992), *as amended* (Jan. 6, 1993), and *Sony Computer Entertainment, Inc. v. Connectix Corp.,* 203 F.3d 596 (9th Cir. 2000).

■ At the preliminary injunction stage, this Court found that "AutoHop ... standing alone, does not infringe." *Fox Broadcasting,* 905 F.Supp.2d at 1105. The Ninth Circuit upheld the ruling, stating that "[i]f recording an entire copyrighted program is a fair use, the fact that viewers do not watch the ads not copyrighted by Fox cannot transform the recording into a copyright violation." 723 F.3d at 1075. At this stage of the proceedings, Fox has presented uncontroverted evidence that it airs a significant number of commercials advertising its own programming, and that it owns copyrights for the clips used in those commercials. Fox argues that this fact changes the analysis regarding whether AutoHop is non-infringing. In the Court's view, it does not. Although at the

preliminary injunction stage, both this Court and the Ninth Circuit noted that the advertisements themselves were not copyrighted by Fox, it was merely as a point of emphasis to show how unlikely it would be for Fox to prevail on its claim that Auto-Hop infringes its copyrights. In other words, if *Sony* permits a consumer *to record* an entire copyrighted program under the fair use doctrine, there could not be less protection for a consumer who declines to watch an ad that is not even copyrighted by Fox. The linchpin in the copyright infringement analysis is whether DISH has infringed Fox's exclusive rights of reproduction and distribution. Auto-Hop neither copies nor distributes anything—it *skips* ads. Absent unauthorized copying or distribution, it is immaterial for purposes of the copyright infringement claim that the ads being skipped are Fox's own commercials.

■■■ This Court found at the preliminary injunction stage that the QA Copies did not constitute fair use and that Fox would likely prevail on its copyright infringement claim as to the QA copies. *Fox Broadcasting*, 905 F.Supp.2d at 1102–06. Having revisited the fair use analysis with the benefit of the current factual record, the Court sees no reason to deviate from its prior conclusion. The four factors used to determine whether not the use of a copyrighted work is fair use include: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 590, 114 S.Ct. 1164, 1171–77, 127 L.Ed.2d 500, 578–92 (1994). While all fair use factors should be considered, the fourth factor is "undoubtedly the most important

element of fair use." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 566, 105 S.Ct. 2218, 2234, 85 L.Ed.2d 588 (1985). Generally, "[t]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Monge v. Maya Magazines, Inc.,* 688 F.3d 1164, 1174 (9th Cir.2012), *citing Campbell,* 510 U.S. at 579, 114 S.Ct. 1164.

■■ The QA copies are not transformative. *Sega* held that intermediate copying of computer code to prepare derivative works based on copyrighted work is fair use where such disassembly and copying is the only way to gain access to the functional elements embodied in a copyrighted work, and where there is a legitimate reason for seeking such access. *Sega,* 977 F.2d at 1527. At the preliminary injunction stage, this Court noted that "Dish makes the QA copies for a purpose fundamentally different than did the plaintiff in Sega." *Fox Broadcasting,* 905 F.Supp.2d at 1103. The intermediate copies in *Sega* were used for the transformative purpose of developing new computer games. 977 F.2d at 1523 ("It is precisely this growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote."). The QA copies are simply used to allow users to automatically skip commercials in the copyrighted programming rather than to create original programming or content. These copies in no way alter their originals "with new expression, meaning, or message." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164. The Court's assessment that the QA copies are not transformative remains unchanged.

The commercial purpose of the QA copies weighs against a finding of fair use, and the creative nature of the copyrighted

works entitle them to heightened protection. *Fox Broadcasting*, 905 F.Supp.2d at 1104. The fact that the QA copies reproduce an entire work weighs against fair use, but is of "very little weight" compared with other factors due to the limited nature of the ultimate use. *Id.; see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir.2014) ("[T]he third factor asks whether the copying was excessive in relation to any valid purpose asserted under the first factor.").

The likelihood of an adverse impact on the market for the original work—the most heavily weighted factor—weighs against fair use. "By making an unauthorized copy for which it has not paid and using it for AutoHop, Dish harms Fox's opportunity to negotiate a value for those copies and also inhibits Fox's ability to enter into similar licensing agreements with others in the future by making the copies less valuable." *Fox Broadcasting*, 905 F.Supp.2d at 1105.

The record reflects that there is a market for the right to copy and use Fox programs, given that Fox licenses copies of its programming to third-party companies like Hulu, Netflix, and Amazon. There is no demonstrable existing market for the intermediate copies themselves, but there is no material issue of disputed fact that Fox, as a normal course of business, monetizes the right to copy its programming, whether directly (charging for the direct use of copies) or indirectly (allowing the use of copies as a part of a comprehensive licensing agreement). The fact that DISH's use of the QA copies is *sui generis* and has never been attempted before by any other entity does not mean that it has no intrinsic value. *See Campbell*, 510 U.S. at 592, 114 S.Ct. 1164 ("the market for potential derivative uses includes ... those that creators of original works would in general develop or license others to develop"); *Harper & Row Publishers, Inc.*, 471

U.S. at 568, 105 S.Ct. 2218 (the fourth factor "must take account not only of harm to the original but also of harm to the market for derivative works").

Fox has adduced uncontroverted evidence to show that it would normally negotiate a licensing agreement or royalty payment for the right to copy Fox programming in any manner. DISH's unauthorized use of QA copies would impair Fox's ability to monetize that use not only as to DISH but also as to any other future technology creator that makes analogous use of such copies.

### ii. Section 119 of the Compulsory Licensing Framework

▆▆▆ Fox also contends that AutoHop violates the Copyright Act's compulsory licensing framework for secondary transmission of network stations by satellite providers. 17 U.S.C. §§ 119, 122. Section 119(a)(5) states that "the secondary transmission to the public by a satellite carrier of a performance or display of a work embodied in a primary transmission made by a ... network station is actionable as an act of infringement ... if the content of the particular program in which the performance or display is embodied, or any commercial advertising or station announcement transmitted by the primary transmitter during, or immediately before or after, the transmission of such program, is in any way willfully altered by the satellite carrier through changes, deletions, or additions." AutoHop does not change, delete, or add anything to the commercials at issue. AutoHop provides a mechanism for automatically skipping commercials by marking when the commercial breaks begin and end, but does not delete or otherwise alter the commercials from the PTAT recordings. Thus, AutoHop does not violate the Copyright Act's compulsory licensing framework.

Inasmuch as the Court finds that Auto-Hop does not infringe Fox's copyrights and the QA copies are not a fair use as a matter of law, DISH's motion for summary judgment on the copyright infringement claim is **GRANTED** as to the AutoHop feature, but **DENIED** as to the use of the QA copies. Fox's motion for partial summary judgment as to DISH's liability for copyright infringement for the AutoHop feature is **DENIED,** but its motion as to DISH's liability for direct infringement for using the QA copies is **GRANTED.**

### 2. Contract Claim

Fox contends that the QA copies breach the No–Copying Provision of the 2002 RTC Agreement: "[DISH] shall not, for pay or otherwise, record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission of any portion of any Station's Analog Signal without prior written permission of the Station, except as is specifically permitted by this Agreement."

EchoStar in its current incarnation is not a party to the 2002 RTC Agreement. DISH contends that EchoStar is DISH's "technology vendor" and made the QA copies as an "independent contractor for DISH," and that "[t]his fact alone disposes of Fox's contract claim." DISH MSJ Opp. at 38. The No–Copying Provision, however, prohibits the *authorization* of copying of any portion of Fox's programming without permission. It is undisputed that EchoStar made the QA Copies on behalf of DISH in order to provide a service to DISH's subscribers. The QA Copies constitute a breach of the No–Copying Provision of the 2002 RTC Agreement.

 Under New York law, in order to recover on a claim for breach of contract, a plaintiff must show: (1) the existence of a contract; (2) plaintiff's performance under the contract; (3) defendant's breach of the contract; and (4) the resulting damages to the plaintiff. *J.P. Morgan Chase v. J.H. Elec. of New York, Inc.,* 69 A.D.3d 802, 893 N.Y.S.2d 237, 239 (2010). Fox has established the existence of a contract and failure to perform the contract by defendant. No party has suggested nonperformance by Fox.

 Fox seeks only reasonable royalties for its contract claims, and does not seek any actual damages. Joint Stipulation for Defendant's Motion to Compel, June 9, 2014 ("Joint Stipulation") at 31 [Doc. # 226]; FAC at 24, Prayer For Relief at ¶¶ 3–4 [Doc. # 135]. DISH argues that reasonable royalties are not available in a breach-of-contract claim under New York law, and that Fox is therefore unable to show an essential element of the claim, because it cannot show damages as a result of the breach. DISH MSJ at 41.

As discussed below in section IV.E.1 (Breach of Contract Damages), reasonable royalties are available to plaintiffs under New York law as a remedy for breach of contract. The Court finds no genuine material dispute that Fox would have charged for copies of its programming, and therefore that some amount of damages resulted from DISH's breach of the Agreement. Although Fox has established all essential elements of its claim that the QA copies breached the No Copying Provision, the question of what amount of royalties would be reasonable during the limited period that DISH used the QA copies presents a triable issue of fact. Fox's motion for partial summary judgment as to DISH's liability for breach of contract in using the QA copies is **GRANTED** and DISH's motion for summary judgment as to this claim is **DENIED.**

### D. Hopper Transfers

Hopper Transfers allows DISH subscribers to transfer copies of recordings from a DVR to a tablet or smartphone for

later viewing at any location with or without an Internet connection. Copies will not play if the device has not contacted the DISH Anywhere site for 30 days, and DISH has restrictions on certain programming regarding the number of devices to which copies can be transferred and the length of time that programs can reside on a mobile device before they expire. Some programming cannot be copied at all. Fox alleges that DISH is liable for primary and secondary infringement of both the reproduction right and the distribution right for offering Hopper Transfers to its subscribers. Fox also contends the Hopper Transfers violates the No–Copying Provision of the 2002 RTC Agreement.

### 1. Copyright Claims

#### a. DISH Does Not Engage in Volitional Conduct Giving Rise to Direct Infringement.

██ DISH's control over the Hopper Transfers process is significantly less than its control over the PTAT process, which the Court has already found is not sufficient volitional conduct to amount to liability for direct infringement. DISH subscribers, not DISH, make and transfer the Hopper Transfers copies using DISH's equipment. Any potential distribution or performance is also by DISH subscribers, not DISH. DISH is not liable for direct infringement by offering Hopper Transfers.

#### b. DISH Subscribers' Use of Hopper Transfers is Fair Use.

██ Hopper Transfers is a technology that permits non-commercial time- and place-shifting of recordings already validly possessed by subscribers, which is paradigmatic fair use under existing law. *See Recording Indus. Ass'n of Am.*, 180 F.3d at 1079 (making copies "in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive . . . is paradigmatic noncommercial use."). As

with PTAT, where the subscriber engaged in the volitional conduct of copying, Fox has not demonstrated that DISH subscribers' use of Hopper Transfers standing alone is likely to cause harm to the secondary market for Fox programming that rises beyond the speculative, such that the question should be presented to a jury. (*See* Section IV.B.1.b., *supra*, re speculative nature of market harm.) Subscribers' activation of Hopper Transfers is fair use, and DISH is not liable for secondary infringement.

DISH's motion for summary judgment as to copyright infringement by Hopper Transfers is **GRANTED** as a matter of law.

### 2. Contract Claim

Fox maintains that DISH violates section 9(a) of the 2002 RTC Agreement (the No–Copying Provision) by authorizing DISH subscribers to make copies of Fox programming for use outside the home using Hopper Transfers. DISH argues that copyright law itself, not DISH, "authorizes" subscribers to make the copies, because their use of Hopper Transfers is fair use. DISH MSJ at 38.

██ Fair use is not a defense to a breach of contract claim. *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir.2004), *opinion amended on denial of reh'g*, 400 F.3d 658 (9th Cir.2005) (claim for breach of contract not preempted by the Copyright Act because it alleged additional element); *see also eScholar, LLC v. Otis Educ. Sys., Inc.*, 387 F.Supp.2d 329, 333 (S.D.N.Y.2005) ("the existence of explicit contractual rights makes a breach of contract claim qualitatively different from a claim for copyright infringement."); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 186 F.Supp.2d 592, 594–95 (D.Md.2002) (parties' express contract establishes "private law" governing fair use of the copyrighted works). Copyright law will not

preempt a contractual agreement unless the elements of the claims are identical.

The No–Copying Provision differs from the copyright infringement claim in that, among other things, it includes carve-outs for "private home use" by subscribers and for specific permission under the Agreement, and is therefore not preempted by the Copyright Act. Congress's general "authorization" of activity permitted under the Copyright Act has no bearing on contract claims. Parties are free to bargain away their rights to make fair use of copyrighted material under the "private law" of contractual agreements. Fair use is an affirmative defense to copyright infringement, not a catch-all permission to make use of copyrighted material in contravention of the terms of a contract. DISH—not Congress—has authorized its subscribers to make copies of Fox Programming under certain prescribed circumstances.

In using Hopper Transfers, DISH subscribers are unquestionably making copies for use outside the home. *See* DISH Reply GDMF at ¶ 107 (Hopper Transfers allows subscribers to play back recordings *at any location* even if the mobile device is not connected to the Internet). As discussed above, "authorize" means, among other things, to empower, to formally approve, to sanction, or to give power or permission to do something. Only DISH subscribers in good standing, whose devices have contacted the DISH Anywhere site within the past 30 days, may use Hopper Transfers. DISH gives both the means and permission to users to make copies for use outside the home, which amounts to "authorization" in violation of the No–Copying Provision.

The Court **GRANTS** Fox's motion for partial summary judgment as to DISH's liability for breach of the No–Copying Provision by implementing Hopper Transfers,

and **DENIES** DISH's motion for summary judgment as to the same claim.

### E. Damages

Fox's motion for partial summary judgment is granted as to the contentions that DISH Anywhere, the QA copies, and Hopper Transfers violate the No–Copying Provision of the 2002 RTC Agreement.

#### 1. Breach of Contract Damages

DISH argues that "[m]onths of discovery have revealed *no harm* that Fox has suffered as a result of Dish's alleged breach of the 2002 and 2010 agreements." DISH MSJ at 40.. Fox stipulates that it is not seeking to recover any actual damages suffered as a result of Defendants' breaches of contract, but instead seeks reasonable royalties. Joint Stipulation at 31 ("Fox has confirmed repeatedly [that] it is not seeking lost profits or los[t] revenues as damages.").

DISH contends that reasonable royalties are not available for a breach of contract under New York law. DISH MSJ at 41. To the contrary, a New York Court of Appeals case from 1951 approves reasonable royalties as a measure of damages for a breach of contract which "furnishes a sufficiently definite standard as a practical means that will be just to the parties." *Spitz v. Lesser*, 302 N.Y. 490, 494, 99 N.E.2d 540 (N.Y.1951).

DISH cites some more recent unpublished cases which suggest that reasonable royalties *may* not be available in a breach-of-contract action, but which do not cite any controlling authority for that proposition. *See, e.g., Jill Stuart (Asia) LLC v. Sanei Intern. Co., Ltd.,* 12 CIV. 3699 KBF, 2013 WL 3203893, at *5 (S.D.N.Y. June 17, 2013), *aff'd* 566 Fed.Appx. 29 (2d Cir.2014) (reasonable royalty theory of damages "cannot apply," citing an unpublished order granting motion to exclude expert testimony on royalties); *see also Jill Stuart*

**1180**

*(Asia) LLC v. Sanei Intern Co. Ltd.*, 566 Fed.Appx. 29, 32 (2d Cir.2014) (reasonable royalty theory fails, even if hypothetically available under New York law, because plaintiff fails to show reasonable certainty).

Fox cites two relatively recent cases approving reasonable royalties as damages in breach-of contract cases decided under New York law. *See Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F.Supp.2d 655, 664 (S.D.N.Y.2013); *Inside Out Prods. v. Scholastic Inc.*, No. 90–7233, 1995 WL 375927, at *6 (S.D.N.Y. June 23, 1995).

Because no controlling law holds that reasonable royalties are *not* available as a remedy for a breach-of-contract claim, this Court concludes that reasonable royalties are potentially available under New York law as a remedy for the contract breach claims regarding the QA copies, DISH

Anywhere, and Hopper Transfers. There is a triable issue of fact, however, as to whether Fox can establish the calculation of such royalties with reasonable certainty and, if so, what the amount would be.[20]

DISH argues that, even if reasonable royalties are available as a remedy for contract breach under New York law, Fox waived any such right because of the applicable agreements' express disclaimer for any liability for "incidental or consequential damages." DISH MSJ at 41; 2004 Agreement ¶ 29. The parties' 2004 Agreement waives incidental or consequential damages only as to "THIS AGREEMENT." 2004 Agreement ¶ 29 (capitalization in original). The 2002 RTC Agreement, which is the applicable agreement for the remaining claims, does not include a disclaimer of liability for incidental or consequential damages.[21]

---

**20.** Reasonable royalties are a calculation of the hypothetical license which would have been paid but for the conduct giving rise to the claim. *Georgia–Pac. Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970) *modified sub nom. Georgia–Pac. Corp. v. U.S. Plywood–Champion Papers, Inc.*, 446 F.2d 295 (2d Cir.1971); *see also Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974) (assessing "reasonable estimate of royalties [plaintiff] would have earned had [defendant] not breached its promise to publish."). An award of reasonable royalties must generally be supported by showing with "reasonable certainty" both that royalties were lost and the amount of that loss. *Trovan, Ltd. v. Pfizer, Inc.*, No. CV–98–00094, 2000 WL 709149, *17 (C.D.Cal. May 24, 2000).

"If there is no established royalty, the amount of a reasonable royalty may be determined with reference to a hypothetical negotiation." *Funai Elec. Co. v. Daewoo Electronics Corp.*, 593 F.Supp.2d 1088, 1107 (N.D.Cal. 2009) *aff'd*, 616 F.3d 1357 (Fed.Cir.2010). "Even in cases without [a prior licensing agreement between the parties] ... courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to calculate them." *Gucci Am., Inc. v. Guess?, Inc.*, 858

F.Supp.2d 250, 253–54 (S.D.N.Y.2012). Courts have upheld awards of reasonable royalties that are consistent with royalties between the parties, between a plaintiff and third parties, or even comparable royalties entirely between third parties. *See QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA 12–CV–0451, 2013 WL 1953719, at *4 (C.D.Cal. May 9, 2013). Records of business negotiations between parties or between the parties and third parties may provide an adequate level of "reasonable certainty" regarding reasonable royalties. *Id.* at *5.

**21.** Paragraph 26 of the 2004 RTC Agreement states that "[t]his Agreement supersedes any and all other prior and contemporaneous agreements, whether oral or written, pertaining to the distribution of any Service by Affiliate." Neither party has suggested that the 2004 Agreement supersedes the 2002 RTC Agreement as a whole, and it has instead been described as an "amendment" to that agreement. *See* DISH MSJ at 4, n. 1. Although it is difficult to fathom an issue that has not been briefed by the parties in their voluminous filings, this issue has not been specifically briefed and therefore the Court does not address it *sua sponte*. The Court assumes, without deciding, that the provisions of the 2002 RTC Agreement pertinent to this dispute re-

### 2. Copyright Infringement Remedies

Fox has demonstrated that the QA copies infringe its copyrights. Fox seeks statutory damages, compensatory damages in the form of reasonable royalties, and disgorgement of profits. DISH argues that there is no reasonable royalties remedy under the Copyright Act. DISH MSJ at 43.

 Statutory damages, hypothetical or lost license fees, and disgorgement of profits are all available under the Copyright Act and potentially available if Fox prevails at trial as to damages. *See Nintendo of Am., Inc. v. Dragon Pac. Int'l,* 40 F.3d 1007, 1011 (9th Cir.1994) (statutory damages may be appropriate when lost profits would be an inadequate measure); *see also Oracle Corp. v. SAP AG,* 765 F.3d 1081, 1087–88 (9th Cir.2014) (hypothetical-license damages are an appropriate form of damages in copyright case); *Polar Bear Productions, Inc. v. Timex Corporation,* 384 F.3d 700, 710 (9th Cir.2004) (upholding hypothetical lost license fee damages); *Fahmy v. Jay–Z,* 835 F.Supp.2d 783, 794 (C.D.Cal.2011) (infringer's revenues available as damages if the result of copyright infringement). Thus, Fox is entitled to seek these potential remedies for the copyright infringement claim as to the QA copies.

 DISH contends that it is entitled to judgment on Fox's claim for disgorgement of profits because there is no causal nexus between the copyright infringement and DISH's subscriber revenues. *Mackie v. Rieser,* 296 F.3d 909, 915–16 (9th Cir. 2002) (copyright holder "must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement."). The QA copies facilitated one of the services that DISH offers its subscribers in order to convince them to subscribe. Fox has not demonstrated, however, that it can separate out DISH's profits that flow from the use of the Auto-Hop feature, let alone those that emanate solely from the limited-time use of the QA copies. In the absence of a triable issue as to disgorgement of profits, the Court **GRANTS** DISH's motion for summary adjudication as to this particular remedy.

### F. Exceeding the Scope of a License

DISH seeks summary adjudication of the issue that exceeding the scope of a license is not a copyright claim, as "a plaintiff cannot bypass the elements of a copyright infringement simply by proving breach of contract." DISH MSJ at 19.

 In acknowledging the close relationship between the contract claims and the copyright claims at issue in this case, this Court noted at the preliminary injunction stage that "[a] licensee infringes the owner's copyright if its use exceeds the scope of its license." *Fox Broadcasting,* 905 F.Supp.2d at 1097 (internal citations and quotation marks omitted). While this statement remains true in the proper context, DISH is correct that a plaintiff must nonetheless establish that the defendant's conduct has violated one of the copyright owner's statutory rights, and not merely that the defendant is in breach of contract, in order to gain the benefits of copyright protection. *See Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1122 (9th Cir.1999). This determination, however, does not alter the outcome of either the contract claims or the copyright claims at issue here, except to clarify that a finding of contract breach does not perforce give rise to liability for copyright infringement unless the fundamental elements of a statutory violation also have been established.

main in effect and that the 2004 RTC Agreement did not supersede it in toto.

### G. Implied Covenant of Good Faith and Fair Dealing

 Fox has alleged that DISH's conduct generally constitutes a breach of the implied covenant of good faith and fair dealing. FAC at ¶¶ 97–100. Every contact includes an implied covenant of good faith and fair dealing in the course of performance. *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 68, 412 N.Y.S.2d 827, 385 N.E.2d 566, 569 (1978). The duties of good faith and fair dealing encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496, 501 (2002) (internal citation and quotation marks omitted).

 "[A] party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists." *Rowe* at 69, 412 N.Y.S.2d 827, 385 N.E.2d 566. "Thus, a party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole." *Id.* "The covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel." *D & L Holdings, LLC v. RCG Goldman Co., LLC,* 734 N.Y.S.2d 25, 31, 287 A.D.2d 65, 73 (App.Div.2001).

Here, the 2010 Letter Agreement contains a merger provision and thus the Court cannot consider any implied promises which explain, add to, or contradict the express terms of that agreement. In any event, Fox has not specified what covenants might be implicit in either the 2002 RTC Agreement or the 2010 Letter Agreement that DISH has breached, and therefore has not demonstrated that there are any triable issues of fact as to the implied covenant claims. The Court therefore GRANTS DISH's motion for summary judgment as to the claims for breach of the implied covenant of good faith and fair dealing.

### F. Anti–Circumvention Provision

The 2010 Letter Agreement states that "[a]t no time during the Term may any of the Fox Parties or DISH take any action whatsoever intended to frustrate or circumvent, or attempt to frustrate or circumvent, the protections granted to the other Party pursuant to any provision in this Letter Agreement" ["Anti–Circumvention Provision"]. 2010 Letter Agreement at ¶ 5. Fox alleges that DISH breached the Anti–Circumvention Provision. FAC at ¶ 93. DISH moves for summary judgment as to this alleged contract breach.

Fox contends that DISH circumvented and frustrated the 2010 Letter Agreement by developing PTAT and offering it to its subscribers. Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Fox Opp. MSJ") at 37. [Doc. # 531.] According to Fox, DISH circumvented and frustrated the agreement because PTAT is similar to VOD, and PTAT does not disable fast-forwarding of commercials. *Id.*

The Court already has determined that PTAT does not violate the No–Distribution Provision of the 2002 RTC Agreement, because, even if it is similar to VOD, it does not "distribute" anything. If DISH has not breached the No–Distribution Provision itself, DISH certainly has not breached or circumvented the protections offered by that Provision. The Anti–Circumvention Provision does not aid Fox's cause.

DISH's motion for summary judgment is **GRANTED** as to the claim that it breached the Anti–Circumvention Provision.

## V.

### *CONCLUSION*

In light of the foregoing, the Court orders the following:

1. Fox's motion for partial summary judgment is **DENIED** as to whether DISH:
 a. is infringing Fox's exclusive right to publicly perform its copyrighted works by offering DISH Anywhere;
 b. is breaching the 2010 Letter Agreement by offering DISH Anywhere; and
 c. is breaching the 2002 RTC Agreement by offering PTAT;
2. Fox's motion for partial summary judgment is **GRANTED** as to whether DISH:
 a. is breaching the 2002 RTC Agreement by offering Hopper Transfers;
 b. breached the 2002 RTC Agreement by making QA copies of Fox's programming in connection with the operation of the AutoHop service; and
 c. infringed Fox's exclusive right of reproduction of its copyrighted works by making the QA copies.
3. DISH's motion for summary judgment is **GRANTED** as to whether DISH:
 a. infringed or is infringing Fox's exclusive copyrights by offering DISH Anywhere, PTAT, AutoHop, or Hopper Transfers;
 b. violated the 2010 Letter Agreement by offering PTAT;
 c. violated the 2002 RTC Agreement by offering PTAT or Hopper Transfers;
 d. violated the Anti–Circumvention Provision of the 2010 Letter Agreement; and
 e. violated the implied covenant of good faith and fair dealing as to all of its conduct.
4. DISH's motion for summary judgment is **DENIED** as to whether DISH:
 a. infringed Fox's exclusive right of reproduction of its copyrighted works by making the QA copies;
 b. violated the 2010 Letter Agreement by offering DISH Anywhere; and
 c. violated the 2002 RTC Agreement by offering DISH Anywhere and making the QA copies,
5. DISH's motion for summary judgment is **DENIED** as to whether Fox has asserted any viable contract or copyright remedies but **GRANTED** as to whether Fox is entitled to disgorgement of profits.

Because this Order quotes from the parties' confidential agreements and other proprietary documents, which have been filed under seal, within five days from the date of this Order, the parties shall meet and confer regarding which portions of this Order, if any, they propose to be redacted such that the Court may issue a redacted version of the Order. The parties shall file a joint report by no later than January 17, 2015 regarding the proposed redacted version of the Order.

**IT IS SO ORDERED.**

**NUTRIVITA LABORATORIES, INC., Plaintiff,**

v.

**VBS DISTRIBUTION INC., et al., Defendants.**

**Case No.: SACV 13-01635-CJC(DFMx)**

United States District Court, C.D. California, Southern Division.

Signed January 27, 2016

Anthony B. Cartee, Ng Do–Khanh, Irvine, CA, Daniel D. Do-Khanh, Ng Do–Khanh PC, Costa Mesa, CA, for Plaintiff.

Henry P. Friesen, Friesen Guy and Associates, Irvine, CA, William Edward Levin, Levin Intellectual Property Law Group, Laguna Beach, CA, for Defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND SANCTIONS

CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

Plaintiff Nutrivita Laboratories, Inc. ("Nutrivita") brought this action against VBS Distribution Inc., Kings Herb Corporation, and Joseph C. Nguyen (collectively, "VBS"), alleging that VBS unlawfully copied its trade dress in violation of the Copyright Act, the Lanham Act, and various state statutes. The parties evidently reached an agreement that the case should be dismissed, and on December 23, 2015, Nutrivita filed a stipulation to dismiss the case with prejudice, (Dkt.40), which the Court granted on December 30, 2015. Currently before the Court is VBS's motion for attorneys' fees and sanctions. (Dkt.41.) For the following reasons, that motion is DENIED.[1]

### II. BACKGROUND

Plaintiff Nutrivita is a marketer and distributor of what it calls "nutraceutical supplements," including a dietary supplement called Arthro–7. (Dkt. 17 ("First Amended Complaint" ("FAC")) ¶ 10.) Arthro–7 is sold in capsule form and was developed to promote joint health. (*Id.* ¶ 11.) Arthro–7 is a registered trademark. (*Id.* ¶ 11.)

Defendant VBS markets and sells a competing product called "JN–7 Best," which is apparently also a dietary supple-

---

1. Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed.R.Civ.P. 78; Local Rule 7–15. Accordingly, the hearing set for February 8, 2016 at 1:30 p.m. is hereby vacated and off calendar.

ment, sold in capsule (or caplet) form, and designed to promote joint health. (FAC ¶ 15.) Arthro–7 and JN–7 Best are marketed toward the same set of consumers and are occasionally sold side-by-side in stores. (*Id.* ¶ 16.) In September 2013, Nutrivita noticed that the packaging for JN–7 Best "included the same design elements found on the Arthro–7 label, including the same or similar fonts, colors, and patterns." (*Id.* ¶ 15.) Believing that VBS was attempting to "unfairly capitaliz[e] on [Nutrivita's] goodwill," (FAC ¶ 16), Nutriva sent VBS a demand letter on October 8, 2013. (*See* Dkt. 44–3.) The letter accused JN–7 Best of "closely mimic[king] the name, label, style, and distinctive elements of Arthro–7's trademark, copyright, and trade dress" by "us[ing] the same color schemes, layout, almost identical fonts, and art to make the box and labels of [JN–7 Best] substantially similar and infringing [sic] of Arthro–7." (*Id.* at 1.) Nutrivita also highlighted a number of claims JN–7 Best's packaging made regarding the product's health, informing VBS that it believed those claims to be false and in violation of Food and Drug Administration regulations. (*Id.* at 1.) Nutrivita demanded that VBS immediately stop promoting, advertising, and selling JN–7 Best, disclose the quantities of JN–7 Best being held by VBS, and disclose the profits VBS had already earned from selling JN–7 Best. (*Id.* at 2.) Finally, the letter threatened suit if VBS did not respond and cooperate.

On October 12, 2013, Defendant Joseph C. Nguyen sent a polite letter back to Nutrivita, apologizing for the "confusion" between the products and telling Nutrivita that it was "not [VBS's] intention" to infringe its intellectual property. (Dkt. 44–4 at 1.) Nguyen also offered to sell JN–7 Best in bottle form only (i.e., without any cardboard box packaging) "until [VBS could] come up with a new design and a new color for [its] box." (*Id.*)

Apparently unhappy with this response, Nutrivita filed a complaint in this Court on October 18, 2013. The complaint alleged thirteen causes of action, for (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, *et seq.*; (2) federal unfair competition under the Lanham Act; (3) trade dress infringement under the Lanham Act; (4) copyright infringement under the Copyright Act, 17 U.S.C. § 301 *et seq.*; trademark dilution under the Lanham Act; (6) false advertising under the Lanham Act; (7) false advertising under Cal. Bus. and Prof.Code § 17500; (8) contributory trademark infringement under the Lanham Act; (9) contributory trade dress infringement under the Lanham Act; (10) contributory copyright infringement under the Copyright Act; (11) contributory trademark dilution under the Lanham Act; (12) contributory false advertising under the Lanham Act; and (13) unfair competition under Cal. Bus and Prof.Code § 17200. (*See generally* FAC.) After Nutrivita served its complaint, Mr. Nguyen filed a motion to dismiss the case as to him on the ground that Nutrivita had inadequately alleged that he was an alter ego of VBS Distribution Inc. (Dkt.10.) That motion was granted with leave to amend, and Nutrivita filed a First Amended Complaint that adequately alleged alter ego liability. (Dkt.17.) Litigation then proceeded slowly. Counsel for VBS, Henry Friesen, fell seriously ill, and the parties stipulated to advance deadlines a number of times to accommodate his illness and recovery. (*See* Dkt. 29; Dkt. 31; Dkt. 33; Dkt. 36.) Some discovery apparently was also exchanged, and eventually it came to light in 2015 that VBS had changed the box and bottle label for JN–7 Best and informed Nutrivita of the amount of infringing labels and packaging it had originally created. (Dkt. 45–1 ¶ 20–21.) VBS also made changes to the health claims on the labels. (*Id.* ¶ 22.) Satisfied with the changes, Nu-

trivita agreed to dismiss its lawsuit with prejudice.

Roughly two weeks before the dismissal, with its original counsel still ailing, VBS retained another lawyer, William Levin. (Dkt. 45–1 ¶ 12.) Unsatisfied with the subsequent dismissal with prejudice, Mr. Levin filed this motion for attorneys' fees and sanctions, arguing that as a prevailing party, VBS is eligible for a fee award under the Copyright Act and Lanham Act, and that Nutrivita should be sanctioned under Rule 11. The motion alleges that Nutrivita's claims were meritless from the start and that Nutrivita subjected VBS to protracted litigation in order to disadvantage a competitor. Mr. Levin requests approximately $150,000 in attorneys' fees, although he concedes that he has not seen Mr. Friesen's bills, and he does not know how long Mr. Friesen spent working on the case. Accordingly, Mr. Levin declares, the actual amount of fees he would ultimately like to request may be "significantly more or less" than his $150,000 estimate, but that in any event, he considers the estimate to be "a relatively small amount" given the "complex, combined intellectual property law" issues in this case. (Dkt. 41–2 at 10.) He does not submit any bills or invoices, and instead suggests that the Court determine liability for fees first, and then refer the calculation of fees to a magistrate judge or a special master.[2]

Nutrivita, for its part, expresses shock at the estimated amount of requested fees, given the very limited litigation activity in this lawsuit (consisting, in its telling, of "one set of written discovery from each side, two depositions, two motions, and $5,623.76 in costs"). (Pl.'s Opp'n. at 1.) It also complains that Mr. Levin has not submitted bills or invoices, or even a declaration from Mr. Friesen, and points out

that the protracted nature of this litigation is mostly attributable to its willingness to stipulate to continuances for Mr. Friesen's sake. Nutrivita adds that it was surprised by the fee motion because it—not VBS—got what it wanted in this lawsuit (a change in VBS's packaging), and that in any event, fees and sanctions are unwarranted.

## III. DISCUSSION

VBS requests attorneys' fees under two statutes—the Lanham Act and the Copyright Act—and argues in addition that the Court should sanction Nutrivita under Federal Rule of Civil Procedure 11. Under the Lanham Act and the Copyright Act, only a prevailing party may recover fees. As a result, the Court will first consider whether VBS is in fact a prevailing party before turning to whether it is actually entitled to fees and whether Nutrivita should be sanctioned under Rule 11.

### A. Prevailing Party Status

■ Attorneys' fees under the Lanham and Copyright Acts are only available to prevailing parties. *See* 17 U.S.C. § 505 ("[T]he court may ... award a reasonable attorney's fee to the prevailing party."); 15 U.S.C. § 1117 ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."). Here, neither party secured a judgment from the Court, but Nutrivita did stipulate to the dismissal of its claims with prejudice. The parties disagree as to whether a plaintiff's voluntary dismissal with prejudice confers prevailing party status on a defendant.

That question is one of some dispute in the federal courts. The dispute stems from the Supreme Court's decision in *Buckhannon Bd. and Care Home, Inc. v.*

---

**2.** As Nutrivita points out, magistrate judges do not review motions for attorneys' fees in

this District. General Order 05–07.

*W.Va. Dept. of Health and Human Resources*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), which interpreted prevailing party provisions in the Americans with Disabilities Act of 1990 and Fair Housing Amendment Act of 1988. In *Buckhannon*, a West Virginia statute required that residents at assisted living facilities be capable of "self-preservation," or in other words, be "capable of moving themselves from situations involving imminent danger, such as fire." *Id.* at 600, 121 S.Ct. 1835. After an assisted living facility failed an inspection because some of its residents did not meet the requirements of the state statute, the facility sued West Virginia, arguing that the state law self-preservation requirement violated the FHAA and ADA. Partway through the litigation, West Virginia repealed the requirement, and the district court dismissed the case as moot. The assisted living facility moved for fees, but the Supreme Court ultimately determined that prevailing party status required a "judicially sanctioned change in the legal relationship of the parties," and that no such·change had occurred in the assisted living facility's case, so it was not a prevailing party. *See id.* at 605, 121 S.Ct. 1835 ("A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change.").

■ As the Ninth Circuit has explained, [*Buckhannon*] identified two judicial outcomes under which a party may be considered a 'prevailing party' for the purpose of awarding attorney's fees: (1) an enforceable judgment on the merits; or (2) a settlement agreement enforceable through a court-ordered consent decree. The former provides the necessary foundation for a plaintiff's status as a prevailing party because the plaintiff has received at least some relief based on the merits of the claim. The latter is

acceptable—even without an admission of liability—because it is a court-ordered change in the legal relationship between the parties.

*Perez–Arellano v. Smith*, 279 F.3d 791, 793 (9th Cir.2002) (internal citations omitted). The problem here is that a plaintiff's voluntary dismissal with prejudice does not fall neatly into either of these outcomes: it is not quite an enforceable judgment on the merits, because although a plaintiff is barred from reasserting its claims after a voluntary dismissal with prejudice, the dismissal says nothing about the *merits* of those claims. But neither is it exactly like a court-enforced settlement agreement; although the district court accepts the parties' stipulation and closes the case, and although a future court would no doubt dismiss the claims if brought again, the dismissal itself is not backed up by a consent decree. But although a voluntary dismissal with prejudice does not fall exactly within the bounds of *Buckhannon's* rule, it is clearly *something* more than voluntary conduct which moots a dispute, as in *Buckhannon*, and the mechanism of dismissal *with prejudice* does contemplate judicial enforcement. Buckhannon is therefore a somewhat clumsy fit for voluntary dismissals with prejudice, and district and circuit courts have wrestled with how to apply *Buckhannon's* rule in situations like these.

Happily, however, the Ninth Circuit has resolved the issue with reasonably clear guidance. In *Cadkin v. Loose*, it held in the context of the Copyright Act that a plaintiff's voluntary dismissal *without* prejudice does *not* confer prevailing party status on a defendant. 569 F.3d 1142, 1150 (9th Cir.2009). Because the defendant "remain[s] subject to the risk of refiling," the Ninth Circuit explained, a voluntary dismissal without prejudice "does not alter the legal relationship with the parties." *Id.* at 1149. It then went on to add that "a

defendant *is* a prevailing party following dismissal of a claim if the plaintiff is judicially precluded from refiling the claim against the defendant in federal court." *Id.* at 1150 (emphasis added). That is precisely the circumstance here. By stipulating to a dismissal with prejudice, Nutrivita agreed to never reassert these claims against VBS in federal court. That is a sufficient alteration in the parties' legal relationship to confer prevailing party status on VBS under *Cadkin* and *Buckhannon.*[3] *See Bruce v. Teleflora, LLC,* No. CV13–3279 ODW (CWx), 2014 WL 2710974, at *2 (C.D.Cal. June 16, 2014) (holding that a plaintiff's voluntary dismissal with prejudice conferred prevailing party status on a defendant and citing *Cadkin* ).

### B. Fees

#### 1. Discretionary Award under the Copyright Act

■ Under the Copyright Act, "the court in its discretion may allow the recovery of full costs by or against any party .... [and] the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Whether to award attorneys' fees to a prevailing party "is reposed in the sound discretion of the district courts." *Fantasy, Inc. v. Fogerty,* 94 F.3d 553, 555 (9th Cir.1996) (*Fogerty II* ). Whatever factors the district court considers when determining whether to award fees must be applied evenhandedly to prevailing plaintiffs and prevailing defendants and must further the purposes of the Copyright Act. *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534 & n. 19, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (*Fogerty I* ); *see also*

*Mattel, Inc v. MGA Entm't, Inc.,* 705 F.3d 1108, 1111 (9th Cir.2013).

Here, VBS argues that it should recover fees because Nutrivita did not have—and had not even applied for—a copyright that VBS could have possibly infringed. *See* 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."). Nutrivita does not dispute that it had not applied for a copyright at the time it filed its lawsuit, but argues nonetheless that an application of the *Fogerty* factors should persuade the Court, in its discretion, to deny fees.

■ The Ninth Circuit has invited district courts to consider five factors when determining whether to award fees in copyright cases. Those factors are: (1) "the degree of success obtained on the claim"; (2) "frivolousness"; (3) "motivation"; (4) "objective reasonableness of factual and legal arguments"; and (5) "need for compensation and deterrence." *Maljack Prods., Inc. v. GoodTimes Home Video Corp.,* 81 F.3d 881, 889 (9th Cir.1996). Here, the first factor—degree of success—cuts against an award of fees. True, VBS has prevailed in the sense that Nutrivita has withdrawn its claims and agreed not to reassert them. But that result has only occurred because VBS agreed to change its labeling. The Court at no point ruled that VBS prevailed on the merits of the disputes here, including the copyright dispute. Accordingly, VBS obtained a relatively small degree of success for the purposes of determining a fee award. *See Bridgeport Music, Inc. v. London Music,*

---

3. This result is somewhat counterintuitive because, as Nutrivita points out, it only agreed to dismiss its claims once VBS stopped infringing its trade dress. It is indeed strange that a defendant who makes concessions to a plaintiff in order to have claims dismissed can

subsequently be granted prevailing party status. But Nutrivita elected to wind down this lawsuit with a voluntary dismissal with prejudice, and *Cadkin* clearly holds that that procedural mechanism confers prevailing party status on a defendant.

*U.K.*, 345 F.Supp.2d 836, 843 (M.D.Tenn. 2004) ("[A] stipulation of dismissal with prejudice is clearly a much lesser degree of success than a judicial vindication of the defendants' position.")

 The second and fourth *Fogerty* factors—"frivolousness" and "objective reasonableness of factual and legal arguments"—weigh in favor of a fee award. Nutrivita does not dispute that having not preregistered or registered for a copyright, it was barred from bringing a civil action under § 411. Nutrivita's amended complaint notes that Nutrivita "intends to apply for registration of its copyright," (FAC ¶ 55), but Nutrivita neither alleges that it ever actually applied nor that a mere intention to apply enables it to bring a copyright action. *See Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 621 (9th Cir.2010) ("[R]eceipt by the Copyright Office of a complete application satisfies the registration requirement of § 411(a)."). As a result, from the record before the Court, it appears that Nutrivita's copyright claim was groundless.

 The final two factors—"motivation" and "need for compensation and deterrence"—weigh against a fee award. There is no evidence in the record of an improper motive on Nutrivita's part, and the Court is not persuaded that Nutrivita alleged its copyright claim in bad faith. Moreover,

the addition of a weak claim to an otherwise meritorious complaint is not the sort of thing that needs to be actively deterred by aggressive fee awards. The parties seem to agree that VBS's product labeling was problematic, and after VBS produced evidence that it had fixed the labeling, Nutrivita agreed to dismiss its claims. There is no reason to infer a malevolent motivation on Nutrivita's part.

Some of the *Fogerty* factors weigh in favor of a fee award, and some weigh against. Having considered the factors and the facts of this case holistically, the Court finds that a fee award is not merited, and exercises its discretion to DENY VBS's request for fees on Nutrivita's copyright claim.

### 2. Exceptional Case Determination under the Lanham Act

 Nutrivita's next cause of action is for trademark infringement under the Lanham Act, 15 U.S.C. § 1114 *et seq.* The Lanham Act provides that the "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). In the Ninth Circuit, "[a]n action may be considered exceptional when a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith." *Secalt S.A. v. Wuxi Shenxi Constr. Machinery Co., Ltd.*, 668 F.3d 677, 687 (9th Cir.2012).[4] Although the "line distin-

---

4. In its reply brief—but not in its motion—VBS argues that the bar for exceptionality in the trademark context was lowered by the Supreme Court's decision in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, —— U.S. ——, 134 S.Ct. 1749, 188 L.Ed.2d 816 (2014). *Octane Fitness* considered the meaning of "exceptional" in the Patent Act's fee provision, which provides—like the Lanham Act does—that a district court may award fees "in exceptional cases." *Id.* at 1753; *see also* 35 U.S.C. § 285. *Octane Fitness* held that "[a]n exceptional case ... is simply one that stands out from other with respect to the substantive strength of a party's litigation position ... or the unreasonable manner in which the case

was litigated." *Id.* at 1756. Some district courts have applied *Octane Fitness* 's holding to trademark cases under the Lanham Act. *See, e.g., Apple, Inc. v. Samsung Elecs. Co.*, Case No.:11–CV–01846–LHK, 2014 WL 4145499, at *6 (N.D.Cal. Aug. 20, 2014). And there are good reasons for doing so. *See Octane Fitness*, 134 S.Ct. at 1756 (noting that the Lanham Act's fee-shifting provision is "identical" to that of the Patent Act). Nonetheless, the matter is not settled, and VBS's failure to make this argument in its motion meant that Nutrivita had no meaningful opportunity to respond to it. As a result, the Court will disregard it. *See U.S. v. Alcan Elec. and Engineering, Inc.*, 197 F.3d 1014,

guishing exceptional cases from non-exceptional cases is far from clear" and is "especially fuzzy where the *defendant* prevails due to [a] plaintiff's failure of proof," the Ninth Circuit has held that "an action is exceptional under the Lanham Act if the plaintiff has no reasonable or legal basis to believe in success on the merits." *Id.* (emphasis in original). A district court's determination that a Lanham Act case is exceptional is reviewed *de novo*, but a district court's decision to award fees in an exceptional case is reviewed for abuse of discretion. *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir.2003).

■ Here, VBS argues that its trademark—"JN–7 Best"—is so dissimilar from Nutrivita's mark—"Arthro–7"—that Nutrivita could not have possible had any "reasonable or legal basis to believe in success on the merits" of its trademark infringement claim; *see Secalt*, 668 F.3d at 687. To be sure, although the marks do bear a superficial similarity (the "–7" designation), Nutrivita faced an uphill battle in proving its trademark infringement claim. Nonetheless, the Court is not persuaded that Nutrivita lacked *any* reasonable basis to believe that the claim was worthwhile. "In cases where the Ninth Circuit has affirmed the district court's denial of attorneys' fees based on a finding that [a Lanham Act] case was not exceptional, the key factor appears to be that the plaintiff raised 'debatable issues' and had a legitimate reason for bringing the lawsuit." *Am. Optometric Soc., Inc. v. Am. Bd. of Optometry, Inc.*, No. CV10–03983 AHM (FFMx), 2012 WL 6012861, at *2 (C.D.Cal. Dec. 3, 2012) (citing *Applied Info. Sci. Corp. v. eBay, Inc.*, 511 F.3d 966, 973 (9th Cir.2007). Here, whether VBS's

mark is similar enough to Nutrivita's mark to justify a trademark infringement claim is at least debatable. And, importantly, VBS makes no credible argument that Nutrivita brought this claim in bad faith or to harass VBS with needless litigation. On the contrary, the fact that VBS modified its product packaging is good reason to believe that there was something to Nutrivita's lawsuit, even if its trademark infringement claim was not particularly strong. And Nutrivita's willingness to grant continuances, combined with the general lack of activity in this case, strongly suggests that Nutrivita was not in it just to make things difficult for a competitor. *See Applied Info.*, 511 F.3d at 973 (affirming a district court's denial of attorneys' fees where there was "no compelling proof that [the plaintiff] acted capriciously or pursued litigation to harass [the defendant], or that [the plaintiff] intended to bring a meritless or unreasonable case"). Accordingly, the relative strength of Nutrivita's trademark infringement claim is not a ground for an exceptional case determination.

■ VBS offers one more argument for why the Court should determine this case exceptional under the Lanham Act. It argues that Nutrivita's trade dress claim was meritless because Nutrivita did not sue VBS until *after* VBS had changed the offending trade dress. VBS points to the letter it sent to Nutrivita on October 12, 2013, six days before the complaint was filed. (*See* Dkt. 41–3 Exh. 7.) That letter apologizes to Nutrivita for the "confusion" of the similar packaging and notes that it was "not [VBS's] intention" to distribute a confusingly similar product. (*Id.*) The letter says that to "eliminate such confusion,"

---

1020 (9th Cir.1999) (arguments made for the first time in a reply brief are waived). However, even if the Court were to apply the *Octane Fitness* rule to this case, it would

determine that this case does not "stand out" and therefore that an award of attorneys' fees under the Lanham Act would be unwarranted.

VBS would sell JN–7 Best in bottle form only—i.e., without cardboard packaging—until it could come up with an alternative design. (*Id.*) VBS believes that this letter should have notified Nutrivita that any trade dress infringement ceased before the lawsuit was filed, so even assuming that VBS's old trade dress *did* infringe, Nutrivita's trade dress claims were meritless.

This argument misses the point. Nutrivita believed that the JN–7 Best *bottle* infringed its trade dress, just like the JN–Y Best *box,* so VBS's offer to sell the product in bottle form only did not mean that VBS had ceased all potentially infringing behavior. (*See* FAC ¶ 49 (alleging that VBS was copying Nutrivita's "distinctive packaging"); Pl.'s Opp. at 2–3 (explaining that Nutrivita believed both the JN–7 Best bottle and the box to be trading on its distinctive trade dress).) As a result, Nutrivita's trade dress claim was not meritless when it was filed, and this case is not an exceptional one under the Lanham Act. VBS's request for fees based on an exceptional case determination is DENIED.

### C. Rule 11 Sanctions

Finally, VBS argues that Nutrivita should be sanctioned under Federal Rule of Civil Procedure 11, which requires attorneys to certify that filings are not "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Its theory is basically that Nutrivita went out of its way to harass a competitor by bringing a frivolous lawsuit and then litigating it slowly, over more than two years.

▮ As an initial matter, the fact that VBS includes a Rule 11 motion in its motion for attorneys' fees is improper. Rule 11 motions "must be made separately from any other motion." Fed.R.Civ.P. 11. However, even if VBS's motion for Rule 11 sanctions were procedurally compliant, the Court would deny it. At bottom, Nutrivita sued VBS because it believed that VBS's packaging was similar to its own and would confuse consumers. VBS made the requested changes. Litigation was protracted, but from the Court's review of the thin record, it appears that the chief reason for the delays was that Nutrivita–the plaintiff, who undoubtedly wanted a resolution of the case–was willing to grant defense counsel multiple continuances on account of his health. Some of Nutrivita's claims were stronger than others, but there is no reason to believe that the lawsuit was frivolous or the filings improper. The Court therefore DENIES VBS's request for Rule 11 sanctions.

### IV. CONCLUSION

For the foregoing reasons, the Court in its discretion declines to award VBS attorneys' fees, and VBS's motion is DENIED.

**DIRECTV, A DELAWARE CORPORATION,**
**Plaintiff,**

v.

**FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island corporation, Defendants.**

**Case No. CV 14-08673 DDP (x)**

United States District Court, C.D. California.

Signed February 1, 2016

Kirk A. Pasich, Michael S. Gehrt, Iman Grace Wilson, Liner LLP, Los Angeles, CA, for Plaintiff.

Amy M. Churan, Scott G. Johnson, Robins Kaplan LLP, Los Angeles, CA, Audrey Elizabeth Burnett, Robins Kaplan LLP, Minneapolis, MN, for Defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DEAN D. PREGERSON, United States District Judge

Presently before the court is Defendant Factory Mutual Insurance Company ("Factory Mutual")'s Motion to Dismiss. Having considered the submissions of the parties and heard oral argument, the court

grants the motion and adopts the following Order.

## I. Background

Plaintiff DIRECTV distributes digital entertainment programming, primarily via satellite, to residential and commercial subscribers. DIRECTV satellite dishes pick up signals from satellites and transmit those signals to a DIRECTV Receiver (also known as a "set-top box" or "STB"), which in turn transmits the signals to the subscriber's television.

As of October 2011, DIRECTV contracted with four companies to manufacture and supply its STBs: (1) Technicolor Connected Home USA, LLC; (2) Pace Americas Inc.; (3) Samsung Electronics America, Inc.; and (4) Humax USA, Inc. These four STB manufacturers purchased the component parts and incorporated them into the finished STBs, placing the "DIRECTV" logo and trademark on the STBs they manufactured. The four STB manufacturers then sold the finished STBs to DIRECTV.

Some STBs include, as a component part, hard disk drives ("HDDs" or "hard drives"). In October 2011, all four of the STB manufacturers used HDDs made by one of two companies, Western Digital Technologies, Inc. ("Western Digital") and Seagate Technology LLC ("Seagate"). Western Digital also sold hard drives to Jabil Global Services, a third-party repair service provider that would fix defective STBs for DIRECTV.

DIRECTV categorizes the STB manufacturers as its "Tier 1" suppliers and Western Digital and Seagate as its "Tier 2" suppliers. Although DIRECTV shared pricing and technical specification requirements with Seagate and Western Digital and instructed its STB manufacturers to use only certain Seagate and Western Digital products, DIRECTV did not, during the relevant time periods, purchase any hard drives from Seagate or Western Digital or otherwise contract with either HDD manufacturer.

During the relevant time period, DIRECTV had a property insurance policy provided by Factory Mutual. The policy provided coverage for both property damage and time element, or business interruption, losses. A "contingent time element" provision of the policy extended coverage, including business interruption and extra expense coverage, beyond DIRECTV's own property to certain "contingent time element locations." The policy's definition of such locations included any location "of a direct supplier, contract manufacturer or contract service provider to [DIRECTV]."

In October 2011, monsoonal flooding in northern Thailand damaged two of Western Digital's hard drive manufacturing facilities located there. Although the flooding did not affect any of the four STB manufacturers' facilities, DIRECTV alleges that the damage to the Western Digital facilities reduced the supply of hard drives available for incorporation into DIRECTV's STBs. DIRECTV further claims that the resulting price increase in Western Digital HDDs, as well as the expense of obtaining substitute HDDs from Seagate, caused DIRECTV approximately $22 million in losses and extra expenses.

DIRECTV made a claim under the Factory Mutual policy for contingent time element losses. In December 2013, after a series of communications between the parties regarding DIRECTV's supply chain and relationship with Western Digital, Factory Mutual denied the claim on the basis that Western Digital is not DIRECTV's "direct supplier," and therefore does not fall within the ambit of the contingent time element location provision. DIRECTV's position is that, despite the lack of any contractual relationship between

DIRECTV and Western Digital, the latter is nevertheless a "direct supplier" by dint of the direct working relationship between the two. DIRECTV's Complaint, first filed in state court, alleges breach of contract and seeks declaratory relief. Factory Mutual removed to this court and now moves for summary judgment.

## II. Legal Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323, 106 S.Ct. 2548.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256, 106 S.Ct. 2505. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. 2548. A genuine issue

exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir.1996). Counsel has an obligation to lay out their support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir.2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." Id.

## III. Discussion

■ The only question before the court is whether the terms "direct supplier, contract manufacturer or contract service provider" are applicable to the relationship between Western Digital and DIRECTV. Such policy interpretations are matters of law, amendable, in the absence of disputed material facts, to summary judgment. See, e.g. Grange Ins. Assoc. v. Linott, 77 F.Supp.3d 926, 933 (N.D.Cal.2015). Under California law, insurance policies are governed by the same general rules that apply to any contract interpretation. Bank of the W. v. Superior Court, 2 Cal.4th 1254, 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992); MacKinnon v. Truck Ins. Exch., 31 Cal.4th 635, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (2003).

■ Under these rules, "the mutual intention of the parties at the time the

contract is formed governs interpretation," and this intent "is to be inferred, if possible, solely from the written provisions of the contract." Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 5 Cal.4th 854, 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993) (citing Cal. Civ. Code §§ 1636, 1639); Grange, 77 F.Supp.3d at 934. "The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense" governs judicial interpretation of the contract unless the terms are "used by the parties in a technical sense or a special meaning is given to them by usage." Bay Cities, 5 Cal.4th at 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (quotations omitted); see also Cal. Civ. Code §§ 1639, 1644, 1638. Within these limits, however, an insurance contract's language must be construed "in the context of that instrument as a whole, and in the circumstances of that case ...." Id. Moreover, "[i]n an insurance policy, coverage provisions are interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly." Amerigraphics, Inc. v. Mercury Cas. Co., 182 Cal.App.4th 1538, 1551, 107 Cal.Rptr.3d 307 (2010).

■ DIRECTV argues first that the phrase "direct supplier" should be defined according to its usage in the "electronics supply chain industry" based on the context of the Policy and the parties' usage of the phrase. DIRECTV points to no evidence, however, that the parties intended "direct supplier" to have some technical or industry-specific definition, nor any usage of that phrase either within or outside the policy itself in a manner that would suggest a definition other than the ordinary and popular one. The policy does include specialized definitions of otherwise ordinary terms, including "location," "occurrence," "wind," "earth movement," "flood," "terrorism," "contamination," "normal," and "Great Britain," as well as definitions

of less common phrases, such as "soft costs." The fact that "direct supplier," in contrast, is not defined anywhere in the policy suggests that the parties did not intend the term to carry any technical or specialized meaning.

Rather than identify evidence of definition or technical usage, DIRECTV contends that "insurers are presumed to know and be bound by the meaning of the terms used in their insureds' industries." (Opp. at 11-12.) The authorities that DIRECTV cites in support of this principle are of little help. In Guipre v. Kurt Hitke & Co., Inc., 109 Cal.App.2d 7, 14, 240 P.2d 312 (1952) and Hazard's Administrator v. New England Marine Insurance Co., 33 U.S. (8 Pet.) 557, 583, 8 L.Ed. 1043 (1834), the courts did not hold that the insurers were "bound by the meaning of the terms used in their insureds' industries," but rather that the insurers were bound by the technical meaning of terms used in their own insurance industry or market. In Guipre, the court held that, because the defendant insurance agent was in the business of insuring automobiles, he was deemed to have contracted in reference to the usages and practices in that trade, particularly the practice of oral ratification of insurance coverage. Guipre, 109 Cal.App.2d at 14–15, 240 P.2d 312.

In Hazard's Administrator, a ship owner seeking insurance represented in a letter sent from New York to Boston that his ship was "one of the strongest and best ships in the whale fishery [and] has been newly coppered ...." Hazard's Administrator, 33 U.S. at 579. The ship and its owner were both in New York, but the insurer issued the policy from its location in Boston. Id. at 580. Although the Court stated that the Boston underwriters, given their experience in the marine insurance business, must have known that ship-related definitions differ from port to port, and

therefore "must have considered the ship to be described according to the New York usage" of the term "coppered," it did so not in the course of selecting one interpretation of that term over another, but rather in holding that the ship's owner had not misrepresented the condition of the product insured. Id. at 583.

Nor does Wolf v. Superior Court, 114 Cal.App.4th 1343, 8 Cal.Rptr.3d 649 (2004), support DIRECTV's position. There, a dispute arose about the meaning of the term "gross receipts" in a contract between the creator of movie characters and a movie studio. Even putting aside that the court found the term "gross receipts" ambiguous, the court only adopted the definition customary in the motion picture industry because "both the nature of the contract and the circumstances involved the motion picture industry." Wolf, 114 Cal.App.4th at 1357, 8 Cal.Rptr.3d 649. Here, there is no analogous ambiguity or extrinsic evidence that Factory Mutual has any particular knowledge about the "electronics supply chain industry," or why any such knowledge would be particularly pertinent where DIRECTV is itself not a member of that industry in any capacity other than as an end customer.[1]

Absent any evidence that the parties intended "direct supplier" to have any technical, or industry-specific meaning, there is no reason to look beyond the ordinary meaning of the term. And without recourse to electronics supply industry jargon, any definition of "direct supplier" to mean "customer-controlled component supplier" would not be reasonable. See Bay Cities, 5 Cal.4th at 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263 ("An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are *reasonable.* Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (Internal quotations and citations omitted)).

Despite DIRECTV's Herculean efforts to stitch together various dictionary definitions of "direct" and "supplier," no ordinary and popular meaning of "direct supplier" could possibly encompass its relationship with Western Digital. DIRECTV, by its own admission, "does not receive components directly." (Opp. at 16:6-7.) It did not have any contract with Western Digital, never paid Western Digital anything, and never received any freestanding Western Digital hard drives. Western Digital hard drives only flowed to DIRECTV as a component part of STB's manufactured or refurbished by third parties with whom DIRECTV did have a contractual relationship. Indeed, DIRECTV acknowledges that STB manufacturers were free, at least initially, to select either Seagate or Western Digital hard drives. (Opp. at 5.) Although DIRECTV contends that it retained some power to instruct STB manufacturers to switch HDD suppliers, the fact that such intervention might have been necessary to ensure that DIRECTV received any STBs containing Western Digital products further underscores the indirect supply relationship between Western Digital and DIRECTV. Nor is DIRECTV's current attempt to characterize its direct, Tier 1 suppliers of STBs as "assemblers" rather than "manufacturers" meaningful or persuasive. Simply put, the ordinary

---

1. City Fuel Corp. v. National Fire Ins. Co. of Hartford, 446 Mass. 638, 846 N.E.2d 775 (2006), is also ultimately of little moment. Although the City Fuel court did state that "[a]n insurance policy is to be construed with reference to the customs of the trade or course of business respecting which it is issued," the court applied the ordinary meaning of the phrase "in the course of transit" as an objective purchaser would understand the term, without reference to any technical or transportation industry-specific usage.

meaning of "direct supplier" does not apply to a situation where DIRECTV never received anything from Western Digital.

## IV. Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

**Abdul M. KHAN et al.,**

v.

**Jeh JOHNSON, et al.**

**Case No. 2:14-CV-06288-CAS(CWx)**

United States District Court,
C.D. California.

Signed February 1, 2016

Attorneys Present for Plaintiffs: Laura Weinstock.

Attorneys Present for Defendants: Anthony Bianco.

**Proceedings:** PLAINTIFF'S MOTION FOR COLLATERAL ESTOPPEL (Dkt. 46, filed November 19, 2015)

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT (Dlt. 49, filed December 7, 2015)

The Honorable CHRISTINA A. SNYDER, Judge

## I. INTRODUCTION

On October 6, 2015, plaintiff filed the operative First Amended Complaint ("FAC") in this action against defendants Jeh Johnson, in his capacity as the Secretary of the Department of Homeland Security, Leon Rodriguez, in his capacity as the Director of the United States Bureau of Citizenship and Immigration, and Susan Curda, in her capacity as the Director of the Los Angeles office of the United States Citizenship and Immigration Services ("USCIS") (collectively, "defendants"). Dkt. 41.

Plaintiff fled Pakistan in 2001 out of fear of persecution for his involvement with a Pakistani political group the Muhajir Qau-

mi Movement—Altaf Faction ("MQM—A"). See Certified Administrative Record ("CAR"), at 442-43. Plaintiff applied for asylum in the United States and was, eventually, granted asylum in 2006. Id. at 56, 442-43. One year later, plaintiff applied with USCIS to adjust his citizenship status from asylee to permanent resident. Id. at 51-55. However, USCIS denied plaintiff's application. Id. at 1-4. Specifically, USCIS determined that the MQM—A was an "undesignated terrorist organization" and therefore found that plaintiff was statutorily ineligible for an adjustment of status to permanent resident because he had provided "material support" to terrorist activity. Id. In his complaint, plaintiff requests that the Court set aside USCIS's denial of his application for adjustment to permanent status. Plaintiff argues that in granting his application for asylum defendants necessarily determined that plaintiff's involvement with the MQM—A did not constitute "terrorist activity" and thus did not render him statutorily ineligible for an adjustment of status. Accordingly, plaintiff argues that, under the doctrine of collateral estoppel, defendants should be precluded from denying plaintiff's application for an adjustment of status on the grounds that he has engaged in terrorist activity.

On November 19, 2015, plaintiff filed a motion for summary judgment. Dkt. 46.[1] On December 7, 2015, defendants filed an opposition to plaintiff's motion and filed their own motion for summary judgment. Dkt. 49. On January 11, 2016, plaintiff filed an opposition to defendants' motion, Dkt. 57, and on January 15, 2016, defendants filed a reply in support of their motion, Dkt. 58. Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II. BACKGROUND

Except where noted, the following facts are undisputed and are taken from the certified administrative record in this matter, which has been lodged with the court. Dkt. 47.

### A. Statutory Framework

8 U.S.C. § 1158 governs the process by which a foreign national may apply for asylum. Pursuant to this statute, "[a]ny alien who is physically present in the United States or who arrives in the United States . . . may apply for asylum." 8 U.S.C. § 1158(a)(1). In order for an Immigration Judge ("IJ") to grant an application for asylum, the applicant must demonstrate that he or she qualifies as a "refugee." Id. § 1158(b)(1)(A). A refugee is defined as a person who is unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). In addition, the IJ must determine there are no statutory bars that preclude the applicant from obtaining asylum. Id. § 1158(b)(2)(A). As relevant here, one of those statutory bars is that the applicant has been involved in "terrorist activity." Id. § 1158(b)(2)(A)(v).

After an applicant has been granted asylum, 8 U.S.C. § 1159, governs the process by which an asylee may apply for an adjustment of citizenship status to "permanent resident." Under this section, the

---

1. Plaintiff's motion is entitled "Motion for Collateral Estoppel." Dkt. 46. The Court construes this motion as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff appears to be arguing that based on the administrative record in this action and the declarations of his attorney, i.e. materials outside of his pleadings, he is entitled to judgment as a matter of law. Such an inquiry is appropriately addressed on a motion for summary judgment.

Secretary of Homeland Security or the Attorney General may, in their discretion, adjust to permanent resident the status of any alien granted asylum who, *inter alia*, "has been physically present in the United States for at least one year after being granted asylum," "continues to be a refugee within the meaning of section 1101(a)(42)(A)," and "is admissible (except as otherwise provided under subsection (c) of this section) as an immigrant under this chapter at the time of examination for adjustment of such alien." Id. § 1159(a)(2)(B)(1)–(5). Subsection (c), in turn, refers to section 1182, which defines ten categories of individuals who are ineligible for admission to the United States. As relevant here, one of these categories includes individuals who are involved in "terrorist activities." Id. § 1182(a)(3)(B).

### B. Khan's Application for Asylum

Khan is a citizen of Pakistan who entered the United States on November 14, 2001 with his wife and two of his children. CAR, at 51, 442-43. On November 6, 2002, Khan filed an application for asylum on behalf of himself, his wife, and his children, with the former Immigration and Naturalization Services ("INS").[2] CAR, at 441-49. Khan submitted his application via an INS form I-589, Application for Asylum and for Withholding of Removal. Id. In response to several of the questions on the I-589 form, Khan referred to his membership with the MQM—A. For example, one of the questions asks: "Do you fear harm or mistreatment if you return to your home country?" Id. at 445. Khan responded: "I am in fear of returning to my home country, where I would be detained and beaten, and possibly killed by the police because of my membership with the M.Q.M." Id. Another question asks: "Are you afraid of

being subjected to torture in your home country or any other country to which you may be returned?" Id. at 446. Khan responded: "I am afraid that I will be harassed by the military police, as I was detained and beaten because of my membership in the M.Q.M., and threatened by death." Id. at 446. In addition, Khan attached a declaration to his I-589 form in which he admitted that he joined the MQM—A in September of 1996, and that his responsibilities with the group included distributing leaflets and helping Mohajirs in Pakistan to find housing, employment, and utility services. Id. at 452.

In May of 2003, an asylum officer in the INS's Los Angeles Asylum Office interviewed Khan regarding his asylum application. Id. at 427. The asylum officer denied Khan's application because he found that Khan's testimony was "not credible because it contained material discrepancies within itself and with evidence [Khan] brought to his interview." Id. The asylum officer also prepared an "assessment" of Khan based upon Khan's interview. Id. at 429-31. In this assessment, the asylum officer made frequent reference to Khan's involvement with the MQM—A. See, e.g., id. at 429 ("[Khan] related that he has been an active member in the MQM—Altaf party since September 1996 and was still a member at the time of his asylum interview."); id. at 430 ("The applicant presented, at the time of his interview, a letter from the MQM—A dated February 05, 2002, which indicates that he has been a member of this party since 1996"). The asylum officer also noted, in his assessment, that he questioned Khan regarding allegations that the MQM—A was a violent group. Id. at 431. Specifically, the asylum officer stated:

---

**2.** On March 1, 2003, the INS was dissolved and many of its relevant functions were transferred to the newly created Department of

Homeland Security. See Homeland Security Act of 2002, Pub. L. No. 107–296, 110 Stat. 2135 (Nov. 25, 2002).

The applicant was asked if MQM—A was not a violent group or accused of this. He replied that his party had never done acts of violence, and that it was the rival MQM–H[aqiqi] which had committed the violent acts. However, credible country conditions indicate that the MQM—A has engaged in numerous acts of violence and torture during the 1990's against off duty police officers and their families; Mohajirs who choose to join political parties other than the MQM have been intimidated or attacked by MQM loyalist[s]; and the MQM has attacked and intimidated news agencies critical of it. The leadership [of] the MQM know which of its members commit terrorists activities [sic], but chooses not to expel them because they are deemed to be useful.

Id. The asylum officer noted Khan's testimony that the MQM—A was a non-violent organization as one of the discrepancies that made his testimony not credible. Id.

As a result of the asylum officer's findings, the INS did not grant Khan's asylum application, and issued him a Notice to Appear ordering him to appear before an Immigration Judge ("IJ") for removal proceedings on June 23, 2003, as well as for a *de novo* consideration of his asylum claim. Id. 424-25. Khan appeared before an IJ on June 23, 2003, and renewed his asylum claim. Id. at 162. Khan's asylum hearing was held on July 21, 2004. Id. at 165.

During his asylum hearing, Khan was asked whether he was a member of any political party or organization in Pakistan. Id. at 178. In response to this question, Khan informed the IJ that he was a member of the MQM—A and had been a member since September of 1996. Id. Khan was also asked why he had joined the MQM—A and what services he provided for that organization. Id. at 179. He responded that he had joined the MQM—A "for the benefit of the Muhajirs" who face difficulties

finding employment and gaining access to utilities and other services in Pakistan. Id. Khan was asked to be more specific regarding his activities on behalf of the MQM—A. Id. He elaborated that his activities had also included fundraising, recruitment, and the "resolution of people's complaints." Id. Khan was then asked follow-up questions regarding what he meant by "resolution of people's complaints" and Khan explained that various members of the MQM—A would complain that they were having difficulty obtaining access to water and public utilities and finding jobs, and Khan would help resolve these complaints. Id. at 179-80.

Ultimately, the IJ determined that Khan lacked credibility and denied his application for asylum on July 22, 2004. Id. at 152-56. The IJ issued a formal order in which he explained that he was denying Khan's application because he found that Khan had failed to sufficiently establish that he was a refugee with a credible fear of persecution. Id. In this order, the IJ also briefly referred to Khan's testimony that he was a member of the MQM—A and had performed various tasks for that organization. See id. at 147 ("The respondent paraphrased that he acted as an ombudsman and as a figure head for the MQM by advocating better housing, utilities, and employment, as well as resolving disputes and fundraising on behalf of the Muhajirs.").

Khan appealed the IJ's denial of his application to the Board of Immigration Appeals ("BIA"). Id. 293. Khan argued on appeal that the IJ's credibility determinations were unsupported by the facts in the record and articulated by the IJ during Khan's asylum hearing. Id. at 120. On October 27, 2005, the BIA sustained Khan's appeal and found that it could not uphold the IJ's negative credibility finding. Id. at 58-60. Specifically, the BIA rea-

soned that under the law of the Ninth Circuit, the "Immigration Judge's speculation that the respondent was not fleeing persecution when he arrived in the United States in 2001" could not support a negative credibility finding, and noted that the "Ninth Circuit has often stated that an Immigration Judge may not deny an asylum application based simply upon his or her perception that an alien's testimony is implausible." Id. at 59. In its order, the BIA also noted Khan's testimony that he had fled Pakistan in 2001 after he was arrested and detained for his support of the MQM—A party. Id. The BIA suggested that this testimony supported Khan's assertion that he had a reasonable fear of persecution if he returned to Pakistan. Id. Accordingly, the BIA ordered that Khan was statutorily eligible for asylum and that he was not "undeserving of such relief as a matter of discretion." Id. at 60.[3]

The BIA remanded Khan's asylum application to the IJ, id. at 60, and the IJ granted Khan, and his family, asylum status on June 5, 2006, id. at 56.

### C. Khan's Application for Adjustment of Status

On June 8, 2007, Khan filed an application for adjustment of status with USCIS requesting that he, and his family, be made permanent residents of the United States. CAR, at 51-55. Khan submitted his application via a USCIS form I-485, Application to Register Permanent Resident or Adjust Status. Id. On June 24, 2009, USCIS sent Khan a letter conveying that he appeared to be ineligible for admission to the United States. See Dkt. 1, Compl. Ex. D. USCIS stated that the grounds for Khan's ineligibility was his affiliation with the MQM—A, an organization USCIS contends is a terrorist organization. Id. Nonetheless, rather than denying Khan's appli-

cation, USCIS stated that it was "holding adjudication in abeyance" while the Department of Homeland Security considered policies that might enable USCIS to approve Khan's application in the future. Id. More specifically, beginning in March 2008, USCIS enacted a policy that, in cases where an applicant was inadmissible for terrorist-related activities, USCIS would place an application on hold in order to await the possible exercise of the Secretary of Homeland Security's discretionary authority to create exemptions to the inadmissibility bars, such that the applicant could receive a favorable adjudication. Dkt. 11–1, Canaan Decl., at 5-9. Khan and his family's applications were placed on hold pursuant to this policy.

On August 11, 2014, Khan and his family filed a complaint in this Court claiming that defendants had unreasonably delayed adjudicating their applications to adjust status. Dkt. 1, Compl. By the time Khan filed his complaint, his and his family's I-485 applications had been pending for over seven years. On April 17, 2015, the Court held a telephonic status conference. Dkt. 24. During this conference, defendants represented that, although the I-485 applications of the other members of Khan's family had been adjudicated in those person's favor, defendants would not adjudicate Khan's application unless ordered to do so by the Court. See Dkt. 25, at 2. Accordingly, the Court, on its own motion, ordered defendants to adjudicate Khan's I-485 application within sixty days. Id.

On April 28, 2015, USCIS issued Khan a Notice of Intent to Deny ("NOID") on the grounds that plaintiff had engaged in terrorist activities by providing material support to the MQM—A. CAR, at 15-17. In the NOID, USCIS noted that Khan had stated on his asylum application that he

---

**3.** The BIA did not, however, make an express determination regarding whether Khan's in-

volvement with the MQM—A constituted "terrorist activity."

was a member of the MQM—A and, as a member, had "distributed leaflets, collected money and persuaded others to join the group." Id. at 16. USCIS then went on to explain why it considered the MQM—A to be a terrorist organization, as that term is defined under the Immigration and Naturalization Act (the "INA"). Id. at 16-17.[4] Specifically, USCIS stated that "[a]ccording to widely available public information, the MQM—A engaged in numerous violent activities, including killings, in Pakistan during the 1990s." Id. at 16. Based on these acts, USCIS explained that it considered the MQM—A to meet the definition of an "undesignated terrorist organization" under the INA. Id. at 17.

On May 26, 2015, Khan, through his counsel, filed a response to the NOID. Id. at 9-10. In this response, Khan noted that at no time during his asylum proceedings was he ever found to have been involved in "terrorist activity." Id. at 9. Khan also noted that the MQM—A had never been designated as either a Tier I or Tier II organization, and that the NOID represented the first time in this case in which USCIS had designated the MQM—A as a terrorist organization. Id. Finally, Khan challenged USCIS's finding that his services on behalf of the MQM—A constituted "material support" for terrorist activities and argued that USCIS had failed to establish that Khan knew or should have known that his actions might constitute

material support for terrorist activities. Id. at 9-10.

On June 11, 2015, USCIS formally denied Khan's application, finding him to be ineligible for admission to the United States on the basis of his activities with the MQM—A. Id. at 1-4. On October 6, 2015, Khan filed an amended complaint with this Court requesting that the Court set aside USCIS's denial of his application.

## III. LEGAL STANDARD

### A. Motion for Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely

---

4. The INA sets forth three categories of terrorist organizations referred to as Tier I, II, and III organizations. See 8 U.S.C. § 1182(a)(3)(B)(vi). Tier I and II organization are formally designated as terrorist organization either by statute under the INA itself (Tier I) or by the Secretary of State in consultation with the Attorney General or the Secretary of Homeland Security (Tier II). Id. § 1182(a)(3)(B)(vi)(I)–(II). By contrast, Tier III organizations, referred to as "undesignated terrorist organizations," need not be formally designated. Id.

§ 1182(a)(3)(B)(vi)(III). Instead, Tier III organizations are defined as "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, [terrorist activity]." Id. The INA then sets forth a series of criteria regarding what constitutes "terrorist activity." Id. § 1182(a)(3)(B)(iv)(I)–(IV). Decision makers, such as Immigration Judges, may then find, based on the facts of a given case, and in light of the criteria set forth in the INA, that a particular group is an undesignated terrorist organization. Id.

on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); see also Celotex, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. 2548; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir.1997).

In light of the evidence presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n. 3 (9th Cir.1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir.1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587, 106 S.Ct. 1348.

### B. Standard of Review under the Administrative Procedure Act

■ A reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if the agency acts without observing "procedure required by law," 5 U.S.C. § 706(2)(D). A reviewing court must examine the administrative record to determine whether the agency has "articulated a rational relationship between its factual findings and its decision ... [and whether] its decision was based on relevant factors and does not constitute a clear error of judgment." Fence Creek Cattle Co. v. U.S. Forest Serv., 602 F.3d 1125, 1132 (9th Cir.2010). In regards to the USCIS in particular, it is "an abuse of discretion for the Service to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law." Kazarian v. U.S. Citizenship & Immigration Services, 596 F.3d 1115, 1118 (9th Cir.2010). In addition, when an agency offers multiple, independent and adequate grounds for its decision, a court should "affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable." BDPCS, Inc. v. F.C.C., 351 F.3d 1177, 1183 (D.C.Cir.2003).

## IV. ANALYSIS

Khan argues that USCIS should be collaterally estopped from denying his application for adjustment of status on the grounds that he has engaged in terrorist activity with the MQM—A. Defendants argue that the Court should reject this argument for two reasons: First, they argue that the doctrine of collateral estoppel does not apply to USCIS's determination of an applicant's eligibility for admission to the United States. Second, they argue that, even applying the doctrine of collateral estoppel, Khan has failed to satisfy all of the elements of collateral estoppel. The Court addresses each of these arguments in turn.

### A. Whether Collateral Estoppel Applies to USCIS's Adjudication of an Adjustment of Status Application

"Congress is understood to legislate against a background of common-law adju-

dicatory principles." <u>Astoria Fed. Sav. & Loan Ass'n. v. Solimino</u>, 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). Accordingly, the Supreme Court has held that there is a presumption that Congress intended for well-established common-law principles, such as collateral estoppel, to apply to the decisions of administrative agencies. <u>Id.</u> ("[W]here a common-law principle is well established, as are the rules of preclusion, the courts may take it as given that Congress has legislated with an expectation that the principle will apply") (citations omitted); <u>see also</u> <u>Univ. of Tenn. v. Elliott</u>, 478 U.S. 788, 798, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) ("We have previously recognized that it is sound policy to apply principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity."). This presumption applies "except when a statutory purpose to the contrary is evident." <u>Astoria</u>, 501 U.S. at 108, 111 S.Ct. 2166. In other words, absent a legislative intent to the contrary, the Court should presume that common-law principles such as collateral estoppel, apply to the decisions of USCIS. The Supreme Court has also noted that the legislative intent to bar application of collateral estoppel does not require a "clear statement" to that effect; rather, it can be inferred from the plain language of the statute. <u>Id.</u>, 501 U.S. at 108, 111 S.Ct. 2166.

■ Defendants concede that the governing statute in this case—the INA—does not contain an express provision requiring USCIS to adopt any particular preclusion principles. However, they argue that it is apparent from the plain language of the INA that Congress did not intend for administrative collateral estoppel to apply. In particular, they note that 8 U.S.C. § 1159(b)(5) states that, in adjudicating an application for adjustment of status, USCIS must determine whether an applicant is eligible for admission to the United States "*at the time* of examination for adjustment." (emphasis added). Defendants argue that, regardless of any earlier asylum proceedings, the language "at the time" requires USCIS to conduct an entirely new inquiry into the asylee's admissibility when he or she applies to become a permanent resident. Defendants contend that if the IJ's findings in the asylum proceeding were to have preclusive effect, that would limit the efficacy of having USCIS conduct a second and new inquiry when the applicant applies for permanent residency.

Defendants are correct that the INA envisions a two-step inquiry whereby an applicant's admissibility to the United States is evaluated both when they apply for asylum and when they apply for permanent residency. However, that Congress intended for applicants to be evaluated twice does not, in and of itself, suggest that Congress intended to bar the application of collateral estoppel—particularly given that there is a presumption that collateral estoppel *should* apply to the decisions of administrative agencies.

Moreover, the purpose of having a two-step inquiry is not to give the government two bites at the apple. Rather, as Khan argues, the purpose of the second inquiry is to evaluate any new circumstances that may have arisen or any new facts that have come to light during the one year period applicants are required to wait between when they are granted asylum and when they apply for permanent residency. As one court recently described it: "the two step process is not indicative of the legislative intent to bar collateral estoppel ... The one year wait time is a trial period to allow the government to assess how an asylee adjusts to the United States. The second step is to evaluate any new information or problems that may have arisen in that year." <u>Islam v. Department of Homeland Security</u>, 136 F. Supp. 3d 1088,

1094, 2015 WL 5653548, at *5 (N.D. Cal. 2015). Accordingly, were new circumstances to arise during the year after Khan was granted asylum, USCIS could consider those circumstances in ruling on his application for permanent residency. For example, if new evidence were to come to light regarding Khan's involvement with the MQM—A and his purported support of terrorist activities, USCIS might have cause to reevaluate Khan's admissibility.

■ However, in cases such as this, where the parties appear to concede that no material facts have changed since the applicant was granted asylum, permitting the same issue to be adjudicated twice would only cause inefficiency and potentially result in inconsistent decisions. These are exactly the harms collateral estoppel is intended to prevent—i.e., wasting judicial resources, unfairness to parties who have already fully litigated an issue, and inconsistent decisions. See also Elliott, 478 U.S. at 798, 106 S.Ct. 3220 ("Th[e] value [of collateral estoppel], which encompasses both the parties' interest in avoiding the cost and vexation of repetitive litigation and the public's interest in conserving judicial resources, is equally implicated whether factfinding is done by a federal or state agency.") (citations omitted).

Defendants' argument is also undermined by the fact that USCIS's evaluation of an application for adjustment of status involves a number of bars to admissibility that do not apply when an applicant applies for asylum. Specifically, section 1158—which governs applications for asylum—contains six statutory bars for which an IJ must deny an application for asylum. These include: (1) if the alien has participated in the persecution of any person; (2) if the alien has been convicted of a particularly serious crime; (3) if there are reasons for believing that the alien has committed a serious nonpolitical crime outside the United States; (4) if there are reasonable grounds for regarding the alien as a danger to the security of the United States; (5) if the alien has engaged in terrorist activity; and (6) if the alien was firmly resettled in another country prior to arriving in the United States. 8 U.S.C. § 1158(b)(2)(A)(i)-(vi).

By contrast, section 1158—which governs applications for adjustment of status—incorporates section 1182, which is the INA's general provision regarding the classes of aliens who are ineligible for visas or admission to the United States. 8 U.S.C. § 1159(c). Section 1182 sets forth multiple expansive categories under which an alien may be deemed inadmissible to the United States. These categories include, *inter alia*, health-related grounds, criminal-related grounds, persons who are likely to become a public charge, and a host of "miscellaneous" grounds. 8 U.S.C. § 1182(a)(1)–(10). Notably, for purposes of this action, under section 1182, "terrorist activities" is listed as only one basis for inadmissibility within the broader category of "Security and related grounds." Id. § 1182(a)(3)(B). While none of these grounds are implicated in the instant case, theoretically, USCIS can consider each of these additional bars to admissibility when an applicant applies for an adjustment of statute.

Accordingly, the INA envisions a much more expansive inquiry when an applicant applies for an adjustment of status to permanent resident. Thus, even if the IJ's findings during the asylum proceedings are given preclusive effect, that does not defeat the purpose of the two-step inquiry because USCIS can still consider the numerous other grounds for admissibility that do not apply when an applicant applies for asylum. And, as already stated, USCIS can consider whether any new circumstances have arisen or any new evi-

dence has come to light since the applicant was granted asylum.

Finally, other courts have applied principles of collateral estoppel to administrative decisions under sections 1158 and 1159. See Amrollah v. Napolitano, 710 F.3d 568 (5th Cir.2013) (applying collateral estoppel and holding that IJ's decision to grant asylum application precluded USCIS from denying application for adjustment of status on grounds of engaging in terrorist activities.); Sile v. Napolitano, 2010 WL 1912645, at *3–4 (N.D.Ill. May 12, 2010) (holding that, USCIS was "collaterally estopped in classifying [applicant] as ineligible for adjustment of status on the ground of firm resettlement" when issue of "firm resettlement" had already been adjudicated in an earlier asylum proceeding). And, as a general matter, the Ninth Circuit has held that "[i]ssue preclusion applies to immigration proceedings." Belayneh v. I.N.S., 213 F.3d 488, 492 (9th Cir.2000).

Accordingly, the Court finds that neither the plain language of sections 1158 and 1159, nor the statutory framework of the INA, indicates a congressional intent to bar the application of collateral estoppel. The Court will, therefore, evaluate whether collateral estoppel can apply in light of the facts of this case.[5]

## B. The Elements of Collateral Estoppel

■ "Collateral estoppel applies to a question, issue, or fact when four conditions are met: (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the

prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." Oyeniran v. Holder, 672 F.3d 800, 806 (9th Cir.2012) (citing Montana v. United States, 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). Here, defendants only dispute whether Khan has established the first two elements of collateral estoppel.

### 1. Actually Litigated and Decided

■ During Khan's asylum proceeding, neither the IJ, nor the BIA, made an express finding regarding whether Khan was statutorily ineligible on the basis of engaging in a terrorist activity. Defendants argue that this prevents the Court from applying collateral estoppel in this case. However, under Ninth Circuit case law, collateral estoppel may still apply, even when there has not been an express finding, "if the court in the prior proceeding necessarily decided the issue." In re Harmon, 250 F.3d 1240, 1247 (9th Cir. 2001); See also Clark v. Bear Stearns & Co., 966 F.2d 1318, 1321 (9th Cir.1992) ("When the issue for which preclusion is sought is the only rational one the factfinder could have found, then that issue is considered foreclosed, *even if no explicit finding of that issue has been made.*") (emphasis added); Stoehr v. Mohamed, 244 F.3d 206, 208 (1st Cir.2001) ("An issue may be 'actually' decided even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary compo-

---

5. Lastly, the Court notes the decision in Mugomoke v. Hazuda, 2014 WL 4472743 (E.D.Cal. Sept. 11, 2014). In that case, the court determined that, in light of the two-step evaluation process for obtaining permanent residency, it would "contravene the legislated process" to apply collateral estoppel to decisions made pursuant to sections 1158 and 1159. Id. at *7. While the Court recognizes

Mugomoke as contrary authority, ultimately the Court finds the reasoning in Islam and Amrollah more persuasive. Accordingly, for the reasons stated *supra* the Court finds that the application of collateral estoppel to sections 1158 and 1159 does not contradict the legislative purpose in having a two-step evaluation process for obtaining permanent residency.

nent of the decision reached in the prior litigation.").

Here, while neither the IJ nor the BIA made an express finding regarding whether Khan had engaged in terrorist activity, that issue was "necessarily" decided during Khan's asylum proceeding. As explained above, under the statutory framework of the INA, before an IJ may grant asylum he or she *must* determine that none of the statutory bars to admissibility applies to the applicant. See 8 U.S.C. § 1158(b)(2). One of these statutory bars applies if the applicant has engaged in "terrorist activity." 8 U.S.C. § 1158(b)(2)(A)(v). Accordingly, before the IJ could grant Khan's application for asylum he was required to determine that Khan had not engaged in a terrorist activity. Had he determined that Khan's involvement with the MQM-A constituted a terrorist activity, the IJ would have been statutorily precluded from granting Khan asylum. Therefore, this issue was necessarily litigated and decided during Khan's asylum proceeding.

Under similar circumstances, at least two other courts have reached the same conclusion. In Amrollah, the plaintiff fled Iran in 1998 and applied for asylum in the United States. 710 F.3d at 570. In his application for asylum and during his asylum hearing, the plaintiff acknowledged that he had provided support for the mujahedeen movement in Iran. Id. An IJ granted the plaintiff's application for asylum in 1999. Id. A year later, the plaintiff applied for an adjustment of status to permanent resident. Id. After several delays, the government denied the plaintiff's application on the grounds that he had engaged in a terrorist activity, namely, his support for the mujahedeen movement in Iran. Id.

On appeal, the plaintiff argued that the government should have been collaterally estopped from denying his application, because the IJ had already, and necessarily,

determined that his support for the mujahedeen movement did not constitute terrorist activity when he granted the plaintiff's application for asylum. Id. at 571. The Fifth Circuit agreed. The court stated that, under these circumstances, the actually litigated prong was "easily satisfied." Id. They explained that:

> [T]he immigration judge was *not permitted* to grant asylum to [the plaintiff] if he satisfied any of [the] exceptions to admissibility under § 1182, including providing material support to any individual or organization that engaged in terrorist activities. In other words, the IJ's ruling that [the plaintiff] was admissible necessarily included, under the structure of the statute, a finding that [plaintiff] did not provide support to an individual or organization that engaged in terrorist activities.

Id. at 572 (emphasis in original).

Similarly, in Islam, the plaintiff fled Pakistan in 2000 and applied for asylum in the United States. 2015 WL 5653548, at *1. During his asylum proceedings, the plaintiff acknowledged that, like Khan, he was a member of the MQM—A. Id. An IJ ultimately granted the plaintiff's application for asylum. Id. A year later, the plaintiff applied with USCIS for an adjustment of status to permanent resident. Id. However, USCIS determined that the plaintiff was ineligible because he had engaged in a terrorist activity—his involvement with the MQM—A. Id.

The plaintiff appealed that denial and argued that USCIS should be collaterally estopped from denying his application on the grounds that he had engaged in a terrorist activity. Id. at *2. The defendants argued, however, that "the IJ's opinion never mentioned the relevant statute, 8 U.S.C. § 1182 [which defines 'terrorist activity']" and "neither the IJ nor the BIA in granting [the plaintiff] asylum relied on the absence of any terrorist activity." Id.

at *3. Therefore, the defendants contended, the issue has not been actually litigated. Id. The court rejected this argument and found for the plaintiff. Specifically, the court reasoned that, "[b]ecause the IJ was statutorily barred from granting [the plaintiff] asylum if he was found to have participated in terrorist activity, that issue was necessarily decided when the IJ did in fact grant [the plaintiff] asylum." Id. Therefore, the court found that it was not necessary for the IJ to have made an express finding that the plaintiff did not engage in terrorist activity, because under the statutory framework such a finding was inherent in the decision to grant asylum. Id. The Court finds the reasoning in these cases persuasive.

Nonetheless, defendants argue that these cases are distinguishable. Specifically, they argue that in Islam the court noted that the Department of Homeland Security cross-examined the plaintiff about his involvement with MQM-A, and that during closing arguments both the Department of Homeland Security and the plaintiff's counsel addressed his involvement in terrorist activity. Id. Similarly, in Amrollah, the Fifth Circuit noted that the "government cross-examined [the plaintiff] extensively about his support of the mujahedeen movement." 710 F.3d at 571. Defendants argue that, unlike in these cases, the issue of Khan's involvement in terrorist activity was not significantly addressed during his asylum proceedings. However, it is not clear that this factor was essential to the decisions in either Islam or Amrollah. Rather, both of those courts explained in great detail how, under the statutory framework of the INA, the decision to grant an application for asylum necessarily entails a determination that the applicant has not engaged in terrorist activity.

Moreover, contrary to defendants' assertion, the issue of Khan's involvement with the MQM—A *was* significantly addressed during his asylum proceedings. Khan referenced the MQM—A in multiple questions on his application for asylum and submitted a declaration admitting that he had joined the MQM—A in September of 1996 and describing the group's activities. CAR, at 445-46, 451-52. In fact, the basis for Khan's application for asylum was that he feared persecution in Pakistan because of his membership with the MQM—A. See id at 441-49. The immigration officer also addressed the MQM—A in Khan's assessment. Id. at 429-31. Most significantly, in his assessment, the immigration officer noted as one of the discrepancies in Khan's testimony that he had described the MQM—A as a non-violent organization when, in fact, publicly available documents indicated that the organization had engaged in violent activities and that its leaders had condoned terrorist activities. Id. at 431. In addition, during his asylum hearing before the IJ, Khan was asked a number of questions about his activities on behalf of the MQM—A and the IJ referenced these questions in his order denying Khan's application. Id. at 147, 178-80. Finally, the BIA mentioned Khan's membership in the MQM—A in its order reversing the decision of the IJ. Id. at 59. Accordingly, the issue of Khan's involvement with the MQM—A was raised at every stage of Khan's asylum proceeding.[6]

---

**6.** Defendants also argue that the Ninth Circuit applies a more limited version of collateral estoppel than that applied by the Fifth Circuit in Amrollah. Specifically, they argue that "the Ninth Circuit requires an examination of the proceeding and a determination that the factfinder could not have reached its decision on other grounds." Dkt. 49, at 19 (citing Clark,

966 F.2d at 1321 ("We must decide whether a rational factfinder could have reached a conclusion based upon an issue other than that which the defendant seeks to foreclose.")). However, that is precisely what occurred here. As explained above, the IJ "could not have reached its decision" to grant Khan asylum *unless* he determined that Khan had not

Finally, at oral argument, counsel for defendants cited Kim v. Johnson, 2016 WL 48090 (N.D. Cal. Jan. 5, 2016), a recent decision of the Northern District of California, which he contends weighs against the application of collateral estoppel in this case. In Kim, the plaintiff initially applied for permanent residency with USCIS. Id. at *3. On his application, the plaintiff was asked whether he had ever procured a visa by fraud, to which he answered, "yes." Id. Procuring a visa by fraud renders an applicant statutorily ineligible for permanent residency. 8 U.S.C. § 1182(a)(6)(C)(i). Nonetheless, USCIS granted the plaintiff's application for an adjustment of status to permanent resident. Kim, 2016 WL 48090, at *3. The plaintiff then applied for naturalization with USCIS. Id. One of the requirements for naturalization is that the applicant must have been previously "lawfully admitted for permanent residence." 8 U.S.C. § 1427(a). Despite USCIS's earlier ruling granting the plaintiff's application for adjustment of status, USCIS denied the plaintiff's application for naturalization. Kim, 2016 WL 48090, at *3 Specifically, USCIS reasoned that because plaintiff had previously procured a visa by fraud he should not have been granted permanent resident status. Id.

On appeal before the district court, the plaintiff argued that USCIS should be deemed to have waived the "fraud" bar to admissibility when it granted his application for adjustment of status. Id. Specifically, the plaintiff noted that, pursuant to section 1182(i)(1), the Attorney General may exercise his or her discretion to waive application of the fraud bar to admissibility. Id. at *5. While the plaintiff acknowledged that USCIS had made no express finding to waive application of the fraud bar, the plaintiff argued that the court could infer a waiver since his application could not have been granted in the absence of a waiver of the fraud bar. Id. at *8. The court disagreed and upheld the decision of USCIS. However, this case is distinguishable from the instant case for several reasons.

First, Kim involves a different immigration proceeding than the present case— i.e., an application for naturalization as opposed to an application for adjustment of status. Second, Kim did not involve the application of collateral estoppel. Rather, in Kim the court addressed whether the Attorney General's discretionary right to waive bars to admissibility for certain applicants could be exercised implicitly, and whether such an implicit waiver could bind USCIS in a subsequent proceeding.

However, most significantly, in Kim the defendants presented evidence that USCIS's initial decision to grant the plaintiff permanent residency constituted a legal error. Specifically, while the INA grants the Attorney General the discretion to waive bars to admissibility in certain cases, USCIS has promulgated regulations regarding the process by which the Attorney General may exercise that discretion. See 8 C.F.R. § 212.7. In particular, an applicant is required to submit a formal application requesting a waiver and pay a fee. Id. § 212.(7)(a)(1). Unless an applicant com-

engaged in a terrorist activity. And, as already stated, the Ninth Circuit has recognized that an issue may have been necessarily decided by implication. See Clark, 966 F.2d 1318, 1321 (9th Cir.1992) ("When the issue for which preclusion is sought is the only rational one the factfinder could have found, then that issue is considered foreclosed, *even if no explicit finding of that issue has been made.*")

(emphasis added); see also *Moore's Federal Practice—Civil* § 132.03[3][e] (Matthew Bender 3d ed.) ("An issue that was necessarily implicit in a larger determination is given issue preclusive effect. An issue that is distinctly presented in the pleadings and necessarily resolved may be reflected in the decision that includes that point, although it may not be expressly mentioned in the decision.").

plies with these regulations, USCIS is not permitted to waive the applicant's bar to admissibility. See 8 C.F.R. § 245.1(f) ("an application [for a waiver] under this part shall be the sole method of requesting the exercise of discretion under section [1182(i) ] as [it] relate[s] to the inadmissibility of an alien in the United States."). In Kim, it was undisputed that the plaintiff had not complied with USCIS's regulations. 2016 WL 48090, at *8. Thus, the court reasoned:

Plaintiff argues that USCIS waived his bar to admissibility de facto and sub silencio. There is no evidence to support that finding. USCIS's regulations make clear that Plaintiff was required to affirmatively apply for a waiver of his bar to admissibility when he applied for adjustment of status by completing a designated form and paying a certain fee. See 8 C.F.R. §§ 212.7(a)(1) and 245.1(a). It is undisputed that Plaintiff never did so. The Court cannot find a silent waiver-in-fact given these express application requirements.

Id.

Accordingly, in Kim, when USCIS granted the plaintiff's application for permanent residence, it lacked the legal authority to waive the fraud bar because the plaintiff had not formally requested a waiver. By contrast, here, there can be no question that the IJ had the legal authority to consider the evidence of Khan's involvement with the MQM—A and find that this involvement did not constitute "terrorist activity." Moreover, what USCIS is attempting to do in this case is reevaluate the same evidence considered by the IJ in order to reach a different conclusion. While, USCIS may not agree with the findings of the IJ, that does not constitute a legal error. Thus, there is no evidence of a legal error by the IJ during Khan's asylum proceeding, and this case is, therefore, readily distinguishable from Kim.

For all of the foregoing reasons, the Court finds that the issue of Khan's involvement in terrorist activity was actually litigated and decided during his asylum proceeding.

### 2. Identical Issues

■ Defendants argue that the issues at stake in Khan's asylum and adjustment of status applications are not identical. More specifically, they argue that applications for asylum and for adjustment of status are entirely different applications that provide an applicant with different benefits. For example, defendants note that "while an asylum grant provides an asylee with a lawful status and the right to work," an "adjustment of status provides the asylee with the right to live permanently in the United States." Dkt. 49, at 20-21. Defendants' argument misses the mark.

The relevant inquiry is not whether Khan would have received different benefits from his application for asylum and his application for adjustment of status. Rather, the question for the Court is whether the IJ and USCIS relied upon the same facts and legal standard when determining whether Khan was statutorily ineligible on the grounds that he had engaged in terrorist activity.

Thus, in Amrollah, the court evaluated whether the definition of "terrorist activity" had changed between 1999, when the plaintiff was granted asylum, and 2010, when the plaintiff applied for an adjustment of status, and after Congress had enacted the PATRIOT Act. 710 F.3d at 572–73. The Fifth Circuit found that the PATRIOT Act had not altered the definition of "terrorist activity" in any material respect and that the Government had not presented "any additional facts which would make the IJ's ruling distinguishable." Id. Accordingly, the court found that the issues were identical in both plaintiff's application for asylum and his application

for adjustment of status. Id. at 571–73(citing Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 290 (5th Cir.2005)) ("[R]elitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings.").

Similarly, here, the parties agree that Khan's last involvement with the MQM—A occurred before he came to the United States in November of 2001. Accordingly, both the IJ and USCIS considered the same factual record when evaluating whether Khan was statutorily barred on the grounds of engaging in terrorist activity. Moreover, the definition of "terrorist activity" is the same when adjudicating an application for asylum and an application for adjustment of status. Both sections 1158 and 1159 incorporate the definition of "terrorist activities" set forth under 8 U.S.C. § 1182(a)(3)(B)(i). See also Amrollah, 710 F.3d at 571 ("In other words, both 8 U.S.C. § 1158 (the statute governing petitions for asylum) and 8 U.S.C. § 1159 (the statute governing petitions for permanent resident status), look to 8 U.S.C. § 1182 (the statute governing inadmissible aliens) to determine whether an alien is eligible for relief."). Accordingly, when adjudicating Khan's respective applications, the IJ and USCIS relied upon the same factual record and applied an identical legal standard to determine whether Khan was statutorily ineligible on the grounds that he had engaged in terrorist activity. The issues were therefore identical in both of Khan's proceedings.

Therefore, because Khan has established that all of the elements of collateral estoppel are satisfied, the Court finds that defendants are collaterally estopped from concluding that Khan is ineligible for an adjustment to permanent resident on the grounds that he has engaged in terrorist activity.

## V. CONCLUSION

In accordance with the foregoing, the Court finds that USCIS is collaterally estopped from denying plaintiff's application for adjustment of status on the grounds that he has engaged in a terrorist activity. The Court, therefore, **GRANTS** plaintiff's motion for summary judgment and **DENIES** defendant's motion for summary judgment. USCIS's denial of plaintiff's application is hereby set aside pursuant to 5 U.S.C. § 706.

IT IS SO ORDERED.

**UNIGESTION HOLDING, S.A.,
a foreign corporation, d/b/a
Digicel Haiti, Plaintiff,**

v.

**UPM TECHNOLOGY, INC. d/b/a UPM
Telecom, Inc, and UPM Marketing,
Inc., an Oregon corporation; UPM
Telecom, Inc., an Oregon a/b/n; UPM
Marketing, Inc., an Oregon a/b/n; Benjamin Sanchez a/k/a Benjamin Sanchez Murillo, an Oregon resident; Baltazar Ruiz, an Oregon resident, and
Tyler Allen, an Oregon resident, Defendants.**

**Case No. 3:15-cv-00185-SI**

United States District Court,
D. Oregon.

Signed February 3, 2016

Richard K. Hansen and Anne M. Talcott, SCHWABE WILLIAMSON & WYATT, PC, 1211 SW Fifth Avenue, Suite 1800, Portland, OR 97204; Robert C.L. Vaughan, Cherine Smith Valbrun, and Leah Storie, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL 33394. Of Attorneys for Plaintiff.

Kathryn P. Salyer and Eleanor A. DuBay, TOMASI SALYER BAROWAY, 121 SW Morrison Street, Suite 1850, Portland, OR 97204. Of Attorneys for Defendants.

## OPINION AND ORDER

Michael H. Simon, District Judge.

Plaintiff Unigestion Holding, S.A., doing business as "Digicel Haiti" ("Digicel"), asserts claims against Defendants, alleging common law fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. §§ 1962(b)–(d), conversion, and unjust enrichment.[1] Defendants move to dismiss Digicel's claims in its Amended Complaint.[2] Defendants argue that the amended allegations of fraud continue to lack clarity and specificity as to the nature and substance of any alleged misrepresentation. For the reasons that follow, Defendants' motion is denied.

## STANDARDS

### A. Rules 12(b)(6) and 8(a) of the Federal Rules of Civil Procedure

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dis-

---

1. Plaintiff also alleges as separate counts "civil conspiracy" (Count VI) and "injunction" (Count IX). Civil conspiracy, however, is not cognizable as a separate claim under Oregon law. *See Granewich v. Harding*, 329 Or. 47, 53, 985 P.2d 788 (1999) ("neither 'conspiracy' nor 'aid and assist' is a separate theory of recovery"). Similarly, an injunction, whether temporary, preliminary, or permanent, is a form of relief, not a separate theory of recovery.

2. Defendants previously moved to dismiss Plaintiff's original Complaint. The Court granted Defendants' motion with leave to replead, and Plaintiff filed its Amended Complaint, which is the subject of the pending motion.

miss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir.2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1140 (9th Cir.2012); *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir.2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n. 2 (9th Cir.2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Establishing the plausibility of a complaint's allega-

tions is a two-step process." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir.2014). At the first step, "a court should 'identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* at 996 (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937) (alteration in original). At the second step, "a court should 'assume the[ ] veracity' of 'well pleaded factual allegations' and 'determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937) (alteration in original).

Additionally, "[w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir.2013) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). Plaintiffs must offer "[s]omething more ... such as facts tending to exclude the possibility that the alternative explanation is true, ... in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* A complaint will survive a motion to dismiss where a plaintiff "offer[s] facts that tend[ ] to exclude the defendant's innocuous alternative explanation." *Eclectic Props.*, 751 F.3d at 997. Moreover, if two alternative explanations exist, "one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible." *Id.* (quoting *Starr*, 652 F.3d at 1216).

## B. Rule 9(b) of the Federal Rules of Civil Procedure

■ Plaintiffs alleging fraud or mistake must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To state a claim under this standard, a plaintiff "must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) · (quotation marks and alteration omitted). The plaintiff's allegations must provide "notice of the particular misconduct which is alleged to constitute the fraud charged," in enough detail to permit the defendant to "defend against the charge and not just deny that [it has] done anything. wrong." *Ebeid ex·rel. U.S. v. Lungwitz*, 616 F.3d 993, 999 (9th Cir.2010) (quotation marks omitted).

■ Both the plausibility requirement of Rule 8(a) and the particularity requirement of Rule 9(b) apply to allegations of fraud. *Cafasso*, 637 F.3d at 1055. Allegations of scienter may be pled generally, Fed. R. Civ. P. 9(b), but must still include sufficient factual material to be plausible. *Eclectic Props.*, 751 F.3d at 995 n.5. The heightened standard of Rule 9(b) also applies to RICO claims alleging predicate acts involving fraud. *See, e.g., Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir.1991) (mail fraud); *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392–93 (9th Cir.

1988) (mail and wire fraud); *Best Deals on TV, Inc. v. Naveed*, 2007 WL 2825652, at *11 (N.D.Cal. Sept. 26, 2007) (access-device fraud).

## BACKGROUND

As alleged in the Amended Complaint (Dkt. 34), Digicel provides mobile telecommunications services to customers in Haiti. Digicel operates telephone switching systems in Miami, Florida, and New York City, New York, that route international calls from third-party providers (such as AT&T and Verizon) to Digicel customers in Haiti. The switching systems use an international gateway that allows Digicel to manage call routing and account for any billing and associated regulatory charges. Under Haitian law, international telephone carriers must charge at least 23 cents per minute for international calls terminating in Haiti. Accordingly, Digicel charges third-party providers at least 23 cents per minute to route international calls to Digicel customers in Haiti.

UPM is an Oregon corporation[3] that offers to route international calls to Haiti at lower rates than Digicel. UPM does so by purchasing large quantities of pre-paid Digicel Subscriber Identity Module ("SIM") cards[4] in Haiti, shipping the cards to UPM's operations in Oregon, and incorporating the cards into a system connected to the internet. Digicel alleges. that UPM sends money by international wire to its agents in Haiti for the purchase of Digicel SIM cards. According to Digicel, shipping

---

**3.** UPM Technology, UPM Telecom, and UPM Marketing are all aliases of the same business, collectively referred to here as "UPM."

**4.** According to Digicel, a SIM card acts as a small circuit board that is placed inside a cellular phone in order to identify the cellular device associated with an individual customer's unique telephone number and account. SIM cards allow customers to access Digicel's

cellular network and, in turn, allow Digicel to account for and invoice communications made from cellular devices containing specific SIM cards. Digicel customers can use SIM cards for voice, data, and messaging services on the Digicel network. Customers can add credits, in the form of minutes, to SIM cards by using, among other methods, vouchers and online "top-ups."

documents show that agents shipped Digicel SIM cards from Haiti to Oregon, addressed to Defendant Benjamin Sanchez ("Sanchez"), Owner of UPM Marketing and President of UPM Telecom, and Defendant Tyler Allen ("Allen"), who is also affiliated with UPM. Customer forms also show that Defendant Baltazar Ruiz ("Ruiz"), Project Manager of UPM Telecom, shipped computer equipment to Haiti. Digicel asserts that Ruiz provided laptops, internet routers, and generators to co-conspirators in Haiti to facilitate UPM's operations.[5]

UPM's system includes "SIM Boxes" or "SIM Servers," located in Oregon, into which SIM cards are loaded. UPM uses the information on the SIM cards to assist in transmitting calls to Haiti in ways that indicate that the calls have originated from Haitian telephone numbers associated with Digicel SIM cards. Accordingly, the Digicel telecommunications system charges local, or non-international, rates for the calls. Digicel refers to UPM's activities as "bypass fraud." Digicel alleges that UPM engages in two categories of fraudulent activities: non-technological fraud and technological fraud.

## A. Non-Technological Fraud

According to Digicel, the non-technological fraud occurs at the point of sale of Digicel's SIM cards. Digicel alleges that UPM sends "agents" to Digicel's authorized retailers in Haiti, including grocery and convenience stores, to purchase SIM cards under the "false premise" that those SIM cards are for the agents' own personal use in cellular handset devices. Dkt. 34

¶ 65. UPM must obtain Digicel SIM cards in this manner because Digicel does not allow for the unauthorized bulk purchase of SIM cards. Digicel cautions its authorized retailers not to sell SIM cards to anyone who the retailers suspect will resell the SIM cards. Retailers must document all SIM card purchases.

In order to purchase a Digicel SIM card in Haiti, an individual must complete and file a Customer Registration Card form using his or her government-issued identification card. Digicel alleges that UPM's agents sometimes purchase SIM cards "using false or altered identification documents procured by local co-conspirators at the instruction and direction of the head of the fraudulent enterprise." *Id.* ¶ 30. With its Amended Complaint, Digicel submitted a sample copy of a Customer Registration Card form.[6] The form asks the customer for identifying information, including the customer's name, birth date, occupation, and government-issued identification number. The form also asks for the customer's cellular device information, including the device's International Mobile Equipment Identity ("IMEI"). Finally, the form asks for information about the retailer and agent who sold the SIM card to the customer.

The Customer Registration Card does not ask the customer for any information about how the customer intends to use the SIM card. Further, at no point does the form require a written affirmation that the customer will only use the SIM card in the cellular device corresponding to the IMEI specified on the form. Nor does the form

---

**5.** Digicel obtained copies of receipts and shipping documents evincing these transactions from the Haitian Police. Digicel attached the copies to its Amended Complaint as Exhibits C-M. The original documents remain in the custody of the Haitian Police.

**6.** Digicel filed a certified translation of the Customer Registration Card form (Dkt. 52-1), which Digicel originally submitted in French as Exhibit A to Digicel's Amended Complaint (Dkt. 34-1). UPM does not object to the translation. The Court therefore assumes that the translated copy of Exhibit A is true and accurate.

require an express, written affirmation that the customer will refrain from reselling the SIM card.

Digicel also does not allege that its retailers ask customers for oral representations that the customers are purchasing SIM cards for exclusively personal use. Other than the assertion that UPM's agents used false or altered identification documents, Digicel provides no details regarding how UPM's agents "purchase SIM Cards under the false premise that those SIM Cards are for their own individual, retail use in cellular handset devices." Dkt. 34 ¶ 65.

## B. Technological Fraud

According to Digicel, technological fraud occurs after UPM sells minutes either wholesale to third parties or directly to consumers through phone cards or retail sales of cellular plans and devices. Then, asserts Digicel, the technological fraud occurs in one of two ways.

First, UPM purchases Digicel SIM cards and registers the cards for Digicel's Roam-Like-You're-Home ("RLYH") plan. For an access fee of approximately $25, the RLYH plan allows registered Digicel customers to make international calls to Haiti at rates similar to the domestic, or local, rate during the pre-paid period. When a UPM customer places a call, the call is routed to UPM's SIM Servers in Oregon. The SIM Servers, containing SIM cards purchased from Digicel's dealers and registered for Digicel's RLYH plan, direct the call to a third-party carrier's cellular tower in the United States, which then directs the call to Digicel's network as a call coming from a RLYH subscriber eligible for the lower calling rate. Digicel alleges that UPM uses the RLYH plan "to cause international calls to be manipulated in these SIM servers, retransmitted, terminated, and accounted for as 'regular' local calls." *Id.* ¶ 72.

Second, when a call is made by a UPM customer outside of Haiti, the call is routed to UPM's SIM Servers in Oregon. The SIM Servers then "clone" Digicel's SIM cards, meaning the Servers "manipulate[ ]" the SIM cards to retrieve and then transmit the unique identifying information contained in a SIM card. *Id.* ¶ 69. The identifying information from the SIM card is "packaged" with the call into Haiti, and then the "package" is routed via the internet to a local "Receiver" in Haiti. *Id.* ¶¶ 68, 89-91. The local Receiver, allegedly operated by agents of UPM in Haiti, uses the "cloned" SIM card data to complete the call to the ultimate recipient in Haiti through Digicel's telecommunications network in that country. *Id.* ¶¶ 87, 91. This process allows UPM to "pretend" to initiate a local call in Haiti when the call was in fact initiated outside of Haiti, thus "bypassing" Digicel's international switches and international charges. *Id.* ¶ 69. In this way, UPM "intentionally manipulate[s] the SIM card data to misrepresent the international call to Digicel's Haitian network as a domestic call made in Haiti, and only the domestic calling fees are charged." *Id.* ¶ 98.

Additionally, alleges Digicel, "[t]o avoid easy detection, [UPM] use[s] multiple, portable Receivers in various locations. The software [on the SIM Servers] manipulates calling patterns by directing calls to be spread among various Receivers." *Id.* ¶ 96. Spreading the calls among multiple receivers "is intended to mimic the calling patterns of real people." *Id.* ¶ 94. According to Digicel, "if all calls went to—and then from—a single Receiver in a static location, the abnormal call volumes to the particular tower in the area of the Receiver could be flagged as a sign of bypass fraud." *Id.* ¶ 95.

UPM refers to the second routing method as Voice over Internet Protocol

("VoIP"). UPM argues that the method has never involved "cloning" or copying SIM cards because UPM lawfully purchases the SIM cards and simply uses the pre-paid minutes on the cards to enable customers to make local calls in Haiti using the Digicel local network as any local caller would.[7] UPM further argues that because it pays for both the RLYH plans and the minutes purchased on the SIM cards, UPM and its customers legitimately acquire access to Digicel's local network. According to UPM, its activities do not involve "misrepresentations" of any kind.

## DISCUSSION

### A. Common Law Fraud

In Oregon, a plaintiff must allege the following elements to state a claim for fraud:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury.

Or. Pub. Emps.' Ret. Bd. ex rel. Or. Pub. Emps.' Ret. Fund v. Simat, Helliesen & Eichner, 191 Or.App. 408, 424, 83 P.3d 350 (2004) (quotation marks omitted).

In addition to affirmative misrepresentations, a fraud claim can be based on the omission of a material fact, at least under certain circumstances. When fraud is based on silence or nondisclosure of a material fact, a party first must "demonstrate that the defendant either (1) remained silent when the defendant had a duty to speak,[8] or (2) assumed the obligation to make a full and fair disclosure of the whole truth by making a representation in the nature of a 'half-truth.'" Smith v. U.S. Bank, N.A., 2011 WL 7628515 at *6 (D.Or. Oct. 26, 2011) (footnote added), report and recommendation adopted 2012 WL 1029364 (D.Or. Mar. 26, 2012); see also Benson Tower Condo. Owners Ass'n. v. Victaulic Co., 22 F.Supp.3d 1126, 1132–33 (D.Or.2014); Gregory v. Novak, 121 Or. App. 651, 655, 855 P.2d 1142 (1993) (holding that "one who makes a representation that is misleading because it is in the nature of a 'half-truth' assumes the obligation to make a full and fair disclosure of the whole truth").

In addition to fraud by affirmative misrepresentation or omission, there is a

---

7. UPM offers the following definition of "cloning" SIM cards: "Cloning a SIM card would enable more than one handset to be operated from the same identifying information contained on the original SIM card. Cloning is illegal because it would allow the cloner to operate a cell phone for free, while the holder of the original SIM card would be billed both for her own and the cloner's calls." Dkt. 46 at 13.

8. A duty to speak or disclose information exists when there is a special relationship between a plaintiff and a defendant. Gardner v. First Escrow Corp., 72 Or.App. 715, 720, 696 P.2d 1172 (1985). When a special relationship exists, the defendant has a duty to disclose to the plaintiff all material matters of which the

defendant had knowledge. See Gebrayel v. Transamerica Title Ins. Co., 132 Or.App. 271, 281, 888 P.2d 83 (1995) (citing Restatement (Second) of Torts § 551 (1976)). A special relationship exists when the plaintiff has authorized the defendant to exercise independent judgment on the plaintiff's behalf and the defendant has accepted this responsibility. Bennett v. Farmers Ins. Co. of Or., 332 Or. 138, 160–62, 26 P.3d 785 (2001). A special relationship does not exist if the parties were merely in an "arm's-length" commercial or business relationship where they were acting in their own economic interest. See Conway v. Pac. Univ., 324 Or. 231, 239–41, 924 P.2d 818 (1996); A.T. Kearney, Inc. v. Int' Bus. Mach. Corp., 73 F.3d 238, 243–44 (9th Cir.1995).

third category of fraud recognized under Oregon law, actual concealment. Further, where "fraud is based on actual concealment, as opposed to simple nondisclosure, a duty to speak is not required." *Caldwell v. Pop's Homes, Inc.*, 54 Or.App. 104, 113, 634 P.2d 471 (1981); *see also Wieber v. FedEx Ground Package Sys., Inc.*, 231 Or.App. 469, 484, 220 P.3d 68 (2009) ("Moreover, even in the absence of a duty to speak, actions by a defendant to actively conceal the truth can constitute fraud."). As explained by the Oregon Court of Appeals:

> The distinction [between active concealment and nondisclosure] is made clearer by Prosser's classification of active concealment with affirmative statements as follows: "* * * Any words or acts which create a false impression covering up the truth, * * * or which remove an opportunity that might otherwise have led to the discovery of a material fact as by floating a ship to conceal the defects in her bottom, * * * sending one who is in search of information in a direction where it cannot be obtained, * * * or even a false denial of knowledge by one in possession of the facts * * * are classed as misrepresentations, no less than a verbal assurance that the fact is not true."

*Paul v. Kelley*, 42 Or.App. 61, 65–66, 599 P.2d 1236 (1979) (quoting Prosser, *Law of Torts*, § 106, at 695 (4th ed. 1971)); *see Caldwell*, 54 Or.App. at 113, 634 P.2d 471 (same); *see also* 10 Stuart M. Speiser, Charles F. Krause & Alfred Gans, *The American Law of Torts* § 32:73 (Monique C.M. Leahy ed., 2012) ("It is a basic principle in the law of fraud in respect to the effect of nondisclosure that the proposition that, in the absence of a duty to speak, nondisclosure is not fraudulent presupposes mere silence and is not applicable where, by words or conduct, a false representation is intimated or any deceit practiced.") (footnote omitted).

In addition, the *Restatement (Second) of Torts* (1977) states: "One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." § 550. A comment to this section explains that this rule applies "when the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts; or when the defendant frustrates an investigation." *Id.* § 550 cmt. b; *see also Caldwell*, 54 Or.App. at 113, 634 P.2d 471 ("*Restatement (Second) of Torts* §§ 550, 551 (1977) states that nondisclosure is actionable where there is a duty to speak, but notes no such duty requirement where there has been an active concealment.").

 Further, the U.S. Court of Appeals for the Fourth Circuit has explained in a thorough decision:

> [T]he common law clearly distinguishes between concealment and nondisclosure. The former is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter. The latter is characterized by mere silence. Although silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does.
>
> * * *
>
> In short, at common law, no fiduciary relationship, no statute, no other independent legal duty to disclose is necessary to make active concealment actionable fraud—simple "good faith" imposes

an obligation not to purposefully conceal material facts with intent to deceive.

*United States v. Colton,* 231 F.3d 890, 899–900 (4th Cir.2000).

### 1. Non-Technological Fraud

■ Digicel alleges that UPM sends its agents to "purchase SIM Cards under the false premise that those SIM Cards are for their own individual, retail use in their cellular handset devices." Dkt. 34 ¶ 65. Digicel, however, pleads no specific facts regarding the nature of this "false premise." In its Amended Complaint, Digicel does not specify whether the "false premise" is oral or written, what questions—if any—Digicel's retailers ask customers regarding the intended use of the SIM cards, or whether customers are in any way made aware of Digicel's expectations regarding use of the SIM cards.[9]

These conclusory allegations fall short of sufficiently pleading fraud. Digicel alleges no facts showing that UPM's agents made any false, material representations (or even half-truths) regarding the intended use of the SIM cards or that Digicel relied on any such representations. The only possible false, material representation alleged is UPM agents' use of false or altered identification documents. Digicel does not, however, allege any facts concerning how this alleged misrepresentation is material or induced Digicel's reliance. Digicel does not allege that it would have declined to sell SIM cards to the agents if the agents had used their true names or their actual government-issued identification cards. If non-technological fraud constituted Digi-

cel's only theory of how UPM defrauded Digicel, the Court would dismiss the claim.

### 2. Technological Fraud

Digicel also asserts a theory of technological fraud. According to Digicel, UPM intentionally manipulates the data on Digicel's SIM cards to represent either that an individual RLYH subscriber is calling Haiti or that an international call has originated from a single cellular device located in Haiti. According to Digicel, UPM assigns the international calls bound for Haiti to a local number at the SIM Servers in Oregon, and from this moment forward, UPM fraudulently misrepresents the true origination of the calls. Additionally, Digicel alleges that UPM's software manipulates the calls routed to UPM's Receivers to mimic the local calling patterns of individual Digicel customers. Digicel argues that these transactions constitute both affirmative misrepresentations and active concealment.

#### a. Affirmative Misrepresentations

■ UPM responds that it makes no affirmative misrepresentations to Digicel. According to UPM, the fact that it pays for the RLYH plans makes its use of those plans indistinguishable from an individual Hatian subscriber using a RLYH plan while abroad. Additionally, argues UPM, the VoIP works essentially the same way as a Skype call coming over the internet to someone in Haiti while the person in Haiti holds his or her cellphone up to the receiving computer's speaker so that a recipient of the telephone call can hear the Skype transmission. UPM uses its own infra-

---

**9.** At oral argument, Digicel's counsel asserted that Digicel's retailers ask customers, either orally or on the Customer Registration Card form, whether they intend to use the SIM cards "legally." The Court could locate no such assertion in Digicel's amended complaint or in the text of the form (Dkt. 52-1) and does not consider this assertion a well-

pleaded fact. Even if Digicel had made this assertion in its amended complaint, however, the ambiguous assertion that the customer will use the card "legally" would not suffice to show that UPM's agents committed fraud by reselling the SIM cards to UPM or mailing the cards to UPM for use in UPM's Servers.

structure to pipe the call over the internet and then, by buying Digicel's SIM cards, pays for access to Digicel's local network to complete the call. Thus, concludes UPM, no affirmative misrepresentation has taken place.

The Court agrees with UPM that Digicel has not alleged sufficient facts showing that UPM has made an affirmative misrepresentation. Digicel alleges no facts showing that Digicel's telecommunications network requires any express verification that the calls associated with Digicel SIM cards or RLYH plans come from personal, or individual, cellular handset devices. Although the calls that UPM connects to Digicel's network come from Servers in Oregon rather than individual Digicel customers, Digicel has not pled facts showing that UPM affirmatively misrepresents the nature of the calls.

### b. Active Concealment

Regarding active concealment, UPM argues that Oregon courts recognize active concealment only in the context of a negotiated relationship or transaction between a plaintiff and a defendant in which the defendant either makes an outright misrepresentation, states a half-truth, or remains silent in the face of a duty to speak. According to UPM, its activities cannot constitute active concealment because it has never engaged in any negotiated relationship or transaction with Digicel, made an outright misrepresentation, stated any half-truth, or become subject to a duty to speak.

Digicel responds that, among other things, it has alleged that UPM engages in a "transaction" with Digicel. According to Digicel, UPM buys Digicel SIM cards through UPM's agents in Haiti and also purchases RLYH plans from Digicel. Thus, as a customer of Digicel, UPM uses the minutes purchased on the SIM cards and the RLYH plans to place calls, thereby accessing Digicel's telecommunications

network. Thus, UPM has engaged in transactions with Digicel.

 In addition, UPM misunderstands the requirements for active concealment under the Oregon common law. As previously noted, in Oregon, active concealment occurs—even in the absence of a duty to speak—when a defendant engages in "acts which create a false impression covering up the truth." *Paul*, 42 Or.App. at 66, 599 P.2d 1236 (quoting *Prosser*); *see also* Speiser, Krause & Gans, *The American Law of Torts* § 32:73 (when there is no duty to speak, nondisclosure can become fraudulent "where, by words or conduct, a false representation is intimated or any deceit practiced"). Applying Oregon law, the Ninth Circuit reversed a decision granting summary judgment to a defendant on a claim of fraudulent misrepresentation based, in part, on the proposition that "no duty to disclose is required when fraud is based upon active concealment." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1222 (9th Cir.1999).

In *Salem Sand & Gravel Co. v. City of Salem*, 260 Or. 630, 492 P.2d 271 (1971), an allegation that the defendants suppressed material information sufficed to state a claim for fraud. In that case, the plaintiffs had successfully bid on a project to construct a sewer line for the City of Salem. Included among the defendants were engineers hired by the city to prepare plans and specifications for the sewer project and to supervise the project's construction. The plaintiffs sued the engineers for fraud, alleging that the engineers withheld the results of subsurface tests conducted before the preparation of the plans and specifications and the calling of bids. According to the plaintiffs, the engineers possessed records and photographs of subsurface conditions substantially less favorable than the conditions described in the data given to the plaintiffs to use in preparing their

bids. Finding that the plaintiffs had alleged sufficient facts to withstand the defendants' demurrer, motion to strike, and motion for judgment on the pleadings, the Oregon Supreme Court noted, "Defendants overlook the established law that fraud may be committed by concealment of material facts as well as by affirmative and positive misrepresentation." *Id.* at 638, 492 P.2d 271. At no point did the court articulate a requirement for a negotiated relationship, an outright misstatement, a half-truth,[10] or a duty to speak.

In this case, Digicel alleges that when UPM transmits a call to Digicel's network, UPM conceals both the original telephone number associated with the non-Digicel subscriber and the fact that the call comes from UPM's Servers rather than an individual cellular handset device. According to Digicel's Amended Complaint, UPM accomplishes the concealment both by manipulating the SIM card data to "package" the data with the non-Digicel customer's call and by using software to replicate the calling patterns of Digicel's local Haitian subscribers. This replication avoids any abnormal call volume to any particular Digicel cellular tower, which Digicel could detect, or flag, as a sign of "bypass" operations. Digicel further alleges that UPM uses portable, easy-to-move Receivers in various locations to prevent detection by Digicel. Digicel thus alleges "contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter,"

amounting to active concealment under the common law. *Colton,* 231 F.3d at 899.

UPM's response that Digicel's allegations are "implausible" in light of other innocent, innocuous explanations is unavailing. UPM first asserts that there is no plausible reason for UPM to "clone" or copy Digicel's SIM cards because UPM has purchased the cards. UPM's argument regarding cloning, however, does not render Digicel's description of the SIM-card copying implausible because UPM acknowledges that the SIM cards are physically located in Oregon and that the information on the SIM cards must somehow be transmitted to Haiti.[11]

UPM also responds that Digicel's allegations that UPM manipulates data to conceal the nature of incoming calls is implausible because Digicel's own programming of the SIM cards—rather than any concealment or misrepresentation—enables the calls transmitted through UPM's Servers to enter the Digicel network at discounted rates. UPM's alternative explanation does not address Digicel's allegation that even when UPM uses RLYH plans to direct calls, UPM still must manipulate data to disguise the fact that the calls are not coming from personal or individual cellular handset devices. Nor does UPM's explanation address Digicel's allegation that UPM packages a non-Digicel customer's information with the SIM card information to disguise the true origin of the call coming through VoIP.

---

10. The Court notes that the plaintiffs in *Salem Sand & Gravel* alleged that the engineers "include[ed] only the favorable data" regarding the subsurface conditions and thereby "represented that the subsurface conditions were more favorable than 'they were in fact.' " 260 Or. at 633, 492 P.2d 271. The representations in the data submitted to the plaintiffs thus could be construed as half-truths, but the Oregon Supreme Court described the allegations not as representations in the nature of half-

truths but as "*withholding* the results of certain subsurface tests," *id.* at 632, 492 P.2d 271 (emphasis added), "fraudulent withholding," *id.* at 637, 492 P.2d 271, and the "concealment or suppression of any data," *id.* at 638, 492 P.2d 271.

11. The Court recognizes that a more precise definition of "cloning" may have to wait until a later stage of the litigation.

UPM also argues that any alleged acts of concealment are more plausibly viewed merely as steps taken to protect UPM's business activities from competitors' examination. UPM's explanation does not, however, refute Digicel's argument that active concealment has occurred. Digicel alleges that in order to serve UPM's customers, UPM must perpetuate Digicel's mistaken beliefs about the nature of the incoming calls. According to Digicel, it attempts to "detect and deter bypass fraud" and has worked with the Haitian Police to stop bypass operations. Dkt. 34 ¶¶ 47–55. This leads to the reasonable inference that Digicel would not connect the calls coming from UPM's Receivers if Digicel knew that UPM routed the calls from SIM Servers in Oregon. UPM must thus mimic calling patterns of Digicel's subscribers to avoid detection and lead Digicel to connect the calls coming from UPM's Receivers. This alleged activity constitutes more than ordinary business strategies undertaken by a competitor.

UPM further argues that what Digicel asserts is concealment by UPM in routing calls to multiple receivers in Haiti in order to thwart detection is merely an innocent act by UPM to attempt to find the best reception in Haiti or to avoid overloading the carrying capacity of any of Digicel's towers in Haiti. UPM thus offers a plausible explanation for its actions. Where a defendant, however, offers a plausible innocent explanation for its actions and there is also a plausible wrongful explanation for the same actions, a court may not dismiss a complaint unless the "defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible." *Eclectic Props.*, 751 F.3d at 996 (quoting *Starr*, 652 F.3d at 1216). That is not the case here. Moreover, whether the actual facts support either UPM's or Digicel's explanations is a matter more appropriately determined at summary judgment or trial.

In addition to asserting that UPM has engaged in active concealment of material facts, Digicel alleges that the information concealed is "crucial" to Digicel's decision to connect incoming calls through its telecommunications network. This is sufficient to allege materiality. *See generally Caldwell*, 54 Or.App. at 113, 634 P.2d 471. Digicel further alleges that UPM has diverted millions of minutes of calling time away from Digicel's international switches, for which UPM has not compensated Digicel. Digicel's allegations satisfy the elements of common law fraud in Oregon.

## B. RICO Claims

Digicel pleads three federal RICO claims, under 18 U.S.C. § 1962(b), (c), and (d), each of which requires a "pattern of racketeering activity," comprised of predicate acts set forth in § 1961(1). Digicel alleges three predicate acts: mail fraud under § 1341; wire fraud under § 1343; and access-device fraud under § 1029.

### 1. Mail and Wire Fraud

Mail and wire fraud are "identical except for the particular method used to disseminate the fraud" and may therefore be analyzed together. *Eclectic Props.*, 751 F.3d at 997. The elements of mail or wire fraud are "(A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Id.* A scheme to defraud is a scheme that is "reasonably calculated to deceive persons of ordinary prudence and comprehension;" a scheme to defraud pled with sufficient factual specificity may give rise to a reasonable inference of specific intent to defraud. *See id.* (quoting *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir.1984)) (quotation marks omitted); *In re Galena Biopharma, Inc. Derivative Litig.*, 83 F.Supp.3d 1047, 1064–65 (D.Or. Feb. 4,

2015) ("When a complaint alleges with particularity the circumstances constituting fraud ... then generally it will also have set forth facts from which an inference of scienter could be drawn." (alterations and quotation marks omitted)). It is not, however, necessary to plead that the scheme succeeded, or that anyone suffered a loss or secured a gain. *Schreiber Distributing Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir.1986).

 Digicel alleges that UPM, through Sanchez, Ruiz, and Allen, uses the mails and wires to fund and directly provide money and computer equipment to Haitian co-conspirators. Digicel has thus pled sufficient facts to satisfy the second element of mail and wire fraud. The first and third elements are closer calls, and for the reasons discussed above, Digicel cannot satisfy these elements based only on allegations of a non-technological scheme to defraud.

Digicel also alleges that UPM processes calls through its SIM Servers with the sole purpose of facilitating international telephone traffic into Haiti without Digicel's knowledge that the calls do not originate on individual cellular handset devices. According to Digicel, UPM facilitates this international traffic into Haiti by manipulating information on Digicel SIM cards and using software to mimic the calling patterns of Digicel's Haitian subscribers. UPM also uses portable, easy-to-move Receivers to avoid detection by Digicel. These specific allegations of the circumstances constituting fraud allow for a reasonable inference of intent to defraud. *Galena Biopharma*, 83 F.Supp.3d at 1065. Digicel thus has pled sufficient facts of mail and wire fraud.

### 2. Access Device Fraud

The federal access device fraud statute, 18 U.S.C. § 1029(a), prohibits a number of related offenses related to the improper use of "unauthorized" and "counterfeit"

"access device[s]." Digicel correctly argues that the SIM cards bought by UPM are "access devices." *See* § 1029(e)(1) (defining an "access device" as any "means of account access that can be used ... to obtain money, goods, services, or any other thing of value"). Indeed, UPM does not dispute that SIM cards are access devices. Dkt. 51 at 27 ("UPM does not take issue with the fact that § 1029 could theoretically cover the use of the internet in cellular telecommunications and/or an unaltered SIM card.").

 Digicel, however, does not specify which of the ten enumerated offenses UPM has allegedly violated. One of the offenses that appears to be most applicable to Digicel's allegations is § 1029(a)(3), which prohibits anyone from "knowingly and with intent to defraud possess[ing] fifteen or more devices which are counterfeit or unauthorized access devices." Digicel alleges that UPM, through Sanchez, has knowingly received "hundreds of Digicel SIM Cards from Haiti for use in SIM Boxes in Oregon." Dkt. 34 § 126(b). For the reasons discussed above, Digicel has alleged sufficient facts allowing for an inference of intent to defraud. The question remains, however, whether UPM has possessed "unauthorized access devices."

Under the statute, an "unauthorized access device" is defined as "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." § 1029(e)(3). The SIM cards are not lost, stolen, expired, revoked, or canceled; therefore, the only issue is whether UPM obtained the cards with intent to defraud. Digicel alleges that UPM obtained the SIM cards with the intent of inserting the cards into the SIM Servers in Oregon and actively concealing the fact that the telephone calls UPM transmits to Digicel's telecommunications network do not come directly from individual cellular

handset devices. These allegations are sufficient to state a claim that UPM knowingly and with the intent to defraud possesses more than fifteen unauthorized access devices. Digicel has pled sufficient facts to satisfy the elements of access device fraud.